1   BRENDAN DOLAN, State Bar No. 126732
    L. JULIUS M. TURMAN, State Bar No. 226126
2   STEVEN J. GARRETT, State Bar No. 221021
    MORGAN, LEWIS & BOCKIUS LLP
3   One Market, Spear Street Tower
    San Francisco, CA 94105-1126
4   Tel: 415.442.1000
    Fax: 415.442.1001
5   E-mail: email

6   Attorneys for Plaintiff
    POSDATA CO., LTD., a South Korean corporation
7

8              UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10                  SAN JOSE DIVISION

11

12  POSDATA CO., LTD., a South Korean        Case No. C 07 2504 RMW
    corporation,
13                                            **PLAINTIFF POSDATA CO. LTD.'S**
                                              **MEMORANDUM OF POINTS AND**
                          Plaintiff,          **AUTHORITIES IN SUPPORT OF**
14                                            ***EX PARTE* APPLICATION FOR:**
              vs.
15                                            **(1)  TEMPORARY RESTRAINING**
    SEYOUNG KIM, an individual, and           **ORDER;**
16  INQUADRON, INC., a California
    corporation,                              **(2)  ORDER TO SHOW CAUSE WHY A**
17                                            **PRELIMINARY INJUNCTION SHOULD**
                          Defendants.         **NOT ISSUE; AND**
18
                                              **(3)  ORDER PERMITTING EXPEDITED**
19                                            **DISCOVERY.**

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7555920.2

C 07 2504 RMW
PLTF'S MEM. OF POINTS &AUTHORITIES ISO
POSDATA'S *EX PARTE* APPLICATION

# I.  INTRODUCTION

This case is about blatant theft of property, company resources, and trade secrets by the Defendants, Dr. Seyoung Kim ("Kim") and InQuadron, Inc. ("InQuadron").

Plaintiff Posdata Co., Ltd. ("Plaintiff" or "Posdata") has incontrovertible evidence that Defendant Dr. Seyoung Kim and other former and current employees of Posdata formed Defendant InQuadron, Inc., while still employed by Posdata, to create their own company in the mobile WiMAX technology industry.  Rather than undertaking the time, expense, and effort to build their company, Defendants and their associates have attempted to jumpstart their business by misappropriating Posdata resources, by stealing Posdata's valuable trade secrets and property, and by raiding Posdata's workforce.

Four of Kim's associates have been arrested in Korea in connection with a criminal investigation, and have confessed to stealing Posdata technology for Kim and InQuadron.  The Seoul Korea Central District Prosecutors' Office has also confirmed that Kim, and six other associates, are wanted as the principals in a scheme to steal Posdata's proprietary technology for InQuadron's benefit.

Plaintiff brings this motion for a temporary restraining order and order to show cause why a preliminary injunction should not issue to halt Defendants' unlawful conduct.  Injunctive relief is necessary to prevent further misuse and exploitation of Posdata's trade secrets and property, as well as the further solicitation of current Posdata employees.  Defendants' conduct continues to inflict immediate and irreparable injury on Plaintiff.

Posdata also seeks an order for expedited discovery because Plaintiff cannot wait to initiate formal discovery.  Posdata has only been able to obtain a small fraction of the evidence that it believes confirms Defendants' unlawful activities. Posdata needs to obtain discovery that is within Defendants' possession to further support its request for a preliminary injunction against Defendants.

# II.  STATEMENT OF FACTS

## A.    Posdata Pioneers Mobile WiMAX Technology

Posdata was founded in 1989 by Korean parent company Posco.  (Declaration of Ho Tae

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7555920.2                    1

C 07 2504 RMW
PLTF'S MEM. OF POINTS & AUTHORITIES ISO
POSDATA'S *EX PARTE* APPLICATION

1    Han in Support of *Ex Parte* Application ("Han Decl.") ¶3.) Since its founding, Posdata has

2    evolved into a leading information technology company, offering unique products and services to

3    its customers, which includes telecommunication companies, Internet service providers, and

4    computer companies. (*Id.*) Posdata has been a leader in the development of mobile Worldwide

5    Interoperability for Microwave Access, ("WiMAX") technology since 2004. (*Id.*) Mobile

6    WiMAX is a next-generation wireless telecommunications technology which enables users to

7    have access to broadband wireless Internet while traveling at high speeds across large geographic

8    areas, seamlessly receiving data and multimedia services. (*Id.*)

9            Currently, there are other technologies inferior to WiMAX, that provide for mobile

10   wireless access, such as:  1) wired broadband Internet; 2) wireless Internet for mobile

11   communications; and 3) Wireless Lan ("WLAN"). (*Id.* at ¶4.) Although wired broadband

12   Internet and WLAN offer high-speed services, they are restricted by access location and mobility.

13   (*Id.*) Wireless Internet supports mobility, but is restricted by slow transmission rates and high

14   cost. (*Id.*) Mobile WiMAX is superior because it addresses the shortcomings of the other

15   existing access services by providing seamless, high speed access to people on the move

16   comparable to broadband Internet. (*Id.*) The emerging market for mobile WiMAX technology in

17   the United States is  extremely lucrative due to the superiority of Mobile WiMAX technology

18   compared to existing data services. (*Id.*) Demand for WiMAX is projected to increase and it is

19   anticipated that the market will become more competitive as evidenced by Sprint Nextel's

20   announcement to build the first nationwide mobile WiMAX network in U.S. by the end of 2008.

21   (*Id.*)

22           Posdata's substantial work in developing WiMAX technology is principally manifested by

23   its FLYVO (*Id.* at ¶5.) FLYVO is Posdata's mobile WiMAX technology product line that

24   enables users to have wireless mobile high speed broadband access to the Internet while

25   physically moving. (*Id.*) FLYVO is a complete end-to-end system providing base stations,

26   control servers, network and customer management systems, chipsets, and end user mobile

27   devices. (*Id.*) The development of this technology has allowed Posdata to gain a competitive

28   advantage and position in the mobile WiMAX industry. (*See Id.* at ¶37.)

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7555920.2

2

C 07 2504 RMW
PLTF'S MEM. OF POINTS &AUTHORITIES ISO
POSDATA'S *EX PARTE* APPLICATION

1

    **B.**    **Posdata's Development of Base Stations**

2        Posdata's mobile WiMAX FLYVO system utilizes base stations to serve as the central

3    access point linking the mobile stations wirelessly to the service providers' core network. (*Id.* at

4    ¶5.) Posdata's larger base stations are designed for use in densely populated areas and receive a

5    broad range of radio frequency ("RF") transmissions. (*Id.* at ¶10.) Posdata's smaller Portable

6    Radio Access base stations ("RAS" or "Pico RAS"), are designed for use in less populated areas,

7    and capable of covering smaller geographic areas, like university campuses or buildings, and

8    receive a smaller range of RF transmissions. (*Id.*) Although the two types of base stations have

9    different geographic coverage, they both are adapted for specific use of the same core technology

10    that Dr. Seyoung Kim was hired by Posdata to help develop. (*See Id.*)

11

    **C.**    **Posdata's Investment in Developing its Core Technology- The Digital Channel Card Unit**

12

13        One of the key components of a Posdata base station is the Digital Channel Card Unit

14    ("DCCU" or "channel card"). (*Id.* at ¶6.) The DCCU's primary function is to efficiently manage

15    user traffic data by processing the communication signals under various RF environments

16    according to the mobile WiMAX standard. (*Id.*) Larger base stations use up to nine channel

17    cards, while smaller mobile base stations such as the Pico RAS typically have only one channel

18    card. (*Id.* at ¶10.)

19        Posdata's DCCU consists of several commercial processors and components, which are

20    placed on a Printed Circuit Board ("PCB"). (*Id.* at ¶6.) Although the processors and components

21    are generic, the combination of the processors and components used and their placement on the

22    PCB is unique to Posdata. (*Id.*) The processors and components are operated by Posdata's MAC

23    and PHY source code that control the operation and overall performance of the DCCU. (*Id.*) The

24    overall effect of the processors and components, Posdata's PCB design and layout, and Posdata's

25    software and source code creates architecture for optimal interface between hardware and

26    software. (*Id.*) Posdata closely guards this design configuration because it creates a proprietary

27    process to support its large and small base stations in achieving connectivity to the Internet, while

28    physically moving at high speeds. (*Id.*) This is a significant step in developing the next

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7555920.2

3

C 07 2504 RMW
PLTF'S MEM. OF POINTS &AUTHORITIES ISO
POSDATA'S *EX PARTE* APPLICATION

1   generation of WiMAX technology. (*Id.*)

2         The creation of Posdata's DCCU has taken more than three years, through a tedious

3   development process of trial and error, expending a significant amount of financial and human

4   resources. (*Id.* at ¶7.) The technology has been refined and improved upon through several

5   stages of re-engineering and further development. (*Id.*) Posdata's DCCU was subjected to the

6   GCT Semiconductor, Inc's. ("GCT") mobile station chip Interoperability ("IOT") testing, in

7   November 2006. (*Id.*) The IOT reports contained data for Posdata's engineers to evaluate the

8   performance of Posdata's mobile WiMAX system, compatibility with other mobile vendors,

9   detect system problems, and test solutions to these problems. (*Id.*) The IOT reports are critical to

10  the design process because it shows areas of needed improvement and provides ideas and data to

11  aid in future development. (*Id.*) The IOT testing and reports reflect a substantial monetary and

12  labor investment in the research and development process of the DCCU. (*Id.*) To protect its

13  invention and to keep results of the IOT testing confidential, Posdata entered into a non-

14  disclosure agreement with GCT. (*Id.*) The non-disclosure agreement forbade the disclosure of

15  the secret IOT reports to third parties. (*See Id.* ¶ 42, Ex. 27)

16        Posdata's DCCU was also part of the Mobile Plugfest reports in June 2006, September of

17  2006, and February 2007. (*Id.* at ¶8.) The Plugfest reports are the result of a multi-vendor

18  WiMAX Forum to measure the interoperability between the different base station technologies

19  developed by member companies. (*Id.*) To participate in the forum and receive the results of the

20  data testing, members are required to sign a confidentiality agreement, treating the report as

21  proprietary information and not disclose the data outside of the member company group. (*Id.*)

22  The reports noted that Posdata's base station's DCCU performed well in comparisons to other

23  mobile WiMAX vendor products. (*Id.*) The actual testing measurements allows Posdata's

24  product to be touted in the industry as superior and has a significant impact on future market

25  share. (*Id.*)

26        In May 2006, Posdata's FLYVO system, including the DCCU, was sent to Nippon

27  Telephone & Telegraph ("NTT") DoCoMo for 10 months of extensive testing. (*Id.* at ¶9.) NTT

28  DoCoMo is Japan's biggest mobile operator with a prestigious computer technology consulting

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7555920.2

4

C 07 2504 RMW
PLTF'S MEM. OF POINTS &AUTHORITIES ISO
POSDATA'S *EX PARTE* APPLICATION

1    and testing facility. (*Id.*) NTT DoCoMo testing provided detailed feedback used to further

2    develop and re-engineer the DCCU. (*Id.*) NTT DoCoMo conducted its analysis through ongoing

3    trial runs and a collaborative testing process that is specifically tailored to evaluate and measure

4    Posdata's DCCU. (*Id.*) As part of the rigorous testing process, Posdata executed a non-

5    disclosure agreement with NTT DoCoMO before revealing the DCCU's design data, previous test

6    results, and detailed testing protocol. (*Id.*) The results of the trial runs from NTT DoCoMo are

7    proprietary because they provide a roadmap of strengths and weaknesses of the DCCU and also

8    identify areas that require further development and research and targeted areas for improvement

9    of the quality and performance of the DCCU. (*Id.*)

10       **D.    Defendant Seyoung Kim's Employment with Posdata**

11       Defendant Kim was first hired by Posdata as Director for the America R&D Center in San

12   Jose in 2004. (*Id.* at ¶12.) From February 2005 to June 2006, Kim was Posdata's Director for

13   R&D Lab 1, the "core technology development team," because his engineering background and

14   previous experience with certain technological platforms for American engineers, which was

15   thought to be suitable for a project manager position in that department. (*Id.*) During 2006,

16   however, Kim and some of his team became confrontational and uncooperative with other

17   Posdata R&D labs and the business development team. (*See Id.* at ¶17.) To alleviate this tension,

18   Posdata reorganized the teams at the America R&D Center in July 2006. (*See Id.*) After the

19   reorganization, Kim led the System Engineering Lab. (*Id.* at ¶12.)

20       Kim became even more difficult to manage and Posdata ultimately entered into an

21   employment and separation agreement with him on October 27, 2006. (Han Decl. ¶19, Exh. 6;

22   Declaration of Song Ae Park in Support of Motion ("Park Decl.") ¶9, Exh. 6.) The agreement

23   provided that: (1) Kim would remain an employee through June 17, 2007 even though he would

24   no longer be working on any Posdata projects; (2) the company would provide him with an

25   apartment and automobile for that period of time; and (3) that Kim would protect and not disclose

26   the company's trade secrets. (*Id.*) Although Kim was to remain an employee through June 17,

27   2007, Kim was not to work on any Posdata projects as of October 27, 2006, and was to refrain

28   from any contact with Posdata's San Jose facility. (*Id.*)

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7555920.2

5

C 07 2504 RMW
PLTF'S MEM. OF POINTS &AUTHORITIES ISO
POSDATA'S *EX PARTE* APPLICATION

1    **E.    Kim Diverts Company Resources to Develop the "Turtle Card"**

2    During early 2006, Kim had pressed the company to let his team develop a small base

3    station. (Han Decl. at ¶14.) Posdata, however, instructed Kim and his team to dedicate their

4    resources to enhancing the core technology itself. (*Id.*) Development of the small base station

5    was the responsibility of the team that was then known as R&D Lab 2. (*Id.* at ¶¶ 14-15.)

6    Despite instructions to the contrary, Defendant Kim and other Posdata employees,

7    unbeknownst to Posdata and without authorization, used Posdata's resources and concentrated

8    their efforts on developing the smaller base station and what they referred to as the Modular

9    Channel Card Assembly ("MCCA) for the base station, which they also called the "Turtle Card".

10    (*Id.* at ¶ 39.)

11    Because of increasingly uncooperative and hostile behavior by Kim and his team, Posdata

12    grew suspicious of them. (*See* Han Decl. at ¶ 13.) It engaged the services of Kroll, Inc., to

13    conduct a forensic computer and data investigation in February/March 2007. (*Id.;* Declaration of

14    Renee Yoon in Support of *Ex Parte* Application ("Yoon Decl.") at ¶4) The Kroll investigation

15    revealed that Dr. Kim's team constructed a design for its MCCA/Turtle Card by utilizing

16    Posdata's PCB design and layout, MAC and PHY source code and proprietary architecture for

17    interface between hardware and software. (Han Decl. ¶39.) Kim took Posdata's DCCU core

18    technology for use in the smaller base station and created an almost identical version of the

19    DCCU- the MCCA/Turtle Card. (*Id.*) Dr. Kim's team also took Posdata's test methods,

20    comparison data, results of the trial runs from NTT DoCoMo, and interoperability test data on the

21    communication between Posdata's RAS and GCT mobile station chip, to gain information about

22    how its knock-off MCCA/Turtle Card, which was essentially the same as the Pico RAS, would

23    perform. (*Id.*) By engaging in these activities, Kim and his associates were attempting to

24    jumpstart InQuadron by skipping several tedious and expensive steps in the research and

25    development process by stealing Posdata's core technology for use in its own MCCA/Turtle

26    Card. (*Id.*)

27    **F.    Kim and His Associates Form InQuadron**

28    Several emails that were obtained in the Kroll investigation from around the summer of

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7555920.2                6                C 07 2504 RMW
PLTF'S MEM. OF POINTS &AUTHORITIES ISO
POSDATA'S *EX PARTE* APPLICATION

1   2006 show that Kim contemplated starting a new business venture to compete against Posdata in

2   the WiMAX industry, even though he was still an employee of Posdata. (*Id.* at ¶18.) Kim

3   promised several Posdata employees in a June 29, 2006 email after Posdata restructured its San

4   Jose R&D operation that Posdata "will come to know soon their childish, shallow plan could not

5   succeed" because he was "going to look for an opportunity for our team to work together again."

6   (Han Decl. ¶18, Exh. 5.) Kim promised to start a new company and urged his colleagues to

7   continue their "development job[s] for the purposes of both Posdata's future and our future."

8   (*Id.*) Kim's correspondence illustrates his clear intent to have his colleagues develop technology

9   based on Posdata's trade secrets for the benefit of InQuadron.

10          Kenneth D. Lee, an associate of Kim, filed articles of incorporation for InQuadron, Inc.

11   with the Secretary of State of California on December 4, 2006. (Han Decl. ¶20, Exh. 7.) A few

12   months later in February 2007, amended articles of incorporation for InQuadron, Inc. were filed,

13   along with a statement of information filed with the Secretary of State listing Kim as the Chief

14   Executive Officer and Lee as Chief Financial Officer and Secretary of the corporation.

15   (Han Decl. ¶20, Exh. 8.) The filing also listed Kim, Lee, and current Posdata employees

16   Hwayong Joung, and Joonsug Chung as directors of the corporation. (*Id.*) Although InQuadron

17   was not incorporated until December 2006, the Kroll investigation revealed that former Posdata

18   employee Hwayong Joung registered the domain name InQuadron.com on November 6, 2006.

19   (Han Decl. ¶20.)

20          The Kroll investigation also uncovered InQuadron's "2007 Expense Plan" that listed the

21   salaries that InQuandron would pay to 24 individuals, including several current and former

22   Posdata employees, for the time period of March through December 2007. (Han Decl. ¶25, Exh.

23   13; Yoon Decl. ¶16, Exh. 13.) The InQuadron plan also outlined expenses for office rent and

24   utilities. (*Id.*) The Kroll investigation also revealed a projected InQuadron Organization Chart

25   for its United States and Korean operations. (Han Decl. ¶25, Exh. 14; Yoon Decl. ¶17, Exh. 14.)

26   In the United States, Defendant Kim would serve as the CEO/CTO and Research and

27   Development Lead while Kenneth Lee would serve as the CFO/COO. (Han Decl. ¶25.) In

28   addition, the U.S. team would consist of system, hardware/DSP, and software engineers

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7555920.2

7

C 07 2504 RMW
PLTF'S MEM. OF POINTS &AUTHORITIES ISO
POSDATA'S *EX PARTE* APPLICATION

1   presumably from Posdata. (*Id.*) In Korea, Joonsug Chung would be in charge of business

2   development and Hwayong Joung, a Posdata employee, would be the Korea Research and

3   Development Team Lead. (*Id.*) The Korean team would also consist of system, hardware,

4   software, and field test engineers presumably from Posdata. (Han Decl. ¶25, Exh. 14; Yoon Decl.

5   ¶17, Exh. 14.) The loss of their expertise and transfer of Posdata's intellectual property and trade

6   secrets by the 22 current and former Posdata employees shown on the organizational chart as

7   InQuandron employees to a venture like InQuadron would not only unfairly benefit InQuadron

8   but would severely cripple Posdata's operations, particularly with respect to Posdata's San Jose

9   facility. (Han Decl. ¶25.)

10      Emails also reveal that InQuadron approached several other companies to develop the

11  Turtle Card and capitalize on other Posdata intellectual property, including: 1) Mark Kelly,

12  General Manager/CTO of Next Wave; 2) Dukyoung Kim, President of KMW; 3) Yongchun Kim,

13  President of NSC; and 4) Kwangsun Kim, President of D&T. (Han Decl. ¶30, Exh. 22; Park

14  Decl. ¶15, Exh. 22; Yoon Decl. ¶24, Exh. 22.) The correspondence also suggests that Joung and

15  Sanggeum Hwang worked with a company to test the "Turtle" system. (Han Decl. ¶30.)

16      InQuadron also formed a business partnership with Axstone Technology Co., Ltd. in

17  Korea to manufacture the Printed Circuit Board ("PCB") for the MCCA/Turtle Card. (Han Decl.

18  ¶31, Exh. 23; Park Decl. ¶16, Exh. 23; Yoon Decl. ¶25, Exh. 23.) The correspondence showed

19  that both companies planned to develop the product and share profits. (*Id.*) In a February 26,

20  2007 email to Joung, Kim implied that "PCB Gerber File" was prepared for development of

21  products in cooperation with Axstone and that InQuadron needed to demonstrate its capability to

22  potential customers such as "N" company. (*Id.*) The PCB Gerber File may be indicative of

23  "MCCA PCB fab. Gerber data" that Kim received from Choon Shin on February 20, 2007 or the

24  "MCCA REV.C GERBER DATA" (MCCA-C-3-GBR-NOP.zip) from Shin on March 2, 2007.

25  (Han Decl. ¶31, Exh. 11; Park Decl. ¶12, Exh. 11; Yoon Decl. ¶15, Exh. 11.)

26      There is no doubt that InQuadron was started and formed while Kim and others worked

27  for and owed a duty of loyalty and were obligated not to use Posdata intellectual property or trade

28  secrets other than for Posdata's benefit.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7555920.2

8

C 07 2504 RMW
PLTF'S MEM. OF POINTS & AUTHORITIES ISO
POSDATA'S *EX PARTE* APPLICATION

G.    **Defendants Steal Posdata's Trade Secrets and Property**

Kim, while still employed by Posdata, misappropriated the company's intellectual property, trade secrets and confidential proprietary information by unlawfully soliciting Posdata employees to steal trade secrets and confidential information from Posdata. (Han Decl. ¶28.) The May 18, 2007, Seoul Central District Prosecutors' Office confirmed in a news release of its investigation that Kim and his associates attempted to leak the WiBro (mobile WiMAX) Core Technology. (Declaration of Brendan Dolan in Support of *Ex Parte* Application ("Dolan Decl.") ¶6, Exh. F.) The release names seven principal offenders, including Dr. Seyoung Kim, Choon Shin, Jong Kwan "Jeffrey" Choi, Hwayong Joung, Seongdong Park, Jongwook Lee, and Sang Geun Hwang. *Id.* Joung, Park, Lee, and Hwang were arrested by the Korean police and indicted for trade secret misappropriation. (*Id.*) Currently, the Korean authorities are seeking to bring Kim, Shin, and Choi back to Korea to face criminal charges. (*Id.*) The release stated Joung stole proprietary and confidential documents from Posdata, including: (1) technical memoranda about its technology; (2) design documents reflecting the system interface architecture of how to implement certain hardware and software; and (3) performance documents including test data. (*Id.*) According to the release, Park and Lee stole MAC source code for use in developing InQuadron's mobile WiMAX system. (*Id.*) The release also notes Hwang stole Posdata's interoperability test results, which provided technical feedback regarding the performance of Posdata's base station and its components. (*Id.*) Although not all of the relevant facts have been uncovered, these investigations have revealed substantial evidence of a blatant pattern of wrongdoing by Kim and his associates.

Blatant misappropriation is also demonstrated by December 11, 2006, email showing that Posdata employee Jeffrey Choi forwarded to Dr. Kim the IOT reports containing measurement data on performance between the GCT terminal chip and Posdata's DCCU. (Han Decl. ¶21, Exh. 9; Park Decl. ¶10, Exh. 9; Yoon Decl. ¶13, Exh. 9.) Choi also promised to obtain any data from future tests, and reminds Kim "to distribute the data that I sent to the people you think they may need." (*Id.*) The IOT reports contain data useful for Posdata's engineers, and for that matter its competitors, to evaluate the performance of the DCCU and the mobile WiMAX base station,

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7555920.2                                    9                    C 07 2504 RMW
PLTF'S MEM. OF POINTS &AUTHORITIES ISO
POSDATA'S *EX PARTE* APPLICATION

compatibility of the DCCU with other mobile vendors, detect system problems, and test solutions to these problems. (Han Decl. ¶21.) Since Dr. Kim was no longer working on any Posdata projects at that time, Dr. Kim was clearly getting this information for his own benefit and use in connection with InQuadron. (*Id.*) Defendants' receipt of this information was with conscious knowledge that they were stealing Posdata's trade secrets and intellectual property, to improperly benefit from the fruits of Posdata's labor. Clearly aware of his misconduct, Kim reminds Lee to keep their communications "strictly confidential." (Han Decl. ¶21, Exh. 9; Park Decl. ¶10, Exh. 9; Yoon Decl. ¶13, Exh. 9.)

As evidenced by a December 11, 2006 email attachment, Choi received the NTT DoCoMo test results from Jinyoung Park. (Han Decl. ¶21, Exh. 10; Park Decl. ¶11, Exh. 10; Yoon Decl. ¶14, Exh. 10.) Having these test results would allow InQuadron to have precise data as to the strengths and weaknesses of the DCCU, as well as identify areas for development and research. (Han Decl. ¶21.) Access to this information would deprive Posdata of the fruits of its laborious achievement and allow a competitor to easily create a product that would be on an equal footing, without exerting any effort. (*Id.*)

The Kroll investigation also revealed that Kim continued to receive proprietary information from Posdata employee Choon Shin in 2007. On February 18, Kim and Shin used their personal email accounts to send a copy of the Mobile 3 Plugfest Interim Report. (Han Decl. ¶22, Exh. 11; Park Decl. ¶12, Exh. 11; Yoon Decl. ¶15, Exh. 11.) Plugfest reports are peer data reports that measures performance against other vendors' products. (Han Decl. ¶22.) A competitor who is not a member company has a significant advantage in jumpstarting viability testing and comparisons to the competition, free of labor and expense. (*Id.*)

In a February 20, 2007 email from Shin (while still an employee of Posdata) to Kim (who was also still employed by Posdata ), Kim was told that the "Gerber Data for the MCCA (Turtle Channel Card) for the production of PCB, Gerber Data is prepared." (Han Decl. ¶23, Exh. 11; Park Decl. ¶12, Exh. 11; Yoon Decl. ¶15, Exh. 11.) On March 2, Shin (while still employed by Posdata) also emailed a file named. "MCCA REV.C GERBER DATA" (MCCA-C-3-GBR-NOP.zip) to Kim. (*Id.*) During the forensic examination and Posdata's review of the material,

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7555920.2

10

C 07 2504 RMW
PLTF'S MEM. OF POINTS &AUTHORITIES ISO
POSDATA'S *EX PARTE* APPLICATION

1  the attachment was unable to be opened. On May 31, 2007, however, the Prosecutor's Office

2  requested that Posdata review documents that were seized from Axstone Technology Co., Ltd.,

3  which has been established to be InQuadron's PCB manufacturer. (Han Decl. ¶23; Declaration of

4  Seokhwan Choi in Support of *Ex Parte* Application ("Choi Decl.") ¶6.) An examination of the

5  file in the possession of the Prosecutor revealed that InQuadron's contractor was in possession of

6  the same Gerber file attachment. (*Id.*) The file contained Posdata's proprietary information

7  regarding the PCB design and layout. A review of the file showed that the MCCA was an

8  acronym for the "Turtle Card," which was almost identical to the DCCU. (*Id.*) The

9  MCCA/Turtle Card had an almost identical design and used the same make and specifications of

10  processors and components as Posdata's DCCU. (*Id.*)

11  Posdata also recovered from an external storage device which Choon Shin turned in to

12  Posdata, along with his computer, on May 14, 2007, a file named "RAS-portable-111306-

13  12.doc." (Han Decl. ¶24, Exh. 12; Choi Decl. ¶7, Exh. 12.) This file contained a document

14  entitled the "Modular RAS Implementation" showing Posdata's proprietary PCB design. (*Id.*)

15  The MCCA/Turtle Card's hardware architecture was identical to the DCCU's core technology

16  hardware architecture. (*Id.*)

17  Posdata recently discovered, on June 9, 2007 that Shin's external storage device also

18  contained a file named "MCCA-mentor-2-orcad.pdf." (Han Decl. ¶40, Exh. 26.) The file

19  contained 64 pages of schematic drawing design plans for Posdata's DCCU, which had been

20  securely stored on Posdata's computer network. (*Id.*) The file found on Shin's computer was

21  identical to Posdata's securely stored "Rev. 0.4 DCCU Block Diagram," except that Shin's

22  version had redlined through the text of Posdata's Diagram name and written in "MCCA." Shin

23  had downloaded the file from Posdata's network to his external storage device. (*Id.*)

24  Kim and InQuadron's counsel recently produced business presentations to venture

25  capitalists, including a December 22, 2006 Technology Evaluation Report. (Han Decl. ¶36, Exh.

26  25; Park Decl. ¶18, Exh. 25.) The report reveals that InQuadron blatantly references Posdata's

27  technology development accomplishments as their own. (Han Decl. ¶36, Exh. 25.) For example,

28  the numerical values which represent the excellence of the channel card such as the 65msec ping

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7555920.2

11

C 07 2504 RMW
PLTF'S MEM. OF POINTS &AUTHORITIES ISO
POSDATA'S *EX PARTE* APPLICATION

1    delay and 60msec hand-off delay are all Posdata's achievements. (*Id.*) In addition, InQuadron

2    claims competitive strengths, which are clearly fruits of Posdata's labor, such as their industry-

3    lead know-how on functional implementation and performance enhancement based on field tests

4    over 4 years and field trial experience with 7 technology-leading companies, and touts Posdata's

5    development team which developed the high performing Plugfest reports. (*Id.*)

6         The mystery surrounding Defendants' plan and scheme has unraveled in recent weeks as

7    the data and documents obtained in the Kroll investigation have been translated and analyzed. In

8    addition, Kim's associates have admitted to stealing Posdata's trade secrets and property at the

9    direction of Kim and for the benefit of InQuadron. (Dolan Decl. ¶6.)

10        Posdata Senior Manager Ho Tae Han met with Posdata employee Choon Shin on May 10

11   and May 11, 2007 during a recent visit to the United States. (Han Decl. ¶35.) As is described

12   above, Shin was working closely with Kim. During those meetings, Shin confessed to Mr. Han

13   that he and other members from former Lab 1 had been working with Kim and his associates to

14   covertly develop the MCCA/Turtle Card at Posdata since April 2006. (*Id.*) Shoon admitted that

15   InQuadron's Turtle Card was Posdata's Pico RAS card. (*Id.*)

16        **H.    Defendants Raid Posdata of Its Employees**

17        While employed by Posdata, Kim and other individuals actively solicited current and

18   former Posdata employees to work for InQuadron. (Han Decl. ¶26.) As previously discussed, the

19   Kroll investigation uncovered InQuadron's 2007 Expense Plan that listed salaries for 24

20   individuals, including several current and former Posdata employees, for the time period of

21   March through December 2007. (Han Decl. ¶25, Exh. 13; Yoon Decl. ¶16, Exh. 13.)

22        Kim, while still employed by Posdata, actively participated in the recruitment of Posdata

23   employees. (Han Decl. ¶26.) For instance, Kim emailed Sukchan Lee, Jinyoung Park, and

24   Gwangseok Kim on June 29, 2006 to discuss the prospects of working with them at his future

25   business venture. (Han Decl. ¶26, Exh. 5; Park Decl. ¶8, Exh. 5; Yoon Decl. ¶12, Exh. 5.) Kim

26   also emailed several individuals on February 14, 2007 about the establishment of InQuadron and

27   specifically requested Kenneth Lee to prepare offer letters for Hojun Kim, Jeffrey Choi, Yoonki

28   Hong, and other Korean Posdata employees. (Han Decl. ¶26, Exh. 16; Yoon Decl. ¶19, Exh. 16.)

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7555920.2                    12                    C 07 2504 RMW
PLTF'S MEM. OF POINTS &AUTHORITIES ISO
POSDATA'S *EX PARTE* APPLICATION

On February 27, Yongkeun Pang emailed Kim to discuss employment at InQuadron. (Han Decl. ¶26, Exh. 17; Park Decl. ¶14, Exh. 17; Yoon Decl. ¶20, Exh. 17.) Kim expressed in an email to Kenneth Lee on February 27, 2007 that he had already sent informal verbal offers to four engineers through Hwayong Joung in the prior week. (Han Decl. ¶26, Exh. 18; Yoon Decl. ¶21, Exh. 18.) A recent examination of Kim's computer revealed it contained job offer letters and Employee Proprietary Rights and Confidentiality Agreements for approximately 10 individuals of the proposed InQuadron teams located in the United States and Korea. (Han Decl. ¶26, Exh 19; Yoon Decl. ¶21, Exh. 19.) In addition, Kim invited former Posdata employee William Li via email on March 12, 2007 to join InQuadron. (Han Decl. ¶26, Exh. 20; Yoon Decl. ¶22, Exh. 20.)

Ultimately, Kim and InQuadron's solicitation efforts were successful as several Posdata employees resigned from the company during the past year. (Han Decl. ¶27.) For example, Hwayong Joung resigned on October 20, 2006, Seondong Park resigned on December 20, 2006, Yongkeun Pang resigned on March 20 2007, Jongwook Lee resigned March 30 2007, and Jeffrey Choi resigned in March 2007. (*Id.*)

## I.    Defendants' Attempt to Cover Their Tracks

Kroll has conducted a forensic review of the company computers of Kim, Choi, and other former Posdata employees. (Han Decl. ¶34; Yoon Decl. ¶6.) Their review of the hard drives of these computers revealed that numerous files have been downloaded to external storage devices. (Han Decl. ¶34; Yoon Decl. ¶¶ 7, 26, and 29.) The Kroll investigation also showed that Choi and Kim either destroyed company data or attempted to conceal their activities by using software designed to erase files and wipe hard drives. (Han Decl. ¶34; Yoon Decl. ¶¶ 27, 28, and 30.) Kroll was only able to recover a portion of data and files on these computers due to Kim and his associates' efforts to conceal their activities. (*Id.*) Their conduct evidences a conscious and willing disregard for Posdata's trade secret and property rights.

## III.    ARGUMENT

### TEMPORARY RESTRAINING ORDER SHOULD AND MUST ISSUE AGAINST DEFENDANTS IN THIS CASE

The United States Court of Appeals for the Ninth Circuit has held that a party seeking

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7555920.2

13

C 07 2504 RMW
PLTF'S MEM. OF POINTS &AUTHORITIES ISO
POSDATA'S *EX PARTE* APPLICATION

1  injunctive relief must satisfy either a traditional test or an alternative test for obtaining

2  preliminary injunctive relief.  Under the traditional test, the Court must consider the following

3  factors: (i) the likelihood of plaintiff's success on the merits; (ii) the possibility that plaintiff will

4  suffer irreparable injury if the relief is not granted; (iii) the extent to which the balance of

5  hardships tips in the plaintiff's favor; and (iv) in certain cases, whether the public interest will be

6  advanced by providing the injunctive relief sought.  *United States v. Odessa Union Warehouse*

7  *Corp.*, 833 F.2d 172, 174 (9th Cir. 1987).

8       Under the alternative test, the moving party must show either: "(1) a combination of

9  probable success on the merits and the possibility of irreparable harm; or (2) that serious

10  questions are raised and the balance of hardships tips in [Plaintiff's] favor."  *A&M Records Inc. v.*

11  *Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001).  These are not separate formulae, but rather

12  reflect "two points on a sliding scale in which the required degree of irreparable harm increases as

13  the probability of success decreases."  *Id.* (citing *Prudential Real Estate Affiliates, Inc. v. PPR*

14  *Realty, Inc.*, 204 F.3d 867, 874 (9th Cir. 2000)).  Though phrased in the alternative, they are

15  "merely extremes of a single continuum" rather than entirely separate tests.  *Benda v. Grand*

16  *Lodge of Int'l Assn. of Machinists & Aerospace Workers*, 584 F.2d 308, 315 (9th Cir. 1978).  "If

17  the balance of harm tips decidedly toward the [moving party], then the [moving party] need not

18  show as robust a likelihood of success on the merits as when the balance tips less decidedly."  *Id.*

19  **A.    Defendants' Misappropriation of and Apparent Continued Use of Posdata's**

20  **Trade Secrets Satisfies the Requirements For Injunctive Relief**

21       A restraining order and injunctive relief are warranted in the present matter because

22  Defendants' have misappropriated Posdata's trade secrets.  The information taken constitutes

23  trade secrets because it is the result of Plaintiff's substantial investment.  (Han Decl. ¶¶7, 41.)

24  Furthermore Posdata's stolen trade secrets have given it a competitive advantage and would be

25  valuable to others.  Posdata's trade secrets are unknown by other mobile venders in its industry.

26  (*See* Han Decl. ¶42.)

27       Posdata's stolen trade secrets, now in the hands of Defendants, include:

28  1)    Posdata's DCCU technology, including the (a) the design and layout of the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   DCCU's Printed Circuit Board ("PCB"); (b) the combination of generic processors and

2   components selected for placement on the DCCU's PCB; (c) the placement of the generic

3   processors and components on the DCCU's PCB; (d) Posdata's MAC and PHY software, which

4   contains unique Posdata-created source codes that control the operation and overall performance

5   of the DCCU; (e) Posdata's other software, which contains unique Posdata-created source codes

6   that control the generic processors and components in the DCCU; (f) an overall proprietary

7   architecture and design for optimal interface between the DCCU's hardware and source

8   code-operated software; (g) the "Modular RAS Implementation" file; and (h) the "Rev. O.4

9   DCCU Block Diagram" file.  (Han Decl. ¶¶6, 24, 31, 39, and 40.)

10          2)      Posdata's test methods and comparison data in support of its research and

11   development of the DCCU and related Mobile WiMAX technology, including the results of the

12   trial runs from NTT DoCoMo in Japan, the Mobile 3 Plugfest Interim report, and inoperability

13   test data on the communication between Posdata's RAS and GCT's mobile station chip.  (Han

14   Decl. ¶¶6-9, 21-23, 31, 36, and 39.); and

15          3)      The Modular Chanel Card Assembly ("MCCA"), which Kim and his associates

16   called the "Turtle Card."  (Han Decl. ¶¶6, 23, and 39.)

17          On June 21, 2007, counsel for Posdata served Defendants' counsel with Plaintiff's Trade

18   Secrets Designation pursuant to Code of Civil Procedure Section 2019.210.  (Dolan Decl. ¶ 13.)

19   The Designation specified and detailed each of the above items, as proprietary, trade secrets. .

20          A former employer has the "right to have the ingenuity and industry [it] invests in the

21   success of the business or occupation protected from the gratuitous use of that 'sweat-of-the-

22   brow' by others."  *Morlife, Inc. v. Perry*, (1997) 56 Cal.App.4th 1514, 1520.  Moreover,

23   technology developed by employees related to an employer's current or anticipated business,

24   even if done on their own time, belongs to the employer.  *Daniel Orifice Fitting Co. v. Whalen*

25   (1962) 198 Cal.App.2d 791, 797 ("That which he has been employed and paid to accomplish

26   becomes, when accomplished, the property of his employer.").  Under the Uniform Trade Secrets

27   Act ("UTSA"), Cal. Civ. Code §3426, *et seq.*, misappropriation of trade secrets may be enjoined.

28   Cal. Civil Code § 3426.1.  An injunction should issue once the moving party establishes the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7555920.2                                          15                    C 07 2504 RMW
                                                             PLTF'S MEM. OF POINTS &AUTHORITIES ISO
                                                             POSDATA'S *EX PARTE* APPLICATION

1    (1) existence of trade secret information, and (2) an unauthorized disclosure or use of the trade

2    secret, or "threat" of such unauthorized disclosure or use. *Courtesy Temporary Service, Inc. v.*

3    *Camacho* (1990) 222 Cal.App. 3d 1278, 1291.

4        The usual standard for obtaining a preliminary injunction, however, is superseded by

5    express statutory injunction provisions. *Trailer Train Co. v. State Bd. of Equalization*, 697 F.2d

6    860, 869 (9th Cir. 1983). The UTSA expressly permits a court to enjoin "[a]ctual or threatened

7    misappropriation." Cal. Civ. Code §3426.2. Likewise, California's Unfair Competition Law

8    ("UCL"), Bus. & Prof. Code §17200, *et seq.*, states that, "[a]ny person who engages, has

9    engaged, or proposes to engage in unfair competition may be enjoined in any court of competent

10   jurisdiction." Bus. & Prof. Code §17203. Because Defendants' theft of Posdata's trade secrets

11   and property is a violation of the UTSA and the UCL, injunctive relief to prevent Defendants'

12   willful misconduct is warranted. Plaintiff does not have to demonstrate irreparable injury,

13   although it exists, because Plaintiff can show that injunctive relief under these statutes is proper.

14   Moreover, the usual balancing of hardships is unnecessary because Defendants' conduct was

15   intentional. *See U.S. v. Marine Shale Processors*, 81 F.3d 1329, 1359 (5th Cir. 1996) ("A court

16   need not 'balance the hardships' when defendant's conduct has been willful.") Clearly,

17   Defendant Kim's blatant course of action in stealing the valuable proprietary and trade secret

18   information requires restraint as to further actions.

19        **1.    Defendants Have Stolen Posdata's Trade Secrets and Property**

20        The UTSA defines a trade secret as "information, including a formula, pattern,

21   compilation, program, device, method, technique or process, that:  (1) derives independent

22   economic value, actual or potential, from not being generally known to the public or the other

23   persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts

24   that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code §3426.1(d).

25        During Defendants' research and development of the Turtle Card, Kim received

26   proprietary and confidential information from several Posdata employees regarding Posdata's

27   DCCU technology, DCCU's PCB design and layout, DCCU's system interface, MAC and PHY

28   source code, test methods, the "Modular RAS Implementation" file, the "Rev. O.4 DCCU Block

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

                                                      C 07 2504 RMW
                                  PLTF'S MEM. OF POINTS &AUTHORITIES ISO
                                  POSDATA'S *EX PARTE* APPLICATION

1   Diagram" file, comparison data, results of the trial runs from NTT DoCoMo in Japan, the Mobile

2   Plugfest reports, and inoperability test data on the communication between Posdata's RAS and

3   GCT's mobile station chip. (Han Decl. ¶¶6-9, 21-24, 31, 36, and 39-40.) Kim utilized this

4   information for InQuadron's benefit by forwarding this information to other associates so that

5   they could capitalize on the data in connection with InQuadron's development of mobile WiMAX

6   technology of its Turtle Card.

7         Despite the reasonable steps that Posdata took to protect its trade secrets and proprietary

8   information from disclosure, Kim and others ignored the directives in order to accomplish their

9   unlawful objective. Posdata stored the information securely, restricted access to the information

10  to a "need to know" basis for its engineers, and used confidentiality provisions in employment

11  contracts and agreements that obligated employees and vendors not to use or disclose the

12  information. (*See* Han Decl. ¶¶42-44); *see Morlife,* 56 Cal.App.4th at 1522; *Whyte v. Schlage*

13  *Lock Co*, (2002) 101 Cal.App.4th 1443, 1454 (requiring employees to sign confidentiality

14  agreements is a reasonable step to ensure secrecy). Posdata even requested Kim to protect and

15  not disclose confidential information by inserting a provision in the October 27, 2007 agreement.

16  (Han Decl. ¶19, Exh. 6; Park Decl. ¶9, Exh. 6.)

17        Kim not only ignored his obligations, but directed others he knew had to access to steal on

18  his behalf. (*See* Han Decl. ¶39.) Posdata also obtained confidentiality agreements when dealing

19  with outside vendors with regard to the testing of its technology. (Han Decl. ¶¶7-9, 42.) For

20  instance, the Plugfest report is confidential and proprietary information because Posdata entered

21  into a WiMAX Forum Multi-vendor Interoperability Testing Confidentiality Agreement (Multiple

22  Events) with WiMAX Forum on May 14, 2006. (Han Decl. ¶¶8, 42.) Even if these agreements

23  were found to be ineffectual, judicial relief is warranted because the confidential information was

24  disseminated on a "need to know" basis and access to the information was restricted. *See*

25  *Courtesy*, 222 Cal.App. 3d at 1288. Therefore, Posdata was diligent in its efforts to maintain the

26  secrecy of its trade secrets and could not prevent the theft of these secrets by determined and

27  well-organized disloyal employees.

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7555920.2

17

C 07 2504 RMW
PLTF'S MEM. OF POINTS &AUTHORITIES ISO
POSDATA'S *EX PARTE* APPLICATION

## 2.    Defendants' Unauthorized Use of Posdata's Trade Secrets

The UTSA defines misappropriation as: "(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) Disclosure or use of a trade secret of another without express or implied consent ..." Cal. Civ. Code § 3426.1(b).  Under the UTSA, actual or threatened misappropriation of trade secrets may be enjoined.  Cal. Civil Code §3426.2.  Moreover, "[m]isappropriation is not limited to the initial act of improperly acquiring trade secrets; the use and continuing use of the trade secrets is also misappropriation." *PMC, supra,* 78 Cal.App.4th at 1385.  Even an innocent use or disclosure of an employer's trade secrets may be actionable. *See American Credit Indem. Co. v. Sacks* (1989) 213 Cal.App.3d 622, 637.

Defendants Kim and InQuadron have engaged in the unauthorized use of Posdata technology and test data to develop their prototype Turtle Card.  (Han Decl. ¶39.)  In addition, Defendants formed a business partnership with Axstone Technology Co., Ltd. to manufacture the PCB for the Turtle Card.  (Han Decl. ¶31, Exh. 23; Park Decl.¶16, Exh. 23; Yoon Decl. ¶25, Exh. 23.)  Even if Defendants did not intend to commercialize their product, their research and development efforts constitute "use" for the purposes of awarding damages or injunctive relief under the UTSA. *02 Micro Intern. Ltd. V. Monolithic Power Systems, Inc.*, N.D. Cal. 2005, 399 F.Supp.2d 1064 (even internal experimentation with trade secret information not resulting in a market product can constitute "use.")

### B.    Posdata Alternatively Satisfies the Requirements For Injunctive Relief As a Result of Defendants' Conversion of Plaintiff's Property and Kim's Breach of is Duty of Loyalty

Injunctive relief is warranted because of the misappropriation of Posdata's trade secrets, as described above.  Furthermore, to the extent that Posdata's property falls outside the bounds of "trade secrets," if any does, then Defendants' theft and conversion still require injunctive relief. Moreover, Kim's breach of his duty of loyalty warrants injunctive relief to prevent further irreparable harm and injury.

### 1.    Posdata is Likely To Succeed on the Merits of Its Conversion Claim

In order to succeed on a claim for conversion, Posdata need only show that:  (1) it owns

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7555920.2

18

C 07 2504 RMW
PLTF'S MEM. OF POINTS &AUTHORITIES ISO
POSDATA'S *EX PARTE* APPLICATION

1   the property or has a right to the property; (2) Defendants' conversion of the property was by

2   wrongful act or disposition of the property; and (3) Posdata suffered damages. *Firoozye v.*

3   *Earthlink Network*, 153 F.Supp.2d 1115 (N.D. Cal. 2001). Plaintiff will prevail on its conversion

4   claim because it can make the required showing that Defendants stole its property.

5        Defendants took Posdata's DCCU, MAC and PHY source code, test methods, the

6   "Modular RAS Implementation" file, the "Rev. O.4. DCCU Block Diagram" file, comparison

7   data, results of the trial runs from NTT DoCoMo in Japan, the Mobile Plugfest reports,

8   inoperability test data on the communication between Posdata's RAS and GCT's mobile station

9   chip, and the Modular Chanel Card/Turtle Card. (Han Decl. ¶¶ 6-9, 21-24, 31, 36 and 39-40.) By

10  utilizing this information, Kim and his associates were able to skip entire phases of development

11  that would have been expensive and time consuming. (*Id.*)

12       In early 2006, Kim and his associates diverted company resources to create an

13  unauthorized channel card, which they called the Turtle Card. (Han Decl. ¶¶23, 39.) Kim stole

14  Posdata's proprietary technology to develop his own MCCA/Turtle Card. (*Id.*) The

15  MCAA/Turtle Card prototype and related technology developed by Kim and his associates using

16  company time and resources is clearly Posdata property under California law. Labor Code

17  § 2860 provides that "Everything which an employee acquires by virtue of his employment,

18  except the compensation which is due to him from his employer, belongs to the employer,

19  whether acquired lawfully or unlawfully, or during or after the expiration of the term of his

20  employment." Not only did Defendants steal the prototype, but they unlawfully pilfered

21  Posdata's DCCU, MAC, and PHY source code, test methods, comparison data, results of the trial

22  runs from NTT DoCoMo in Japan, the Mobile Plugfest reports, inoperability test data on the

23  communication between Posdata's RAS and GCT's mobile station chip, and the Modular Chanel

24  Card/Turtle Card. (Han Decl. ¶39.) The investigations by Kroll and the Prosecutor's Office have

25  revealed a substantial amount of evidence that prove Defendants' stole Posdata's property

26  through illicit means. (Han Decl. ¶28.) As previously discussed, there is substantial evidence

27  that its property has been stolen.

28

, Lewis &
us LLP
 at Law
cisco

1-SF/7555920.2

19

C 07 2504 RMW
PLTF'S MEM. OF POINTS &AUTHORITIES ISO
POSDATA'S *EX PARTE* APPLICATION

1   Because Posdata was unwittingly paying its employees who were involved in the theft of

2   its intellectual property and development of technology for InQuandron's benefit, it suffered

3   damages in the form of its own development efforts being delayed.

4   Defendants also downloaded files to portable storage devices, against company policy.

5   (Han Decl. ¶34.)  The exact nature of the property, whether they be trade secret or other

6   proprietary and confidential information, is unknown.  The unauthorized taking for Defendants'

7   own use is conversion in its purest form.

8   Defendants' theft has deprived Posdata the benefit and exclusivity of its intellectual

9   property.  Posdata has invested three years worth of research and data collection in developing its

10   technology.  (Han Decl. ¶¶7, 41.)  Posdata's property and technology have allowed Posdata to

11   maintain its competitive advantage in the market.  Defendants' actions have diminished the value

12   of this property by using proprietary property that had not yet been introduced to the marketplace.

13        2.     **Posdata is Likely to Succeed on the Merits of Its Breach of Duty of Loyalty Claim**

14

15   Defendant Kim has also breached his duty of loyalty to Posdata because any employee

16   that participates in business activities adverse to the employer is subject to liability for unfair

17   competition.  *See Daniel Orifice Fitting Co. v. Whalen* (1962) 198 Cal.App.2d 791, 801.  In

18   addition, California Labor Code § 2863 provides "An employee who has any business to transact

19   on his own account, similar to that entrusted to him by his employer, shall always give the

20   preference to the business of the employer."  There is overwhelming evidence that Kim breached

21   his duty of loyalty by starting Defendant InQuadron to compete against Posdata in the WiMAX

22   industry even though he was still an employee of Posdata.  Plaintiff's likelihood of success on the

23   merits is high because Kim's theft of Posdata property to support his competing business is

24   nothing less than a catastrophic breach of his duty of loyalty.

25   Kim's plan to start a competing WiMAX business was a carefully pre-meditated course of

26   action.  Starting in June 2006, Kim claimed that Posdata "will come to know soon their childish,

27   shallow plan could not succeed" because he was "going to look for an opportunity for our team to

28   work together again."  (Han Decl. ¶18, Exh. 5; Park Decl. ¶8, Exh. 5; Yoon Decl. ¶12, Exh. 5.)

, LEWIS &
'JS LLP
AT LAW
'ISCO

1-SF/7555920.2                                    20                    C 07 2504 RMW
                                                        PLTF'S MEM. OF POINTS &AUTHORITIES ISO
                                                        POSDATA'S *EX PARTE* APPLICATION

1    While employed by Posdata, articles of incorporation were filed for InQuadron, Inc. on December

2    4, 2006. (Han Decl. ¶20, Exh. 7.) A few months later in February 2007, amended articles of

3    incorporation for InQuadron, Inc. were filed and Kim was listed as the Chief Executive Officer.

4    (*Id.*, Exh. 8.) Kim actively recruited Posdata employees to join InQuadron and he encouraged

5    them to steal Posdata property and divulge Posdata trade secrets. (Han Decl. ¶¶25-26.) The Kroll

6    investigation uncovered InQuadron's 2007 Expense Plan that listed salaries for 24 individuals, of

7    which 22 of them were current or former Posdata employees. (Han Decl. ¶25, Exh. 13; Yoon

8    Decl. ¶16, Exh. 13.) Moreover, Kim sent offer letters to several current Posdata employees.

9    (Han Decl. ¶26 Exhs. 16, 18-19; Yoon Decl. ¶¶19, 21, Exhs. 16, 18-19.) The loss of these

10   employees to InQuadron would cripple Posdata's operations, particularly with respect to

11   Posdata's San Jose facility. (Han Decl. ¶25.)

12        Kim also used Posdata's property to help raise venture capital funds for InQuadron and to

13   solicit business. (Han Decl. ¶36.) Defendants contacted several companies to test and

14   manufacture the Turtle Card. (Han Decl. ¶¶30-31, Exhs. 22-23; Park Decl. ¶¶15-16, Exhs. 22,

15   23; Yoon Decl. ¶¶24-25, Exhs. 22-23.) Defendants and Axstone formed a business partnership to

16   manufacture PCB of Turtle Card. (Han Decl. ¶31, Exh. 23; Park Decl. ¶16, Exh. 23; Yoon Decl.

17   ¶25, Exh. 23.) Defendants even obtained two Gerber files from Choon Shin to aid in their efforts

18   to mass produce the stolen Podsata property under InQuadron's name. (Han Decl. ¶23, 31, Exh.

19   11; Park Decl. ¶12, Exh. 11; Yoon Decl. ¶15, Exh. 11.)

            3.    **Posdata Will Suffer Irreparable Harm if Relief is Not Granted**

21        Defendants' theft of Posdata property and Kim's flagrant breach of his duty of loyalty to

22   the company and inducement of others to breach their duty of loyalty will cause Posdata

23   immediate substantial and irreparable damage, including the loss of goodwill and potential

24   clients. (Han Decl. ¶38.) Defendants' conduct must be enjoined. The property taken from

25   Posdata is the product of Posdata's substantial investment in research and development of

26   WiMAX technology both in the United States and Korea. (Han Decl. ¶¶37-39, 41.) If one of

27   Posdata's competitors were to have access to this information or Posdata's proprietary

28   information, that competitor would have gained access to thee years worth of research and data

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7555920.2                    21              C 07 2504 RMW
                                   PLTF'S MEM. OF POINTS &AUTHORITIES ISO
                                   POSDATA'S *EX PARTE* APPLICATION

1  collection as well as proprietary technological concepts. (Han Decl. ¶37.) This information

2  could be used to effectively jump-start a new technology company, such as InQuadron, into a

3  full-fledged competitor overnight. (*Id.*) Without injunctive relief, Defendants have the instant

4  ability to potentially leapfrog over Posdata into the blossoming WiMAX market in the United

5  States. (*Id.*) The extent of this damage cannot be fully ascertained until the full extent of

6  Defendants' misconduct is known. Whatever damage Posdata has suffered thus far pales in

7  comparison to the damage that Posdata will incur if nothing prohibits Defendants from using

8  Posdata's property or trade secrets to compete in the WiMAX market. (Han Decl. ¶38.)

9           4.    **The Balance of Hardships Favor of Posdata**

10          The balance of hardships tip sharply in favor of Posdata. Posdata is only seeking to

11  protect its property and prevent further unlawful raids of its employees by Defendants. Without

12  injunctive relief, years of investment by Posdata in researching and developing WiMAX

13  technology will be lost. Posdata could instantly lose its position as a leading developer of mobile

14  WiMAX technology if Defendants are not enjoined. Posdata has already lost valuable time and

15  resources caused by Defendants' disruptive and illicit behavior.

16          On the other hand, Defendants seek to short cut the research and development process.

17  Rather than undertaking the time, expense, and effort to build their company, Defendants and

18  their associates have created their business by stealing Posdata's most valuable trade secrets and

19  property and raiding Posdata of several key employees. In contrast to the irreparable harm

20  suffered by Posdata, Defendants would simply be required to refrain from inflicting further harm

21  upon Posdata. Defendants, through their unlawful actions, have created the need for Posdata to

22  seek injunctive relief.

23          C.    **Defendants' Conduct Must Be Enjoined as Unfair Competition**

24          Like the UTSA, California's Unfair Competition Law also authorizes an injunction to

25  issue against unlawful conduct. Business and Professions Code § 17200 defines unfair

26  competition as an "unlawful, unfair or fraudulent business practice and unfair, deceptive, untrue

27  or misleading advertising. ..." Business and Professions Code § 17203 provides that "[a]ny

28  person performing or proposing to perform an act of unfair competition within this state may be

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7555920.2                22                C 07 2504 RMW
                              PLTF'S MEM. OF POINTS &AUTHORITIES ISO
                              POSDATA'S *EX PARTE* APPLICATION

1    enjoined in any court of competent jurisdiction."

2        A former employee's right to compete with his former employer does not include the right

3    to use the former employer's trade secrets.  The *Courtesy* court held that, even if the information

4    misappropriated by the defendants in that case failed to rise to the level of "trade secret," the

5    same conduct entitled the plaintiff to an injunction for its claim for unfair competition pursuant to

6    Cal. Bus. & Prof. Code §17200.  *Courtesy*, 222 Cal.App.3d at 1291 ("Even if [Plaintiff's] list

7    would not qualify as a 'trade secret' under section 3426.1, the unfair and deceptive practices of

8    employees in stealing Courtesy's customers should have been enjoined under Business and

9    Professions Code section 17200, *et seq.*" *Id.* at 1291.)  The Court reasoned "[i]ndeed, the cases

10    are legion holding that a former employee's use of confidential information obtained from his

11    former employer to compete with him and to solicit the business of his former employer's

12    customers is regarded as unfair competition." *Id.* at 1292 (citing *Greenly v. Cooper*, 77

13    Cal.App.3d 382, 391-392, 143 Cal.Rptr. 514, 520-521 (1978); *IMAX Corp. v. Cinema*

14    *Technologies, Inc.*, 152 F.3d 1161, 1169 (9th Cir. 1998); *Self Directed Placement Corp. v.*

15    *Control Data Corp.*, 908 F.2d 462, 466-67 (9th Cir. 1990).

16        Defendants must be enjoined on this separate ground as well because Defendants

17    threatened and substantially likely use of Posdata's trade secrets and confidential information

18    constitutes an unfair business practice.  Defendants brazenly stole Posdata's trade secrets to start a

19    competing venture in the WiMAX industry.  Accordingly, injunctive relief is appropriate.

20        **D.    Plaintiff is Entitled To Expedited Discovery**

21        Posdata is entitled to expedited discovery to further uncover Defendants' unlawful

22    conduct prior to the preliminary injunction hearing.  As previously discussed, Defendants have

23    attempted to establish a new WiMAX business venture in the United States and Korea that

24    remains an immediate threat to directly compete against Posdata.  Defendants have attempted to

25    create an overnight competitor, without doing the requisite research and development, by stealing

26    Posdata's trade secrets and property.  However, Plaintiff's cannot know the full extent of what

27    has been stolen until they have the right to discover the nature of the information downloaded

28    onto storage devices.  As Defendants have already used cleaning and sweeping technologies to

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  hide their theft, expedited discovery is necessary before the existence of the information is

2  concealed.

### 1.     Posdata is Seeking Injunctive Relief Against Defendants

4  Posdata has reason to believe that unless Defendants are enjoined, Posdata will continue

5  to be immediately and irreparably harmed.  Without immediate relief, Plaintiff's substantial

6  investment in its extensive research and development efforts would be fruitless if Defendants are

7  allowed to market Posdata's technology as their own.  In addition, Defendants may continue to

8  raid Posdata of its employees and encourage them to steal Posdata's property and trade secrets.

9  To prevent such injuries, Posdata seeks a temporary restraining order to prevent further harm until

10  a preliminary injunction is issued.  Although Plaintiff believes they it has gathered enough

11  evidence to warrant the issuance of a preliminary injunction, Posdata needs to determine the

12  extent of Defendants' misconduct.

### 2.     Posdata Must Obtain Discovery to Support Its Preliminary Injunction

14  A court may authorize discovery before the Rule 26(f) meeting when "good cause" exists,

15  meaning that the need for discovery outweighs any possible prejudice to the party from whom

16  discovery is sought.  *Semitool, Inc. v. Tokyo Electron America, Inc.*, 208 F.R.D. 273, 276 (N.D.

17  Cal. 2002).  "Good cause" for expedited discovery has been found to exist in cases involving

18  infringement or unfair competition where physical evidence may be consumed or destroyed, or in

19  which a preliminary injunction is sought.  *Pod-Ners LLC v. Northern Feed & Bean of Lucerne*

20  *Ltd. Liability Co.*, 204 F.R.D. 675, 676 (D. Colorado 2002); *Qwest Communications Int'l, Inc. v.*

21  *WorldQuest Networks, Inc.*, 213 F.R.D. 418, 419 (D. Colorado 2003).

22  Denial of access to discovery before the preliminary injunction hearing will hamper

23  Posdata's ability to learn the extent of the Defendants' solicitation of Posdata employees or the

24  theft of Posdata's property and trade secrets.  Good cause exists to issue an order for expedited

25  discovery because this case involves Defendants' conduct and theft of Plaintiff's proprietary and

26  confidential information constitutes unfair competition.  *See Courtesy*, 222 Cal.App.3d at 1291.

27  Moreover, expedited discovery is also justified because there is a real risk that Defendants

28  will attempt to destroy documents, data, and other evidence related to their activities, as

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7555920.2                                      24                        C 07 2504 RMW
                                                                PLTF'S MEM. OF POINTS &AUTHORITIES ISO
                                                                POSDATA'S *EX PARTE* APPLICATION

1  evidenced by Kim's use of software designed to erase data files and conceal his activities.

2  Finally, Posdata's need for discovery far outweighs any prejudice that Defendants may suffer.  A

3  denial of expedited discovery will permit Defendants to continue to unlawfully benefit from its

4  theft and have additional time to destroy critical data and information.

5      Defendants will suffer no prejudice if they are required to respond to written discovery

6  requests or appear for deposition.  The absence of prejudice is further confirmed in the fact that

7  Posdata is willing to engage in reciprocal discovery.

8                          IV.    **CONCLUSION**

9      Based on the foregoing, Defendants' Motion should be granted.  Only an order for

10  expedited discovery and a temporary restraining order against Defendants will stop the ongoing

11  misuse of Posdata's trade secrets and confidential information.

12  Dated: June ____, 2007

13                                          MORGAN, LEWIS & BOCKIUS LLP

14

15                              By _____

16                                  Brendan Dolan
                                   Attorneys for Plaintiff
17                                  POSDATA CO., LTD., a South Korean
                                   Corporation

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7555920.2

25

C 07 2504 RMW
PLTF'S MEM. OF POINTS &AUTHORITIES ISO
POSDATA'S *EX PARTE* APPLICATION