1  BRENDAN DOLAN, State Bar No. 126732
   L. JULIUS M. TURMAN, State Bar No. 226126
2  STEVEN J. GARRETT, State Bar No. 221021
   MORGAN, LEWIS & BOCKIUS LLP
3  One Market, Spear Street Tower
   San Francisco, CA  94105-1126
4  Tel:  415.442.1000
   Fax:  415.442.1001
5  E-mail:  bdolan@morganlewis.com

6  Attorneys for Plaintiff
   POSDATA CO., LTD.

7

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10                  SAN JOSE DIVISION

11 POSDATA CO., LTD., a South Korean          Case No. C 07 2504 RMW
   corporation,
12                                            **DECLARATION OF HO TAE HAN IN
                    Plaintiff,                SUPPORT OF POSDATA'S *EX PARTE*
13                                            APPLICATION FOR**

14        vs.                                 **(1)  TEMPORARY RESTRAINING
                                              ORDER;**
15 SEYOUNG KIM, an individual and
   INQUADRON, INC., a California              **(2)  ORDER TO SHOW CAUSE WHY A
16 corporation,                               PRELIMINARY INJUNCTION SHOULD
                                              NOT ISSUE; AND**
                    Defendants.
17                                            **(3)  ORDER PERMITTING EXPEDITED
18                                            DISCOVERY.**

19

20        I, Ho Tae Han, declare:

21        1.     I have personal knowledge of the facts set forth in this declaration, and if called as

22 a witness, I could and would competently testify to them.

23        2.     I am a Senior Manager of the Business Support Team in the FLYVO Business

24 Department of Posdata Co., Ltd. ("Posdata" or "Plaintiff"), a Korean corporation with its

25 principal place of business in the Republic of Korea.  I was hired by Posdata on January 4, 1994

26 and have held several positions since joining the company, including a Team Manager in the

27 Investment Department, Manager of the Overseas Business Team in the System Integration

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7548786.2

                                        C 07 2504 RMW
                                   HAN DECLARATION ISO
                          POSDATA'S EX PARTE APPLICATION

1  Department, and Assistant Manager of the Corporate Planning Team.  In my position as Senior

2  Manager of the Business Support Team in the FLYVO Business Department, I am responsible for

3  coordinating the business and budget plan for the FLYVO Business Division which includes the

4  FLYVO Business Department and the FLYVO Research and Development ("R&D") Center,

5  reviewing employee complaints and proposing new HR policy to headquarters, reviewing

6  contracts and offering recommendations to the FLYVO Business Division, and distributing

7  monthly status updates for the FLYVO Business Division.  I am also responsible for supporting

8  Posdata's San Jose facility and its employees.  Although my office is located in Seongnam-City,

9  Kyeonggi-do, Korea, I frequently work with and occasionally visit the R&D facility in San Jose,

10  California.

11       3.       Posdata was founded in 1989 by Korean parent company Posco.  Over the years,

12  Posdata has evolved into a cutting edge information technology company offering unique

13  products and services to its customers, which includes telecommunication companies, Internet

14  service providers, and computer companies.  Posdata has been a leader in the development of

15  mobile WiMAX (Worldwide Interoperability for Microwave Access) technology since 2004.

16  Mobile WiMAX is a next-generation wireless telecommunications technology which enables

17  users to have broadband wireless Internet access while physically moving.  Mobile WiMAX

18  makes it possible to access broadband wireless Internet anytime and anywhere and also offers

19  true mobility by allowing wireless users to travel at high speeds across large geographic areas

20  while seamlessly receiving data and multimedia services.  Mobile WiMAX is the technology

21  most suitable to meet users' various needs.

22       4.       Existing data services are divided into three categories: 1) wired broadband

23  Internet; 2) wireless Internet for mobile communications; and 3) Wireless Lan ("WLAN").

24  Wired broadband Internet and WLAN offer high-speed services, but are restricted by access

25  location and mobility.  Wireless Internet supports mobility, but is restricted by slow transmission

26  rates and high cost.  Mobile WiMAX addresses the shortcomings of these existing data services

27  by providing seamless services to people on the move while offering high-speed data services

28  comparable to broadband Internet.  Mobile WiMAX technology is a lucrative and competitive

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7548786.2

2

C 07 2504 RMW
HAN DECLARATION ISO
POSDATA'S EX PARTE APPLICATION

1    market for Posdata as evidenced by the announcement of Sprint Nextel to build the first

2    nationwide mobile WiMAX network in U.S. by the end of 2008.

3        5.      Posdata has recently focused its WiMAX efforts on creating more advanced base

4    station technology that can support wireless mobile high-speed broadband Internet access.

5    FLYVO is Posdata's mobile WiMAX product line that enables users to have wireless mobile high

6    speed broadband access to the Internet. As a result of its efforts, Posdata has created the FLYVO

7    system. FLYVO is a complete end-to-end system providing base stations, control servers,

8    network and customer management systems, chipsets, and end user mobile devices. Posdata's

9    mobile WiMAX base stations are designed to serve as the central access point linking the mobile

10    stations wirelessly to the service providers' core network. Posdata has invested substantial time

11    and capital in developing its WiMAX technology and FLYVO system.

12        6.      One of the key components of a Posdata base station is its core technology- the

13    Digital Channel Card Unit ("DCCU" or "channel card"). The DCCU's primary function is to

14    efficiently manage user traffic data by processing the communication signals under various RF

15    environments according to the mobile WiMAX standard. Posdata's DCCU consists of several

16    commercial processors and components, which are placed on a Printed Circuit Board ("PCB").

17    Although the processors and components are generic, the combination of the processors and

18    components used and their placement on the PCB is unique to Posdata and unknown to its

19    competitors. The processors and components are operated by Posdata's MAC and PHY software,

20    which controls the operation and overall performance of the DCCU. The overall effect of the

21    processors and components, Posdata's PCB design and layout, and Posdata's source code creates

22    architecture for optimal interface between hardware and software. Posdata closely guards this

23    design configuration because it creates a proprietary process to support its large and small base

24    stations in achieving connectivity to the Internet, while physically moving at high speeds. This is

25    a significant step in developing the next generation of WiMAX technology.

26        7.      The creation of Posdata's DCCU has taken more than three years to develop,

27    through a tedious process of trial and error, expending a significant amount of financial and

28    human resources. The technology has been refined and improved upon through several stages of

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3

1-SF/7548786.2

C 07 2504 RMW
HAN DECLARATION ISO
POSDATA'S EX PARTE APPLICATION

1  re-engineering and further development. Posdata's DCCU was subjected to the GCT

2  Semiconductor, Inc. ("GCT") mobile station chip Interoperability ("IOT") testing, on November

3  28, 2006. Prior to engaging in the IOT testing, we entered into a mutual non-disclosure

4  agreement with GCT to protect Posdata's proprietary technology and confidential information.

5  The IOT reports contained data useful for Posdata's engineers to evaluate the performance of

6  Posdata's mobile WiMAX system, compatibility of the system with other mobile vendors, detect

7  system problems, and test solutions to these problems. The IOT reports are critical to the design

8  process because it shows areas of needed improvement and provides Posdata engineers with ideas

9  and data to aid in the future design of the system. The IOT testing and reports represented a

10  substantial monetary and labor investment in the research and development process of the DCCU.

11      8.    Posdata's DCCU was also part of the Mobile Plugfest reports in June 2006,

12  September of 2006, and February 2007. The Plugfest reports are the result of a multi-vendor

13  WiMAX Forum to measure the interoperability between the different base station technologies

14  developed by member companies. To participate in the forum and receive the results of the data

15  testing, members are required to sign a confidentiality agreement, treating the report as

16  proprietary information and not disclose the data outside of the member company group. The

17  reports noted that Posdata's base station's DCCU performed well in comparisons to other mobile

18  WiMAX vendor products. The actual testing measurements allows Posdata's product to be

19  touted in the industry as superior and has a significant impact on future market share.

20      9.    On May 25, 2006, Posdata's FLYVO system, including the DCCU, was sent to

21  Nippon Telegraph and Telephone Corporation ("NTT") DoCoMo for 10 months of extensive

22  testing. NTT DoCoMo is Japan's biggest mobile operator with a prestigious computer

23  technology consulting and testing facility. The parties entered into a non-disclosure agreement to

24  protect Posdata's proprietary technology and confidential information prior to conducting the trial

25  runs. The results from trial runs conducted by NTT DoCoMo provided very detailed feedback,

26  used in the further development and re-engineering of the DCCU. NTT DoCoMo conducts its

27  testing analysis through ongoing trial runs and a collaborative testing process that is specifically

28  tailored to evaluate and measure Posdata's DCCU. As part of the rigorous and testing process,

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7548786.2

4

1    Posdata was required to provide NTT DoCoMo with extensive design data, previous test results,

2    and detailed testing protocol designed by Posdata. The results of the trial runs from NTT

3    DoCoMo are proprietary because they reflect not only a roadmap of areas which have been

4    identified by Posdata's prior testing measurements as strengths and weaknesses of the DCCU, but

5    also identify Posdata's areas that require further development and research and targeted areas for

6    improvement of the quality and performance of the DCCU and the overall base station.

7        10.    Posdata's larger base stations have many DCCU's or channel cards, designed for

8    use in densely populated areas and receive a broad range of RF transmissions. Posdata's smaller

9    Portable Radio Access base stations ("RAS" or "Pico RAS"), have only one DCCU or channel

10   card and are designed for use in less populated areas, are capable of covering smaller geographic

11   areas like university campuses or buildings, and receive a smaller range of RF transmissions. In

12   addition, smaller mobile base stations typically have one channel card while larger base stations

13   have up to nine channel cards. Although the two types of base stations have different geographic

14   coverage, the channel cards respectively adapted for use in the two types of base stations are

15   derived from the same technology and have thus been a product of the same development and

16   testing as is described above.

17       11.    Posdata has dual R&D Centers: the America R&D Center is located in San Jose,

18   California; and the FLYVO R&D Center is in Korea. The San Jose America R&D Center was

19   established in January 2004 to capitalize on the research infrastructure available and rich pool of

20   engineering talent in Silicon Valley. Although both the FLYVO and San Jose R&D Centers have

21   worked together to develop the FLYVO system, the America R&D Center has been responsible

22   for the development of the core technology and has also been responsible, with some support

23   from engineers in Korea, for the development of the channel card for the mobile WiMAX system.

24   The FLYVO R&D Center in Korea has been implementing the commercial system based on core

25   technology. Work on Posdata's next generation base station technology, occurring in both R&D

26   Centers was, and still is, highly technical, confidential, valuable, and proprietary because it

27   concerns new next generation technology that would continue to allow Posdata to be a leading

28   developer of mobile WiMAX technology.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

C 07 2504 RMW
HAN DECLARATION ISO
POSDATA'S EX PARTE APPLICATION

1    12.    Dr. Seyoung Kim was hired by Posdata as director for America R&D Center in

2    San Jose in 2004.  From February 2005 to June 2006, Dr. Kim was Posdata's director for R&D

3    Lab 1, the core technology development team, ("Lab 1") because of his engineering background

4    and previous experience with certain technological platforms for American engineers, which was

5    thought to be suitable for a project manager position in that department.  After the reorganization

6    in July 2006, Dr. Kim led the System Engineering Lab until October 2006

7    13.    While working as project lead for the R&D Lab 1, Dr. Kim and some of his team

8    refused to share their work with many Posdata employees in other organizational units, and would

9    not save their data to the company's computer network.  As suspicion about Dr. Kim's actions

10   increased, Posdata retained Kroll, Inc., a premiere electronic analysis and investigative service, to

11   conduct an investigation of Dr. Kim and other individuals' suspicious activities.  On one occasion,

12   Dr. Kim urged Posdata employee Brian Kim to not mention to anyone outside Brian Kim's unit

13   the current status of an ongoing development project.  Attached as Exhibit 1 to my declaration is

14   a true and correct copy of Kim's April 12, 2006 email to Brian Kim.  Also attached to Exhibit 1 is

15   an English translation of the email.

16   14.    During this time period, Dr. Kim also pressed the company to let his team develop

17   a smaller base station whose market was forecast to continue to expand.  Posdata, however,

18   instructed Dr. Kim and his team to dedicate their resources to only enhancing the core technology

19   for use in its larger base stations.  Meanwhile, another division at Posdata worked to develop

20   smaller base stations.   In addition, developing specific uses for the channel card is primarily the

21   job of R&D Lab 2 team, with some cooperation and input of the Lab 1 team, in accordance with

22   Posdata's Role and Responsibility Regulations.

23   15.    Under the direction of R&D Lab 2 team, Posdata developed its Pico RAS (small

24   base station) channel card for its smaller base station.  Following a corporate reorganization in

25   2006, Posdata formed a new division called the "Hardware Development Lab," which is currently

26   continuing to development of the small base station.

27   16.    Dr. Kim continued to make his discontent with Posdata management known

28   throughout 2006.  Dr. Kim threatened to leave the company if Posdata did not make a deal with

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6
1-SF/7548786.2

C 07 2504 RMW
HAN DECLARATION ISO
POSDATA'S EX PARTE APPLICATION

1    the service provider NextWave.  Attached as Exhibit 2 to my declaration is a true and correct

2    copy of Kim's May 7, 2006 email to Michael Schy.  Also attached to Exhibit 2 is an English

3    translation of the email.  Posdata ultimately declined to contract with NextWave because it did

4    not want to go into broadcasting, nor did the company want to deviate too far from its core

5    strength.  Dr. Kim also fostered discontent among his team as evidenced by Jeffrey Choi's email

6    stating there was still a "bunch of 'SOB' in Korea."  Attached as Exhibit 3 to my declaration is a

7    true and correct copy of Choi's June 27, 2006 email to William Li.

8         17.    During the summer of 2006, the company finally split up Dr. Kim's core

9    technology team, Lab 1, because Dr. Kim and his team refused to be "team players" in supporting

10   the company's goals and in cooperating with the company's other R&D team, Lab 2, and the

11   business development team, also known as Lab 2.  Dr. Kim acknowledged in a July 28, 2006

12   email to Posdata employee Michael Schy that his team was broken up because the team had

13   become "too strong" for headquarters to handle and because the company perceived Lab 1 as too

14   "arrogant."  Attached as Exhibit 4 to my declaration is a true and correct copy of Kim's July 28,

15   2006 email to Michael Schy.  Also attached to Exhibit 4 is an English translation of the email.  Dr.

16   Kim further opined that expansion into the U.S. market has been too slow and that the San Jose

17   facility should become the focal point of Posdata's operations.  Id.

18        18.    Dr. Kim promised several Posdata employees, in a June 29, 2006 email, that

19   Posdata "will come to know soon their childish, shallow plan could not succeed" because he was

20   "going to look for an opportunity for our team to work together again."  Attached as Exhibit 5 to

21   my declaration is a true and correct copy of Kim's June 29, 2006 email to several Posdata

22   employees.  Also attached to Exhibit 5 is an English translation of the email.  Dr. Kim promised

23   to start a new company and urged his colleagues to continue their "development job[s] for the

24   purposes of both Posdata's future and our future."  Id.  I would later learn that this company was

25   to be called InQuadron, Inc. ("InQuadron"), would be a direct competitor to Posdata and would

26   rely on misappropriated Posdata technology.

27        19.    On October 27, 2006, Posdata entered into an agreement with Dr. Kim that

28   outlined the terms of Dr. Kim's separation from the company.  Attached as Exhibit 6 to my

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7
1-SF/7548786.2

C 07 2504 RMW
HAN DECLARATION ISO
POSDATA'S EX PARTE APPLICATION

1   declaration is a true and correct copy of the Separation Agreement.  Also attached to Exhibit 6 is

2   an English translation of the Agreement.  The agreement essentially provided that: (1) Dr. Kim

3   would remain on the company's payroll through June 17, 2007 even though he would no longer

4   be working on Posdata projects; (2) the company would provide him with an apartment and

5   automobile for that period of time; and (3) that Dr. Kim would protect and not disclose the

6   company's trade secrets.  Id.  Although Dr. Kim was to refrain from contact with the San Jose

7   facility and cease all work on any Posdata projects as of October 27, 2006, Dr. Kim was to remain

8   an employee through June 17, 2007 per the agreement.

9       20.     I know Kenneth D. Lee, an associate of Dr. Kim's, filed articles of incorporation

10  for InQuadron, Inc. with the Secretary of State of California on December 4, 2006.  Attached as

11  Exhibit 7 to my declaration is a true and correct copy of InQuadron's Articles of Incorporation.

12  A few months later, amended articles of incorporation for InQuadron were filed.  Attached as

13  Exhibit 8 to my declaration is a true and correct copy of the Amended and Restated Articles of

14  Incorporation and Statement of Information.  I am also aware that the statement of information

15  filed with the Secretary of State listed Dr. Kim as the Chief Executive Officer and Lee as Chief

16  Financial Officer and Secretary of the corporation.  Id.  The filing also listed Kim, Lee, Hwayong

17  Joung, and Joonsug Chung as directors of the corporation.  Id.  Although InQuadron was not

18  incorporated until December 2006, I know that Hwayong Joung registered the domain name

19  InQuadron.com on November 6, 2006.

20      21.     A blatant misappropriation of Posdata's trade secrets and confidential information

21  occurred on December 11, 2006, when Posdata employee Jeffrey Choi forwarded to Dr. Kim the

22  IOT reports containing measurement data on performance between the GCT terminal chip and

23  Posdata's DCCU.  Attached as Exhibit 9 to my declaration is a true and correct copy of Jeff

24  Choi's December 11, 2006 email to Dr. Kim and Dr. Kim's response to that email.  Also attached

25  to Exhibit 9 is an English translation of the email chain.  Choi briefly commented that the GCT

26  engineers were impressed with the performance of Posdata's RAS during tests and recounts how

27  the Posdata Test Mobile 1 may become unstable under certain test conditions.  Id.  Choi also

28  promised to obtain any data from future tests, tells Kim that he has many things to discuss with

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

I-SF/7548786.2

C 07 2504 RMW
HAN DECLARATION ISO
POSDATA'S EX PARTE APPLICATION

1   him, and reminds Kim "to distribute the data that I sent to the people you think they may need."

2   Id. The IOT reports contains data useful for Posdata's engineers, and for that matter its

3   competitors, to evaluate the performance of the DCCU and the mobile WiMAX base station,

4   compatibility of the DCCU and the base station with other mobile vendors' base stations, detect

5   system problems, and test solutions to these problems.  Distribution of the IOT reports through

6   email is a violation of company policy as these reports should have been saved on Posdata's

7   Electronic Document Management System ("EDMS") and should have been viewed only by

8   using the EDMS system. After October 27, 2006, Kim no longer had access to Posdata's EDMS

9   system. Since Dr. Kim was no longer working on any Posdata projects at that time, it is clear to

10  me now that Dr. Kim was getting this information for his own benefit and use in connection with

11  InQuadron's development of mobile WiMAX technology.   In forwarding Choi's email to

12  Kangmin Lee, Kim reminds Lee to keep their communications "strictly confidential." Id. As

13  evidenced by a December 11, 2006 email attachment, Choi received the NTT DoCoMo test

14  results from Jinyoung Park. Attached as Exhibit 10 to my declaration is a true and correct copy of

15  an email between Choi and Park, including the attached DoCoMo Report.  Also attached to

16  Exhibit 10 is an English translation of the email. Having these test results would allow InQuadron

17  to have precise data as to the strengths and weaknesses of the DCCU, as well as identify areas

18  that require further development and research.  Access to this information would allow a

19  competitor to easily create a product that will be on an equal footing, without doing exerting any

20  extraordinary effort.

21          22.     I learned that Kim continued to receive proprietary information from Posdata

22  employee Choon Shin in 2007. On February 18, Kim and Choi used their personal email

23  accounts to send a copy of the Mobile 3 Plugfest Interim Report. Attached as Exhibit 11 to my

24  declaration is a true and correct copy of Kim's email to Choon Shin, attaching the Mobile 3

25  Plugfest Interim Report.  Also attached to Exhibit 11 is an English translation of the email.  Again

26  Plugfest reports are peer data reports that measures performance against other vendors' products.

27  A competitor who is not a member company has a significant advantage in jumpstarting viability

28  testing and comparisons to the competition, free of labor and expense.  Once again, our company

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    policy requires that the Plugfest reports be saved and viewed only on Posdata's EDMS system.

2         23.    I discovered a February 18, 2007 email between Shin (while still an employee of

3    Posdata) and Kim (who was also still employed by Posdata ), discussing the "Gerber Data for the

4    MCCA (Turtle Channel Card) for the production of PCB, Gerber Data is prepared." This email is

5    also part of Exhibit 11 to my declaration. On March 2, Shin (while still employed by Posdata)

6    also emailed a file named. "MCCA REV.C GERBER DATA" (MCCA-C-3-GBR-NOP.zip) to

7    Kim. This email showing this attachment was recovered during the Kroll's forensic computer

8    investigation and is part of Exhibit 11 to my declaration. The actual attachment was not

9    recovered. These files should not have been distributed in violation of Posdata's policy requiring

10   all Posdata related documents, reports, and materials be saved and viewed on the EDMS. On

11   May 31, 2007, the Computer Investigation Department of the Seoul Central Prosecutor's Office

12   requested that Posdata review documents that were seized from Axstone Technology Co., Ltd.,

13   which has been established to be InQuadron's PCB manufacturer. An examination of the files in

14   the possession of the Prosecutor revealed that InQuadron's contractor was in possession of

15   "MCCA REV.C GERBER DATA" (MCCA-C-3-GBR-NOP.zip) attachment. The file contained

16   Posdata's proprietary information regarding the PCB design and layout. A review of the file

17   showed that the MCCA was an acronym for a new version of a channel card, which they had

18   named the "Turtle Card." The MCCA /Turtle Card's PCB had a very similar design and layout to

19   Posdata's DCCU. The MCCA/Turtle Card also used the same make and specifications of

20   processors and components as used in Posdata's DCCU. Dr. Kim was no longer working on any

21   Posdata projects at that time and had no other use for that data other than in connection with the

22   business that we now know he had established as InQuadron.

23       24.    Posdata also recovered from an external storage device of Choon Shin's, which

24   Shin turned in to Posdata, along with his computer, on May 14, 2007. An examination of the

25   storage device revealed a file named "RAS-portable-111306-12.doc." Attached as Exhibit 12 is a

26   true and correct copy of this file. This file contained a document entitled the "Modular RAS

27   Implementation" showing Posdata's proprietary PCB design. The MCCA/Turtle Card's hardware

28   architecture was identical to the DCCU's core technology hardware architecture. InQuadron

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10

1-SF/7548786.2

C 07 2504 RMW
HAN DECLARATION ISO
POSDATA'S EX PARTE APPLICATION

1  contained three FPGA processors, all carrying the same nicknames as the Posdata DCCU: MAC;

2  BE and FE. In addition, InQuadron's hardware also contained two DSP processors and six

3  SRAMs, all with the same specifications, make and models as those used by Posdata's DCCU. Id.

4  at pg 8.

5         25.     While employed by Posdata, Kim and other individuals actively solicited current

6  and former Posdata employees to work for their new business venture. A review of InQuadron's

7  2007 Expense Plan lists salaries for 24 individuals, including several current and former Posdata

8  employees, for the time period of March through December 2007. Attached as Exhibit 13 to my

9  declaration is a true and correct copy of InQuadron's 2007 Expense Plan. The InQuadron plan

10  also outlined expenses for office rent, utilities, and a variety of research and development tools.

11  Id. I also reviewed a projected InQuadron Organization Chart for its U.S. and Korean operations.

12  Attached as Exhibit 14 to my declaration is a true and correct copy of the InQuadron

13  Organization Chart. In the United States, Dr. Kim would serve as the CEO/CTO and Research

14  and Development Lead, while Kenneth Lee would serve as the CFO/COO. Id. In addition, the

15  U.S. team would consist of system, hardware/DSP, and software engineers presumably from

16  Posdata. Id. In Korea, Joonsug Chung would be in charge of business development and

17  Hwayong Joung would be the Korea Research and Development Team Lead. Id. The Korean

18  team would also consist of system, hardware, software, and field test engineers, presumably from

19  Posdata. Id. The loss of employee expertise and transfer of Posdata's trade secrets by the current

20  and former Posdata employees to a competing venture like InQuadron would not only unfairly

21  benefit InQuadron but would severely cripple Posdata's operations, particularly with respect to

22  Posdata's San Jose facility.

23         26.     I am aware that Dr. Kim (while still employed by Posdata) actively participated in

24  the recruitment of Posdata employees. For instance, Dr. Kim emailed Sukchan Lee, Jinyoung

25  Park, and Gwangseok Kim on June 29, 2006, to discuss the prospects of working with them at his

26  future business venture. See Exhibit 5. In correspondence between Kim and Jinyoung Park dated

27  February 8 and 9, 2007, they discussed a potential ownership interest in Dr. Kim's new WiMAX

28  business and that Kim's "secret negotiations" should be fruitful. Attached as Exhibit 15 to my

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO                                    11                          C 07 2504 RMW
                                          1-SF/7548786.2              HAN DECLARATION ISO
                                                              POSDATA'S EX PARTE APPLICATION

1    declaration is a true and correct copy of Kim's February 8, 2007 email to Jinyoung Park. Also

2    attached to Exhibit 15 is a translation of the email which I believe to be true and correct. I am also

3    aware other individuals on behalf of Dr. Kim also actively recruited individuals for InQuadron.

4    Hwayong Joung offered Yongwoo Kim, the RF group lead in Posdata's SOC development lab, a

5    position within Joung's new company, presumably InQuadron, on February 13, 2007 because

6    Yongwoo Kim reported this offer to Posdata. I am also aware that Kim emailed several

7    individuals on February 14, 2007 about the establishment of InQuadron and specifically requested

8    Kenneth Lee to prepare offer letters for Hojun Kim, Jeffrey Choi, Yoonki Hong, and other

9    undisclosed Korean employees. Attached as Exhibit 16 to my declaration is a true and correct

10   copy of Kim's February 14, 2007 email to Kenneth Lee. On February 27, Yongkeun Pang

11   emailed Dr. Kim to discuss employment at InQuadron. Attached as Exhibit 17 to my declaration

12   is a true and correct copy of Pang's February 27, 2007 email to Kim. Also attached to Exhibit 17

13   is a translation of the email which I believe to be true and correct. Dr. Kim expressed in an email

14   to Kenneth Lee on February 27, 2007 that he had already sent informal verbal offers to four

15   engineers through Hwayong Joung in the prior week. Attached as Exhibit 18 to my declaration is

16   a true and correct copy of Kim's February 27, 2007 email to Kenneth Lee. I am also aware that a

17   recent examination of Kim's computer revealed it contained job offer letters and Employee

18   Proprietary Rights and Confidentiality Agreements for approximately 10 individuals of the

19   proposed InQuadron teams located in the United States and Korea. Attached as Exhibit 19 to my

20   declaration is a true and correct copy of recovered correspondence found on Kim's computer

21   from Kenneth Lee. In addition, Kim contacted former Posdata employee William Li via email on

22   March 12, 2007 to join InQuadron. Attached as Exhibit 20 to my declaration is a true and correct

23   copy of Kim's March 12, 2007 email to Li.

24        27.    Ultimately, Dr. Kim and InQuadron's solicitation efforts were successful as

25   several Posdata employees resigned from the company during the past year. For example,

26   Hwayong Joung resigned on October 20, 2006, Seondong Park resigned on December 20, 2006,

27   Yongkeun Pang resigned on March 20 2007, Jongwook Lee resigned March 30 2007, and Jeffrey

28   Choi resigned in March 2007.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12
1-SF/7548786.2

C 07 2504 RMW
HAN DECLARATION ISO
POSDATA'S EX PARTE APPLICATION

28.     As discussed above, the investigations by Kroll and the Prosecutor have uncovered that Kim, InQuadron and their associates have misappropriated Posdata's trade secrets, solicited current and former Posdata employees to join InQuadron and engaged in other unlawful activities. For instance, former Posdata software developers and current InQuadron employees, Seongdong Park and Jongwook Lee, have admitted to Prosecutors that they stole Posdata's MAC and PHY source code to aid in the development of InQuadron's Turtle Card and related WiMAX technology.

29.     Dr. Kim explains in a February 8, 2007, email to Jinyoung Park that he expected his "secret negotiations" with a famous company and soon to be important customer should turn out well. See Exhibit 15. Kim was encouraged that the market and interest on WiMAX was increasing in the United States, which was good news for his new business. Id. Kim and Kenneth Lee discussed the establishment of InQuadron's operations in a February 14, 2007 email. See Exhibit 16. Kenneth Lee replied to Dr. Kim's email regarding an operations update for InQuadron in the United States and Korea.  Attached as Exhibit 21 to my declaration is a true and correct copy of Kenneth Lee's March 14, 2007 email to Kim.  Kenneth Lee notes the start date for the United States team will be March 1. Id. Lee also states that Joung and Park, both KT Data Company (KTD) employees, should become IQI-Korea (InQuadron, Inc.) employees as soon as possible even though they could continue to act as consultants for KTD. Id. Kenneth Lee emphasizes these measures are necessary because the establishment of IQI-Korea (InQuadron, Inc.) was ahead of schedule. Id.

30.     InQuadron had a business relationship with an undisclosed company and that Kim and his associates had approached several other companies to develop the Turtle Card and capitalize on other Posdata trade secret information.  The emails show Dr. Kim and his associates contacted the following individuals as indicated in series of late February emails: (1) Mark Kelly, General Manager/CTO of Next Wave; (2) Dukyong Kim, President of KMW; (3) Yongchun Kim, President of NSC; and (4) Kwangsun Kim, President of D&T. Attached as Exhibit 22 to my declaration is a true and correct copy these emails to various companies ranging from February 21 through March 14, 2007. Also attached to Exhibit 22 is a translation of the email which I believe

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

13
1-SF/7548786.2

C 07 2504 RMW
HAN DECLARATION ISO
POSDATA'S EX PARTE APPLICATION

1   to be true and correct. This correspondence also suggests that Joung and Sanggeum Hwang

2   worked with a company to test "Turtle" system. Id.

3       31.     InQuadron has apparently formed a business partnership with Axstone to

4   manufacture PCB of Turtle Card. Attached as Exhibit 23 to my declaration is a true and correct

5   copy of email dated February 26, 2007 between Hwayong Joung and Kim. Also attached to

6   Exhibit 23 is a translation of the email which I believe to be true and correct. The Axstone

7   contact appears to be Kihong Bang. Id. The correspondence indicates both companies planned to

8   cooperate in developing products and share profits. Id. Dr. Kim urged Hwayong Joung to move

9   forward with the Axstone agreement outlining the contractual terms related to the scope of

10  product development, business model, profit sharing, and future business alliances between two

11  companies. Id. In a February 26, 2007 email to Joung, Dr. Kim implied that "PCB Gerber File"

12  was prepared for development of products in cooperation with Axstone and that InQuadron

13  needed to demonstrate its capability to potential customers such as "N" company. Id. The PCB

14  Gerber File may be indicative of "MCCA PCB fab. Gerber data" that Dr. Kim received from

15  Choon Shin on February 20, 2007 or the "MCCA REV.C GERBER DATA" (MCCA-C-3-GBR-

16  NOP.zip) from Shin on March 2, 2007. See Exhibit 11. Once again, these files contain

17  information regarding Posdata's proprietary PCB design and layout. By March 1, Dr. Kim was

18  no longer working on any Posdata projects and, therefore, only getting this information for his

19  own benefit and use in connection with InQuadron's development of mobile WiMAX technology

20  for its Turtle Card. I also know that Dr. Kim and InQuadron initiated the development of the

21  Channel Card PCB and its sub-system in cooperation with Axstone, and it was already in the

22  process of preparing the patent application.

23      32.     InQuadron has sought investors to fund its operations and that InQuadron had

24  already established a place of business located at 2310 Walsh Avenue in Santa Clara, California.

25      33.     On March 21, 2007, Posdata notified Kim that his employment was terminated and

26  that he needed to return company property and vacate his company apartment. Attached as

27  Exhibit 24 to my declaration is a true and correct copy of the letter sent to Kim notifying him of

28  his termination. Also attached to Exhibit 24 is an English translation of the letter.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

14
1-SF/7548786.2

C 07 2504 RMW
HAN DECLARATION ISO
POSDATA'S EX PARTE APPLICATION

34.    We authorized Kroll to conduct a forensic review of the company computers of Kim, Choi, and other former Posdata employees. I also know their review of the hard drives of these computers revealed numerous files may have been downloaded to external storage devices. The Kroll investigation also showed that Choi and Kim either destroyed company data or attempted to conceal their activities by using software designed to erase partitions and wipe hard drives. Kroll was only able to recover a portion of data and files on these computers due to Dr. Kim and his associates' efforts to conceal their activities.

35.    On a recent visit to the United States, I met with Posdata employee Choon Shin on May 10 and May 11, 2007. During those meetings, Shin told me that he and other associates from former Lab 1 had been working with Dr. Kim and his associates to unofficially develop the Turtle Card since April 2006 for InQuadron. Shin admitted that InQuadron's Turtle Card was the same as Posdata's Pico RAS Card.

36.    I have reviewed several documents recently produced by Kim and InQuadron's counsel, including business plans, presentations to venture capitalists, and a Technology Evaluation Report. Attached as Exhibit 25 to my declaration is a true and correct copy of the Technology Evaluation Report produced by David Elkins on May 14, 2007. Also attached to Exhibit 25 is an English translation of the Technology Evaluation Report. These documents reflect valuable trade secrets and confidential and proprietary Information that Posdata owns. My review of the December 22, 2006 Technology Evaluation Report reveals that InQuadron blatantly references Posdata's technology development accomplishments as their own. For example, the numerical values which represent the excellence of the channel card such as the 65msec ping delay and 60msec hand-off delay are all Posdata's achievement. In addition, InQuadron claims competitive strengths, which are clearly fruits of Posdata's labor, such as their industry-lead know-how on functional implementation and performance enhancement based on field tests over 4 years and field trial experience with 7 technology-leading companies, and touts Posdata's development team which developed the high performing Plugfest reports. Posdata has taken tremendous steps to protect the confidentiality of this information.

37.    The information contained in these documents and from other sources outlined

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

15

1-SF/7548786.2

C 07 2504 RMW
HAN DECLARATION ISO
POSDATA'S EX PARTE APPLICATION

1  above is the product of Posdata's substantial investment in research and development of WiMAX

2  technology. If one of Posdata's competitors were to have access to this information or Posdata's

3  proprietary information, that competitor would have gained access to years worth of research and

4  data collection as well as proprietary technological concepts. This information could be used to

5  effectively jump-start a new technology company such as InQuadron into a full-fledged

6  competitor overnight. With this information, Defendants have the instant ability to skip

7  expensive and time consuming research and development and potentially leapfrog over Posdata

8  into the blossoming WiMAX market in the United States.

9       38.    If a competitor had access to these documents or the company's proprietary

10  information, Posdata would suffer immediate substantial and irreparable damage, including

11  rendering the theft of company technology, the loss of goodwill and potential clients. The extent

12  of this damage cannot be fully ascertained until we learn the full extent of misappropriation of

13  Posdata's proprietary information. Whatever damage Posdata has suffered thus far pales in

14  comparison to the damage that Posdata will incur if nothing prohibits Defendants from using

15  Posdata's trade secrets to compete against Posdata.

16       39.    It is apparent to me that from reviewing several emails between Dr. Kim, Choon

17  Shin and Jeff Choi (members of Dr. Kim's former Lab 1 team), and other correspondence

18  between Kim and his associates, that they stole Posdata's trade secrets to develop their own

19  smaller base station MCCA/Turtle Card, during company time and using company resources. I

20  am also aware that Dr. Kim's team constructed a prototype of the MCCA/Turtle Card by utilizing

21  Posdata's PCB design and layout, MAC and PHY source code and proprietary architecture for

22  interface between hardware and software. Kim and InQuadron adapted Posdata's DCCU core

23  technology for use in the smaller base station and remodeled it into their version of the DCCU-

24  the MCCA/Turtle Card. It is also clear to me that it would be impossible for Kim and InQuadron

25  to develop a functional MCCA/Turtle Card since April 2006 unless they utilized Posdata's DCCU

26  technology, including Posdata's PCB design and layout, MAC and PHY source code and

27  proprietary architecture for interface between hardware and software. Dr. Kim and his associates

28  developed the Turtle Card for their own benefit and use in their new business venture. Dr. Kim's

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

16
I-SF/7548786.2

C 07 2504 RMW
HAN DECLARATION ISO
POSDATA'S EX PARTE APPLICATION

1  team also utilized Posdata's test methods, comparison data, results of the trial runs from NTT

2  DoCoMo, and interoperability test data on the communication between Posdata's RAS and GCT

3  mobile station chip to gain information about how its knock-off MCCA/Turtle Card, which was

4  essentially the same as the Pico RAS, would perform.  Kim and his associates attempted to

5  jumpstart InQuadron by skipping several tedious and expensive steps in the research and

6  development process by stealing Posdata's core technology for use in its own MCCA/Turtle Card.

7      40.    On June 9, 2007, we discovered a file named "Mcca-mentor-2-orcad.pdf" in the

8  directory "logical drive:\choon\RAS-modular\Schematic" of Choon Shin's external storage

9  device that he turned in to Posdata on May 14, 2007.  Attached as Exhibit 26 is a true and correct

10  copy of this file.  This file reflects a November 30, 2006 backup of Shin's laptop created by him.

11  The file contained 64 pages of schematic drawings and design plans for Posdata's DCCU which

12  should have been securely stored on Posdata's EDMS and not on Shin's external storage device.

13  Posdata's version of the document saved on the EDMS was entitled "Rev. 0.4 DCCU Block

14  Diagram." The filed found on Shin's computer was identical except for the fact that he redlined

15  through certain text in the document, including changing the name of the document from "Rev.

16  0.4 DCCU Block Diagram" to "MCCA."

17      41.    Posdata has made a substantial capital and labor investment to develop its mobile

18  WiMAX technology and DCCU.  During the past three years, Posdata has invested nearly 100

19  million dollars in pioneering its mobile WiMAX technology, including the DCCU, and as a result

20  the number of R&D employees at Posdata's has grown to over 170 employees.  Posdata's

21  engineers have spent countless hours during the past three years researching and developing the

22  DCCU, including its PCB design and layout, MAC and PHY source code and a proprietary

23  interface between hardware and software.  Posdata has also invested millions of dollars to test its

24  mobile WiMAX technology and obtain comparison data, Plugfest data, results of the trial runs

25  from NTT DoCoMo, and interoperability test data on the communication between Posdata's RAS

26  and GCT mobile station chip.

27      42.    We have closely guarded Posdata's proprietary trade secrets when dealing with

28  external customers and vendors.  We have implemented a policy that forbids Posdata employees

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

17

I-SF/7548786.2

C 07 2504 RMW
HAN DECLARATION ISO
POSDATA'S EX PARTE APPLICATION

1    from sharing our technology, confidential information or trade secrets with anyone outside of

2    Posdata.  To protect Posdata's proprietary technology, we require all customers, vendors, and

3    other companies that work with our engineers to test our mobile WiMAX technology and DCCU

4    technology to sign non-disclosure agreements.  Attached as Exhibit 27 to my declaration is a true

5    and correct copy of three non-disclosure agreements Posdata entered into with GCT, NTT

6    DoCoMo, and Plugfest WiMAX Forum.  As a further precaution to maintain the secrecy of

7    Posdata's technology, we send Posdata engineers to perform all research, development, or testing

8    of Posdata's technology with these groups.

9         43.    In light of Posdata's substantial capital and labor resource investments, we have

10   always taken precautions to protect our proprietary and confidential information by requiring all

11   employees to have a password to login into their work stations.  We upgraded our security

12   measures by installing a secure EDMS to protect Posdata's DCCU and mobile WiMAX

13   technology related documents.  We also installed ClearCase of IBM Rational to store Posdata's

14   source codes.  Our policy requires all employees to store and view Posdata related documents,

15   reports, and materials on the EDMS.  In fact, we require all Posdata employees to store on the

16   EDMS all proprietary information related to the DCCU, MAC and PHY source code, comparison

17   data, Plugfest data, results of the trial runs from NTT DoCoMo, and interoperability test data on

18   the communication between Posdata's RAS and GCT mobile station chip.  Posdata's EDMS

19   utilizes a Digital Rights Management ("DRM") program that scrambles these documents and

20   prevents them from being viewed unless the user has an authorization code to decode the

21   documents.  As part of our security measures, only Posdata employees that need this information

22   to complete their R&D work are given authorization codes to gain access to these documents.  In

23   addition, we require all employees viewing EDMS documents on their personal laptops to use

24   login passwords.  We have issued several memoranda to our engineers during the past year

25   reminding them of these security procedures.  Although Dr. Kim was to refrain from contact with

26   Posdata employees and cease all work on any Posdata projects as of October 27, 2006, he

27   breached our security network by obtaining confidential proprietary information from Choon Shin,

28   Jeffrey Choi, and his other associates as evidenced by the correspondence listed above.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

18
1-SF/7548786.2

C 07 2504 RMW
HAN DECLARATION ISO
POSDATA'S EX PARTE APPLICATION

44.     As part of our efforts to protect Posdata's trade secrets, we required all employees, including our engineers, to sign confidentiality agreements to protect Posdata's proprietary information and requiring them to not disclose its trade secrets. On May 7, 2004, Dr. Kim signed an agreement that required him to recognize all trade secrets created by Posdata employees belong to the company and that he could not use these secrets or disclose any confidential or proprietary information to third parties. Attached as Exhibit 28 to my declaration is a true and correct copy of the agreement signed by Dr. Kim. On March 23, 2005, Choi and Shin also signed agreements with nearly identical terms protecting Posdata's proprietary information. Attached as Exhibit 29 to my declaration is a true and correct copy of the agreements signed by Choi and Shin. In addition, we generally require all departing employees to sign confidentiality agreements to not disclose Posdata proprietary information. Attached as Exhibit 30 to my declaration is a true and correct copy of a confidentiality agreement signed by Choon Shin on May 11, 2007.

I declare under penalty of perjury of the laws of the United States and the State of California that the foregoing is true and correct.

Executed on June 20, 2007.

HO TAE HAN

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

19
1-SF/7548786.2

C 07 2504 RMW
HAN DECLARATION ISO
POSDATA'S EX PARTE APPLICATION

EXHIBIT 1

| | |
|---|---|
| 식별정보 | M5_LOG_20060412_000000/{4AEC5431-706F-4918-AD77-D5D36336A319} |
| 프로토콜 | SMTP |
| 크기 | 8KB |
| 파일개수 | 파일없음 |
| 보낸 IP | 203.238.203.206 |
| 받는 IP | 203.246.184.101 |
| 저장시각 | 2006-04-12 01:15:48 |
| 보낸사람 | "Seyoung Kim" <seyoungkim@posdata-usa.com> |
| 받는사람 | "'Brian Kim'" <briankim@posdata-usa.com> |
| 참조인 | "'Hwayong Joung'" <hyjoung@posdata.co.kr> |
| 실수취인 | briankim@posdata-usa.com,hyjoung@posdata.co.kr |
| 제목 | RE: Test vector with interference |

김병철 박사님,

몇 시간 전에 메일을 보내드렸습니다마는 한 가지 더 부탁드리려고 합니다.
김병철 박사께서 개발 하시는 사실과 중간결과에 대해서는 당분간 팀
내에서만 국한되었으면 합니다. SV 내에서 Arraycomm과 접촉하는
엔지니어들이 우연치 않게 Arraycomm에게 그들의 test vector나 다른 개발
정보를 이용해 자체 개발 하고 있다는 사실을 알게 될 경우 곤란할 경우가
생기지 않을까 하는 우려가 있습니다.

그리고 사업부내 아무에게도 김박사님의 자체 개발 중간 과정에 대해서는
언급하지 않는 것이 좋겠습니다. 기술적인 내용 및 개발 process를 잘
모르는 사업부 사람들이 호들갑을 떨어 우리 기술로 Smart Antenna 제품
개발을 추진한다는 등의 어리석은 소동을 피하기 위함입니다. 불행하게도
사업부내에 이런 일을 제대로 계획하고 용의주도하게 추진할 인물이
없습니다. 우리 자체 기술에 대한 확신 및 본격적 개발 계획이 서기
전까지는 조용히 우리 내부적으로만 국한시켜 쓸데없고 소모적인 잡음을
피해야 하겠습니다.
감사합니다.

김세영

**ENGLISH
Translation**

| Identifiable Information | M5_LOG_20060412_000000/{4AEC5431-706F-4918-AD77-D5D36336A319} |
|---|---|
| Protocol | SMTP |
| Size | 8KB |
| File Count | None |
| Sender's IP | 203.238.203.206 |
| Recipient's IP | 203.246.184.101 |
| Date | 2006-04-12 01:15:48 |
| Sender | "Seyoung Kim" <seyoungkim@posdata-usa.com> |
| Recipient | "'Brian Kim'" <briankim@posdata-usa.com> |
| Cc | "'Hwayong Joung'" <hyjoung@posdata.co.kr> |
| Actual Recipient | briankim@posdata-usa.com,hyjoung@posdata.co.kr |
| Subject | RE: Test vector with interference |

Dear Dr. Byungchul Kim,

I have sent you an email few hours ago already, but let me ask you for just one more favor. I wish you, Dr. Byungchul Kim, to confine the facts and interim results of your development just to the team. I am afraid that it might cause troubles if the engineers who handles Arraycomm in the SV find out about the fact that we are developing it by ourselves using their test vector and other development information.

Moreover, it is better not to tell anyone in the business department about Dr. Kim's own interim of development stage. It is to avoid absurd agitation by the business department people who do not know the technical content and developmental process; they might shoot crap that we are promoting Smart Antenna product development with our own technical expertise. Unfortunately, there is no one inside the business department careful enough to plan out and promote such project. We should avoid unnecessary, self-defeating interferences by keeping it to ourselves until we have the conviction of our own technical side and until we are into the development process in full scale.

Thank you.

Seyoung Kim

EXHIBIT 2

| 식별정보 | M5_LOG_20060507_000000/{C9C3A22C-932D-464F-90F5-EE91DE03ABFF} |
|---|---|
| 프로토콜 | SMTP |
| 크기 | 35KB |
| 파일개수 | 파일없음 |
| 보낸 IP | 203.238.195.88 |
| 받는 IP | 203.246.184.101 |
| 저장시각 | 2006-05-07 14:20:13 |
| 보낸사람 | "Seyoung Kim" <seyoungkim@posdata-usa.com> |
| 받는사람 | <mschy@posdata-usa.com> |
| 실수취인 | mschy@posdata-usa.com |
| 제목 | RE: NextWave MoU |

Hi Mike,

This guy is nuts. Joonil is surrounded by handpicked no-brainers and he once yelled in his Business Team staff meeting that there is no one who can help him to achieve what he wants or even the ones who can persistently insist what is wrong with him. Poor souls..

Let's see what CEO would do for this case. I told him that I have to consider leaving Posdata if this deal is intentionally aborted without any reasonable consensus. My team is ready as always.

Regards,

Seyoung

-----Original Message-----
From: Michael Schy [mailto:mschy@posdata-usa.com]
Sent: Saturday, May 06, 2006 10:48 AM
To: 'Seyoung Kim'
Subject: FW: NextWave MoU

FYI - more stupid stuff from DJ...

Mike

-----Original Message-----

From: Michael Schy [mailto:mschy@posdata-usa.com]

Sent: Saturday, May 06, 2006 7:06 AM

To: dna@posdata.co.kr

Cc: 'Byung-Chang Yoo'; 'Joon-Il Shin'; 'Hyunchul Yoo';

hyunjin@posdata.co.kr; kevin.lee@posdata.co.kr; 'KwangSeob Yoo'

Subject: RE: NextWave MoU

Dear DJ,

There is no difference from my response to your proposal back in March,

which I said during a weekly status meeting with the CEO -

1. It makes no sense and is completely ridiculous to have the

customer's evaluation system in Bundang, when they're based in another

country

2. No real Service Provider (KT, Sprint, etc.) pays for trials,

including equipment and support personnel - if you don't believe me, ask

your employee Inkyu Paek if Hanaro ever paid for trial equipment and

support

1. You may debate whether or not NextWave is a real Service

Provider, but there aren't too many Service Providers to choose from at

this point

2. The idea of leasing the equipment makes no sense

What other opportunities do we have that have a better Return on

Investment than this potential opportunity? If we fail during the

trial, we get all of our equipment back. The time and resources spent

are the cost of doing business.

I am just clarifying the situation as it was explained to me by the CEO.

I handle all interaction with NextWave but you are responsible for the

business. I want it very clear that I won't be following up with the

various teams in Bundang (Legal, Engineering, etc.) to get the MoU

signed. As you recall, the Nokia RFI was handled very poorly. The

Business Team took over responsibility and at the last minute wanted to

know what progress I made. I don't want any confusion in this case. I

don't think anything is changing with Account Management. If this
business is too tough for you now, what happens when we actually have
complicated business deals?

Best,

Mike
-----Original Message-----
From: DJNA [mailto:dna@posdata.co.kr]
Sent: Saturday, May 06, 2006 5:27 AM
To: mschy@posdata-usa.com
Cc: 'Byung-Chang Yoo'; 'Joon-Il Shin'; 'Hyunchul Yoo';
hyunjin@posdata.co.kr; kevin.lee@posdata.co.kr; 'KwangSeob Yoo'
Subject: RE: NextWave MoU
Dear Mike,

I appreciate your efforts to follow up NextWave.
But the MOU seems to be far from our inputs or conditions suggested
by the related teams in business department in Mar.
Have you ever discussed with NextWave about the conditions to negotiate?

What will be Return On investment from NextWave while Supply Agreement
is separated from the MOU/Term sheet ?
I wish the supply agreement is not at NextWave's disposal after all the
investment
(8 BTS, 2 ACR, 100~150 CPE, 8 Full-time engineers etc.).

It is not reasonable for anyone to change the account management in
one's own way.
Give-up, Take-over, and hand-off ?
I have had a hard time enough because of the troubles.

Best Regards,
D.J. Na

_____

From: Michael Schy [mailto:mschy@posdata-usa.com]
Sent: Friday, May 05, 2006 12:32 PM
To: Byung-Chang Yoo; Joon-Il Shin; Dong-Ju Na
Subject: NextWave MoU

Gentlemen,

I received this Binding MoU draft from NextWave today, which has been approved by Allen Salmasi. It is a fair representation of the items I discussed with them many weeks ago and shared with all of you. The only issues I see with the MoU are the first set of dates (June 1 may be too soon for the co-development of schedules).

My biggest concerns about the NextWave trial are the same unanswered ones that I personally asked the Business Team in Bundang and have listed in every status report since March 28:
* Need realistic dates for NextWave's Evaluation System and 10 MHz BW Technical Trial
* Need impact assessment on FCC's change to NextWave's frequency allocation
These issues will materially impact the dates of the Technical and Market trials; thereby, affecting the dates in the MoU.

I'm sure you will also pick up on the fact that there is no mention of purchasing the equipment. That is because this MoU only addresses the Evaluation and Technical trial phases. Purchasing of the Market Trial system is to be negotiated as part of the Supply Agreement. Again, none of this is new information to any of you because I personally spoke to each of you about this.

It is my understanding that I am to hand off all these business issues to DJ Na. Unless I hear differently, I will wait for the Business Team's response and only get involved when asked by the Business Team. If you have any questions, please let me know.

Best Regards,
Mike

**ENGLISH
Translation**

| Identifiable Information | M5_LOG_20060507_000000/{C9C3A22C-932D-464F-90F5-EE91DE03ABFF} |
| --- | --- |
| Protocol | SMTP |
| Size | 35KB |
| File Count | File None |
| Sender's IP | 203.238.195.88 |
| Recipient's IP | 203.246.184.101 |
| Date | 2006-05-07 14:20:13 |
| Sender | "Seyoung Kim" <seyoungkim@posdata-usa.com> |
| Recipient | <mschy@posdata-usa.com> |
| Actual Recipient | mschy@posdata-usa.com |
| Subject | RE: NextWave MoU |

Hi, Mike,

This person is nuts. Joonil is surrounded by handpicked no-brainers and he once yelled in his Business Team staff meeting that there is no one who can help him to achieve what he wants or even the ones who can persistently insist what is wrong with him. Poor souls...
Let us see what CEO would do for this case. I told him that I have to consider leaving Posdata if this deal is intentionally aborted without any reasonable consensus. My team is ready as always.


Regards,


Seyoung


-----Original Message-----
From: Michael Schy [mailto:mschy@posdata-usa.com]
Sent: Saturday, May 06, 2006 10:48 AM
To: 'Seyoung Kim'
Subject: FW: NextWave MoU


FYI - more stupid stuff from DJ...

Mike

-----Original Message-----
From: Michael Schy [mailto:mschy@posdata-usa.com]
Sent: Saturday, May 06, 2006 7:06 AM
To: dna@posdata.co.kr
Cc: 'Byung-Chang Yoo'; 'Joon-Il Shin'; 'Hyunchul Yoo';
hyunjin@posdata.co.kr; kevin.lee@posdata.co.kr; 'KwangSeob Yoo'
Subject: RE: NextWave MoU
Dear DJ,

There is no difference from my response to your proposal back in March,
which I said during a weekly status meeting with the CEO -
1. It makes no sense and is completely ridiculous to have the
customer's evaluation system in Bundang, when they are based in another
country
2. No real Service Provider (KT, Sprint, etc.) pays for trials,
including equipment and support personnel - if you do not believe me, ask
your employee Inkyu Paek if Hanaro ever paid for trial equipment and
support
1. You may debate whether or not NextWave is a real Service
Provider, but there are not too many Service Providers to choose from at
this point
2. The idea of leasing the equipment makes no sense

What other opportunities do we have that have a better Return on
Investment than this potential opportunity? If we fail during the
trial, we get all of our equipment back. The time and resources spent
are the cost of doing business.

I am just clarifying the situation as it was explained to me by the CEO.
I handle all interaction with NextWave but you are responsible for the
business. I want it very clear that I will not be following up with the
various teams in Bundang (Legal, Engineering, etc.) to get the MoU
signed. As you recall, the Nokia RFI was handled very poorly. The
Business Team took over responsibility and at the last minute wanted to
know what progress I made. I don't want any confusion in this case. I

don't think anything is changing with Account Management. If this business is too tough for you now, what happens when we actually have complicated business deals?

Best,

Mike

-----Original Message-----
From: DJNA [mailto:dna@posdata.co.kr]
Sent: Saturday, May 06, 2006 5:27 AM
To: mschy@posdata-usa.com
Cc: 'Byung-Chang Yoo'; 'Joon-Il Shin'; 'Hyunchul Yoo';
hyunjin@posdata.co.kr; kevin.lee@posdata.co.kr; 'KwangSeob Yoo'
Subject: RE: NextWave MoU
Dear Mike,

I appreciate your efforts to follow up NextWave.
But, the MOU seems to be far from our inputs or conditions suggested by the related teams in business department in Mar.
Have you ever discussed with NextWave about the conditions to negotiate?

What will be Return On investment from NextWave while Supply Agreement is separated from the MOU/Term sheet ?
I wish the supply agreement is not at NextWave's disposal after all the investment
(8 BTS, 2 ACR, 100~150 CPE, 8 Full-time engineers etc.).

It is not reasonable for anyone to change the account management in one's own way.
Give-up, Take-over, and hand-off ?
I have had a hard time enough because of the troubles.

Best Regards,
D.J. Na

_____

From: Michael Schy [mailto:mschy@posdata-usa.com]
Sent: Friday, May 05, 2006 12:32 PM
To: Byung-Chang Yoo; Joon-Il Shin; Dong-Ju Na
Subject: NextWave MoU

Gentlemen,

I received this Binding MoU draft from NextWave today, which has been
approved by Allen Salmasi. It is a fair representation of the items I
discussed with them many weeks ago and shared with all of you. The only
issues I see with the MoU are the first set of dates (June 1 may be too
soon for the co-development of schedules).

My biggest concerns about the NextWave trial are the same unanswered
ones that I personally asked the Business Team in Bundang and have
listed in every status report since March 28:
* Need realistic dates for NextWave's Evaluation System and 10 MHz
BW Technical Trial
* Need impact assessment on FCC's change to NextWave's frequency allocation
These issues will materially impact the dates of the Technical and
Market trials; thereby, affecting the dates in the MoU.

I'm sure you will also pick up on the fact that there is no mention of
purchasing the equipment. That is because this MoU only addresses the
Evaluation and Technical trial phases. Purchasing of the Market Trial
system is to be negotiated as part of the Supply Agreement. Again, none
of this is new information to any of you because I personally spoke to
each of you about this.

It is my understanding that I am to hand off all these business issues
to DJ Na. Unless I hear differently, I will wait for the Business
Team's response and only get involved when asked by the Business Team.
If you have any questions, please let me know.

Best Regards,
Mike

EXHIBIT 3

From: Jeffrey Choi [mailto:jchoi@posdata-usa.com]
Sent: Tuesday, June 27, 2006 3:49 PM
To: 'William Li'
Subject: RE: Hello from Jeff : Any chance of getting together?
It's even better with nice and quick reply!!

William,
Let's see on Wednesday. (I can't wait until Thursday ^^)
How about at the Fresh Choice in Great Mall where we met the last time?

I will talk to some of us and go there if anyone is available.

I know you have heard of what is happening in Posdata. I appreciate your
paying attention.
You seem to be still part of the team. Huh?
(You seat and desk is still looking forward to having you back, but I have
to say "be there!!," for the reasons that you going to tell you in the meeting.)

I think Anuj is participating Wimax meeting for Beceem. I hope he is happy there.
All of us are pretty good here if there is no intervention from Korea.
Still there are bunch of "SOB" in Korea.

In Korea, It's demn hot and humid in Seoul Korea. I have barely escaped the
hell of hot season.

Let's see on Wednesday at 12:00PM (noon) in front of Fresh Choice at Great Mall.

Jeff

---------------------------------------------------------------

POSDATA USA R&D Center
Senior Staff Hardware Engineer
Jeffrey J. K. Choi
---------------------------------------------------------------

EXHIBIT 4

| 식별정보 | M5_LOG_20060728_000000/{8B1224F6-DFD4-4BAD-891A-FBDA5BAF64B4} |
|---|---|
| 프로토콜 | SMTP |
| 크기 | 15KB |
| 파일개수 | 파일없음 |
| 보낸 IP | 203.238.203.206 |
| 받는 IP | 203.246.184.101 |
| 저장시각 | 2006-07-28 07:06:01 |
| 보낸사람 | "Seyoung Kim" <seyoungkim@posdata-usa.com> |
| 받는사람 | <m.schy@comcast.net>,<bhkim@posdata-usa.com> |
| 실수취인 | bhkim@posdata-usa.com,m.schy@comcast.net |
| 제목 | RE: Malaysia |

Hi Mike,

Anyway, DJ and Joonil will start to write another story.

I was hinted that Joonil disintegrated Lab 1 because he was afraid of

Lab 1 becoming too strong for him to handle and the only group which

would be chosen for Posdata after all leaving business team evaporated.

He also thinks that Lab 1 has been so arrogant to other teams,

especially for his business team. He, as being appointed as FLYVO

leader, be just behaved as a head of the business team.

I asked Mr. Yoo that the only way to survive for Posdata is to look for

EUM and other niche market in North America and build a team in SV

dedicated to US market under his direct management. If not (most

likely), then people including myself have to find another job for our

own life. I asked him to give me an answer within one or at most two

months which I don't think probable. Then, I am out!!

Cheers,

Seyoung

-----Original Message-----

From: m.schy@comcast.net [mailto:m.schy@comcast.net]
Sent: Thursday, July 27, 2006 2:29 PM
To: seyoungkim@posdata-usa.com; bhkim@posdata-usa.com
Subject: Malaysia

Gentlemen,

Sorry to hear the Malaysia recalled the 2.3 GHz spectrum that was
allocated for WiMAX. I know the guys in BD have been working with DiGi
for quite a while.

Good Luck!

Mike

http://biz.thestar.com.my/news/story.asp?file=/2006/7/21/business/149075
32
532&sec=business> &sec=business

PS I hope Dr. Lim is working quickly on the SoC - Sequans just received
$24 M

**ENGLISH
Translation**

| Identifiable Information | M5_LOG_20060728_000000/{8B1224F6-DFD4-4BAD-891A-FBDA5BAF64B4} |
|---|---|
| Protocol | SMTP |
| Size | 15KB |
| File Count | None |
| Sender's IP | 203.238.203.206 |
| Recipient's IP | 203.246.184.101 |
| Date | 2006-07-28 07:06:01 |
| Sender | "Seyoung Kim" <seyoungkim@posdata-usa.com> |
| Recipient | <m.schy@comcast.net>,<bhkim@posdata-usa.com> |
| Actual Recipient | bhkim@posdata-usa.com,m.schy@comcast.net |
| Subject | RE: Malaysia |

Hi Mike,

Anyway, DJ and Joonil will start to write another story.
I was hinted that Joonil disintegrated Lab 1 because he was afraid of
Lab 1 becoming too strong for him to handle and the only group, which
would be chosen for Posdata after all leaving business team evaporated.
He also thinks that Lab 1 has been so arrogant to other teams,
especially for his business team. He, as being appointed as FLYVO
leader, is just behaved as a head of the business team.

I asked Mr. Yoo that the only way to survive for Posdata is to look for
EUM and other niche market in North America and build a team in SV
dedicated to US market under his direct management. If not (most
likely), then people including myself have to find another job for our
own life. I asked him to give me an answer within one or at most two
months, which I don't think probable. Then, I am out!!

Cheers,

Seyoung
-----Original Message-----

From: m.schy@comcast.net [mailto:m.schy@comcast.net]
Sent: Thursday, July 27, 2006 2:29 PM
To: seyoungkim@posdata-usa.com; bhkim@posdata-usa.com
Subject: Malaysia

Gentlemen,

Sorry to hear the Malaysia recalled the 2.3 GHz spectrum that was
allocated for WiMAX. I know the guys in BD have been working with DiGi
for quite a while.

Good Luck!

Mike

http://biz.thestar.com.my/news/story.asp?file=/2006/7/21/business/149075
32
532&sec=business> &sec=business

PS I hope Dr. Lim is working quickly on the SoC - Sequans just received
$24 M

EXHIBIT 5

| 식별정보 | M5_LOG_20060630_000000/{91BD7101-B30E-426E-92D2-2752A3D839F9} |
|---|---|
| 프로토콜 | SMTP |
| 크기 | 10KB |
| 파일개수 | 파일없음 |
| 보낸 IP | 203.238.200.27 |
| 받는 IP | 141.223.1.1 |
| 저장시각 | 2006-06-30 10:15:57 |
| 보낸사람 | Jinyoung Park <susia@postech.ac.kr> |
| 받는사람 | Seyoung Kim <mountainrun@gmail.com> |
| 참조인 | susia@postech.ac.kr |
| 실수취인 | mountainrun@gmail.com,susia@postech.ac.kr |
| 제목 | Re: 김세영 |

안녕하세요 , 김세영 실장님.

요 며칠 너무 황당한 기분,, 저도 난생 처음인것 같습니다.
Posdata 에서 좋은 동료,상사분들과 열심히 일하고 배울수 있어서 개인적으로
너무 좋았습니다.
그런분들이 있었기에 다들 미친듯이 열심히 일할 수 있었다고 생각되구요.

그런데 회사가 상식을 저버리고 행한 행동에 대해서 너무 어이가 없고 화가
나네요.


암튼 , 여기서 힘내고 ,,, 그리고 기다리겠습니다.
항상 건강하세요..
또 연락드리겠습니다.


- 진영 올림



On Thu, 2006-06-29 at 08:27 -0400, Seyoung Kim wrote:
> 이석찬, 박진영 그리고 김광석씨,

> 
> 졸지에 인사이동 소식을 들어 많이 당황하실 것으로 알고 있습니다. 저도
> 여태까지 오랜 동안 직장생활 하다가 이렇게 황당무계한 경우는 처음 들어
> 보았습니다.
> 이렇게 유치하고 속이 빤히 들여다 보이는 플랜들이 성공하기에는 불가능하
> 리라는 것은 머지 않아 알게 될 것입니다.
> 저는 우리팀이 다시 함께 모여서 일 할 수 있는 기회를 찾으려고 합니다.
> 시간이 걸리기는 하겠지만 그다지 어렵지만은 않을 것입니다. 이러한 팀
> 구성과 그동안 해온 일들 보면 누구나 탐낼 개발 조직이 될 것입니다. 최
> 대한 노력을 해서 우리가 만들고 이끌어 가는 회사를 만들도록 하겠습니다.
> 
> 그동안 인내심을 가지고 기다려 주시기 바랍니다. 그리고 신인철, 신준
> 일, 임용제, 김재형씨등 앞으로 Posdata 를 이끌어 갈 분들의 성공을 위해
> 서(?) 우리가 어떻게 하는 것이 최선인가 잘 아시리라 믿습니다.
> 이제부터는 소식을 전할 경우 절대적으로 개인 메일을 사용하여야 겠습니
> 다. 제 개인메일은 mountainrun@gmail.com 입니다. 그리고 개인 전화 번
> 호는 408-489-2987 입니다.
> 앞으로 계속 기회를 적극적으로 알아볼 터이니 그동안 개발은 계속해야 겠
> 습니다. 그런데 하나는 Posdata 의 장래를 위한 것, 다른 하나는 우리의 장
> 래를 위한 것 이렇게 두 branch 로 영특하게 진행하시리라 믿습니다. 힘을
> 내십시다. 위기는 항상 또다른 좋은 기회를 불러오게 됩니다.
> 
> 김세영

Regards
-Jinyoung ( susia@postech.ac.kr )
PGP Key ID : 8C8D20AD

# ENGLISH
# Translation

| Identifiable Information | M5_LOG_20060630_000000/{91BD7101-B30E-426E-92D2-2752A3D839F9} |
|---|---|
| Protocol | SMTP |
| Size | 10KB |
| File Count | File None |
| Sender's IP | 203.238.200.27 |
| Recipient's IP | 141.223.1.1 |
| Date | 2006-06-30 10:15:57 |
| Sender | Jinyoung Park <susia@postech.ac.kr> |
| Recipient | Seyoung Kim <mountainrun@gmail.com> |
| Cc | susia@postech.ac.kr |
| Actual Recipient | mountainrun@gmail.com,susia@postech.ac.kr |
| Subject | Re: Seyoung Kim |

Hi, Chief , Seyoung Kim,

I've been feeling so absurdly for these couple of days,, It's like the first time for me, too. Personally, I had great time working with, and learning from good fellow members, and bosses at Posdata.   And because of those people, I believe everyone was working so insanely hard.   I am so angry and dumbfounded by company's action, discarding principles.

Anyways, cheers ,,, and I will wait.
Stay well..
I will contact you again.

-from Jinyoung


On Thu, 2006-06-29 at 08:27 -0400, Seyoung Kim wrote:
> Dear Sukchan Lee, Jinyoung Park, and Gwangseok Kim,
>

>I understand that you must be frustrated after hearing about personnel change.   I

>, also, never heard of such a case so absurd, and it is my first time hearing such during

>my long years of working at companies.

>They shall find out in no time that all these childish and plainly visible plans are

>impossible to succeed.

>I will be searching for opportunities for our team to gather up and work again.

>It will take time, but it won't be too difficult.   Looking at this team makeup and the

accomplishments made, we would make a development team that anyone would admire.

>I will put my best effort to make a company that we, ourselves make and lead.

>

>In the mean time, please wait with patience.   And I believe you all know what we should

>do it for (?) the success of, Inchul Shin, Joonil Shin, Yongje Imm, Jaehyung Kim and others who will lead

> Posdata in the ahead.

> From now on, when in making contacts, Absolutely, we must use personal email accounts.

>My personal email is mountainrun@gmail.com.   And my personal phone number is

>408-489-2987.

>I will actively look for opportunities continuously, meanwhile, we should keep doing

development.   But, one thing is for the future of Posdata, and the other is for our future,

>in two different branches, I believe you will make a smart movement .

>cheers.   Crisis always calls for another good chance.

>

>Seyoung Kim


Regards

-Jinyoung ( susia@postech.ac.kr )

PGP Key ID : 8C8D20AD

EXHIBIT 6

## 합  의  서

포스데이타주식회사(이하 '갑"이라 한다)와 김세영(이하 '을' 이라 한다)은
'을'의 고용과 관련하여 아래와 같이 합의한다.

1. '갑'은 '을'의 중도 퇴사 요구가 있는 경우를 제외 하고는 2007. 6.17까지
   '을'을 고용하기로 한다.

2. '갑'은 '을'의 고용기간 동안 '을'에게 아래와 같은 대우를 하기로 한다.
   가. 급여 : '을'이 현재 받고 있는 급여를 지급한다.
   나. 의료(치과, 안과 포함)지원 : 현재와 동일한 조건으로 지원한다.

3. '을'의 2006년도 성과급은 2006.1월1일부터 2006.6월30일까지 근무기간에
   한해 지급한다.단,지급율은 '갑'의 미국연구소 직원의 2006년 성과급 평균 지급
   율로하고 이에 해당하는 금액의 50%를 2007년 1월 중에 지급한다.

4. '갑'은 '을'의 요청이 있는 경우 '을'에게 제공하고 있는 차량 및 주택(지원금
   포함)을 '을'의 전직 시까지 제공한다. 단, 회사의 제공기간은 2007. 6.17을
   초과하지 않는 것으로 한다.

5. '갑'은 '을'의 고용기간 중 '을'의 미국 연구소 출입을 제한할 수 있다.

6. '을'은 '갑'과의 고용관계가 종료된 이후라도 '갑'의 고용기간중 지득한 '갑'의
   업무 및 영업상의 비밀을 제3자에게 제공하거나 공개할 수 없다

7. 본 합의서에서 정한 내용이 본 합의서 체결 이전에 '갑' 과 '을'간에 합의된
   내용과 상충될 경우에는 본 합의서가 우선적 효력을 갖는다.

8. '갑'과 '을'간에 분쟁이 발생될 경우 수원지방법원 성남지원을 관할 법원으로
   한다.

2006.10. 27.

'갑'                                          '을'
경기도 성남시 분당구 서현동 276-2              주소
포스데이타주식회사
경영지원본부장                                 주민등록번호 SSN 173647542
상무어사 조 재 구                              성 명   SEYOUNG KIM

                                                      Seyoung Kim

**ENGLISH
Translation**

# Agreement

Posdata, (hereinafter referred to as "A"), and Seyoung Kim (hereinafter referred to as "B") are entering into an agreement regarding the employment as follows.

1. 'A' agrees to hire "B", except when "B" submits a notice of resignation during his employment, and it shall continue until June 17, 2007.

2. 'A' agrees, during the employment of 'B', to compensate 'B' as follows
   a. Pay Compensation: same pay at current salary
   b. Medical (dental and eye care, included) support: same as present.

3. 'B''s 2006 incentive pay is applies to worked hours to the period from January 1, 2006 to June 30, 2006. Excepting, pay rate is "A''s America Lab employees' 2006 average incentive pay rate. 50% of the applicable amount is paid in January of 2007.

4. 'A' agrees to, when and if 'B' requests, continue to provide automobile and housing (including subsidies) up to the date of moving to a subsequent employment. Excepting, company's providing period will not go beyond June 17, 2007.

5. 'A' can limit or restrict "B"'s access to America Lab during his employment.

6. Even after 'B' ends employment relationship with A, 'A' cannot release nor present "B"'s business record and affairs which may have obtained during employment to a 3rd party.

7. If any terms in this agreement have conflict with agreements made in-between 'A' and 'B', before this agreement is entered, this agreement has the priority validity.

8. In case, If and any conflicts arise between 'A' and 'B', the court in district who has jurisdiction over the matter will be at the Sung Nam Municipal Court, in Soo Won District Court.

2006.10.27.

| 'A' | 'B' |
|---|---|
| #276-2Gyungi-do, Sungnam-si, Bundang-gu, Seohyun-dong, Posdata, Inc. | Address |
| | Resident ID Number: SSN 173647542 |
| Chief in Headquarter of Operation Support Managing Director, Jae Gu Cho | Name Seyoung Kim |

EXHIBIT 7

# ARTICLES OF INCORPORATION

## OF

## INQUADRON, INC.

FILED

in the office of the Secretary of State
of the State of California

DEC 0 4 2006

I

The name of this corporation is INQUADRON, INC.

II

The purpose of this corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of California other than the banking business, the trust company business, or the practice of a profession permitted to be incorporated by the California Corporations Code.

III

The name and address in the State of California of this corporation's initial agent for service of process is:

Name:            Kenneth D. Lee
Street Address:  1871 The Alameda, Suite 331
                 San Jose, California 95126

IV

The corporation is authorized to issue only one class of shares of stock; and the total number of shares which this corporation is authorized to issue is fourteen million (14,000,000).

V

The liability of the directors of the corporation for monetary damages shall be eliminated to the fullest extent permissible under California law.

VI

The corporation is authorized to indemnify the directors, officers, and agents of the corporation to the fullest extent permissible under California law.

Dated: December 1, 2006

Kenneth D. Lee, Incorporator

# EXHIBIT 8

2936174

.. office of the Secretary of
of the State of California

### AMENDED AND RESTATED
### ARTICLES OF INCORPORATION
### OF
### INQUADRON, INC.

FEB 2 2 2007

Seyoung Kim and Kenneth D. Lee certify that:

1.    They are the President and Secretary, respectively, of INQUADRON, INC., a California corporation.

2.    The Articles of Incorporation of the corporation are amended and restated to read in full as set forth in Exhibit A attached to this certificate as if fully set forth herein.

3.    The amendment and restatement of Articles of Incorporation attached hereto as Exhibit A has been duly approved by the Board of Directors of the corporation.

4.    The amendment and restatement of Articles of Incorporation attached hereto as Exhibit A has been duly approved by the required vote of shareholders in accordance with Section 902 of the California Corporations Code. The corporation has one class of shares of stock, consisting of 4,000,000 outstanding shares of Common Stock. The number of shares voting of each class in favor of the amendment equaled or exceeded the vote required. The percentage vote required was more than fifty percent (50%) of the outstanding Common Stock of the corporation.

We further declare under penalty of perjury under the laws of the State of California that the matters set forth in this certificate are true and correct of our own knowledge.

Dated:  January 30, 2007

Seyoung Kim, President

Kenneth D. Lee, Secretary

EXHIBIT A

AMENDED AND RESTATED

ARTICLES OF INCORPORATION

OF

INQUADRON, INC.

### ARTICLE I

The name of this corporation is InQuadron, Inc.

### ARTICLE II

The purpose of this corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of California other than the banking business, the trust company business or the practice of a profession permitted to be incorporated by the California Corporations Code.

### ARTICLE III

This corporation is authorized to issue two classes of stock, designated "Common Stock" and "Preferred Stock," respectively (collectively, the "Company's Stock"). The total number of shares which the corporation is authorized to issue is 14,500,000, with no par value, of which twelve million (12,000,000) shares shall be designated as Common Stock, and two million five hundred (2,500,000) shares shall be designated as Series A Preferred Stock (the "Series A Preferred Stock").

### ARTICLE IV

The rights, preferences, privileges and restrictions granted to and imposed on the Common Stock and the Preferred Stock are as follows.

A. **Payment of Dividends.** The holders of Series A Preferred Stock shall be entitled to receive, when and as declared by the Board of Directors of the corporation (the "Board"), out of any assets at the time legally available therefore, dividends at the rate of $0.05 per share of Series A Preferred Stock per annum (subject to proportionate adjustment for any stock dividend, stock split, combination of shares, reorganization, recapitalization, reclassification or other similar event), payable in preference and priority to any payment of any dividend on Common Stock of the corporation. Such dividends shall not be cumulative and no right to such dividends shall accrue to holders of Preferred Stock unless declared by the Board. No dividends or other

- 2 -