distributions shall be made with respect to the Common Stock, other than dividends payable solely in Common Stock, until all declared dividends on the Preferred Stock have been paid or set apart. If, after dividends in the full preferential amount specified in this Section A for the Preferred Stock have been paid or declared and set apart in any calendar year, the Board shall declare additional dividends, other than dividends payable solely in Common Stock, then such additional dividends shall be paid pro rata on the Common Stock and the Preferred Stock, on an equal priority, pari passu basis, according to the number of shares of Common Stock held by the shareholders, where each holder of Preferred Stock is to be treated for this purpose as holding (in lieu of such shares of Preferred Stock) the greatest whole number of shares of Common Stock then issuable upon conversion in full of such shares of Preferred Stock in accordance with this Article IV.

B.    Liquidation Preference.  In the event of any liquidation, dissolution or winding up of the corporation, whether voluntary or involuntary, the funds and assets of the corporation that may be legally distributed to the corporation's shareholders (the "Available Funds and Assets") shall be distributed to shareholders in the following manner:

1.    If (i) the Available Funds and Assets divided by (ii) the number of shares of Common Stock and Preferred Stock (on an as converted basis) is greater than or equal to $1.00 (subject to proportionate adjustment for any stock dividend, stock split, combination of shares, reorganization, recapitalization, reclassification or other similar event), then the entire Available Funds and Assets, if any, shall be distributed among the holders of the Common Stock and the Preferred Stock in proportion to the shares of Common Stock then held by them (with the Preferred Stock being treated on an as converted to Common Stock basis).

2.    If (i) the Available Funds and Assets divided by (ii) the number of shares of Common Stock and Preferred Stock (on an as converted basis) is less than $1.00 (subject to proportionate adjustment for any stock dividend, stock split, combination of shares, reorganization, recapitalization, reclassification or other similar event), then the holders of Series A Preferred Stock then-outstanding shall be entitled to be paid, out of the Available Funds and Assets, and prior and in preference to any payment or distribution (or any setting apart of any payment or distribution) of any Available Funds and Assets on any shares of Common Stock, $1.00 (the "Series A Original Issue Price") (subject to proportionate adjustment for any stock dividend, stock split, combination of shares, reorganization, recapitalization, reclassification or other similar event) per share of Series A Preferred Stock plus all declared but unpaid dividends thereon. If upon any liquidation, dissolution or winding up of the corporation, the Available Funds and Assets shall be insufficient to permit the payment to holders of the Preferred Stock of their full preferential amount described in this subsection, then all of the remaining Available Funds and Assets shall be distributed among the holders of the then-outstanding Preferred Stock, pro rata, according to their respective liquidation preferences set forth herein.

3.    Any Available Fund and Assets remaining after all payments required to be made to the Preferred Stock pursuant to Section B.2. above will be distributed among the holders of the Common Stock and the Preferred Stock in proportion to the shares of Common

- 3 -

Stock then held by them (with the Preferred Stock being treated on an as converted to Common Stock basis)

4.    Merger or Sale of Assets.

(a)    For purposes of this Article IV, Section B, a consolidation or merger of the corporation with or into any other corporation or corporations in which the holders of the corporation's outstanding shares immediately before such consolidation or merger do not, immediately after such consolidation or merger, retain stock representing a majority of the voting power of the surviving corporation of such consolidation or merger, or a sale, transfer or other disposition of all or substantially all of the assets of the corporation, shall each be deemed to be a liquidation, dissolution or winding up of the corporation as those terms are used in this Section B

(b)    In the event the corporation shall propose to take any action of the type described in this Section B, the corporation shall, within ten (10) days prior to the consummation of such action or ten (10) days prior to any stockholders' meeting called to approve such action, whichever is earlier, give each holder of shares of Preferred Stock written notice of the proposed action  Such written notice shall describe the material terms and conditions of such proposed action, including a description of the stock, cash and property to be received by the holders of shares of Preferred Stock upon consummation of the proposed action and the proposed date of delivery thereof.  If any material change in the facts set forth in the notice shall occur, the corporation shall promptly give written notice to each holder of shares of Preferred Stock of such material change

(c)    The corporation shall not consummate any proposed action of the type described in this Section B before the expiration of ten (10) days after the mailing of the initial written notice or ten (10) days after the mailing (or sending by e-mail) of any subsequent written notice, whichever is later; provided, however, that any such 10-day period may be shortened upon the written consent of the holders of a majority of the outstanding shares of Preferred Stock on an as converted basis

(d)    If the corporation shall propose to take any action of the type described in this Section B that will involve the distribution of assets other than cash, the value of said assets will be deemed its fair market value as determined by the Board of Directors in good faith  Notwithstanding the foregoing, unless otherwise agreed upon by the written consent of the holders of a majority of the outstanding shares of Preferred Stock (on an as converted basis), any securities to be distributed to the corporation's stockholders pursuant to an action of the type described in this Section B shall be valued as follows

(1)    If traded on a securities exchange or on the Nasdaq National Market System, the value shall be deemed to be the average of the closing prices of the securities on such exchange over the fifteen (15) day period ending three (3) days prior to the closing;

-4-

(2)     If actively traded over-the-counter, the value shall be deemed to be the average of the closing bid or sale prices (whichever is applicable) over the fifteen (15) trading day period ending three (3) days prior to the closing, and

(3)     If there is no active public market, the value shall be the fair market value thereof, as determined in good faith by the Board of Directors.

5.     **Repurchase of Vesting Common Stock.** As authorized by Section 402.5(c) of the California Corporations Code, the provisions of Sections 502 and 503 of the California Corporations Code shall not apply with respect to repurchases by the corporation of shares of Common Stock issued to or held by employees, officers, directors or consultants of the corporation or its subsidiaries upon termination of their employment or services pursuant to agreements providing for the right of said repurchase.

C.     **Voting Rights.**

1.     **Common Stock.** Each holder of shares of Common Stock shall be entitled to one (1) vote for each share thereof held.

2.     **Preferred Stock.** Subject to Article IV, Sections D.3. and D.4. below, each holder of shares of Preferred Stock shall be entitled to the number of votes equal to the number of whole shares of Common Stock into which such shares of Preferred Stock could be converted in accordance with this Article IV at the record date for the determination of the shareholders entitled to vote on such matters or, if no such record date is established, the date such vote is taken or any written consent of shareholders is solicited.

3.     **Voting for Directors.** The authorized number of directors of the corporation will be fixed by the Board or the shareholders to be five (5). The Board will be composed as follows: (a) the holders of shares of Common Stock, voting separately as a class, shall be entitled to elect four (4) directors; and (b) so long as at least 1,500,000 shares of Series A Preferred Stock (as appropriately adjusted for any stock dividend, stock split, recapitalization, consolidation or the like of the Series A Preferred Stock) remain outstanding, the holders of shares of Series A Preferred Stock, voting separately as a class, shall be entitled to elect one (1) director. Any vacancy on the Board occurring because of the death, resignation or removal of a director elected by the holders of the Common Stock or Series A Preferred Stock, respectively, voting separately as a class, shall be filled by the vote or written consent of the holders of the majority of the outstanding shares of the Common Stock or Series A Preferred Stock as the case may be, or, in the absence of action by such holders by action of the remaining directors, provided, however, that in the case of a vacancy created by removal, the election to fill such vacancy, if by written consent of the shareholders entitled to vote thereon, shall be unanimous.

4.     **General.** Subject to the foregoing provisions of this Article IV, Section C, each holder of Preferred Stock shall have full voting rights and powers equal to the voting rights and powers of the holders of Common Stock, and shall be entitled to notice of any shareholders meeting in accordance with the bylaws of the corporation (as in effect at the time) and applicable law, and shall be entitled to vote, together with the holders of Common Stock, with respect to

- 5 -

any matter upon which holders of Common Stock have the right to vote, except as may be otherwise provided by applicable law. Except as otherwise expressly provided herein or as required by law, the holders of Preferred Stock and the holders of Common Stock shall vote together and not as separate classes.

D.    Conversion. The outstanding shares of Preferred Stock shall be convertible into Common Stock as follows:

1.    Optional Conversion. At the option of the holder thereof, each share of Series A Preferred Stock shall be convertible, at any time at the principal office of the corporation or any transfer agent for such shares, into such number of fully paid and nonassessable shares of Common Stock as is determined by dividing the Series A Original Issue Price by the applicable Series A Conversion Price (defined below) in effect at the time of the conversion. The "Series A Conversion Price" shall, with respect to the Series A Preferred Stock, initially be equal to the Series A Original Issue Price, subject to adjustment as hereinafter provided.

2.    Automatic Conversion. Each share of Preferred Stock shall automatically be converted into such number of fully paid and nonassessable shares of Common Stock as is determined by dividing the Series A Original Issue Price by the Series A Conversion Price in effect at the time of such conversion (i) upon the date of the closing of a firm commitment underwritten public offering pursuant to a registration statement filed with the Securities and Exchange Commission under the Securities Act of 1933, as amended, covering the offer and sale of Common Stock for the account of the corporation to the public at an offering price of at least $10.00 with gross proceeds to the corporation, prior to underwriter commissions and expenses, of not less than $15 million or (ii) respect to the Series A Preferred Stock only, on the date that greater than 50% of the shares of Series A Preferred Stock are converted into Common Stock.

3.    Mechanics of Conversion. No fractional shares of Common Stock shall be issued upon conversion of Preferred Stock. In lieu of any fractional shares to which the holder would otherwise be entitled, the corporation shall pay cash equal to such fraction multiplied by the then fair market value of the Common Stock. Before any holder of Preferred Stock shall be entitled to convert the same into shares of Common Stock and to receive certificates therefore, such holder shall surrender the certificate or certificates therefore, duly endorsed, at the office of the corporation or of any transfer agent for the Preferred Stock, and shall give written notice to the corporation at such office that such holder elects to convert the same; provided, however, that in the event of an automatic conversion pursuant to Section D.2 above, the outstanding shares of Series A Preferred Stock shall be converted automatically without any further action by the holders of such shares and whether or not the certificates representing such shares are surrendered to the corporation or its transfer agent, and provided further, that the corporation shall not be obligated to issue certificates evidencing the shares of Common Stock issuable upon such automatic conversion unless the certificates evidencing such shares of Preferred Stock are either delivered to the corporation or its transfer agent as provided above, or the holder notifies the corporation or its transfer agent that such certificates have been lost, stolen or destroyed and executes an agreement satisfactory to the corporation to indemnify the corporation from any loss incurred by it in connection with such certificates. The corporation shall, as soon as practicable

- 6 -

after such delivery, or such agreement and indemnification in the case of a lost certificate, issue and deliver at such office to such holder of such Preferred Stock, a certificate or certificates for the number of shares of Common Stock to which he or she shall be entitled as aforesaid and a check payable to the holder in the amount of any cash amounts payable as the result of a conversion into fractional shares of Common Stock. Such conversion shall be deemed to have been made immediately prior to the close of business on the date of such surrender of the shares of Preferred Stock to be converted, or in the case of automatic conversion on the date of closing of the offering, and the person or persons entitled to receive the shares of Common Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such shares of Common Stock on such date.

4.     In case the corporation shall effect a capital reorganization of the corporation, reclassification of the capital stock of the corporation (other than a subdivision or combination of its outstanding Common Stock), consolidation or merger of the corporation (other than a merger or other reorganization in which the corporation is not the continuing or surviving entity); then, and in any such case, the corporation shall cause to be mailed to the holders of its outstanding Preferred Stock at least ten (10) days prior to the date hereinafter specified, a notice stating the date on which a record is to be taken for the purpose of such dividend, distribution or rights, or such action is to be taken in connection with such reorganization, reclassification, merger or consolidation. Such ten (10) day period may be shortened upon the written consent of the holders of a majority of the outstanding shares of the Preferred Stock on an as converted basis.

5.     <u>Adjustments to Conversion Price for Diluting Issues.</u>

(a)     <u>Special Definitions.</u>  For purposes of this subsection D 5, the following definitions shall apply:

(1)     "<u>Option</u>" shall mean rights, options or warrants to subscribe for, purchase or otherwise acquire either Common Stock or Convertible Securities

(2)     "<u>Original Issue Date</u>" shall mean the date of the filing of these Amended and Restated Articles of Incorporation.

(3)     "<u>Convertible Securities</u>" shall mean any evidences of indebtedness, shares or other securities convertible into or exchangeable for Common Stock

(4)     "<u>Additional Shares of Common Stock</u>" shall mean all shares of Common Stock issued (or, pursuant to Section D 5(c), deemed to be issued) by the corporation after the Original Issue Date, other than shares of Common Stock, Options, or Convertible Securities issued or issuable:

a)     upon conversion of shares of Preferred Stock,

b)     as a dividend or distribution on Preferred Stock or any event for which adjustment is made pursuant to subparagraph D.5(f) hereof;

- 7 -

c) pursuant to loan or equipment lease financing transactions approved by the Board of Directors, provided such transactions are primarily for non-equity financing purposes,

d) to directors and employees of, advisors to, and consultants to, the corporation pursuant to stock purchase or stock option plans, stock bonuses or awards, warrants, contracts, or other arrangements that are approved by the Board of Directors,

e) by way of dividend or other distribution on shares of Common Stock.

(b)  No Adjustment of Conversion Price. No adjustment in the number of shares of Common Stock into which the Preferred Stock is convertible shall be made, by adjustment in the Conversion Prices of such Preferred Stock in respect of the issuance of Additional Shares of Common Stock or otherwise, unless the consideration per share for an Additional Share of Common Stock issued or deemed to be issued by the corporation is less than the Conversion Price of such series of Preferred Stock in effect on the date of, and immediately prior to, the issue of such Additional Share of Common Stock.

(c)  Deemed Issuances of Additional Shares of Common Stock.

(1)  Options and Convertible Securities. In the event the corporation at any time or from time to time after the Original Issue Date shall issue any Options or Convertible Securities or shall fix a record date for the determination of holders of any class of securities entitled to receive any such Options or Convertible Securities, then the maximum number of shares (as set forth in the instrument relating thereto without regard to any provisions contained therein for a subsequent adjustment of such number) of Common Stock issuable upon the exercise of such Options or, in the case of Convertible Securities and Options therefore, the conversion or exchange of such Convertible Securities, shall be deemed to be Additional Shares of Common Stock issued as of the time of such issue or, in the case such a record date shall have been fixed, as of the close of business on such record date, provided that Additional Shares of Common Stock shall not be deemed to have been issued with respect to an adjustment of the Conversion Price for any series of Preferred Stock unless the consideration per share (determined pursuant to subsection D.5(e) hereof) of such Additional Shares of Common Stock would be less than the Conversion Price of such series of Preferred Stock in effect on the date of and immediately prior to such issue, or such record date, as the case may be, and provided further that in any such case in which Additional Shares of Common Stock are deemed to be issued:

a) no further adjustment in the Conversion Prices shall be made upon the subsequent issue of Convertible Securities or shares of Common Stock upon the exercise of such Options or conversion or exchange of such Convertible Securities;

b) if such Options or Convertible Securities by their terms provide, with the passage of time or otherwise, for any increase or decrease in the consideration payable to the corporation, or decrease or increase in the number of shares of Common Stock issuable, upon the exercise, conversion or exchange thereof, the Conversion

- 8 -

Prices computed upon the original issue thereof (or upon the occurrence of a record date with respect thereto), and any subsequent adjustments based thereon, shall, upon any such increase or decrease becoming effective, be recomputed to reflect such increase or decrease insofar as it affects such Options or the rights of conversion or exchange under such Convertible Securities;

c)     upon the expiration of any such Options or any rights of conversion or exchange under such Convertible Securities which shall not have been exercised, the Conversion Prices computed upon the original issue thereof (or upon the occurrence of a record date with respect thereto) and any subsequent adjustments based thereon shall, upon such expiration, be recomputed as if:

i)     in the case of Convertible Securities or Options for Common Stock, only the Additional Shares of Common Stock issued were the shares of Common Stock if any, actually issued upon the exercise of such Options or the conversion or exchange of such Convertible Securities and the consideration received therefore was the consideration actually received by the corporation for the issue of such exercised Options plus the consideration actually received by the corporation upon such exercise or for the issue of all such Convertible Securities which were actually converted or exchanged, plus the additional consideration, if any, actually received by the corporation upon such conversion or exchange, and

ii)     in the case of Options for Convertible Securities, only the Convertible Securities, if any, actually issued upon the exercise thereof were issued at the time of issue of such Options, and the consideration received by the corporation for the Additional Shares of Common Stock deemed to have been then issued was the consideration actually received by the corporation for the issue of such exercised Options, plus the consideration deemed to have been received by the corporation (determined pursuant to subsection D 5(e)) upon the issue of the Convertible Securities with respect to which such Options were actually exercised.

d)     no readjustment pursuant to clause (b) or (c) above shall have the effect of increasing the Conversion Prices to an amount which exceeds the lower of (i) the Conversion Prices on the original adjustment date, or (ii) the Conversion Prices that would have resulted from any issuance of Additional Shares of Common Stock between the original adjustment date and such readjustment date;

e)     in the case of any Options which expire by their terms not more than 30 days after the date of issue thereof, no adjustment of the Conversion Prices shall be made until the expiration or exercise of all such Options issued on the same date, whereupon such adjustment shall be made in the same manner provided in clause (c) above; and

f)     if such record date shall have been fixed and such Options or Convertible Securities are not issued on the date fixed therefore, the adjustment previously made in the Conversion Prices which became effective on such record date shall be canceled as of the close of business on such record date, and thereafter the Conversion Prices shall be adjusted pursuant to subsection D 5(c) as of the actual date of their issuance.

- 9 -

(2)    Stock Dividends, Stock Distributions and Subdivisions.  In the event the corporation at any time or from time to time after the Original Issue Date shall declare or pay any dividend or make any other distribution on the Common Stock payable in Common Stock, or effect a subdivision of the outstanding shares of Common Stock (by reclassification or otherwise than by payment of a dividend in Common Stock), then and in any such event, Additional Shares of Common Stock shall be deemed to have been issued

a)    in the case of any such dividend or distribution, immediately after the close of business on the record date for the determination of holders of any class of securities entitled to receive such dividend or distribution, or

b)    in the case of any such subdivision, at the close of business on the date immediately prior to the date upon which such corporate action becomes effective.

If such record date shall have been fixed and such dividend shall not have been paid on the date fixed therefore, the adjustment previously made in the Conversion Prices which became effective on such record date shall be canceled as of the close of business on such record date, and thereafter the Conversion Prices shall be adjusted pursuant to this subsection D 4(c) as of the time of actual payment of such dividend.

(d)    Adjustment of Conversion Price Upon Issuance of Additional Shares of Common Stock.  In the event the corporation shall issue Additional Shares of Common Stock (including Additional Shares of Common Stock deemed to be issued pursuant to subsection D.5(c), but excluding Additional Shares of Common Stock issued pursuant to subsection D.5(c)(2), which event is dealt with in subsection D.5(f) hereof), without consideration or for a consideration per share less than the Conversion Price of the Series A Preferred Stock in effect on the date of and immediately prior to such issue, then and in such event, the applicable Conversion Price of the Preferred Stock shall be reduced, concurrently with such issue, to prices (calculated to the nearest cent) determined by multiplying the applicable Conversion Price by a fraction (x) the numerator of which shall be (1) the number of shares of Common Stock outstanding immediately prior to such issue, plus (2) the number of shares of Common Stock which the aggregate consideration received by the corporation for the total number of Additional Shares of Common Stock so issued would purchase at that Conversion Price, and (y) the denominator of which shall be (1) the number of shares of Common Stock outstanding immediately prior to such issue plus (2) the number of such Additional Shares of Common Stock so issued, provided that for the purposes of this subsection D 5(d), all shares of Common Stock issuable upon exercise, conversion or exchange of outstanding Options or Convertible Securities, as the case may be, shall be deemed to be outstanding, and immediately after any Additional Shares of Common Stock are deemed issued pursuant to subsection D 5(c) above, such Additional Shares of Common Stock shall be deemed to be outstanding, and provided further that the Conversion Price shall not be so reduced at such time if the amount of such reduction would be an amount less than $0.01, but any such amount shall be carried forward and reduction with respect thereto made at the time of and together with any subsequent reduction which, together with such amount and any other amount or amounts so carried forward, shall aggregate $0.01 or more.

- 10 -

(e)  **Determination of Consideration**.  For purposes of this subsection D.5, the consideration received by the corporation for the issue of any Additional Shares of Common Stock shall be computed as follows:

(1)  **Cash and Property**.  Such consideration shall:

a)  insofar as it consists of cash, be computed at the aggregate amount of cash received by the corporation excluding amounts paid or payable for accrued interest or accrued dividends;

b)  insofar as it consists of property other than cash, be computed at the fair value thereof at the time of such issue, as determined in good faith by the Board of Directors; and

c)  in the event Additional Shares of Common Stock are issued together with other shares or securities or other assets of the corporation for consideration which covers both, be the proportion of such consideration so received, as provided in clauses (b) and (c) above, as determined in good faith by the Board of Directors.

(2)  **Options and Convertible Securities**.  The consideration per share received by the corporation for Additional Shares of Common Stock deemed to have been issued pursuant to subsection D.5(c)(1), relating to Options and Convertible Securities, shall be determined by dividing

a)  the total amount, if any, received or receivable by the corporation as consideration for the issue of such Options or Convertible Securities, plus the minimum aggregate amount of additional consideration (as set forth in the instruments relating thereto, without regard to any provision contained therein for a subsequent adjustment of such consideration) payable to the corporation upon the exercise of such Options or the conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the conversion or exchange of such Convertible Securities, by

b)  the maximum number of shares of Common Stock (as set forth in the instruments relating thereto, without regard to any provision contained therein for a subsequent adjustment of such number) issuable upon the exercise of such Options or the conversion or exchange of such Convertible Securities.

(f)  **Adjustments for Subdivisions, Combinations or Consolidation of Common Stock**.  In the event the outstanding shares of Common Stock shall be subdivided (by stock split, or otherwise), into a greater number of shares of Common Stock, the Conversion Price for each series of Preferred Stock then in effect shall, concurrently with the effectiveness of such subdivision, be proportionately decreased.  In the event the outstanding shares of Common Stock shall be combined or consolidated, by reclassification or otherwise, into a lesser number of shares of Common Stock, the Conversion Price for each series of Preferred Stock then in effect

- 11 -

shall, concurrently with the effectiveness of such combination or consolidation, be proportionately increased.

(g)    Adjustments for Other Distributions  In the event the corporation at any time or from time to time makes, or fixes a record date for the determination of holders of Common Stock entitled to receive any distribution payable in securities of the corporation other than shares of Common Stock and other than as otherwise adjusted in this Section D.5, then and in each such event provision shall be made so that the holders of Preferred Stock shall receive upon conversion thereof, in addition to the number of shares of Common Stock receivable thereupon, the amount of securities of the corporation which they would have received had their Preferred Stock been converted into Common Stock on the date of such event and had they thereafter, during the period from the date of such event to and including the date of conversion, retained such securities receivable by them as aforesaid during such period, subject to all other adjustments called for during such period under this Section D.5 with respect to the rights of the holders of the Preferred Stock.

(h)    Adjustments for Reclassification, Exchange and Substitution.  If the Common Stock issuable upon conversion of the Preferred Stock shall be changed into the same or a different number of shares of any other class or classes of stock, whether by capital reorganization, reclassification or otherwise (other than a subdivision or combination of shares provided for above), the Conversion Price then in effect shall, concurrently with the effectiveness of such reorganization or reclassification, be proportionately adjusted such that the Preferred Stock shall be convertible into, in lieu of the number of shares of Common Stock which the holders would otherwise have been entitled to receive, a number of shares of such other class or classes of stock equivalent to the number of shares of Common Stock that would have been subject to receipt by the holders upon conversion of the Preferred Stock immediately before that change

(i)    Reorganization, Mergers, Consolidations, or Sales of Assets.  Subject to Section B hereof, if at any time or from time to time there shall be a capital reorganization of the Common Stock (other than a subdivision, combination, reclassification, or exchange of shares provided for elsewhere in this Section D) or a merger or consolidation of this corporation with or into another corporation, or the sale of all or substantially all of this corporation's properties and assets to any other person, then, as a part of such reorganization, merger, consolidation, or sale, provision shall be made so that the holders of the Preferred Stock shall thereafter be entitled to receive upon conversion of the Preferred Stock held by them, the number of shares of stock or other securities or property of this corporation, or of the successor corporation resulting from such merger or consolidation or sale, to which a holder of Common Stock deliverable upon conversion would have been entitled up on such capital reorganization, merger, consolidation, or sale.  In any such case, appropriate adjustment shall be made in the application of the provisions of this Section D with respect to the rights of the holders of the Preferred Stock after the reorganization, merger, consolidation, or sale to the end that the provisions of this Section D (including adjustment of the Conversion Prices then in effect and the number of shares purchasable upon conversion of the Preferred Stock) shall be applicable after that event as nearly equivalent as may be practicable

- 12 -

6.    **No Impairment.**  Except as provided for in Article IV, Section F below, the corporation will not, by amendment of its Articles of Incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the corporation but will at all times in good faith assist in the carrying out of all the provisions of this Section D and in the taking of all such action as may be necessary or appropriate in order to protect the Conversion Rights of the holders of the Preferred Stock against impairment.

7.    **Certificate as to Adjustments.**  Upon the occurrence of each adjustment or readjustment of the Conversion Price pursuant to this Section D, the corporation at its expense shall promptly compute such adjustment or readjustment in accordance with the terms hereof and furnish to each holder of Preferred Stock a certificate setting forth the adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based.  The corporation shall, upon the written request at any time of any holder of Preferred Stock, furnish or cause to be furnished to such holder a like certificate setting forth (i) such adjustments and readjustments, (ii) the Conversion Price at the time in effect, and (iii) the number of shares of Common Stock and the amount, if any, of other property which at the time would be received upon the conversion of Preferred Stock.

8.    **Notices of Record Date.**  In the event of any taking by the corporation of a record of the holders of any class of securities for the purpose of determining the holders thereof who are entitled to receive any dividend (other than a cash dividend which is the same as cash dividends paid in previous quarters) or other distribution, the corporation shall mail to each holder of Preferred Stock at least ten (10) days prior to the date specified herein, a notice specifying the date on which any such record is to be taken for the purpose of such dividend or distribution.

E.    **Protective Provisions.**  Series A Preferred Stock.  So long as any shares of Series A Preferred Stock remain outstanding, the corporation shall not, without the approval, by vote or written consent, of the holders of at least fifty percent (50%) of the Series A Preferred Stock then outstanding, voting as a single class:

(a)    authorize any class or series of stock having any preference, priority or pari passu rights as to dividends or liquidation preference equal or superior to any such preference or priority of the Series A Preferred Stock; or

(b)    alter or change the rights, preferences, or privileges of the Series A Preferred Stock; or

(c)    pay or declare any dividend on any security of the corporation; or

(d)    issue any securities of the corporation to any director or executive officer of the corporation or to their relatives or other affiliates, except securities issued pursuant to the corporation's stock option plan; or

- 13 -

(e) incur indebtedness in excess of Seven Million Five Hundred Thousand Dollars ($7,500,000.00), except that no Series A Preferred Shareholder approval (as described in this Article IV E) is needed for this action, if this action is approved by the corporation's Board of Directors, including the approval of at least one (1) director elected by the holders of the Series A Preferred Stock; or

(f) pledge assets of the corporation with a fair market value in excess of Seven Million Five Hundred Thousand Dollars ($7,500,000.00), except that no Series A Preferred Shareholder approval (as described in this Article IV E) is needed for this action, if this action is approved by the corporation's Board of Directors, including the approval of at least one (1) director elected by the holders of the Series A Preferred Stock; or

(g) increase (other than by a stock split or conversion) the total number of authorized shares of Series A Preferred Stock; or

(h) authorize a dissolution, or

(i) increase (other than by a stock split or conversion) the total number of authorized shares of any class or series of stock of the corporation, or

(j) amend its Articles of Incorporation or Bylaws of the corporation, or

(k) increase or decrease the authorized number of directors constituting the Board of Directors of the corporation; or

(l) redeem, purchase or otherwise acquire (or pay into or set aside for a sinking fund for such purpose) any securities, *provided, however*, that this restriction shall not apply to the repurchase of securities from employees, officers, directors, advisors, consultants or other persons performing services for this corporation or any subsidiary pursuant to agreements approved unanimously by the Board of Directors under which this corporation has the option to repurchase, or the right of first refusal over, such shares

## ARTICLE V

Section 1. Limitation of Directors' Liability. The liability of the directors of this corporation for monetary damages shall be eliminated to the fullest extent permissible under California law.

Section 2 Indemnification of Corporate Agents. This corporation is authorized to indemnify the directors and officers of the corporation to the fullest extent permissible under California law.

Section 3 Repeal or Modification. Any repeal or modification of the foregoing provisions of Article V shall not adversely affect any right of indemnification or limitation of liability of an agent of this corporation relating to acts or omissions occurring prior to such repeal or modification

- 14 -

## ARTICLE VI

The corporation reserves the right to amend, alter or repeal any provision contained in these Amended and Restated Articles of Incorporation, in the manner now or hereafter prescribed by law, and all rights and powers conferred by these Amended and Restated Articles of Incorporation on shareholders, directors and officers are granted subject to this reservation.



S

# State of California
## Secretary of State

**STATEMENT OF INFORMATION**
(Domestic Stock Corporation)

**FILED**
in the office of the Secretary of State
of the State of California

FEB 2 2 2007

FEES (Filing and Disclosure): $25.00. If amendment, see instructions.

**IMPORTANT — READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

CORPORATE NAME (Please do not alter if name is preprinted.)

INQUADRON, INC

C 2936174

This Space For Filing Use Only

**DUE DATE:**

**CALIFORNIA CORPORATE DISCLOSURE ACT** (Corporations Code Section 1502.1)
A publicly traded corporation must file with the Secretary of State a Corporate Disclosure Statement (Form SI-PT) annually, within 150 days after the end of its fiscal year. Please see reverse for additional information regarding publicly traded corporations.

**COMPLETE ADDRESSES FOR THE FOLLOWING** (Do not abbreviate the name of the city. Items 2 and 3 cannot be P.O. Boxes.)

| | ADDRESS | CITY AND STATE | ZIP CODE |
|---|---|---|---|
| 2 STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE | 1871 The Alameda, Suite 331 | San Jose, CA | 95126 |
| | | CITY | STATE | ZIP CODE |
| 3 STREET ADDRESS OF PRINCIPAL BUSINESS OFFICE IN CALIFORNIA IF ANY | 1871 The Alameda, Suite 331 | San Jose | CA | 95126 |

**NAMES AND COMPLETE ADDRESSES OF THE FOLLOWING OFFICERS** (The corporation must have these three officers. A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.)

| | ADDRESS | CITY AND STATE | ZIP CODE |
|---|---|---|---|
| 4 CHIEF EXECUTIVE OFFICER  SeYoung Kim | 1871 The Alameda, Suite 331 | San Jose, CA | 95126 |
| 5 SECRETARY  Kenneth O Lee | 1871 The Alameda, Suite 331 | San Jose, CA | 95126 |
| 6 CHIEF FINANCIAL OFFICER  Kenneth O Lee | 1871 The Alameda, Suite 331 | San Jose, CA | 95126 |

**NAMES AND COMPLETE ADDRESSES OF ALL DIRECTORS, INCLUDING DIRECTORS WHO ARE ALSO OFFICERS** (The corporation must have at least one director. Attach additional pages, if necessary.)

| | ADDRESS | CITY AND STATE | ZIP CODE |
|---|---|---|---|
| 7 NAME  SeYoung Kim | 1871 The Alameda, Suite 331 | San Jose, CA | 95126 |
| 8 NAME  Kenneth O Lee | 1871 The Alameda, Suite 331 | San Jose, CA | 95126 |
| 9 NAME  Hwuy.ng Joung | 1871 The Alameda, Suite 331 | San Jose, CA | 95126 |

10 NUMBER OF VACANCIES ON THE BOARD OF DIRECTORS, IF ANY:  none

**AGENT FOR SERVICE OF PROCESS** (If the agent is an individual, the agent must reside in California and Item 12 must be completed with a California address. If the agent is another corporation, the agent must have on file with the California Secretary of State a certificate pursuant to Corporations Code Section 1505 and Item 12 must be left blank.)

| 11 NAME OF AGENT FOR SERVICE OF PROCESS | | | |
|---|---|---|---|
| Kenneth O Lee | | | |
| 12 ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA IF AN INDIVIDUAL | CITY | STATE | ZIP CODE |
| 1871 The Alameda, Suite 331 | San Jose | CA | 95126 |

**TYPE OF BUSINESS**

13 DESCRIBE THE TYPE OF BUSINESS OF THE CORPORATION
Research & Development

14 BY SUBMITTING THIS STATEMENT OF INFORMATION TO THE SECRETARY OF STATE, THE CORPORATION CERTIFIES THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT.

| TYPE OR PRINT NAME OF PERSON COMPLETING THE FORM | SIGNATURE | TITLE | DATE |
|---|---|---|---|

APPROVED BY SECRETARY OF STATE

SI-200 C (REV 01/2006)

Attachment to S/I filing for
Inquation, Inc.

Additional Directors

10.   Name:        Joonsug Chung
      Address:     1871 The Alameda, Suite 331
                   San Jose, CA 95126

# EXHIBIT 9

제목:[RE]Fwd: GCT mobile Station chip IOT reports

보낸사람:ekangmin

김세영 박사님, 안녕하세요?

이강민 입니다.

정수석 통해서 김박사님께서 많이 애쓰고 계신다는 말씀 전해듣고 있습니다.

이력서를 보내드려야 하는데 집에 있는 PC가 뻗어서 조금 지연되고 있습니다.

PC를 복구하는대로 이력서를 보내드리도록 하겠습니다.

(사실 지금도 지금도 실험실에서 회사 네트웍을 피해 메일을 쓰고 있는 중입니다)

그럼, 건강하십시오!!!

이강민 드림


--------[ 받은 메일 내용 ]---------

제목 : Fwd: GCT mobile Station chip IOT reports

날짜 : Mon, 11 Dec 2006 10:19:18 -0800

보낸이 : "Seyoung Kim" <mountainrun@gmail.com>

받는이 : mountainrun@gmail.com

FYI.

Please keep strictly confidential!!


---------- Forwarded message ----------

From: Jeffrey J.K. Choi

Date: Dec 11, 2006 7:39 AM

Subject: GCT mobile Station chip IOT reports

To: SeYoung Kim


안녕하십니까,

일단 GCT IOT 가 전체적으로 끝난 것은 아니지만, 많은 부분이 끝난 것 같습니다. 제가 분당 pss software 그룹에서 부터 얻은 부분을 보내드립니다.

두 엑셀파일에 각 각 담긴 GCT 측정 자료와 POSDATA 측정 자료를 각각 비교해야 되는데, Throught 부터 나머지 부분까지 해당하는 부분을 같이 열고 비교를 하게 되어서 조금 불편하실 지 모르겠습니다. 비교를 쉽게 할 수 있는 통합 자료가 없는 것 같습니다.

덧붙여 이야기를 드리면, 그쪽 개발 담당자들이 우리의 RAS의 성능에 대해서 혀를 내둘렀다고 합니다. GCT 단말과 붙여서 전체 핸드로버 딜레이가 50ms 좀 넘게 나온 것도 우

리 RAS가 최적의 성능을 보였기 때문이라고 .... 그것 외에도 RAS가 상당히 안정적으로 동작하면서 높은 성능을 보인 것에 대해서 상당히 놀랐다는 말과 함께 많은 부러움을 표시하였다고 합니다.

생각보다는 그쪽(GCT)에서 개발하는 환경이 좋지 않을 것으로 이야기를 했답니다. 그리고 우리쪽 PSS(TM1)을 ASIC화 하지 않은 것에 대해서 참으로 의아해 한다고 합니다. 그리고 그것을 제껴두고 왜 전혀다른 기반에 단말 SOC를 하고 있는 지 이해하기 힘들다고요. 대부분 면에서 자기네 것보다 훨씬 낫다고 평가 하면서.... 그 부분은 개발을 같이 하는 저희들도 물론 의아해 하는 부분이지만요.

Word 문서에 나와있는 바와 같이 POSDATA TM1의 경우 16QAM 3/4 이상 부터 CTC를 켜면 단말이 불안정하다고 합니다. 이 부분은 프로세싱이 길어져서 UL-MAP을 원하는 제 시간에 UMAC 얻을 수 없어서 생기는 것 같습니다. 사실 지금도 부분적으로 LMAC의 MAP parser를 조금 수정을 하여 빨리 올려줄 수 있도록 해서 해결할 수도 있으나 다들 무관심 한것 같습니다.
그런 이유로 성능 측정 부분에서는 CTC부분을 모두 뺀것으로 보입니다.

추후에 실시된 시험에 대한 추가된 자료가 있으면 더 얻도록 하겠습니다.

기타 여러가지 이쪽에서 들은 이야기 들이 있는 데 통화가 되면 전해드리겠습니다. 자질구레한  이야기들이 될 수가 있어서...

보낸 데이타를 김세영 박사님께서 필요하신 분들에게 배포하시길 부탁드립니다.

그럼,
Jeff

# ENGLISH
# Translation

Subject:[RE]Fwd: GCT mobile Station chip IOT reports

From:ekangmin

Hi, Dr.Seyoung Kim?

This is Kangmin Lee.

I heard from Suesuk Joung that Dr.Kim, you are putting a lot of efforts.

I should send you a resume, but PC at home crashed so it's taking a little while.

I will send you a resume soon as the PC is repaired.

(In fact, even now, even now, I am in the lab writing email to avoid company's network)

Well, stay good!!!

From Kangmin Lee


---------[ Received E-mail message]----------

Subject : Fwd: GCT mobile Station chip IOT reports

Date : Mon, 11 Dec 2006 10:19:18 -0800

From : "Seyoung Kim" <mountainrun@gmail.com>

To : mountainrun@gmail.com

FYI.

Please keep strictly confidential!!


---------- Forwarded message ----------

From: Jeffrey J.K. Choi

Date: Dec 11, 2006 7:39 AM

Subject: GCT mobile Station chip IOT reports

To: SeYoung Kim


Hi,

First of all, although GCT IOT isn't completed all the way, a big portion of it is done.    I am
sending you the part I got from pss software group in Bundang.


GCT measure data and POSDATA measure data, each contained in two excel files, need to be
compared each, it might be somewhat inconvenient for you having to open and compare the
two from the part containing "Throught"  to the rest of the part.    There seems to be no
integrated data, which allows you to compare it easy.


Additionally speaking, developmental people who are in charge of their side (GCT) were struck
with wonder at our RAS's performance.    They told us that because our RAS is presenting the

optimum performance, when connected with GCT terminal, overall handle-over delay was merely just over 50ms...   Moreover, they were amazed and expressed huge admiration for RAS's significantly stable operation and high performance.

They were saying that developing environment from their side(GCT) is not as good as they had envisioned.   And they wondered why our side PSS(TM1) is not following ASIC.   Furthermore, they could not comprehend why we are doing terminal SOC on a completely different platform. They were appraising ours superior to theirs in most areas,...   even us involved in the development are wondering about that part, too.

As mentioned in the Word document, in the case of POSDATA TM1, terminal becomes unstable when turning on CTC above 16QAM ¾.   I think, this comes from extended processing time so that UL-MAP cannot get UMAC on time.   In fact, it is possible to give solution by making a bit of correction to the LMAC's MAP parser giving it a faster processing, but everyone seems to be unconcerned.
For such reasons, CTC part is all omitted in the Performance measure part.

I will try to obtain more data if there's an updated material, which was tested later.

I have more stories that I heard from this sides but I will tell you on the phone later, for it can be petty details.   Let me ask Dr.., Seyoung Kim, would you please distribute enclosed data to people whom might need it.
Bye then,
Jeff

EXHIBIT 10

| | |
|---|---|
| 식별정보 | M5_LOG_20061211_000000/{3457E6EE-E04C-42A7-9BA8-08532C67D2EE} |
| 프로토콜 | SMTP |
| 크기 | 826KB |
| 파일개수 | 2 개 |
| 보낸 IP | 203.238.200.27 |
| 받는 IP | 203.246.184.99 |
| 저장시각 | 2006-12-11 12:49:19 |
| 보낸사람 | Jinyoung Park <susia@posdata.co.kr> |
| 받는사람 | 'Jeffrey Choi' <jchoi@posdata-usa.com> |
| 참조인 | susia@posdata.co.kr |
| 실수취인 | jchoi@posdata-usa.com,susia@posdata.co.kr |
| 제목 | [Fwd: GCT vs TM1] |
| 첨부이름 | PKG R1 0 Release Note_20061121_DCM.xls,SO-061201-GCT IOT-1.doc |

-------- Forwarded Message --------
From: Sukchan Lee <acetcom@posdata.co.kr>
Reply-To: acetcom@posdata.co.kr
To: Heyoung Kim <hykim@posdata.co.kr>, Gwang-seok Kim
<anoveth@posdata.co.kr>, Sangroc Hwang <srhwang@posdata.co.kr>, Jinyoung
Park <susia@posdata.co.kr>, Woody Jeon <woody@posdata.co.kr>, 'Kangmin
Lee' <kmlee@posdata.co.kr>
Cc: acetcom@posdata.co.kr
Subject: GCT vs TM1
Date: Mon, 04 Dec 2006 13:41:31 +0900

혹시 궁금한 사람들이 많을까봐,... ㅋㅋㅋ

시험팀에서 시험한 결과를 첨부합니다. 혹시 설명 필요하신 분은 저에게 물어
보세요.

그럼. 이석찬 드림.
Best Regards
-Jinyoung Park ( susia@posdata.co.kr )
PGP Key ID : 686DE4E3

# ENGLISH
# Translation

| | |
|---|---|
| Identifiable Information | M5_LOG_20061211_000000/{3457E6EE-E04C-42A7-9BA8-08532C67D2EE} |
| Protocol | SMTP |
| Size | 826KB |
| File Count | 2 개 |
| Sender's IP | 203.238.200.27 |
| Recipient's IP | 203.246.184.99 |
| Date | 2006-12-11 12:49:19 |
| Sender | Jinyoung Park <susia@posdata.co.kr> |
| Recipient | 'Jeffrey Choi' <jchoi@posdata-usa.com> |
| Cc | susia@posdata.co.kr |
| Actual Recipient | jchoi@posdata-usa.com,susia@posdata.co.kr |
| Subject | [Fwd: GCT vs TM1] |
| Attach | PKG R1 0 Release Note_20061121_DCM.xls,SO-061201-GCT IOT-1.doc |

-------- Forwarded Message --------
From: Sukchan Lee <acetcom@posdata.co.kr>
Reply-To: acetcom@posdata.co.kr
To: Heyoung Kim <hykim@posdata.co.kr>, Gwang-seok Kim
<anoveth@posdata.co.kr>, Sangroc Hwang <srhwang@posdata.co.kr>, Jinyoung
Park <susia@posdata.co.kr>, Woody Jeon <woody@posdata.co.kr>, 'Kangmin
Lee' <kmlee@posdata.co.kr>
Cc: acetcom@posdata.co.kr
Subject: GCT vs TM1
Date: Mon, 04 Dec 2006 13:41:31 +0900

Just in case that many people are wondering, …. hehehe

Attached is the result of test from the test team.  If anyone needs explanation, please ask me.

Best Regards

-Jinyoung Park ( susia@posdata.co.kr )

PGP Key ID : 686DE4E3

EXHIBIT 11

,["110d7dded4eab47a",0,0,"Feb                                                    18","<span
id=\u003d\"_upro_choonshin72@sbcglobal.net\">Choon</span>,                <span
id=\u003d\"_upro_mountainrun@gmail.com\">me</span> (2)","<b>&raquo;</b> ","Plugfest
2/17 last day","메일 감사합니다. 결국 다른 회사들은 HO 와 Security 가 제대로 구현되··
&hellip;",[]
,"Mobile 3 Plugfest Interim Report-Feb17-2007.doc,Mobile 3 Plugfest Interim Report-Feb17-
2007.doc"
-------------------------------------------------------------------------------------------------------------------------

,"Feb 20, 2007 10:25 PM","MCCA PCB fab. Gerber data ready.","",[]
,1,,,"Tue Feb 20 2007_10:25 PM","On 2/20/07, Choon Shin <choonshin72@sbcglobal.net>
wrote:","On      2/20/07,      <b      class\u003dgmail_sendername>Choon      Shin</b>
&lt;choonshin72@sbcglobal.net&gt;
wrote:",,,"sbcglobal.net","","",0,,"<45DBE5C8.8010201@sbcglobal.net>",1172039112000,,0,"In
reply to \"MCCA PCB fab. Gerber data ready.\"",0]

,["mb","<div style\u003d\"direction:ltr\">안녕하세요,<br /><br />전화로 이야기 한 내용을 보내
드립니다.<br /><br />MCCA (Turtle Channel Card) PCB 제작용 Gerber Data 가 준비
되었습니다.<br /><br />지금까지 시험한 내용을 정리하여 적용 하였습니다. CPU, Flash,
SDRAM,<br />Ethernet Switch 등에 대하여 시험을 마쳤으며, 최종적으로 external
machine<br />(PC 등)와 CPU 가 ping 이 되는 것을 확인 하였습니다. 현재 제작되어
있는<br />board 에서 시험 할 수 있는 부분은 가능한 시험을 모두 마쳤습니다.<br /><br
/>또한, 현재 제작되어 있는 board 는 비록 FPGA 부분이 동작하지 않지만 CPU<br />및
network 이 동작 하므로 software 동작 및 검증용으로 어느 정도 사용 가<br />능합니다.<br
/><br />이제 FPGA 및 DSP code 등을 모두 올려서 시험 할 수 있는 board 를 만들려고<br
/>하오니, 제작 가능 여부를 알려 주시면 Gerber Data 및 Part List 를 보내 드<br
/>리겠습니다.<br /><br />회신 기다리겠습니다.<br /><br />감사합니다.<br />신춘
-------------------------------------------------------------------------------------------------------------------------

,["111110910fe49f9c",0,0,"Mar 1","<span id=\u003d\"_upro_choonshin72@sbcglobal.net\">Choon
Shin</span>","<b>&raquo;</b> ","mcca rev.c gerber data","안녕하세요, 첨부와 같이
MCCA REV.C GERBER DATA 를 보내 드리오니 업무에 참고 &hellip;",[]
,"MCCA-C-3-GBR-NOP.zip","111110910fe49f9c",0,"Thu Mar 1 2007_10:04 PM",0,"",0,0,1]

"Mar  2,  2007  12:03  AM","mcca  rev.c  gerber  data","",[["0.1","MCCA-C-3-GBR-
NOP.zip","application/zip",5622678,-1,"0.1"]
,1,,,"Fri Mar 2 2007_12:03 AM","On 3/2/07, Choon Shin <choonshin72@sbcglobal.net>
wrote:","On      3/2/07,      <b      class\u003dgmail_sendername>Choon      Shin</b>
&lt;choonshin72@sbcglobal.net&gt;
wrote:",,,"sbcglobal.net","","",0,,"<45E7B01C.5040306@sbcglobal.net>",1172811804000,,0,"In
reply to \"mcca rev.c gerber data\"",0]
,["mb","<div style\u003d\"direction:ltr\">안녕하세요, <br /><br />첨부와 같이 MCCA REV.C
GERBER DATA 를 보내 드리오니 업무에 참고 바라며,<br />PCB 제작 진행 부탁
드립니다.<br />질문이 있으시면 언제 든지 연락 바랍니다.<br /><br />감사합니다.<br
/>신춘,<br /><br /></div>",0]
,["ma",[1,"<table          class\u003datt          cellspacing\u003d0          cellpadding\u003d5

border\u003d0><tr><td><table    cellspacing\u003d0    cellpadding\u003d0><tr><td><img width\u003d16    height\u003d16    src\u003d\"/mail/images/zip.gif\"><td width\u003d7><td><b>MCCA-C-3-GBR-NOP.zip</b><br>5491K    Scanning    for viruses...</table></table>","111110910fe49f9c"]

# ENGLISH
# Translation

,["110d7dded4eab47a",0,0,"Feb                                                    18,""<span

id\u003d\"_upro_choonshin72@sbcglobal.net\">Choon</span>,                        <span

id\u003d\"_upro_mountainrun@gmail.com\">me</span> (2)","<b>&raquo;</b> ","Plugfest

2/17 last day"," Thank you for your email.    In the end, other companies… properly implemented

HO and Security

&hellip;",[]

,"Mobile 3 Plugfest Interim Report-Feb17-2007.doc,Mobile 3 Plugfest Interim Report-Feb17-2007.doc"

-------------------------------------------------------------------------------------------------

,"Feb 20, 2007 10:25 PM","MCCA PCB fab. Gerber data ready.","",[]
,1,,"Tue Feb 20 2007_10:25 PM","On 2/20/07, Choon Shin <choonshin72@sbcglobal.net>
wrote:","On    2/20/07,    <b    class\u003dgmail_sendername>Choon    Shin</b>
&lt;choonshin72@sbcglobal.net&gt;
wrote:",,"sbcglobal.net",,"","",0,,"<45DBE5C8.8010201@sbcglobal.net>",1172039112000,,0,"In
reply to \"MCCA PCB fab. Gerber data ready.\"",0]
,["mb","<div style\u003d\"direction:ltr\">Hi,<br /><br />I am sending you the contents of our
phone conversation.<br /><br />Gerber Data for MCCA (Turtle Channel Card) for the production
of PCB, Gerber Data is prepared.<br /><br />We have summarized testing records that we have
conducted.    And We have applied these records..  CPU, Flash, SDRAM,<br />Ethernet Switch
has been done tested.    Lastly, external machine<br />(PC ...etc...)and CPU has been
confirmed ping.    All possible testing that could be done on currently developed<br />board has
been done.<br /><br />Furthermore, even though currently developing board's FPGA part does
not operate, CPU<br />and network is working fine.    Therefore, it is somewhat possible to use
it as a tester, and/or for software operation.<br /><  />Now, we are about to make a board that
can be tested with FPGA and DSP code on it.<br />So if you'd tell me about development
possibility, I will send you Gerber Data and Part List.<br /><br /><br />I will wait for your
reply.<br /><br />Thank you.<br />Choon Shin

-------------------------------------------------------------------------------------------------

,["111110910fe49f9c",0,0,"Mar 1","<span id\u003d\"_upro_choonshin72@sbcglobal.net\">Choon
Shin</span>","<b>&rsquo;</b> ","mcca rev.c gerber data","Hi, I am attaching MCCA
REV.C GERBER DATA.    Please use it as a reference to your work. &hellip;",[]
,"MCCA-C-3-GBR-NOP.zip","111110910fe49f9c",0,"Thu Mar 1 2007_10:04 PM",0,"",0,0,1]

"Mar 2, 2007 12:03 AM","mcca rev.c gerber data","",[["0.1","MCCA-C-3-GBR-
NOP.zip","application/zip",5622678,-1,"0.1"]
,1,,"Fri Mar 2 2007_12:03 AM","On 3/2/07, Choon Shin <choonshin72@sbcglobal.net>
wrote:","On    3/2/07,    <b    class\u003dgmail_sendername>Choon    Shin</b>
&lt;choonshin72@sbcglobal.net&gt;
wrote:",,"sbcglobal.net",,"","",0,,"<45E7B01C.5040306@sbcglobal.net>",1172811804000,,0,"In
reply to \"mcca rev.c gerber data\"",0]
,["mb","<div style\u003d\"direction:ltr\">Hi,<br /><br />Attaching MCCA REV.C GERBER DATA,
please use it as a reference,<br />please proceed developing PCB.<br />Contact me any time if
you have questions.<br /><br />Thank you.<br />Choon Shin,<br /><br /></div>",0]
,["ma",[1,"<table    class\u003datt    cellspacing\u003d0    cellpadding\u003d5
border\u003d0><tr><td><table    cellspacing\u003d0    cellpadding\u003d0><tr><td><img
width\u003d16    height\u003d16    src\u003d\"/mail/images/zip.gif\"><td
width\u003d7><td><b>MCCA-C-3-GBR-NOP.zip</b><br>5491K    Scanning    for
viruses...</table></table>","111110910fe49f9c"]

EXHIBIT 12

# EXHIBIT 12

# DOCUMENT SUBMITTED UNDER SEAL

EXHIBIT 13



## 2007 Expense

| Salary | Base Salary | Mar | Apr | May | Jun | Jul | Aug | Sept | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Seyoung Kim | 185,000 | | 15,417 | 15,417 | 15,417 | 15,417 | 15,417 | 15,417 | 15,417 | 15,417 | 15,417 |
| Ken Lee | 125,000 | 10,417 | 10,417 | 10,417 | 10,417 | 10,417 | 10,417 | 10,417 | 10,417 | 10,417 | 10,417 |
| Joonsug Chung | 90,000 | | | | | | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 |
| Hwayong Joung | 93,000 | | 7,750 | 7,750 | 7,750 | 7,750 | 7,750 | 7,750 | 7,750 | 7,750 | 7,750 |
| Seong Dong Park | 67,000 | | 5,583 | 5,583 | 5,583 | 5,583 | 5,583 | 5,583 | 5,583 | 5,583 | 5,583 |
| Jong Wook Lee | 70,000 | | 5,833 | 5,833 | 5,833 | 5,833 | 5,833 | 5,833 | 5,833 | 5,833 | 5,833 |
| Hojun Kim | 135,000 | | 11,250 | 11,250 | 11,250 | 11,250 | 11,250 | 11,250 | 11,250 | 11,250 | 11,250 |
| Jeff Choi | 130,000 | | 10,833 | 10,833 | 10,833 | 10,833 | 10,833 | 10,833 | 10,833 | 10,833 | 10,833 |
| Ranny Hong | 105,000 | | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 |
| Choon Shin | 130,000 | | | 10,833 | 10,833 | 10,833 | 10,833 | 10,833 | 10,833 | 10,833 | 10,833 |
| Woo Jin Jeon | 81,000 | | | 6,750 | 6,750 | 6,750 | 6,750 | 6,750 | 6,750 | 6,750 | 6,750 |
| Se Jin Lim | 65,000 | | | 5,417 | 5,417 | 5,417 | 5,417 | 5,417 | 5,417 | 5,417 | 5,417 |
| Hung Seung Oh | 65,000 | | | | | | 5,417 | 5,417 | 5,417 | 5,417 | 5,417 |
| Kang Min Lee | 70,000 | | | 5,833 | 5,833 | 5,833 | 5,833 | 5,833 | 5,833 | 5,833 | 5,833 |
| Yerang Hur | 115,000 | | | | | 9,583 | 9,583 | 9,583 | 9,583 | 9,583 | 9,583 |
| Jungnam Yoon | 105,000 | | | | | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 |
| Kiyoung Kwak | 40,000 | | | | 3,333 | 3,333 | 3,333 | 3,333 | 3,333 | 3,333 | 3,333 |
| Suck Chan Lee | 62,000 | | | | 5,167 | 5,167 | 5,167 | 5,167 | 5,167 | 5,167 | 5,167 |
| Jin Young Park | 65,000 | | | | | | 5,417 | 5,417 | 5,417 | 5,417 | 5,417 |
| Kwang Seok Kim | 62,000 | | | 5,167 | 5,167 | 5,167 | 5,167 | 5,167 | 5,167 | 5,167 | 5,167 |
| Sang Geun Hwang | 90,000 | | | | | | | | 7,500 | 7,500 | 7,500 |
| Seung Man Lee | 95,000 | | | 7,917 | 7,917 | 7,917 | 7,917 | 7,917 | 7,917 | 7,917 | 7,917 |
| Ji-Myung Oh | | | | | | | | | | | |
| William Li | | | | | | | | | | | |
| Monthly | | 10,417 | 75,833 | 117,750 | 126,250 | 144,583 | 162,917 | 162,917 | 170,417 | 170,417 | 170,417 |
| Cumulative | | 10,417 | 86,250 | 204,000 | 330,250 | 474,833 | 637,750 | 800,667 | 971,083 | 1,141,500 | 1,311,917 |

| Office Rent/Utility | Mar | Apr | May | Jun | Jul | Aug | Sept | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|
| KR | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 |
| SV | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 |
| Monthly | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 |
| Cumulative | 7,500 | 15,000 | 22,500 | 30,000 | 37,500 | 45,000 | 52,500 | 60,000 | 67,500 | 75,000 |

| R/D Tools | Mar | Apr | May | Jun | Jul | Aug | Sept | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|
| KR | | 276,500 | 46,000 | 4,000 | 4,500 | 4,500 | 3,000 | 3,000 | 3,000 | 3,000 |
| SV | | 282,800 | 15,500 | 42,500 | 39,250 | 18,250 | 3,500 | 3,000 | 3,000 | 3,000 |
| Monthly | | 559,300 | 61,500 | 46,500 | 43,750 | 22,750 | 6,500 | 6,000 | 6,000 | 6,000 |
| Cumulative | | 559,300 | 620,800 | 667,300 | 711,050 | 733,800 | 740,300 | 746,300 | 752,300 | 758,300 |

| R/D Tools (Less SW) | Mar | Apr | May | Jun | Jul | Aug | Sept | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|
| KR | | 64,000 | 6,000 | 4,000 | 4,500 | 4,500 | 3,000 | 3,000 | 3,000 | 3,000 |
| SV | | 147,300 | 15,500 | 42,500 | 39,250 | 18,250 | 3,500 | 3,000 | 3,000 | 3,000 |
| Monthly | | 211,300 | 21,500 | 46,500 | 43,750 | 22,750 | 6,500 | 6,000 | 6,000 | 6,000 |
| Cumulative | | 211,300 | 232,800 | 279,300 | 323,050 | 345,800 | 352,300 | 358,300 | 364,300 | 370,300 |

| Expense Summary (Less SW) | Mar | Apr | May | Jun | Jul | Aug | Sept | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|
| Monthly | 17,917 | 294,633 | 146,750 | 180,250 | 195,833 | 193,167 | 176,917 | 183,917 | 183,917 | 183,917 |
| Cumulative | 17,917 | 312,550 | 459,300 | 639,550 | 835,383 | 1,028,550 | 1,205,467 | 1,389,383 | 1,573,300 | 1,757,217 |

# 2007 Expense

| no | Area | Item | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sept | Oct | Nov | Dec | Total | Remark |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Test / Equipment | Oscilloscope | 5,000 | | | | | | | | | | | | 5,000 | |
| 2 | | Logic Analyzer | | 15,000 | | | | | | | | | | | 15,000 | |
| 3 | | Spectrum Analyzer | | | 15,000 | | | | | | | | | | 15,000 | |
| 4 | | VSA | | | | | | | | | | | | | 0 | Vector Signal Analyzer |
| 5 | | VSG | | | | | | | | | | | | | 0 | Vector Signal Generator |
| 6 | HW Tool / Instruments | Xilinx JTAG | 1,000 | | | | | | | | | | | | 1,000 | Xilinx download cable |
| 7 | | PPC ICE | 3,000 | | | | | | | | | | | | 3,000 | PPC440 in-circuit emulator |
| 8 | | DSP/JTAG emulator | 1,000 | | | | | | | | | | | | 1,000 | XDS510 |
| 9 | HW Tool / License | RTL compiler/simulator | 100,000 | | | | | | | | | | | | 100,000 | Cadence Tool |
| 10 | | RTL Synthesizer | 30,000 | | | | | | | | | | | | 30,000 | Synplicity |
| 11 | | FPGA tools | 2,500 | | | | | | | | | | | | 2,500 | Xilinx s/w, h/w tool |
| 12 | | Schematic Capture | 3,000 | | | | | | | | | | | | 3,000 | OrCad schematic capture |
| 13 | SW Tool | Operating System | | | | | | | | | | | | | 0 | VxWorks |
| 14 | | PC | 4,000 | | | | 4,000 | | | | | | | | 8,000 | PC for Development |
| 15 | BS | Layout (BS) | | | | | | 15,000 | | | | | | | 15,000 | PCB layout outsourcing |
| 16 | | Fabrication (BS) | | | 5,000 | | | | | | | | | | 5,000 | PCB fabrication, 10 pcs |
| 17 | | Assembly (BS) | | | | | | | 5,000 | | | | | | 5,000 | PCB assembly |
| 18 | MS | Layout (MS) | | 15,000 | | | | | | | | | | | 15,000 | PCB layout outsourcing |
| 19 | | Fabrication (MS) | | | 8,000 | | | | | | | | | | 8,000 | PCB fabrication, 10 pcs |
| 20 | | Assembly (MS) | | | | | | | 5,000 | | | | | | 5,000 | PCB assembly |
| 21 | | Parts (BS) | | 32,000 | 8,000 | | | | | | | | | | 40,000 | Parts for Base Station Channel Card assemblies |
| 22 | | Parts (MS) | | | | | 8,000 | 24,000 | 8,000 | | | | | | 40,000 | Parts for Mobile Station Base Band Board assemblies |
| 23 | Outsourcing | Case (BS) | | | | | | | 750 | 750 | | | | | 1,500 | Case for BS |
| 24 | | RF board (BS) | | | | | | | 6,000 | 6,000 | | | | | 12,000 | RF board for BS |
| 25 | | GPS/SR (BS) | | | | | | | 6,000 | 6,000 | | | | | 12,000 | GPS Receiver |
| 26 | | AC/DC (BS) | | | | | | | 1,000 | 1,000 | | | | | 2,000 | Power Supply for BS |
| 27 | | Case (MS) | | | 350 | 350 | | | | | | | | | 700 | Case for MS |
| 28 | | RF board (MS) | | | 4,800 | 4,800 | | | | | | | | | 9,600 | RF board for MS |
| 29 | | AC/DC (MS) | | | 500 | 500 | | | | | | | | | 1,000 | MS power supply |
| 30 | Supplies | Office Supply | 4,000 | 1,000 | 500 | 500 | 500 | 500 | 500 | 500 | | | | | 8,000 | Supplies |
| 31 | | Lab Supply | 3,000 | 1,000 | 1,000 | 1,000 | | | 1,000 | 1,000 | 500 | | | | 8,500 | Storage, Soldering, others |
| 32 | Operation | Office | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 36,000 | Office Rental, Utility, etc |
| | | **TOTAL** | 159,500 | 67,000 | 46,150 | 10,150 | 15,500 | 42,500 | 39,250 | 18,250 | 3,500 | 3,000 | 3,000 | 3,000 | 410,800 | |

| no | Area | Item | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sept | Oct | Nov | Dec | Total | Remark |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Test / Equipment | Oscilloscope | | | 5,000 | | | | | | | | | | 5,000 | |
| 2 | | Logic Analyzer | | | | 15,000 | | | | | | | | | 15,000 | |
| 3 | | Spectrum Analyzer | | | 15,000 | | | | | | | | | | 15,000 | |
| 4 | | VSA | | | | | | | | | | | | | 0 | Vector Signal Analyzer |
| 5 | | VSG | | | | | | | | | | | | | 0 | Vector Signal Generator |
| 6 | HW Tool / Instruments | FPGA download cable | 1,000 | | | | | | | | | | | | 1,000 | FPGA download cable |
| 7 | | PPC ICE | 3,000 | | | | | | | | | | | | 3,000 | PPC440 in-circuit emulator |
| 8 | | DSP/JTAG emulator | 1,000 | | | | | | | | | | | | 1,000 | XDS510 |
| 9 | HW Tool / License | RTL compiler/simulator | | | 100,000 | | | | | | | | | | 100,000 | Cadence Tool |
| 10 | | RTL Synthesizer | | | 30,000 | | | | | | | | | | 30,000 | Synplicity |
| 11 | | FPGA tools | | | 2,500 | | | | | | | | | | 2,500 | FPGA s/w, h/w tool |
| 12 | SW Tool | Operating System | | | | | | | | | | | | | 0 | VxWorks |
| 13 | | PC | | | 40,000 | 40,000 | 40,000 | | | | | | | | 120,000 | PC for Development |
| 14 | Supplies | Supplies | | | 7,000 | | | | | | | | | | 7,000 | Supplies |
| 15 | | Supplies | 1,000 | 500 | | 1,000 | 2,000 | 500 | 1,000 | 1,000 | | | | | 7,000 | Supplies |
| 16 | | Storage | 1,000 | 500 | | 1,000 | 1,000 | 500 | 500 | 500 | | | | | 5,000 | Storage, Soldering, others |
| 17 | Operation | Office | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 36,000 | Office Rental, Utility, etc |
| | | **TOTAL** | 10,000 | 4,000 | 202,500 | 60,000 | 46,000 | 4,000 | 4,500 | 4,500 | 3,000 | 3,000 | 3,000 | 3,000 | 347,500 | |

758,300

# EXHIBIT 14



InQuadron Organization Chart
(Projected by the End of 2007)

# EXHIBIT 15

| 식별정보 | M5_LOG_20070209_000000/{DC41A92D-19D2-4261-B2E0-294287490CE0} |
|---|---|
| 프로토콜 | SMTP |
| 크기 | 4KB |
| 파일개수 | 파일없음 |
| 보낸 IP | 203.238.200.27 |
| 받는 IP | 141.223.1.1 |
| 저장시각 | 2007-02-09 12:07:13 |
| 보낸사람 | Jinyoung Park <susia@postech.ac.kr> |
| 받는사람 | Seyoung Kim <mountainrun@gmail.com> |
| 참조인 | jyounggo@gmail.com |
| 실수취인 | mountainrun@gmail.com,jyounggo@gmail.com |
| 제목 | Re: 사업 _시작_신호탄!!! |

안녕하세요 ,

잘 지내셨는지요 ?
잘 진행되고 있다는 소식을 들으니 기분이 좋네요.
성동씨랑은 종종 만나서 소식은 듣고 있습니다.
저는 앞으로 2 주 동안 plugfest 관계로 spain 에 가 있을것 같습니다.

윌리엄과도 잘되어서 정말 !!! 같이 했으면 좋겠습니다.
아시다시피 윌리엄같은 좋은 enginneer 가 PSS SW 쪽을
lead 해 주는 것이 필요하다고 생각됩니다.

윌리엄만 같이 일한다면 여러가지 제가 두려워 하고 걱정했던 일들이
사라질것 같네요, 그리고 다른 사람들이 마음을 굳히는 데도 결정적인
역할을 할것 같구요.

그 외 다른 사업적인것들은 , 김박사님이나 정박사님께서 잘 해주실거라
믿습니다.

다음주에 만나실때 꼬옥,, 윌리엄을 잘 설득시켜주셔서 같이 일하게 해주십
요.!
항상 건강하시구요 , 한국에 오시면 한번 뵈었으면 합니다.

그럼.

- 진영 올림


PS. 제 email 을 앞으로 jyounggo@gmail.com 으로 연락주셨으면 합니다.


On Thu, 2007-02-08 at 08:18 -0800, Seyoung Kim wrote:
> 박진영씨,
>
> 안녕하셨지요?
> 그 동안 자세한 소식을 제대로 듣지 못해서 많이 궁금하셨으리라 생각합니
> 다. 마침내 개발을 시작할 수 있는 fund 가 마련되어 이제는 본격적으로
> 시작할 꿈에 부풀어 있습니다.
> 앞으로 Join하는 팀원들은 대부분이 Founding Member 와 다름없기 때문에
> Stock Option 이라던가 차후 Benefit Sharing 에 대해 가능한 한 최대의 혜
> 택을 줄 것입니다. 회사의 종업원이 아닌 우리 팀원 소유의 회사이기 때
> 문에 가능하겠지요.
>
> 아울러 현재 중요한 Customer 가 될 유명 회사와도 은밀히 협상을 진행중
> 인데 좋은 소식이 있을 것으로 기대합니다.
> 제가 한국에 가서 박진영씨를 직접 만나보고 자세한 이야기도 해주면 좋겠
> 는데 아마도 3월 8일 이후에나 가능하기 때문에 일단 한국에서는 박성동씨
> 와 정화용씨 두분을 통해 접촉을 할 예정입니다.
>
> 박진영씨께 곧 연락이 갈 것이며 Stock Option등 처우에 대해서도 이야기가
> 있을 것입니다. 이제는 시간이 급하기 때문에 신속히 결정하고 움직이도록
> 해야 할 것입니다.
>
> 아울러 이곳에서는 제가 William 을 만날 예정입니다. 전부터 저하고
> 같이 일하고 싶어는 했는데 지난 9월에 만났을 때 현재 회사에 약속한 것
> 이 있는지 당장 움직이기 어렵다고 했지만 이제는 사정이 달라지는 듯한 느
> 낌을 받아 돌아오는 월요일에 만나기로 했습니다.
>
> 혹시 궁금한 사항이 있으시면 박진영씨께서 편하신 시간에 Skype 로 직접
> 통화를 하는 것도 좋겠습니다. 미리 제게 메일을 주시면 그 시간에 접
> 선(?) 을 하지요.

> 한국과는 달리 미국에서는 WiMAX 에 대한 시장과 관심이 점점 커지고 있습
> 니다. 미국을 기점으로 사업을 시작하려는 우리 팀에게 좋은 소식이라고
> 믿습니다.
>
> 그럼 곧 만나뵙기를 기대하며 아무때나 제게 Skype 나 408-489-2987 로 연
> 락해 주시기 바랍니다. 감사합니다.
>
> 김세영
>
Regards

-Jinyoung Park( susia@postech.ac.kr )

PGP Key ID : 8C8D20AD

# ENGLISH
# Translation

| Identifiable Information | M5_LOG_20070209_000000/{DC41A92D-19D2-4261-B2E0-294287490CE0} |
|---|---|
| Protocol | SMTP |
| Size | 4KB |
| File Count | None |
| Sender's IP | 203.238.200.27 |
| Recipient's IP | 141.223.1.1 |
| Date | 2007-02-09 12:07:13 |
| Sender | Jinyoung Park <susia@postech.ac.kr> |
| Recipient | Seyoung Kim <mountainrun@gmail.com> |
| Cc | jyounggo@gmail.com |
| Actual Recipient | mountainrun@gmail.com,jyounggo@gmail.com |
| Subject | Re: Business _Start_Signal !!! |

Hi,

How have you been?

It's good to hear that things are going well.

I see Seongdong from time to time and hear about the news.

I will be in Spain for 2 weeks for plugfest related business.

I wish things would go well between William and.., so !!! wish to work together.

As you know, it's essential that a good engineer like William should lead the PSS SW side.

If I can get William to work with me, I feel like all that I've been afraid and worried about will banish, and it will definitely be the factor for others' to make up their mind.

For all the other business aspects, I believe Dr.Kim or Dr.Joung will do it fine.

When seeing next week, for sure,, convince William so that he will work with me.!

Wish you well, and I would like to meet you If you come to Korea

Bye now.

--from Jinyoung

PS. Please email me to jyounggo@gmail.com from now on.

On Thu, 2007-02-08 at 08:18 -0800, Seyoung Kim wrote:

>Dear Jinyoung Park,

>

>Have you been alight?

>I just figured that you might be so curious about things since you have not heard about detailed news for a while.

>finally, fund has been raised to start the development, and now I am inflated with hopes of   actual startup.

>Because most team members joining now, are almost the Founding Members, We will give the most stock option or future benefit Sharing as we can if possible.   It is made possible because it is our team members' company and, we are not just employees.

>

>In addition, currently we are making negotiations with a noble company, which might be our important customer, and I am expecting good news.

>I want to visit Korea and see Jinyoung Park in person, and tell you the detailed stories, but it will maybe be possible after March 8th, so for now, in Korea, My plan is that I will make contacts through Seongdong Park and Hwayong Joung, two of them.

>

>There will be soon a contact made to Jinyoung Park, How to treat stock Option will be discussed.   It's urgent time now, so you will make decisions fast, and move rapidly.

>

>Furthermore, from here, I made plans to meet with William.   From the past, he wished to work with me.   When we met in last September, he seemed to have commitments to his company at the time, and he told me he could not make a move right away.   Now, I had a feeling that the situation has changed, so in this coming Monday, we promised to see each other.

>

>If you have a question, why don't Jinyoung at your convenient time, use Skype so you can talk directly.   If you give me a prior notice, I will be online at the same time.

>Unlike in Korea, in the United States, interest in WiMAX market's getting bigger.

>I find it the good news for our team since we are about to start a business based in America.

>

>well, hope to see you soon.    Please feel free to contact me by Skype or call me at 408-489-2987.    Thank you.


>

> Seyoung Kim

>

Regards

-Jinyoung Park( susia@postech.ac.kr )

PGP Key ID : 8C8D20AD

EXHIBIT 16

----- Original Message ----- </div>        <div style\u003d\"background:#e4e4e4;font:10pt arial\"><b>From:</b>        <a        title\u003d\"mountainrun@gmail.com\" href\u003d\"mailto:mountainrun@gmail.com\"        target\u003d\"_blank\"    onclick\u003d\"return top.js.OpenExtLink(window,event,this)\">Seyoung    Kim</a>    </div>        <div style\u003d\"font:10pt arial\"><b>To:</b> <a title\u003d\"jounghwayong@gmail.com\"

href\u003d\"mailto:jounghwayong@gmail.com\"    target\u003d\"_blank\"    onclick\u003d\"return top.js.OpenExtLink(window,event,this)\">Hwayong        Joung</a>    ;        <a title\u003d\"kdlee@leekimlaw.com\"        href\u003d\"mailto:kdlee@leekimlaw.com\" target\u003d\"_blank\"    onclick\u003d\"return  top.js.OpenExtLink(window,event,this)\">Kenneth D.    Lee</a>    </div>        <div    style\u003d\"font:10pt    arial\"><b>Cc:</b>    <a title\u003d\"joonsug@gmail.com\"            href\u003d\"mailto:joonsug@gmail.com\" target\u003d\"_blank\"    onclick\u003d\"return  top.js.OpenExtLink(window,event,this)\">Joonsug Chung</a>        ;        <a        title\u003d\"seongdong.park@gmail.com\" href\u003d\"mailto:seongdong.park@gmail.com\"    target\u003d\"_blank\"    onclick\u003d\"return top.js.OpenExtLink(window,event,this)\">Seongdong    Park</a>    </div>            <div style\u003d\"font:10pt arial\"><b>Sent:</b> Wednesday, February 14, 2007        10:04 AM</div>        <div style\u003d\"font:10pt arial\"><b>Subject:</b> Operation Update</div> <div><br> </div>        <div> </div>        <div>Hi Folks,</div>        <div>As we reach the final end of opening business we need to prepare for        the following.</div> <div> </div>        <div>Ken, </div>        <div>We need to prepare job offer letters for Hojun Kim, Jongkwan Choi and        Yoonki Hong in US. The job offers for US team should be immediate.</div>        <div>We also need to prepare job offers to other candidates in Korea who        would join us as an employee at IQI (except Hwayong and Seongdong who are currently with KTD).",1]

,["mb","</div>        <div>For both job offer letters, all the benefit terms would    be included.  I wonder if there is any progress in meeting the insurance        brokers. I will find the phone numbers of Sequoia whom you may        contact.</div>        <div> </div> <div>Hwayong,</div>        <div>For KR employees, I hope Hwayong would send us a sample job offer        form prevailing in Korean industry.</div>        <div>Let's discuss together who and when each candidate would        join the team so that we can prepare the job offer letters ahead of        time.  In Korea, the lead-time to finish the exit process is at least        one month and we should move very quickly from now on. </div> <div> </div>        <div> </div>        <div>There is another very important process we have to start        immediately.</div>        <div>I am aware that the application deadline for  H1 visa  in 2007 is by the end of March with actual permit issue date        commecing October, 2007.</div>        <div>If our budget permits, I would like to proceed for H1 visa application for all key members from Korea. The extension to applying        green card would be a personal matter that should be discussed in the        future, but having H1 visa for selected candidates would be very        beneficial and convenient for our operation. </div>        <div> </div>        <div>I expect Hwayong and I should start to discuss immediately        to decide who would be the candidates by balancing  each one's preference and our budget to afford the legal expense.</div>        <div>Meanwhile, I would like have Ken's input on the expense needed for H1        visa application and ways to save the legal expense.  As I mentioned,        the deadline for H1 visa application is not remote and we should proceed        as soon as possible. </div>        <div> </div> <div>Please let me know if there is any comments.</div>        <div> </div> <div>Regards,</div>        <div><br>Seyoung        <div> </div>",1] ,["mb","</blockquote></span></div></div></blockquote></div><br></span></div>",1] ,["mb","</blockquote></div> ",0]

,["ce"]],"0"].................................................................................................................

EXHIBIT 17

,"Feb 27",["김세영 ¥u003cmountainrun@gmail.com¥>"]

,["방용근 ¥u003cgenius0722@naver.com¥>"]

,"Feb 27, 2007 9:19 AM","안녕하세요. 방용근입니다.","안녕하세요. 방용근입니다. 일전에 주신 메일은 잘 받았습니다. 요청에 응해 주신 점 감사드립니다. 다름이 아니라, 몇가지 더 궁금한 점이 ...",[]

,0,,,"Tue Feb 27 2007_9:19 AM","On 2/27/07, 방용근 ¥u003cgenius0722@naver.com¥> wrote:"

--------------------------------------------------------------------------------

,"Feb 27, 2007 10:48 AM","Re: 안녕하세요. 방용근입니다.","",[]
,1,,,"Tue Feb 27 2007_10:48 AM","On 2/27/07, Seyoung Kim ¥u003cmountainrun@gmail.com¥> wrote:","On 2/27/07, ¥u003cb class¥u003dgmail_sendername¥>Seyoung Kim¥u003c/b¥> &lt;mountainrun@gmail.com; wrote:","gmail.com",,,"","",0,,"¥u003c9d68294f0702270948k63314db6xa8a7d1bd5f97617b@mail.gmail.com¥>",1172598523000,,0,"In reply to¥"안녕하세요. 방용근입니다.¥"",0]

,["mb","¥u003c 방용근씨,¥u003c ¥u003c¥u003c ¥u003c 메일 감사합니다.¥u003c ¥u003c¥u003c ¥u003c 현재로서의 계획은 미국내 SV 와 분당 수내역근처의 사무실을 얻어 두 팀으로 운영을 할 예정입니다. 그래· 한국에서 합류하는 인원은 일단 한국에서 근무하는 것으로 하나 형편에 ·라 일시적으로 미국에서도 당분간 체류를 해야 할 경우도 있을 것입니다. 혹은 본인이 전적으로 미국에서 생활하는 것을 원할 경우는 따로 신중하게 이야기를 해야 할 것입니다. 미국정부에서 발행하는 H1 Visa 쿼타가 한정이 되어있어 장래에 영주권을 받을 생각을 하면 오히려 한국에서 1 년· 지내고· 주재원 자격으로 미국으로 오는 것이 더 빠릅니다. 한국에서 1 년 지내는 동안 물론 미국으로 출장와서 일할 수는 있습니다. 그러나 H1 Visa 를 받을 경우 제일 빨라야 이번 10 월이나 내년이고 H1 Visa 를 신청한 상황에· 미국 여행은 H1 Visa 를 받기 전까지는 미국 출장에 상당한 통제를 받는 것·로 알고 있습니다.  ¥u003c ¥u003c¥u003c ¥u003c 제 계획으로· 본인들이 원하는 곳에서 일하는 것을 원칙으로 하고 싶습니다마는 우리의 예산과 사업의 전개에 따라 탄력적으로 움직여야 할 것으로 생각됩니다.¥u003c ¥u003c¥u003c¥u003c ¥u003c 우리의 예산이 충분하면 모두에게 좋· 연봉을 드리고 싶으나 신생 벤처 기업으로서의 한계가 있음을 잘 아시리· 믿습니다. 그래서 이번에 합류하는 팀원들에게 최소한 현재 연봉을 유지하거나 경우에 따라서는 어느정도의 Plus-Alpha 를 제공하며 좋은 @@ATL@@·@&·^··

**ENGLISH
Translation**

,"Feb 27",["Seyoung Kim ¥u003cmountainrun@gmail.com¥>"]
,["Yongkeun_Bang \u003cgenius0722@naver.com\>"]
,"Feb 27, 2007 9:19 AM","Hi,.   This is Yongkeun Bang."," I. This is Yongkeun Bang.   I have
received your email while ago.   Thank you for accepting my request.   Well, I had few more
questions...", []
,0,,,"Tue    Feb    27    2007_9:19    AM","On    2/27/07,    Yongkeun    Bang
¥u003cgenius0722@naver.com¥> wrote:"

-------------------------------------------------------------------------------------------------------------------------

,"Feb 27, 2007 10:48 AM","Re: Hi, this is Yongkeun Bang.","",[]
,1,,,"Tue    Feb    27    2007_10:48    AM","On    2/27/07,    Seyoung    Kim
¥u003cmountainrun@gmail.com¥>            wrote:","On            2/27/07,            ¥u003cb
class¥u003dgmail_sendername¥>Seyoung    Kim¥u003c/b¥>    &lt;mountainrun@gmail.com;
wrote:","gmail.com",,,"","",0,,"¥u003c9d68294f0702270948k63314db6xa8a7d1bd5f97617b@ma
il.gmail.com¥>",1172598523000,,0,"In reply to ¥" Hi, this is Yongkeun Bang.¥"",0]
,["mb","¥u003c Dear Youngkeun Bang,¥u003c ¥u003c ¥u003c ¥u003cThank you for your
email.¥u003c ¥u003c ¥u003c ¥u003c Currently, the plan is to divide the team in two and run in
two offices located in, SV in America and nearby Soonae Station in Bundang, Korea.  So,
members joining in Korea will be working in Korea for now, but depending on situations, some
might need to stay in America.   Or, if the individual really wishes to live in America, then we
might have to talk independently in serious terms.   H1 Visa that the United States government
issues, have limited quota.   So, if the individual wants to get green card in the future, rather
stay in Korea for a year, then later come to America as a resident member.   Of course, during
the time one who works in Korea, one can make a business trip to America and work.   But, if
you get the H1 visa, the earliest time will be this October or in the next year.   If you already
applied for H1 visa, there will be considerable restrictions when visiting America until the one
gets the H1 Visa.   ¥u003c ¥u003c ¥u003c ¥u003c I wish to set principles to let each individual
choose their working place, however, we should move with flexibility to situations in our budget
and our business development. ¥u003c ¥u003c ¥u003c ¥u003c I wish to compensate well to all
of you if our budget allows, but you might already know that, as a startup venture company, that
there' is a limit.   Therefore, we will be matching at least to the current salary for the newly
joining members this time.   Depending on situations, we will provide certain Plus-Alpha and
good @@ATL@@·@&·^··

# EXHIBIT 18

----- Original Message -----
,["mb","From:  "mountainrun@gmail.com" href¥u003d¥"mailto:mountainrun@gmail.com"
"Seyoung Kim" title"kdlee@leekimlaw.com¥" href¥u003d¥"mailto:kdlee@leekimlaw.com¥"
Kenneth D. Lee    Tuesday, February 27, 2007   11:44 AM
Re: Offer Letters Hi Ken,      Although I have been thinking  on the job offer ¥n      letters for
each individual, I would like to hold them until we ¥n      secure the minimum required fund.
Under the current situation, the starting date of IQI is not clear ¥n      and I don&#39;t want to
give them an impression that a part of our plan is drfting.  I would rather wait until we have a
clearer ¥n      sign.   Please let me know if you have any other thought.   Thanks,
Dr. Kim: Hope all is well with you
Do you have any further  thoughts on the offer letters?  Also, I need to the
Kenneth D. Lee, Esq.1871 The Alameda, Suite ¥n      331",1]
,["mb","¥u003cbr¥>San Jose, California 95126¥u003cbr¥>Tel: (408) 248-4488¥u003cbr¥>Fax:
(408) ¥n      248-8181¥ >kdlee@leekimlaw.com
-----------------------------------------------------------------------------------------------------------


----- Original Message -----
From:"mountainrun@gmail.com¥" "mailto:mountainrun@gmail.com">Seyoung   Kim>
>To:>"kdlee@leekimlaw.com" "mailto:kdlee@leekimlaw.com" >Kenneth D. Lee>
Show quoted text
Tuesday, February 27, 2007 2:19
I totally agree with your thoughts, but I intend to wait a couple of more days until we hear some
news from KTD.  Meanwhile, Joonsug is going to meet two persons, one on Wednesday and
the other one on Friday this week. In fact, I already sent informal and verbal job offers to four ¥n
engineers through Hwayong last week and I am going to check tonight with him on the status.  I
also mentioned already to my team in SV  while ago and only  the formal process is left.   The
correction of PCB took more time than I expected and a partner who would help us in
PCB respin showed  some concerns working with us.  Hwayong and me are in difficult
discussions with the company and we are trying hard ¥n  to make it on the right track.   There
are a couple of concurrent ¥n  difficult situations around me and I need to put priorities to
handle them in ¥n  order.
Regards,
-----------------------------------------------------------------------------------------------------------


On 2/27/07, >Kenneth D> "mailto:kdlee@leekimlaw.com" kdlee@leekimlaw.com¥u003c/a¥>&gt;
¥n  wrote:¥u003c/span¥>"gmail_quote¥"
I share your concerns, but have the following additional thoughts.  First, things look promising
with respect to KTD, even if it may not be in the form that we initially contemplated.  Although
that is not certain, I am heartened by what appears to be Mr. Chan Park&#39;s lack of undue
concern about the KTD situation.  So, hoping for the best, I would like to start moving forward
so we minimize the time lost. Also, as Mr. Park will be coming to California on March 25, I
would like to be able to show him a working office with IQI&#39;s sign in front and happy,
hardworking engineers ¥n     inside.  That way, he will know his money is being put to good
use.  If we don&#39;t get offer letters out soon, and close on the office lease, it will be hard to
be ready for Mr. Park&#39;s visit.   If we have a viable plan to proceed based on initial funding
of $950k, let&#39;s get started while we continue fundraising.
It turns out that Joonsug knows my friend (formerly of LG and Mtekvision) who has done a lot of
investing.  Joonsug is prepared to meet with this person to broaden our fundraising efforts if
KTD should not come through for us.  ¥n     Fortunately, I think people in Korea understand
WiMax and its potential ¥n     better than the average person in the U.S., so I am hoping
raising funds from several individuals will be very much doable.
Waiting longer will also make it ¥n     harder to keep the team intact as they have been waiting
a long time for ¥n     something to happen.  Even if they do not join now, if they see that we ¥n
are moving forward, they may be able to hold on longer before joining us. I don&#39;t want to

unnecessarily rush things under the circumstances, but I also don&#39;t want to start from the beginning once the funding picture does become secure.  This is your ¥n    call, since you are the one that needs to decide if we have a viable option of moving forward with $950k vs. $2,150k.  That to me is the difference between starting now or later.  Of course, another consideration is the probability of doing a deal in the short term with N-sa.  Has there been any further communication with N-sa?

-------------------------------------------------------------------------------------------------------------------------

,"Feb 27, 2007 3:49 PM","Re: Offer Letters","",[]
,1,,,"Tue Feb 27 2007_3:49 PM","On 2/27/07, Kenneth D. Lee ¥u003ckdlee@leekimlaw.com¥> wrote:","On 2/27/07, ¥u003cb class¥u003dgmail_sendername¥>Kenneth D. Lee¥u003c/b¥> &lt;kdlee@leekimlaw.com
I understand and agree.  I am glad you have already spoken with   the team members who are due to join shortly.  Let&#39;s hope KTD comes through soon so we can really get started.  Let me know if I can help ¥nstructure a resolution with the PCB company.
BTW, the landlord came back and asked for $1.20 gross per square foot and a ¥ntwo year lease.  I have told Allison that the rent is o.k., but that we ¥cannot do a two year lease.  I am waiting for their further response.
Regards,
Kenneth D. Lee, Esq.   Lee &amp; Kim
1871 The Alameda, Suite 331¥u003cbr¥>San ¥nJose, California 95126¥u003cbr¥>Tel: (408) 248-4488¥u003cbr¥>Fax: (408) 248-8181
"mailto:kdlee@leekimlaw.com"