1    SQUIRE, SANDERS & DEMPSEY L.L.P.
David S. Elkins (State Bar # 148077)

2    delkins@ssd.com
Allison E. Pitigoi (State Bar # 242211)

3    apitigoi@ssd.com
600 Hansen Way

4    Palo Alto, CA  94304-1043
Telephone:     +1.650.856.6500

5    Facsimile:     +1.650.843.8777

6    SQUIRE, SANDERS & DEMPSEY L.L.P.
Nathan Lane III (State Bar # 50961)

7    nlane@ssd.com
One Maritime Plaza, Third Floor

8    San Francisco, CA  94111
Telephone:     +1.415.954.0200

9    Facsimile:     +1.415.393.9887

10    Attorneys for Defendants
SEYOUNG KIM and INQUADRON, INC.

11

12

13                        UNITED STATES DISTRICT COURT

14                       NORTHERN DISTRICT OF CALIFORNIA

15                             SAN JOSE DIVISION

16    POSDATA CO., LTD., a South Korean
corporation,

17                                 

18                      Plaintiff,

19                      vs.

20    SEYOUNG KIM, an individual and
INQUADRON, INC., a California

21    corporation,

22                      Defendants.

Case No. C 07 2504 RMW (PVT)

**DECLARATION OF DR. SEYOUNG KIM IN SUPPORT OF DEFENDANTS SEYOUNG KIM AND INQUADRON, INC.'S OPPOSITION TO PLAINTIFF POSDATA CO. LTD'S *EX PARTE* APPLICATION FOR:**

**(1)   TEMPORARY RESTRAINING ORDER;**

**(2)   ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE; AND**

**(3)   ORDER PERMITTING EXPEDITED DISCOVERY**

Judge:   The Honorable Ronald M. Whyte
Date:     June 26, 2007
Time:     9:00 a.m.

23

24

25

26

27

28

SQUIRE, SANDERS &
DEMPSEY L.L.P.
600 Hansen Way
Palo Alto, CA  94304-1043

DECL. OF SEYOUNG KIM IN OPPOSITION TO TRO, OSC AND EXPEDITED DISCOVERY
Case No. C 07 2504 RMW (PVT)

1        I, SEYOUNG KIM, declare as follows:

2        1.        I am a defendant in this action and am the CEO of defendant InQuadron, Inc.

3   ("InQuadron").  I have personal knowledge of the facts set forth in this declaration and, if called

4   as a witness, could and would testify competently thereto.

5        2.        My education and job experience has been devoted to wired and wireless

6   telecommunications technology.  Among other degrees, I have a Ph.D. in electrical engineering

7   from Penn State University.

8        3.        I was working at Lucent in 2004 when recruited to join Posdata Co., Ltd.

9   ("Posdata").  Posdata hired me to assemble and then lead a team of engineers in San Jose, called

10  "Lab 1," to develop a channel card, one part of Posdata's planned "WiBro" base station.  A

11  channel card is somewhat analogous to the mother board of a personal computer; the Posdata

12  WiBro channel card consisted of a printed circuit board ("PCB"), a modem comprised of field-

13  programmable gate arrays ("FPGAs"), memory, an off-the-shelf CPU and complimentary PCB

14  devices, and an in/out ("I/O") interface.  A different team of engineers in Korea, in "Lab 3," was

15  charged with creating a new, cheaper modem for the mobile station (user terminal) by replacing

16  the FPGAs with a single application-specific integrated circuit (or "ASIC").  The Lab 3 effort

17  apparently never succeeded.

18       4.        "WiBro," which is shorthand for "wireless broadband," is a name given by a

19  consortium of Korean government and business interests, led by Samsung, to Korea's particular

20  implementation of IEEE 802.16e-2005, which is also called "Mobile WiMax."  Mobile WiMax is

21  intended to be a higher speed alternative to cellular networks (such as CDMA), allowing people

22  to communicate wirelessly while walking or riding in cars.  WiBro is intended to operate at a

23  different data rate than Mobile WiMax, at a different radio transmission bandwidth (8.75 MHz vs.

24  10 MHz) and different frequency (2.3 GHz vs. 2.5–3.5 GHz).

25       5.        In 2006, my Posdata team received a request for assistance from Sang Geun

26  Hwang ("Hwang"), an employee in Posdata's test lab.  Hwang's role was to performance test all

27  WiBro components.  He wanted to build a WiBro test base station in a compact form factor, but

28  could not get approval from his supervisor, Joon-Il Shin.  I thought the compact test system

SQUIRE, SANDERS &
DEMPSEY L.L.P.
600 Hansen Way
Palo Alto, CA  94304-1043

DECLARATION OF DR. SEYOUNG KIM IN OPPOSITION TO TRO, OSC AND EXPEDITED DISCOVERY
Case No. C 07 2504 RMW (PVT)

1    would be useful to Posdata.  Choon Shin, one of my team members, assisted Hwang.  The

2    resulting test system, which included a "turtle board," was fabricated for Posdata by a Korean

3    company called Axstone and sent to Choon Shin for testing.  The turtle board is not a "channel

4    card" capable of use in any WiBro system and lacked a full-featured modem and its associated

5    physical layer (or "PHY," which is the electro-mechanical interface for transmitting data to a

6    physical medium).  Indeed, the turtle board ultimately did not operate at all except to power up

7    the board's CPU.

8            6.      By June 2006, my team at Posdata successfully developed a channel card for

9    Posdata's WiBro base station and successfully passed an interoperability test ("IOT") conducted

10   in Spain.  That same month, I was offered and signed a two-year extension to my Posdata

11   employment agreement.  On or about June 27 or 28, 2006, however, I unexpectedly received a

12   cell phone call from the Posdata lab manager, Inchul Shin, who told me that although I had done

13   a good job, my position was being eliminated as part of a reorganization.  My new position was to

14   supervise three employees whose jobs were to attend various standards committee meetings and

15   summarize the proceedings.  In other words, this was a position with no real responsibility.

16          7.      On August 22, 2006, I attended by phone a meeting at which Posdata's president

17   reprimanded the lab manager, branding his reorganization a failure.  The next day, however, I was

18   suspended from all duties, without any explanation.  After being idled for almost two months, I

19   flew to Seoul, Korea, where I met with Posdata's president, Mr. Yoo, on October 26 or 27, 2006.

20   Yoo gave me the "choice" of staying in Korea and doing nothing or resigning.  With my family

21   living in the U.S., however, this was Posdata's way of firing me.  Yoo offered me a one-year

22   severance, terminating on June 17, 2007, the one-year anniversary of my contract extension.  The

23   oral severance agreement provided that my severance payments would be accelerated and paid all

24   at once that month.  Not wanting to incur the additional tax liability associated with the lump sum

25   payout, I asked if the severance pay could be paid on Posdata's normal pay periods instead.  Yoo

26   agreed.  I told Yoo at that time that I would likely look for other work in the WiMax area.  Since

27   that day (October 27, 2006), I understood that I no longer was an employee of Posdata.

28

SQUIRE, SANDERS &
DEMPSEY L.L.P.
600 Hansen Way
Palo Alto, CA  94304-1043

-2-
DECL. OF SEYOUNG KIM IN OPPOSITION TO TRO, OSC AND EXPEDITED DISCOVERY
Case No. C 07 2504 RMW (PVT)

8.      Beginning with my demotion in late June 2006, as part of the reorganization of Posdata's labs, I realized that my future with Posdata was probably limited and would not last much longer.  I thought about how to reassemble, within Posdata, the team with which I had successfully worked, but I eventually realized doing so would not happen.  I also thought about beginning a new company in which I could use my accumulated knowledge regarding wireless communication products, but I took no concrete steps to do so until after I was fired by Posdata on October 27, 2006.

9.      I eventually decided to create a company, InQuadron, that would design and eventually sell a WiMax modem design as a system on a chip, or "SoC."  I intended that the new company would design the modem to operate with all WiMax implementations, which would require operations over multiple frequencies and required a design and architecture that would be wholly different from the WiBro-only designs Posdata had developed.  This was intentional, because while I wanted to use my experience in the field of wireless communications, I had no desire to follow the same WiBro path as Posdata, which would limit any products to the Korean market and might invite claims by Posdata.

10.      InQuadron ceased its operations by about May 31, except for time necessary to defend against Posdata's claims.  The very existence of Posdata's action ― whether or not its allegations are true ― has rendered us incapable of raising money.

11.      As of the date it ceased operations, InQuadron had (and today still has) no product. We never finalized an architecture for the planned modem, and have no product design or set of specifications.

12.      Neither InQuadron nor I have, ever had or ever used or disclosed to anyone a Posdata channel card, "Posdata's DCCU technology," or any trade secrets that are comprised of "test methods and comparison data."  Neither InQuadron nor I have a any turtle board or card, nor do we have any diagrams, schematics or design documentation for such a board or card.  I have not used any claimed Posdata trade secrets or confidential information to solicit Posdata employees.

SQUIRE, SANDERS &
DEMPSEY L.L.P.
600 Hansen Way
Palo Alto, CA  94304-1043

-3-
DECL. OF SEYOUNG KIM IN OPPOSITION TO TRO, OSC AND EXPEDITED DISCOVERY
Case No. C 07 2504 RMW (PVT)

13.    I did not have any discussions with Posdata employees about their desire to work with me at InQuadron until after Posdata fired terminated me in October 2006.  I have never instructed anyone, directly or indirectly, to steal Posdata trade secrets or property, and I have not misappropriated any Posdata trade secrets or property myself.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on June 22, 2007.

_____
Seyoung Kim

SQUIRE, SANDERS &
DEMPSEY L.L.P.
600 Hansen Way
Palo Alto, CA  94304-1043