**E-FILED on** __6/27/07__

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| POSDATA CO. LTD., <br><br> Plaintiff, <br><br> v. <br><br> SEYOUNG KIM AND INQUADRON, INC., <br><br> Defendants. | No. C-07-02504 RMW <br><br> ORDER GRANTING IN PART APPLICATION FOR TEMPORARY RESTRAINING ORDER <br><br> **[Re Docket No. 10]** |

  Plaintiff Posdata Co. Ltd. ("Posdata") filed a complaint against Dr. Seyoung Kim ("Kim") and InQuadron, Inc. ("InQuadron") on May 10, 2007 alleging, among other things, theft of its trade secrets, conversion, and unfair competition. On May 18, 2007, plaintiff amended its complaint and then on June 21, 2007, filed an *ex parte* request for a temporary restraining order ("TRO"). Defendants opposed plaintiff's application on June 22, 2007. The court held a hearing on plaintiff's application on June 26, 2007. Having read the parties' papers and heard arguments of counsel, the court hereby grants in part plaintiff's TRO application conditioned upon the giving of security in the amount of $25,000 for the payment of such costs and damages as may be incurred or suffered by any defendant who is found to have been wrongfully restrained.

## I. BACKGROUND[1]

Posdata, a South Korean corporation, has developed mobile Worldwide Interoperability for Microwave Access ("WiMAX") technology since 2004. According to plaintiff, mobile WiMAX is a next-generation wireless telecommunications technology which provides users with broadband wireless Internet access while traveling at high speeds across large geographic areas and is superior to other mobile wireless technologies. "WiBro," which is short for wireless broadband, appears to be a variety of WiMAX and is the name given by the Korean government to Korea's particular implementation of IEEE 802.16e-2005.

The WiMAX technology developed by Posdata, its "FLYVO" system, enables users to have wireless mobile high-speed broadband access to the Internet while physically moving. Decl. of Ho Tae Han Supp. TRO ("Han Decl.") ¶ 5. The FLYVO system uses base stations, control servers, network and customer management systems, chipsets and end user mobile devices. *Id.* It receives radio frequency ("RF") transmissions utilizing base stations that link to mobile stations that then link to a service provider's core network. *Id.* Posdata has developed larger base stations designed for use in densely-populated areas and smaller Portable Radio Access base stations ("Pico RAS") for smaller, less-populated areas such as university campuses or buildings. *Id.* ¶ 10. One of the key components of the Posdata base station is the Digital Channel Card Unit ("DCCU"), which is designed to manage user traffic data by processing the communication signals under various RF environments in accordance with the WiMAX standard. *Id.* ¶ 6. According to plaintiff, the DCCU consists of several commercial processors and components placed on a Printed Circuit Board ("PCB"). *Id.* The architecture of the DCCU, specifically, the combination of the processors and components and their design and layout on the PCB, as well as the source code that controls the processors and components, allegedly took over three years for Posdata to develop. *Id.* ¶ 7. The technology has been subjected to a number of tests to determine interoperability with other mobile vendors. *Id.* ¶¶ 7-9. Plaintiff claims that the PCB layout, the source code and the interoperability test data are its trade secrets.

---

[1] The agreements and emails submitted by plaintiff are predominantly in Korean with English translations provided. These translations were produced by Song Ae Park and are attached to Park's declaration.

Both the larger and smaller base stations are allegedly designed using core technology developed by defendant Kim. Kim was hired by Posdata as Director for the America R&D Center in San Jose in 2004. From February 2005 to June 2006, Kim assembled and led Posdata's R&D Lab 1, which was considered the core technology development team for Posdata and was assigned to develop a channel card for Posdata's WiBro base station. Han Decl. ¶ 17; Decl. Seyoung Kim Supp. Opp'n TRO ("Kim Decl.") ¶¶ 2-3. In 2006, the America R&D Center engineering teams were reorganized, after which Kim led the System Engineering Lab. *Id.* ¶ 12.

At some time during 2006, Kim and his research team, R&D Lab 1, began developing a smaller base station which they referred to as the Modular Channel Card Assembly ("MCCA") or the "Turtle Card."[2] This research was allegedly performed contrary to Posdata's instruction and R&D Lab 1 was instead supposed to be working on enhancing Posdata's core technology. Based upon a forensic computer and data investigation conducted in February and March 2007, plaintiff believes that this Turtle Card utilized Posdata's PCB design and layout and the source code and other proprietary architecture of Posdata's. Plaintiff also believes that Kim and his team utilized the test and trial results from Posdata's various interoperability tests to develop the Turtle Card. Defendants, on the other hand, assert that the "Turtle Card" – which defendants contend was always a Posdata project rather than an unauthorized side project as plaintiff asserts – originated when Kim's team at Posdata received a request from an employee in Posdata's test lab to build a test base station in compact form. This base station was to include a "turtle board," which, according to defendants, is not a card at all because it did not have a modem or a layer for transmitting data to a physical medium ("PHY"). Kim Decl. ¶ 5.

According to plaintiff, Kim and some of his engineering team became confrontational and uncooperative with other Posdata engineering and marketing teams. *Id.* ¶ 17. On October 27, 2006, Kim entered into an agreement with Posdata providing that his employment would continue until June 17, 2007, along with certain benefits, during which time Posdata could restrict Kim's access to

---

[2] Defendants refer to the MCCA/Turtle Card as a "turtle board." For the sake of consistency, the court will refer to it as the "Turtle Card," recognizing that defendants have a different definition and nomenclature.

ORDER GRANTING IN PART APPLICATION FOR TEMPORARY RESTRAINING ORDER—No. C-07-02504 RMW MAG        3

1  "America Lab." *Id.* ¶ 19, Ex. 6.[3]  Kim contends that this was a constructive termination of his

2  employment and that his continued "employment" by Posdata was merely a mechanism for

3  fashioning Kim's severance payments to avoid the consequences of a lump sum salary payout.  Kim

4  Decl. ¶ 7.

5       Kim explains that after the constructive termination of his employment, he contemplated

6  forming a new company for the purpose of designing a WiMAX modem design as a system on a

7  chip to operate with all WiMAX implementations (i.e., with a different design and architecture from

8  the WiBro-only designs developed by Posdata).  Kim Decl. ¶ 9.  On November 6, 2006, a former

9  Posdata employee, Hwayong Joung, registered the domain name inquadron.com.  *Id.* ¶ 20.  On

10 December 4, 2006, an associate of Kim's, Kenneth Lee, filed articles of incorporation for InQuadron,

11 Inc. with the California Secretary of State.  *Id.*, Ex. 7.  In February 2007, amended articles of

12 incorporation were filed that listed Kim as the Chief Executive Officer and Lee as the Chief

13 Financial Officer and Secretary of InQuadron.  *Id.* ¶ 20, Ex. 8.

14      After Posdata became suspicious of Kim, the company retained an investigation firm, Kroll

15 Associates, in early 2007 to conduct a forensic investigation of the company-issued computer

16 systems used by Kim and other Posdata employees suspected of being involved with Kim.  Decl.

17 Renee Yoon Supp. TRO ("Yoon Decl.") ¶ 4-7.  The forensic investigation searched, *inter alia*, the

18 hard drives of and mail sent by the target employees.  *Id.*  Subsequent forensic investigation

19 discovered emails between Kim and Posdata employees expressing dissatisfaction with the June

20 2006 reorganization, *id.*, Exs. 4-5; emails that appear to transmit files containing data and test results

21 from Posdata to Kim's private email account, *id.*, Exs. 9-11; documents on Kim's computer system

22 listing an organization chart and salaries for twenty-four InQuadron employees for March through

23 December 2007, that included approximately twenty-two former and current Posdata employees and

24 plans for office expenses for that period; Han Decl. ¶ 25; Yoon Decl. Exs. 13-14; emails that

25 apparently discussed soliciting Posdata employees to join InQuadron and set up plans for that

---

[3] The separation agreement does not appear to provide, as plaintiff argues, that Kim would not disclose company trade secrets or that Kim was not to work on any Posdata projects.  However, plaintiff has also provided a confidentiality agreement signed by Kim on May 7, 2004 providing that he will not disclose any confidential or proprietary information learned during the course of employment to third parties or otherwise use it except in the course of employment.  *Id.*, Ex. 28.

company, Yoon Decl., Exs. 15-21; and emails that appear to be discussing investment financing and a relationship with Axstone Technology Co., Ltd. in Korea for the fabrication of a PCB, *id.*, Exs. 22-23.[4]

Plaintiff contends that InQuadron approached several companies to raise venture funds for InQuadron to develop the Turtle Card. Han Decl., Ex. 22. It also asserts that defendants have formed a business partnership with Axstone to manufacture the PCB for the Turtle Card. *Id.* ¶ 31, Exs. 22-23. As discussed further below, defendants dispute this allegation and claim that they do not have and did not take the Turtle Card from Posdata.

On May 18, 2007, the Seoul Central District Prosecutor's Office issued a news release that an investigation of Kim and his associates had revealed that they had attempted to leak the WiBro core technology. Decl. Brendan Dolan Supp. TRO ("Dolan Decl."), Ex. F. The release names seven principal offenders, defendant Kim, Choon Shin, Jong Kwan "Jeffrey" Choi, Hwayong Joung, Seongdong Park, Jongwook Lee, and Sang Guen Hwang. *Id.* The release states that Joung, Park, Lee, and Hwang were arrested by the Korean police and indicted for trade secret misappropriation and that the Korean authorities are seeking to bring Kim, Shin and Choi back to Korea to face criminal charges. *Id.* The story has since been in the Korean press. Decl. David Elkins Supp. Opp'n TRO ("Elkins Decl."), Exs. A-D; Supplemental Decl. Ho Tae Han Supp. TRO ("Han Supp. Decl."), Ex. 1.

## II. ANALYSIS

Plaintiff asks for a TRO temporarily enjoining defendants from using for research and development ("R&D") purposes or transmitting, *inter alia*: (1) copies or versions of the DCCU for the Pico RAS base station; (2) the Modular Channel Card Assembly ("MCCA") file for the Turtle Card; (3) MAC and PHY source code, PCB design and layout or prototypes of the DCCU, MCCA, Turtle Card or Pico RAS base station; (4) the "Modular RAS Implementation" file, the "Rev. O.4 DCCU Block Diagram" file (discussed below), test methods, comparison data, reports and results from various interoperability tests; and (5) any notes, files, diagrams that depict any of the above

---

[4] As many of the emails and documents provided by plaintiff are in Korean, plaintiff has provided a declaration of Song Ae Park, who translated these documents into English. As these documents are also referenced by plaintiff's fact declarants, the court omits citations to Park's declaration.

ORDER GRANTING IN PART APPLICATION FOR TEMPORARY RESTRAINING ORDER—No. C-07-02504 RMW MAG    5

United States District Court
For the Northern District of California

that were acquired as a result of Kim's or any other person's employment at Posdata. It additionally asks that defendants be enjoined from using any notes, files, data, correspondence, reports, designs, diagrams, test results, materials, documents, prototypes of the DCCU, MCCA, Turtle Card or Pico RAS, and any promotional material, for either R&D or commercial purposes.

Plaintiff also seeks to enjoin defendants from directly or indirectly soliciting plaintiff's employees, consultants and contractors from terminating their employment to work for defendants "or any entity that Defendants may own, be involved in, or affiliated with, that is within the WiMAX technology industry." Finally, it asks the court to enjoin the solicitation of business from plaintiff's clients, prospective clients or business contacts whose identity was obtained by Kim and other current and former employees of Posdata to the extent that the business is related to the DCCU, MCCA, Turtle Card or Pico RAS base station or that would involve disclosure of the same.

In addition, plaintiff asks for expedited discovery in advance of a preliminary injunction hearing and an order requiring defendants to preserve evidence that may be relevant to the case.

### A. Temporary Restraining Order

Although notice was given to defendants of plaintiff's application for the issuance of a temporary restraining order, defendants had limited time to respond. Therefore, the court requires that a showing of immediate and irreparable injury, loss or damage will result to plaintiff if the order is not issued. *See* Fed. R. Civ. P. 65(b).[5] Temporary restraining orders are governed by the same standard applicable to preliminary injunctions. *See Cal. Indep. Sys. Operator Corp. v. Reliant Energy Servs., Inc.*, 181 F. Supp. 2d 1111, 1126 (E.D. Cal. 2001) ("The standard for issuing a preliminary injunction is the same as the standard for issuing a temporary restraining order."); *cf.*

---

[5] Plaintiff contends that the usual requirement for a temporary restraining order that plaintiff demonstrate irreparable injury need not be met if reliance is placed on the injunctive relief provisions of the Uniform Trade Secret Act and California's Unfair Competition Law. Plaintiff cites *Trailer Train Co. v. State Bd. of Equalization*, 697 F.2d 860 (9th Cir. 1983), in which the Ninth Circuit affirmed a district court's grant of a preliminary injunction without a showing of the standard equitable principles for such relief, stating that "[t]he standard requirements for equitable relief need not be satisfied when an injunction is sought to prevent the violation of a federal statute which specifically provides for injunctive relief." *Id.* at 869. However, since the presumption of irreparable injury does not apply in trade secret cases (*see, e.g.*, *Campbell Soup v. Giles*, 47 F.3d 467, 470 (1st Cir. 1995)), for purposes of the instant request for a TRO, the court examines whether plaintiff has shown immediate and irreparable injury.

*Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).

A district court has discretion to grant or deny a request for preliminary injunctive relief. *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1156 (9th Cir. 2006). Under the traditional test for granting preliminary injunctive relief, the applicant must demonstrate: "(1) a likelihood of success on the merits; (2) a significant threat of irreparable injury; (3) that the balance of hardships favors the applicant; and (4) whether any public interest favors granting an injunction." *Raich v. Ashcroft*, 352 F.3d 1222, 1227 (9th Cir. 2003). Alternatively, "[t]he moving party must show either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in favor of the moving party." *Stuhlbarg*, 240 F.3d at 839-40 (9th Cir. 2001). These two formulations of the test "represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *LGS Architects, Inc. v. Concordia Homes of Nev.*, 434 F.3d 1150, 1155 (9th Cir. 2006).

**1. Likelihood of Success on the Merits**

**a. Trade Secrets**

Plaintiff seeks a TRO based largely on the merits of its trade secret misappropriation claim.[6] With regard to misappropriation of trade secrets, plaintiff needs to show that defendant misappropriated information that "[d]erives independent economic value, actual or potential, from not being generally known to the public . . . [and][i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d). Plaintiff asserts that its DCCU designs, test results and the Turtle Card are trade secrets. Defendants dispute this.

Plaintiff submits evidence that its DCCU designs derive economic value from not being known to the public in the form of declarations by its Senior Manager of the Business Support

---

[6] Plaintiff also asserts that it seeks a TRO based on its conversion and breach of duty of loyalty claims. It further contends that defendants' actions must be enjoined as unfair competition.

Team, Ho Tae Han.[7] Han states that the Posdata DCCU and WiMAX technology has taken three years and $100 million to develop and has been protected by confidentiality agreements with customers, vendors and Posdata employees, as well as internal security measures. *See* Han Decl. ¶¶ 7-9, 41-42. Plaintiff submits samples of these confidentiality agreements, along with the confidentiality agreement signed by Kim. *Id.*, Exs. 27-30. For purposes of the present application for TRO and defendants' arguments to the contrary, the court finds that plaintiff has submitted sufficient evidence to demonstrate that plaintiff's purported trade secrets derive economic value from not being known to the public and have been subject to reasonable efforts to preserve their secrecy.

### b.  **Alleged Misappropriation**

Defendants further contend that plaintiff has failed to establish any potential success on its claim that defendants misappropriated anything of value from Posdata. While plaintiff asserts that the Turtle Card was developed with Posdata technology but fabricated on behalf of InQuadron, defendants state that the Turtle Card was developed and fabricated for Posdata and that they did not take the Turtle Card from Posdata and do not have it in their possession.

Plaintiff presents evidence that Kim received information from Posdata employees regarding its DCCU's PCB design and layout, system interface, source code, and test methods and results. Han Decl. ¶¶ 6-9, 21-24, 31, 36, 29-40. In particular, plaintiff points out that an email string discussing InQuadron's relationship with Axstone mentions that a "PCB Gerber File" was ready and seems to indicate that it was necessary for Axstone to commence fabrication of the PCB InQuadron needed. *Id.*, Ex. 23. Plaintiff contends that this "PCB Gerber File" may be indicative of "MCCA PCB fab. Gerber" or the "MCCA REV.C GERBER DATA" (MCCA-C-3-GBR-NOP.zip) files that were sent to Kim by Posdata employee Choon Shin on February 20, 2007 and March 2, 2007, respectively. *See id.*, Ex. 11 (in which Shin states on February 20, 2007, "Gerber Data for the MCCA (Turtle Channel Card) for the production fo PCB, Gerber Data is prepared."). Because the

---

[7] Defendants assert that Han is not competent to testify as to the value of the purported trade secrets at issue because his roles at Posdata (his present role and past roles as Team Manager in the Investment Department, Manager of the Overseas Business Team in the System Integration Department, and Assistant Manager of the Corporate Planning Team) do not provide him with sufficient exposure to Posdata's development process. The court, however, finds that Han's declaration regarding the value of the purported trade secret may be considered.

ORDER GRANTING IN PART APPLICATION FOR TEMPORARY RESTRAINING ORDER—No. C-07-02504 RMW MAG
8

forensic investigation did not recover the files attached to the emails, only the contents of the email, plaintiff cannot be certain of the correlation between the "PCB Gerber File" and any data belonging to Posdata, but posits that the PCB to be fabricated by Axstone for InQuadron is likely to be related to the data forwarded from Shin to Kim. Plaintiff supports this proposition by the fact that subsequent investigation by the Korean Prosecutor's Office revealed that Axstone was in possession of a file that had an identical name to the "MCCA REV.C GERBER DATA" (MCCA-C-3-GBR-NOP.zip) file forwarded from Shin to Kim in March 2007. Decl. Seokhwan Choi Supp. TRO ("Choi Decl.") ¶ 6.

Plaintiff also contends that it discovered on Shin's external storage drive a file named "RAS-portable-111306-12.doc" which contained a document entitled "Modular RAS Implementation" and that showed Posdata's PCB design. Han Decl. ¶ 24, Ex. 12; Choi Decl. ¶ 7, Ex. 12. It also discovered a file named "MCCA-mentor-2-orcad.pdf" which contains 64 pages of schematic design plans for Posdata's DCCU which had been stored on Posdata's network. The file on Shin's computer was identical to Posdata's version except that Shin's version had redlined through the diagram name at the top of the page and substituted "MCCA." Han Decl. ¶ 40, Ex. 26. A senior engineer at Posdata, Seokhwan Choi, asserts that the "Modular RAS Implementation" shows the same hardware architecture as Posdata's DCCU. Choi Decl. ¶ 7. Plaintiff argues that the appearance of this file on Choi's hard drive evidences trade secret misappropriation because all confidential documents were stored on a central secure system and employees were prohibited from keeping separate copies of such information. Defendants assert that the appearance on the external drive does not in any way implicate the misappropriation of trade secrets. It is unclear how the external drive was returned to Posdata – plaintiff seems to assert it was confiscated by the Korean police while defendants assume it must have been returned to Posdata at the end of Shin's employment. The court is unable to assess the import of the appearance of this file on Shin's hard drive.

Defendants contend that they do not have the Turtle Card in their possession and that, because the Turtle Card was developed by Posdata for Posdata, any similarities between the Turtle Card and the DCCU do not suggest wrongdoing by defendants. Specifically, defendants contend that the Turtle Card was developed as a Posdata project, that it was fabricated by Axstone for

1  Posdata and sent to Shin (who was Kim's team member) for testing. Kim Decl. ¶ 5. Even assuming
2  this is true, there appears to be sufficient similarity between the file name of the documents that
3  were sent to Kim that may have been developed at Posdata and the "PCB Gerber File" discussed in
4  the email regarding Axstone to conclude that the Axstone/InQuadron relationship may have
5  involved information developed at Posdata. Further, the fact that Axstone appears to be in
6  possession of the "MCCA REV.C GERBER DATA" (MCCA-C-3-GBR-NOP.zip) file indicates that
7  defendants may have transmitted this data in furtherance of their attempts to fabricate the Turtle
8  Card for InQuadron. Finally, at the hearing on the matter, plaintiff presented an email from Kim
9  sent in September 2006 (before Kim's separation agreement with Posdata), that appears to indicate
10 that he planned on financing the fabrication of the Turtle Card "secretly out of my pocket." Han
11 Supp. Decl., Ex. 2. Defendants legitimately assert that they have not had an opportunity to review
12 the translation from Korean of the contents of this email and that this email may have referred to
13 paying for the fabrication out of Kim's Posdata budget rather than his own pocket. Nevertheless, the
14 court finds that this email lends further support to plaintiff's contention that defendants
15 misappropriated trade secrets for the creation of the Turtle Card, which, based upon evidence
16 presented to date, does not appear to have been for the benefit of Posdata.

17         In summary, the court finds that on the evidence presented plaintiff has raised serious
18 questions as to the merits of its trade secret misappropriation claim. It appears that plaintiff's DCCU
19 technology qualifies as a trade secret. It has actual or potential economic value from not being
20 generally known to the public and has been subject to reasonable measures to maintain its secrecy.
21 There are serious questions as to whether Kim received, retained and used information for the
22 development of the Turtle Card for InQuadron that relates to the DCCU.

23         Plaintiff also asserts that defendants are raiding its employees. This claim is dependent upon
24 the trade secret claim in the absence of some enforceable contractual provision prohibiting
25 solicitation of Posdata employees by defendants (which plaintiff has not provided). "Mere
26 solicitation of an employee, under no contract of employment, to leave and associate with a
27 competing firm is not illegal. . . . 'However, if either the defecting employee or the competitor . . . is
28 guilty of some concomitant, unconscionable conduct, the injured former employer has a cause of

**United States District Court**
For the Northern District of California

1  action to recover for the detriment he has thereby suffered.' Thus, if there is a 'misappropriation of
2  trade secrets as a concomitant of the solicitation,'. . . relief would be granted." *Hollingworth*
3  *Solderless Terminal Co. v. Turley*, 622 F.2d 1324, 1337-38 (9th Cir. 1980) (citations omitted).
4  Plaintiff has not, however, presented evidence that defendants are under any obligation not to solicit
5  employees of Posdata. If the misappropriation of trade secrets by defendants or their associates or
6  agents is enjoined, there does not appear to be any other basis to enjoin solicitation of Posdata
7  employees by defendants.

8      **2.**    **Threat of Irreparable Injury**

9      Plaintiff contends that its trade secrets are extremely valuable because it has invested over
10 $100 million in the DCCU and related technology and that its disclosure to potential competitors
11 would be devastating to it. Han Decl. ¶ 37-38, 41. Defendants have submitted articles from Korean
12 news sources and a television interview of the Posdata Executive Director in Korea, which discuss
13 the potential value of the WiBro technology that Posdata develops. But, as defendants point out,
14 these articles and interviews appear to assert that Posdata lost nothing of value in the attempted
15 misappropriation. *See* Decl. David Elkins, Ex. A ("Posdata added that the losses for the company
16 owing to the attempt to lead technology on this occasion are insignificant, and there will be no great
17 snag in the research and development that is under way."); *see id.*, Exs. B-D.[8]

18     Defendants also assert that the product contemplated by InQuadron is a modem that operates
19 with all WiMAX implementations rather than the WiBro-only designs Posdata develops. The
20 InQuadron product, according to defendants, will require a design and architecture totally different
21 from what was created by Kim and his team at Posdata. Kim Decl. ¶ 9. Additionally, defendants
22 state that Posdata has no product and as of May 31, 2007, defendants have suspended business

---

[8] The evidence submitted by defendants also includes a video interview of Posdata's Executive Director Joon Il Shin from a news broadcast of Korean station YTN in which Shin states that "if the technology had leaked out, our competitors would have been right at our heels . . . ." Elkins Decl., Exs. C-D. Defendants contend that this is an admission that the technology did not leak out. Plaintiff contends that the broadcast report did not include all of Shin's interview and that at the time he made the statement he did not know the extent of defendants' activities. Decl. Joon Il Shin Supp. TRO ¶ 3-4.

ORDER GRANTING IN PART APPLICATION FOR TEMPORARY RESTRAINING ORDER—No. C-07-02504 RMW
MAG    11

operations as a result of the present lawsuit. Kim Decl. ¶¶ 10-11. Accordingly, they contend that there is no immediate risk of irreparable harm.[9]

Although plaintiff's contention that it will suffer irreparable harm is somewhat diminished by evidence that it has stated to the Korean press that any misappropriation of trade secrets by defendants was foiled or of minor consequence, plaintiff has nevertheless demonstrated a significant risk of irreparable harm. It has presented a Technology Evaluation Report, produced by defendants, that appears to be a document prepared for presentation to potential investors. The Technology Evaluation Report seems to indicate that defendants have utilized Posdata information and technology developed by or at Posdata. Han Decl., Ex. 25 ("The current state of [InQuadron's] development of related technology is confirmed as below: . . . . The first test product of Channel Card, which will be used as Mobile WiMax base station equipment, has been completed and is being tested."). The Posdata technology at issue has been developed with substantial company resources and at considerable cost, thus development by InQuadron of this technology or its dissemination may result in irreparable harm to plaintiff.

### 3. Balance of Hardships

On the evidence before the court, the balance of hardships tips rather sharply in plaintiff's favor. Defendants claim that they do not need or use the Posdata technology. They have suspended business operations. Other than the negative impact of the lawsuit, they conceded at the hearing that the requested temporary relief pending a preliminary injunction hearing will not be a hardship.

On the other hand, Posdata has a genuine concern that defendants have taken and may disclose information and technology that is protected as a trade secret. Plaintiff's concerns seem justified even if InQuadron is not currently in operation because the company and its employees or those acting in concert with it may have the disputed information and technology in their possession.

---

[9] Defendants also assert that plaintiff delayed in requesting a TRO. Plaintiff filed its complaint on May 10, 2007, which it amended on May 18, 2007. Only on June 21, 2007 did plaintiff file its *ex parte* request for a TRO. Plaintiff explains that the delay between filing its complaint and requesting a TRO is the result of the slow process of translating the Korean documents and emails to English and also because the parties have been attempting to negotiate a stipulated judgment, but have thus far failed to agree on the terms. In light of plaintiff's explanation, this delay in requesting a TRO is not unreasonable.

1  Thus, assuming defendants have the disputed information in their possession, their use of it for R&D
2  or dissemination of it could cause plaintiff significant hardship.

### 4. Security Requirement

Fed. R. Civ. P. 65(c) requires that as a condition of the issuance of a TRO the applicant must give security in such sum as the court deems proper for payment of such costs and damages as may be incurred or suffered by any party found to have been wrongfully restrained. In view of the defendants' position that it does not need or use the alleged trade secrets, only relatively modest security is needed. The court sets the amount at $25,000 subject to modification on a showing of a larger potential amount needed to cover costs or damages if it is later shown that defendants were wrongfully restrained.

### 5. Conclusion

Plaintiff has raised serious questions as to defendants' alleged misappropriation of trade secrets. Plaintiff has also demonstrated the immediate potential of irreparable harm from the use of or dissemination by the defendants of the alleged trade secret information and technology. Finally, in light of InQuadron's denial of the use or need for the alleged trade secret information and technology for its business plans, the balance of hardship tips heavily in plaintiff's favor. Thus, the court will issue the TRO set forth below.

### B. Expedited Discovery Request[10]

Plaintiff asks the court to grant it expedited discovery "to further uncover Defendants' unlawful conduct prior to the preliminary injunction hearing." Defendants dispute plaintiff's need for discovery in advance of the preliminary injunction hearing and further object to the scope of the expedited discovery request. In the alternative, they argue that should the court be inclined to grant plaintiff's request, defendants should also be granted expedited discovery as to the matters set forth in plaintiff's declarations in support of the TRO application and should be given sufficient time to incorporate any such discovery into their response to plaintiff's motion for preliminary injunction. They also question the need for a preservation order as requested by plaintiff, asserting that they

---

[10] At the hearing, the court asked the parties what their preferences would be for a timeline for expedited discovery assuming both the issuance and non-issuance of a TRO. The parties agreed that approximately 2 months would be appropriate and acceptable in either scenario.

ORDER GRANTING IN PART APPLICATION FOR TEMPORARY RESTRAINING ORDER—No. C-07-02504 RMW
MAG                               13

1  have taken the steps required to place a litigation hold on relevant evidence and that, in any case, the
2  preservation order plaintiff requests binds only defendants when is should apply to both parties.
3        The court believes that expedited discovery is warranted in this case, but limits the amount of
4  discovery pending a hearing on a preliminary injunction. Unless otherwise agreed, each party may
5  serve a narrowly tailored document request, send one set of not more than 15 interrogatories and
6  take five depositions not to exceed a total of thirty-five hours in length. The parties shall have 14
7  days to respond to the document requests and interrogatories. Witnesses under the control of a party
8  are to be produced in California upon 10 days notice. The parties are both to preserve all evidence
9  potentially relevant to a claim or defense.

## III. ORDER

11  For the foregoing reasons, plaintiff's application for temporary restraining order, order to
12  show cause and expedited discovery is GRANTED in part as follows:
13  1. Defendants Kim and InQuadron and all those acting in concert or participation with them and
14      having knowledge of this order, including but not limited to their agents, representatives,
15      partners, employees, and attorneys, are temporarily enjoined and restrained from engaging in
16      or performing any of the following acts:
17      a. Using for any research or development purposes: copies or versions of the Digital
18          Channel Card Unit ("DCCU") for the Pico RAS base station; the Modular Channel
19          Card Assembly ("MCCA") file for the Turtle Card base station; MAC and PHY
20          source code, printed circuit board ("PCB") design and layout, prototypes of the
21          DCCU and MCCA or Turtle Card and/or Pico RAS base stations; the "Modular RAS
22          Implementation" file, the "Rev. O.4 DCCU Block Diagram" file, test methods,
23          comparison data, Plugfest Reports, results of the trial runs from NTT DoCoMo, and
24          interoperability test data on the communication between Posdata's RAS, GCT mobile
25          station chip or any WiMAX technology; notes, files and diagrams that depict, reveal,
26          or demonstrate how the processors and components, Posdata's PCB design and
27          layout, and Posdata's software and source code create an architecture for interface

*United States District Court*
*For the Northern District of California*

    between hardware and software that was acquired as a result of Kim's or any other person's employment or association with Posdata;

  b. Using for any research or development purposes or any commercial purposes: any and all notes, files, data, correspondence, reports, designs, diagrams, test results, materials, documents, prototypes of the DCCU, MCCA, Pico RAS or the Turtle Card, and any promotional/development/marketing materials that pertain to the property identified in paragraph 1.a above;

  c. Disclosing, copying or transmitting any property identified in paragraphs 1.a and 1.b above.

2. The parties shall be permitted to conduct expedited discovery as set forth above. Unless otherwise agreed by the parties, the cutoff for such expedited discovery shall be September 7, 2007.

3. The court shall hear plaintiff's motion for a preliminary injunction on Friday, September 28, 2007. Plaintiff shall file any supplemental moving papers by August 17, 2007. Defendants shall file an opposition to plaintiff's motion by September 7, 2007. Plaintiff shall file its reply by September 14, 2007. The court will not hear testimony of witnesses at the hearing absent an application submitted no later than September 21, 2007 and approved by the court.

4. As a condition of the temporary restraining order, plaintiff is ordered to post a bond in the amount of $25,000 to secure payment of any damages sustained by defendants if they are later found to have been wrongfully enjoined.

ISSUED ON:   6/27/07   at   10:20 a.m.

*Ronald M. Whyte*
RONALD M. WHYTE
United States District Judge

ORDER GRANTING IN PART APPLICATION FOR TEMPORARY RESTRAINING ORDER—No. C-07-02504 RMW
MAG      15

**Notice of this document has been electronically sent to:**

**Counsel for Plaintiff:**

Brendan Dolan            bdolan@morganlewis.com
Steven John Garrett      steven.garrett@morganlewis.com
L. Julius M. Turman      jturman@morganlewis.com

**Counsel for Defendants:**

David S. Elkins              delkins@ssd.com
Nathan Lane , III            nlane@ssd.com
Allison Elizabeth Pitigoi    apitigoi@ssd.com,krose@ssd.com

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

**Dated:** _____6/27/07_____          _____SPT_____
                                              **Chambers of Judge Whyte**