# EXHIBIT G

Morgan, Lewis & Bockius LLP
One Market, Spear Street Tower
San Francisco CA 94105-1126
Tel. 415.442.1000
Fax: 415.442.1001
www.morganlewis.com

# Morgan Lewis
### COUNSELORS AT LAW

**Steven J. Garrett**
Associate
415.442.1194

November 21, 2007

**VIA U.S. MAIL & FACSIMILE**

David S. Elkins, Esq.
Squire Sanders & Dempsey LLP
600 Hansen Way Ste 100
Palo Alto, California 94304-1043

Re:     Posdata v. Kim

Dear Mr. Elkins:

We write to meet and confer regarding InQuadron's responses to Plaintiff's Written Deposition Questions Pursuant to Federal Rule of Civil Procedure 30(b)(6). As discussed, many of InQuadron's responses are inadequate, incomplete, insufficient in detail, and contradict evidence within Posdata's possession. Posdata is surprised and disappointed that some of the written responses are not open, truthful, and candid in light of the evidence attached to Posdata's moving papers that contradict your clients' responses. As you can imagine, the responses are alarming because they raise doubts as to whether your clients are genuinely disclosing all information within their possession or knowledge. The purpose of the written questions was to enable Posdata to be satisfied that it had uncovered all of the improper conduct of Kim and InQuadron. The lack of depth and truthfulness provided by the responses has not enabled Posdata to reach such a conclusion. We urge your clients to be forthright in providing complete and meaningful responses so that Posdata feels comfortable in proceeding with any settlement.

We understand from our conference call that Defendants have segregated all notes, files, data, correspondence, reports, test results, materials, documents, prototypes, and any promotional or marketing materials that are possibly related to Posdata's WiMAX, WiBro, or FLYVO technology. We request that you send these documents as well as all the documents referred to in InQuadron's written responses to us as soon as possible so that we may review them.

We ask your clients to review all of their responses, including but not limited, to the following:

1.  In response to **Question 10**, please elaborate in detail how InQuadron's anticipated

San Francisco  Philadelphia  Washington  New York  Los Angeles  Miami  Pittsburgh  Princeton  Chicago  Minneapolis
Palo Alto  Dallas  Houston  Harrisburg  Irvine  Boston  London  Paris  Brussels  Frankfurt  Beijing  Tokyo

1-SF/7622312.2

David S. Elkins, Esq.
November 21, 2007
Page 2



Morgan Lewis
C O U N S E L O R S   A T   L A W

business or business products or potential products, and/or services or potential services are related to WiMAX but not WiBro. In addition, specifically address: (1) how InQuadron's business, etc. is different from Posdata's plans, business, products or potential products, and/or services or potential services; and (2) how InQuadron can enter the WiMAX or WiBro marketplace without utilizing Posdata technology.

- With respect to **Question 10a**, please provide an explicit description of InQuadron's *past* (i.e. prior the filing of this lawsuit) plans, business, products or potential products, and/or services or potential services than the "Development of WiMAX (non-WiBro) basestation core technology that would lead to the development of a WiMAX basestation baseband modem ASIC for the US market."

- With respect to **Question 10b**, please provide a much more explicit description of InQuadron's *current and future* plans, business, products or potential products, and/or services or potential services. Please also explain how their current and future plans, etc. differ from their past plans, etc.

- InQuadron's response to **Question 10c** that it "has not developed any existing products or potential products to date" is simply not true based on the evidence within our possession. For instance, correspondence between Seyoung Kim and Kenneth Lee dated March 18 and 19, 2007 shows that InQuadron was developing and manufacturing a product referred to as "a first prototype," "test board," "working demo board," and the "new Channel Card PCB." *See* Exhibit 6 to the Supplemental Declaration of Ho Tae Han in Support of Posdata's Ex Parte Application. Please clarify whether the board was in fact an InQuadron product or if the board was indeed Posdata property that was being misappropriated for the benefit of InQuadron. Please provide a detailed candid response to these questions.

- For the **remaining subparts of Question 10**, please supplement the responses with more substantive answers than have been provided.

2. We also request that InQuadron provide clarification and greater detail with respect to its answer to **Question 12**. InQuadron responds to **Question 12b** that it "did not commence material substantive research and development work in either the U.S. or Korea before PosData's legal demands and ultimately the onset of this litigation prevented such work from moving forward." InQuadron similarly responds to **Question 12e** that "[t]he work performed before legal issues forced a cessation of work was limited to product/technology conceptualization and development planning." Please describe any

David S. Elkins, Esq.
November 21, 2007
Page 3



Morgan Lewis
COUNSELORS AT LAW

*non-material substantive research and development work* that InQuadron has conducted related to the WiMAX or WiBro industry. In addition, please provide a detailed explanation reconciling these statements in light of the correspondence between Seyoung Kim and Kenneth Lee dated March 18 and 19, 2007 that shows InQuadron was either developing and manufacturing a product or misappropriating Posdata's technology. *See* Exhibit 6 to Mr. Han's Supplemental Declaration.

- InQuadron's response to **Question 12c** should not be limited to current employees. Please identify all InQuadron employees that have worked at each facility, the dates of their employment, their position, their responsibilities, their salary, and other compensation and benefits.

- With respect to **Question 12f**, several documents within our possession, including the correspondence cited above, demonstrates that InQuadron was working on fabricating and developing a "a first prototype," "test board," "working demo board," and the "new Channel Card PCB." Again, please provide a detailed and frank response to the question.

- For **Question 12g through 12q**, please disclose any utilization of these technologies. Documents with Posdata clearly show that Defendants have some of these items within their possession. For instance, Kim received two emails with attached files named "MCCA PCB fab. Gerber data" and "MCCA REV>C GERBER DATA" from Choon Shin on February 20 and March 2, 2007 which contains information regarding Posdata's printed circuit board ("PCB") design and layout. *See* Exhibit 11 to Mr. Han's Declaration. This Gerber data is precisely the type of information that InQuadron would need to fabricate and develop the "first prototype," "test board," "working demo board," and the "new Channel Card PCB" referred to by Kim and Lee in their March 18 and 19, 2007 correspondence. *See* Exhibit 6 to Mr. Han's Supplemental Declaration. This is only an example of InQuadron's deficient response. Please supplement the answers to these questions with frank and candid responses.

3. In response to **Questions 14 through 16**, InQuadron responded "no." However, Posdata has several documents within its possession contradicting these denials. For instance, Exhibits 11 and 23 of Mr. Han's Declaration and Exhibits 2 through 6 of Mr. Han's Supplemental Declaration show that Kim and InQuadron outsourced the manufacturing and research and development of WiMAX and/or WiBro technology. Please amend these responses accordingly.

4. Seyoung Kim indicates in **Question 21** that he intends "to continue employment with

David S. Elkins, Esq.
November 21, 2007
Page 4


Morgan Lewis
COUNSELORS AT LAW

InQuadron in the same capacity and position with the same responsibilities." In response to **Questions 22 through 24**, Kim indicates he does not plan to operate within the WiMAX or WiBro industry. During our conference call you indicated that Kim and InQuadron may reenter the WiMAX industry in the very near future. Please reconcile these contradictory positions.

5. Please provide a frank and candid response to **Questions 25 and 26**. Although InQuadron claims it has not organized its workforce, we know this is untrue as evidenced by Exhibits 13 and 14 to Mr. Han's Declaration.

6. In response to **Questions 27 through 29**, InQuadron identifies a total of seven employees that worked for InQuadron. As for **Questions 30 and 31**, the list of the individuals contacted by InQuadron or Kim does not appear to be a complete list. A quick review of Exhibit 13 to Mr. Han's Declaration identifies 24 individuals employed by InQuadron. Please provide a frank and candid response to these questions.

7. InQuadron has provided incomplete responses to **Questions 32 through 35** because it only mentions three instances in which InQuadron came into possession of documents or information related to Posdata's WiMAX, WiBro or FLYVO technology. Although InQuadron refers to Posdata's moving papers for other instances, Posdata requires that InQuadron explicitly acknowledge which Exhibits are responsive to this Question. In addition, Posdata requests that InQuadron provide explicit detail for each instance that it has received information or documents related to Posdata's WiMAX, WiBro or FLYVO technology.

8. InQuadron has also failed to accurately answer **Questions 37 through 41** according to the documents already in our possession. For instance, in InQuadron has failed to acknowledge or describe its relationship with several individuals, including but not limited to, Kihong Bang, Axstone Technologies, Hoon Kin, or Mark Kelly, General Manager/CTO of Next Wave. *See* Exhibits 4 and 5 to Mr. Han's Supplemental Declaration and Exhibit 22 to Mr. Han's Declaration.

9. InQuadron's response to **Question 68** is incomplete in light of Kroll's forensic investigation which found that Kim used a software program called "Partition Magic" in an attempt to erase data stored on his computer. *See* Exhibit 33 to the Declaration of Renee Yoon in Support of Posdata's Ex Parte Application. Please update this response accordingly.

10. Posdata expects complete candor with respect to the financial status of InQuadron and Seyoung Kim especially since it is not currently seeking a monetary payment from them as part of a settlement. These questions are particularly relevant since InQuadron

David S. Elkins, Esq.
November 21, 2007
Page 5



claimed to be on the verge of bankruptcy and unable to pay any monetary settlement at
the Settlement Conference.

- InQuadron has failed to specify the amount of its total liabilities as of May 1,
  2007 as requested by **Question 70b**.

- InQuadron has also failed to disclose its current net worth as requested by
  **Question 71**.

- In response to **Question 81**, InQuadron states that it has no liabilities other than
  several leases, yet in **Question 71b** InQuadron claims to have liabilities of
  $150,000 or more. Please reconcile these two answers.

- Please list and explain in detail each and every liability for InQuadron requested
  by **Questions 81 and 82**.

11. InQuadron has also failed to identify and explain in detail its total expenses since its
inception as required by **Question 89**. Please provide a detailed breakdown of each
expense by month. Determining these expenses should not be too burdensome if
InQuadron and Kim were able to prepare an operating budget as shown in Exhibit 13 to
Mr. Han's Declaration.

12. InQuadron's responses to **Questions 94, 96, and 99** and their subparts are incomplete
based on the documents within Posdata's possession that show InQuadron, Axstone and
other entities have received a Turtle Card or "turtle board." The correspondence between
Seyoung Kim and Kenneth Lee dated March 18 and 19, 2007 shows that InQuadron was
developing and manufacturing a product referred to as "a first prototype," "test board,"
"working demo board," and the "new Channel Card PCB." *See* Exhibit 6 to the Mr.
Han's Supplemental Declaration and Exhibit 23 to Mr. Han's Declaration. Please explain
and reconcile InQuadron's response in light of this evidence. InQuadron should provide
very detailed responses. Although Defendants have identified Seyoung Kim, Seongdong
Park, and Hwayong Joung as people that have received a Turtle Card or "turtle board,"
Defendants have failed to provide any further detail regarding their receipt of this item as
requested by **Questions 94, 96, and 99**.

13. InQuadron should also reconsider its responses to **Questions 95, 97, 98, 100, 101, 105,
106, and 107**. Posdata is aware that Defendants have some of these items within their
possession. For example, Kim received two emails with attached files named "MCCA
PCB fab. Gerber data" and "MCCA REV>C GERBER DATA" from Choon Shin on
February 20 and March 2, 2007 which contains information regarding Posdata's printed
circuit board ("PCB") design and layout. *See* Exhibit 11 to Mr. Han's Declaration.

David S. Elkins, Esq.
November 21, 2007
Page 6



Please provide complete and detailed to responses.

14. As part of its response to **Questions 102 through 104**, InQuadron refers to Posdata's moving papers for instances in which Defendants have documents or information within their possession. Posdata requires that InQuadron explicitly acknowledge which Exhibits are responsive to each Question and Posdata asks that InQuadron describe each instance in detail and answer each subpart to the questions.

If you believe that it would be easier to follow up on these written questions through in-person depositions, please let us know. We do not believe that we can go forward with the settlement without this information. However, for the purpose of keeping things moving at this time, we are enclosing a draft of the Settlement Agreement and General Release and the Consent Decree. We retain the right, however, to modify or change the language in the Settlement Agreement and General Release or the Consent Decree based upon the truthfulness and substance of the responses we receive from your clients. We intend to inform the court of the status of our recent discussions and the issues raised by this letter.

Please provide verified updated responses to these written questions as soon as possible. If you have any questions, please give us a call.

Very truly yours,

**MORGAN, LEWIS & BOCKIUS LLP**

Steven J. Garrett

Enclosures

1-SF/7627712.2

1   BRENDAN DOLAN, State Bar No. 126732
L. JULIUS M. TURMAN, State Bar. No. 226126
2   STEVEN J. GARRETT, State Bar No. 221021
MORGAN, LEWIS & BOCKIUS LLP
3   One Market, Spear Street Tower
San Francisco, CA 94105-1126
4   Tel: 415.442.1000
Fax: 415.442.1001
5   E-mail: bdolan@morganlewis.com

6   Attorneys for Plaintiff
POSDATA CO., LTD.

7

8              UNITED STATES DISTRICT COURT

9             NORTHERN DISTRICT OF CALIFORNIA

10                SAN JOSE DIVISION

11

12   POSDATA CO., LTD., a South Korean     Case No. C 07 2504 RMW
corporation,
13                     **STIPULATED CONSENT DECREE AND**
          Plaintiff,         **JUDGMENT IN FAVOR OF POSDATA**
14                     **CO., LTD. AND AGAINST SEYOUNG KIM**
      vs.                **AND INQUADRON, INC.**
15
16   SEYOUNG KIM, an individual and
INQUADRON, INC., a California
17   corporation,

          Defendants.
18

19

20       WHEREAS, Plaintiff Posdata Co., Ltd. ("Plaintiff" or "Posdata") contends that Defendant

21   Seyoung Kim ("Kim") and other former and current employees of Posdata, acting in concert with

22   or in participation with Defendant Kim for the purpose of creating, forming and operating

23   Defendant InQuadron, Inc. ("InQuadron"), have engaged in unlawful conduct related to Posdata's

24   trade secrets, proprietary information, confidential information, intellectual property, tangible

25   property, and Posdata property;

26       WHEREAS, Plaintiff on May 10, 2007, filed and served a Complaint for Monetary

27   Damages and Injunctive Relief against Defendants Seyoung Kim ("Kim") and InQuadron, Inc.,

28   alleging nine causes of action against Defendants, including: (1) Misappropriation of Trade

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7592687.2           1             CONSENT DECREE
                                (C 07 2504 RMW)

1  Secrets; (2) Interference with Prospective Economic Advantage; (3) Interference with Existing

2  Economic Relations; (4) Breach of Contract; (5) Breach of Duty of Loyalty; (6) Interference with

3  Contract; (7) Unfair Competition, Cal. Bus. & Prof. Code § 17200 and Common Law; (8) Unjust

4  Enrichment; and (9) Constructive Trust;

5       WHEREAS, Plaintiff filed and served a First Amended Complaint on May 18, 2007,

6  adding a cause of action for Conversion;

7       WHEREAS, Plaintiff filed an Ex Parte Application for Temporary Restraining Order for

8  Order to Show Cause Why a Preliminary Injunction Should Not Issue and Order permitting

9  Expedited Discovery ("Ex Parte Application for TRO") on June 21, 2007;

10       WHEREAS, the Honorable Ronald M. Whyte of the United states District Court for the

11  Northern District of California, heard Plaintiff's Ex Parte Application for TRO on June 26, 2007,

12  and granted a temporary restraining order against Defendants Kim and InQuadron on June 27,

13  2007;

14       WHEREAS, the Parties attended an Early Settlement Conference with the Honorable

15  Patricia Trumbull of the United States District Court for the Northern District of California on

16  August 3, 2007;

17       WHEREAS, the Parties agree that Posdata's trade secrets, proprietary information,

18  confidential information, intellectual property and tangible property include, but are not limited

19  to:  Posdata's WiMAX technology, FLYVO system, copies or versions of the Digital Channel

20  Card Unit ("DCCU") for the Pico RAS base station; the Modular Channel Card Assembly

21  ("MCCA") file for the Turtle Card base station; MAC and PHY source code, printed circuit board

22  ("PCB") design and layout, prototypes of the DCCU or MCCA or Turtle Card and/or Pico RAS

23  base stations; the "Modular RAS Implementation" file, the "Rev. O.4 DCCU Block Diagram"

24  file, test methods, comparison data, Plugfest Reports, results of the trial runs from NTT DoCoMo,

25  and interoperability test data on the communication between Posdata's RAS, GCT mobile station

26  chip or any WiMAX technology; notes, files and diagrams that depict, reveal, or demonstrate the

27  processors and components used by Posdata, Posdata's PCB design and layout, and Posdata's

28  source code;

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7592687.2

2

CONSENT DECREE
(C 07 2504 RMW)

1    WHEREAS, Plaintiff and Defendants have agreed to a consent decree, including a

2    permanent injunction against Kim and InQuadron and all those acting in concert or participation

3    with any of them and a monetary remedy in the event of a violation of the injunction to alleviate

4    the need for further litigation of this matter; and

5    WHEREAS, the parties now agree as follows:

6    1.    Defendants Seyoung Kim, InQuadron, Inc., and all those acting in concert or

7    participation with them and having knowledge of this Consent Decree, including but not limited

8    to Kenneth Lee, Joonsug Chung, Hwayong Joung, Seong Dong Park, Jong Wook Lee, Hojun

9    Kim, Jongkwan "Jeffrey" Choi, Ranny Hong, Choon Shin, Woo Jin Jeon, Se Jin Lim, Hung

10   Seung Oh, Kang Min Lee, Yerang Hur, Jungnam Yoon, Kiyoung Kwak, Suck Chan Lee, Jin

11   Young Park, Kwang Seok Kim, Sang Geun Hwang, Seung Man Lee, Ji-Myung Oh, William Li,

12   Hoon Paek, Chan Park, Dongkyu Choi, and Defendants' agents, representatives, partners,

13   employees and attorneys, are enjoined and restrained from engaging in or performing any of the

14   following acts:

15   a.    Using for any purpose: copies or versions of the Digital Channel Card Unit

16   ("DCCU") for the Pico RAS base station; the Modular Channel Card Assembly ("MCCA") file

17   for the Turtle Card base station; MAC and PHY source code, printed circuit board ("PCB")

18   design and layout, prototypes of the DCCU or MCCA or Turtle Card and/or Pico RAS base

19   stations; the "Modular RAS Implementation" file, the "Rev. O.4 DCCU Block Diagram" file, test

20   methods, comparison data, Plugfest Reports, results of the trial runs from NTT DoCoMo, and

21   interoperability test data pertaining to Posdata's RAS, GCT mobile station chip or any WiMAX

22   technology; notes, files and diagrams that depict, reveal, or demonstrate the processors and

23   components used by Posdata, Posdata's PCB design and layout, and Posdata's source code; and

24   all information and documents regarding Posdata, its past or current employees, and any

25   technology developed in whole or in part by Posdata, that was acquired as a result of Defendant

26   Kim's or any other persons employment or association with Posdata.

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7592687.2

3

CONSENT DECREE
(C 07 2504 RMW)

b.    Using for any purposes: any and all notes, files, data, correspondence, reports, designs, diagrams, test results, materials, documents, prototypes of the DCCU, MCCA, Pico RAS or the Turtle Card, and any promotional or marketing materials that pertain thereto.

c.    Disclosing, copying or transmitting any information, documents or other property identified in paragraphs 1.a and 1.b above (collectively, "Protected Property").

d.    Directly or indirectly soliciting, orally or in writing, or otherwise encouraging the departure, resignation or other termination of employment, of any of Plaintiff's employees, independent contractors or consultants (collectively, "Plaintiff's Personnel"), to work for Defendants or any entity that Defendants may own, be involved in, or affiliated with, that is within the WiMAX technology industry, and for the purpose of having Plaintiff's Personnel utilize, disclose, or share any of the Protected Property with Defendants or any entity that Defendants may own, be involved in, or affiliated with.

e.    Directly or indirectly soliciting, orally or in writing, or otherwise encouraging Plaintiff's Personnel to disclose, copy or transmit any Protected Property.

2.    Defendants explicitly agree that within five (5) business days of the approval and entry of this Consent Decree by the Court, Defendants shall deliver to the attorneys of record of Posdata all notes, files, data, correspondence, reports, test results, materials, documents, prototypes, and any promotional, or marketing materials that pertain to or constitute the Protected Property.

3.    If within two (2) years following entry of this Consent Decree by the Court, Defendants plan to market, promote, commercialize, manufacture, transfer, or sell any intellectual property or tangible property or products related to the WiMAX industry, Posdata and the attorneys of record of Posdata shall receive no less than 120 days notice in writing and shall be afforded the opportunity for a jointly selected technical expert to thoroughly examine, test, analyze, review, or gather any necessary information from Defendants about products and/or the technology, intellectual property or tangible property to determine whether Defendants' proposed action to market, promote, commercialize, manufacture, transfer or sell such property or products utilized any Posdata technology, including the Protected Property. If the parties cannot agree on a

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7592687.2

4

CONSENT DECREE
(C 07 2504 RMW)

1    jointly selected technical expert, then Posdata shall have the right to select the technical expert to

2    thoroughly examine, test, analyze, review, or gather any necessary information from Defendants

3    about products and/or the technology, intellectual property or tangible property to determine

4    whether Defendants' proposed action to market, promote, commercialize, manufacture, transfer

5    or sell such property or products utilized any Posdata technology, including the Protected

6    Property.

7        4.    This Consent Decree is effective immediately upon the Court's approval and entry,

8    and shall continue in effect permanently, or until such other date as this Court may order in the

9    future.

10       5.    In the event that Defendants Seyoung Kim, InQuadron, Inc., or any person or

11   entity acting in concert or participation with either of them and having knowledge of this Consent

12   Decree or the Confidential Settlement Agreement and General Release executed by the Parties,

13   including but not limited to their agents, representatives, partners, employees and attorneys,

14   breaches paragraph 1, 2, or 3 above, then Plaintiff is entitled to an award of damages, pursuant to

15   this paragraph 5.

16       a.    Plaintiff may file a regularly noticed motion with this Court to enforce the

17   Consent Decree and/or the General Release and Settlement Agreement.

18       b.    If Plaintiff proves by clear and convincing evidence that Defendant

19   Seyoung Kim, InQuadron, Inc., or those acting in concert or participation with either of them, has

20   breached paragraph 1, 2, or 3 above, then the Court shall award damages to Plaintiff, and jointly

21   and severally against Defendants, for the total sum of Seven Hundred Fifty Thousand United

22   States Dollars ($750,000.00), plus its reasonable attorneys' fees and costs in connection with the

23   motion, including expert costs. This amount represents a negotiated compromise agreed upon by

24   the parties as part of their overall settlement of the Action, taking into account all the information

25   known to them at the time of execution of the Stipulated Consent Decree.

26       6.    Defendants waive any rights they have for a stay of execution, for requesting or

27   having a new trial or any right they may have to request or to have an appeal from judgment

28   entered as a result of this Consent Decree.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7592687.2

5

CONSENT DECREE
(C 07 2504 RMW)

7.    Each party is to bear its own costs, expenses and attorneys' fees with respect to this action, except as expressly provided herein or in the Confidential Settlement Agreement and General Release.

8.    The United States District Court Northern District of California shall retain jurisdiction over the parties and over the subject matter herein for the purposes of enforcing this Consent Decree and the Confidential Settlement Agreement, including the determination of whether Defendants, or anyone acting with or on their behalf, violated any term of the Consent Decree or the Confidential Settlement Agreement and General Release.

Dated:    November ___, 2007          MORGAN, LEWIS & BOCKIUS LLP


By _____
   Brendan Dolan
   Attorneys for Plaintiff POSDATA CO.,
   LTD.

Dated:    November ___, 2007          SQUIRE, SANDERS & DEMPSEY LLP


By _____
   David S. Elkins
   Attorneys for Defendants SEYOUNG KIM
   and INQUADRON, INC.


**IT IS SO ORDERED.**


Date:_____          _____
                              Hon. RONALD M. WHYTE
                              United States District Court Judge

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7592687.2          6          CONSENT DECREE
                                   (C 07 2504 RMW)

## CONFIDENTIAL SETTLEMENT AGREEMENT AND GENERAL RELEASE

This Confidential Settlement Agreement and General Release ("Agreement") is entered into by and between Plaintiff Posdata Co., Ltd. ("Plaintiff" or "Posdata") and Defendants Seyoung Kim ("Kim") and InQuadron, Inc. ("InQuadron") (Kim and InQuadron are collectively referred to as "Defendants"). Posdata, InQuadron and Kim are collectively referred to in this Agreement as "Parties," and each individually may be referred to as a "Party."

### RECITALS

WHEREAS, Posdata filed an action against Kim and InQuadron on May 10, 2007, encaptioned *Posdata Co., Ltd. v. Seyoung Kim and InQuadron, Inc.*, Case No. C 07 2504 RMW (hereafter referred to as the "Action"), now pending in the United States District Court for the Northern District of California (the "Court");

WHEREAS, Posdata alleged nine causes of action in the original complaint, namely: (1) Misappropriation of Trade Secrets; (2) Interference with Prospective Economic Advantage; (3) Interference with Existing Economic Relations; (4) Breach of Contract; (5) Breach of Duty of Loyalty; (6) Interference with Contract; (7) Unfair Competition, Cal. Bus. & Prof. Code § 17200 and Common Law; (8) Unjust Enrichment; and (9) Constructive Trust, and, by the first amended complaint, Posdata added a cause of action for Conversion;

WHEREAS, Posdata filed an Ex Parte Application for Temporary Restraining Order, for Order to Show Cause Why a Preliminary Injunction Should Not Issue and Order permitting Expedited Discovery ("Ex Parte Application for TRO") on June 21, 2007, and the Court, the Honorable Ronald M. Whyte presiding, granted a temporary restraining order against Kim and InQuadron on June 27, 2007; and

WHEREAS, to avoid the additional expenditure of time, money and resources attendant to resolving this matter by trial and to avoid the uncertainty of litigation, and with no admission or denial of the allegations in the Action by Kim and InQuadron, the Parties desire to compromise and resolve their dispute by agreement, including a Stipulated Consent Decree that provides for a permanent injunction against Kim and InQuadron and a monetary payment in the event of a breach of the injunction.

NOW, THEREFORE, in consideration of the mutual promises, obligations, and covenants set forth herein, and for other valuable consideration, the sufficiency and receipt of which is hereby acknowledged, the parties agree as follows:

1. **Mutual General Release.** Effective upon entry by the Court of the Stipulated Consent Decree pursuant to paragraph 3 of this Agreement, each of the Parties, on behalf of itself or himself and its or his representatives, attorneys, agents, partners, officers, shareholders, owners, investors, employees, independent contractors, affiliates, predecessors, successors, heirs, executors, beneficiaries and assigns, does hereby release and discharge each other parts, and its or his past and present representatives, attorneys, agents, partners, officers, shareholders, owners, investors, employees, independent contractors, affiliates, predecessors, successors, heirs, executors, beneficiaries and assigns, and each of them, from any and all claims of any kind, and

any and all demands, liabilities, statutory violations, actions, causes of action of every nature, character or description whatsoever, whether known or unknown, suspected or claimed. The releases do not extend to any claims that may arise out of the breach of this Agreement or the Stipulated Consent Decree by any Party, nor do they relieve the Parties of their obligations to perform and comply with the terms and conditions of this Agreement or the Stipulated Consent Decree.

2. <u>Waiver</u>. This Agreement is intended to be a full general release and final accord and satisfaction, extending to all claims of any nature that may exist, whether known or unknown, suspected or anticipated, or unsuspected or unanticipated. The Parties hereby expressly, voluntarily, and knowingly, waive, relinquish, and abandon each and every right, protection and benefit to which they would be entitled now or at any time hereafter under section 1542 of the California Civil Code, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
> WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT
> TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING
> THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE
> MATERIALLY AFFECTED HIS SETTLEMENT WITH THE
> DEBTOR.

3. <u>Stipulated Consent Decree</u>. Concurrent with signing this Agreement, the Parties will execute, the Stipulated Consent Decree, in the form attached to this Agreement as Exhibit A and incorporated herein by reference, providing for permanent injunctive relief and a monetary award in the amount of $750,000 in the event of breach of the injunction. This Agreement is conditioned upon the entry of the Stipulated Consent Decree by the Court. If the Court declines to approve and enter the Stipulated Consent Decree, then this Agreement will be null and void in its entirety.

4. <u>No Admission</u>. This Agreement is a compromise of disputed claims. Nothing contained in this Agreement shall be interpreted or construed to be an admission on the part of, or to the prejudice of any person or any Party.

5. <u>Confidentiality</u>. The terms of this Agreement are confidential, and the Parties agree that they will not reveal, discuss, publish or in any way communicate any of the terms of this Agreement to any person or entity except that each Party: (1) may disclose the terms of this Agreement as necessary, on a "need-to-know" basis only, for accounting, audit, insurance or tax purposes, or to investors or creditors, or for securing legal advice, or to officers, directors or senior management of the Parties on a need-to-know basis, so long as the disclosing Party advises the recipient of the obligation to maintain the information as confidential and the recipient agrees to maintain the information as confidential, or (2) may disclose the Agreement or its terms if required to do so pursuant to a subpoena, court order or order of any governmental agency, or by law, so long as the disclosing Party takes reasonable measures to maintain the information as confidential and provides all other Parties prompt notice, to the extent reasonably possible, prior to disclosure so that the other Parties, at their expense, may seek legal remedies to maintain the confidentiality of the information.

6. No Disparagement. For a period of four years, the Parties agree not to disparage each other, or Posdata's or InQuadron's past and present officers, directors or employees.

7. No Assignment. Each Party each represents and warrants that it or he has not heretofore assigned, transferred or hypothecated or purported to have assigned, transferred or hypothecated or will not in the future assign, transfer or hypothecate any debt, judgment, claim, liability, demand, action, cause of action, or any interest therein, based upon, or arising out of, or pertaining to, or concerning, or connected with any matter, facts, events, circumstances or things released herein.

8. Representations. Kim and InQuadron represent and warrant that the written answers they provided in response to written deposition questions, served on September 21 and November 21, 2007, are true and correct, and they acknowledge that Posdata relied on the information provided in those answers in determining whether and on what terms to settle its claims in the Action and enter into this Agreement. In the event of this representation and warranty is untrue, then Posdata's release of claims provided in paragraph 1 above, shall have no force and effect, and Kim and InQuadron shall waive any statute of limitations defense as to any such claims.

9. Binding Effect. The provisions of this Agreement will be binding upon and inure to the benefit of the heirs, executors, beneficiaries, successors and assigns of each of the Parties. The person signing this Agreement on behalf of each Party has the full authority to enter into this Agreement and to bind the Party to this Agreement.

10. Representation. Each Party represents and acknowledges that it or he conferred with, and has been represented by counsel of its or his own selection with respect to this Agreement, and all matters covered by or related to its subject. Each Party represents that it or he has read this Agreement, or has had it read or explained to it or him by counsel, has been fully advised with respect to all rights which are affected by this Agreement, and is voluntarily entering into this Agreement.

11. Attorneys' Fees. Each Party shall pay its or his own attorneys' fees, costs, and other expenses arising out of the Action and the settlement thereof, except as expressly provided herein.

12. Continuing Jurisdiction. Pursuant to the Stipulated Consent Decree to be approved and entered by the Court pursuant to paragraph 3, above, the Parties agree that the Court shall retain jurisdiction over the Parties and over the subject matter herein for the purposes of enforcing this Agreement and the Stipulated Consent Decree, and all claims arising out of or any motion to enforce this Agreement or the Stipulated Consent Decree shall be brought in the Court and each Party consents to ongoing personal jurisdiction with respect to such matters.

13. No Waiver. The waiver of any breach of this Agreement or of the Stipulated Consent Decree by any Party will not be a waiver of any other subsequent breach.

14. Entire Agreement / No Modification. This Agreement is the final written expression and the complete and exclusive statement of all the agreements, conditions, promises and covenants between and among the Parties with respect to the subject matter hereof. This

Agreement may not be altered, amended, or modified in any respect except by writing duly executed by all of the Parties, and specifically referring to this Agreement. This Agreement shall supersede and render null and void any and all prior agreements, implied, oral, or written, between the Parties.

15. <u>Mutual Drafting / Construction</u>. The terms of this Agreement have been freely negotiated by the Parties, and this Agreement shall not be construed against the drafter. Any presumption that uncertainties in a contract are interpreted against the party causing the uncertainty to exist, is hereby waived by all Parties. The headings are inserted for convenience only and do not define, describe or limit the scope or intent of this Agreement of any of its terms.

16. <u>Recitals and Exhibit</u>. The recitals and exhibit to this Agreement are incorporated as if fully set forth herein in this Agreement.

17. <u>California Law</u>. This Agreement is governed by the laws of the State of California, without regard or effect given to choice of law principles.

18. <u>Counterparts / Facsimile Signatures</u>. This document may be executed in counterparts which shall together constitute the agreement of the Parties. Signature pages transmitted via facsimile shall have the same force and effect as original signatures transmitted through the mail.

Dated: _____, 2007     POSDATA CO., LTD.

                                  By: _____

                                  Print Name: _____

                                  Title: _____


Dated: _____, 2007     INQUADRON, INC.

                                  By: _____

                                  Print Name: _____

                                  Title: _____

Dated: _____, 2007    SEYOUNG KIM

_____

BRENDAN DOLAN, State Bar No. 126732
L. JULIUS M. TURMAN, State Bar. No. 226126
STEVEN J. GARRETT, State Bar No. 221021
MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, CA 94105-1126
Tel: 415.442.1000
Fax: 415.442.1001
E-mail: bdolan@morganlewis.com

Attorneys for Plaintiff
POSDATA CO., LTD.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| POSDATA CO., LTD., a South Korean corporation,<br><br>Plaintiff,<br><br>vs.<br><br>SEYOUNG KIM, an individual and INQUADRON, INC., a California corporation,<br><br>Defendants. | Case No. C 07 2504 RMW<br><br>**NOTICE OF DEPOSITION OF INQUADRON, INC. UPON SUPPLEMENTAL WRITTEN QUESTIONS** |

**PLEASE TAKE NOTICE** that, pursuant to Rules 26, 30(b)(6) and 31 of the Federal Rules of Civil Procedure, the undersigned will take the deposition of Defendant InQuadron, Inc. ("InQuadron") upon written questions.

PLEASE TAKE FURTHER NOTICE that the matters on which examination of the person(s) designated by InQuadron are identified in Attachment A to this Notice of Deposition of InQuadron. As agreed upon by Plaintiff and Defendants and permitted by Rule 30(b)(6), the deposition will conducted upon Plaintiff's written questions and InQuadron will provide written responses. Each question identified in Attachment A shall be answered separately and fully in writing under oath and shall be verified under the penalty of perjury by Kenneth D. Lee or other

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7628677.1                          1                          DEPOSITION OF INQUADRON
(C 07 2504 RMW)

appropriate person(s) designated by InQuadron.  The verified written responses should be served

upon Plaintiff's counsel within 30 days after the service of this notice of deposition.

Dated:        November 21, 2007                    MORGAN, LEWIS & BOCKIUS LLP

                                                   By _____
                                                      Steven J. Garrett
                                                      Attorneys for Plaintiff POSDATA CO.,
                                                      LTD.

## ATTACHMENT A

Pursuant to Rules 26, 30(b)(6) and 31 of the Federal Rules of Civil Procedure, and subject to the parties' agreements in this action, Plaintiff Posdata Co., Ltd. ("Plaintiff") request Defendant InQuadron, Inc. ("InQuadron") answer the following written deposition questions, separately and fully, in writing under oath, within thirty days of service hereof.

## INSTRUCTIONS AND DEFINITIONS

These Instructions and Definitions are provided for purposes of facilitating discovery including without limitation narrowing the scope of the written questions. Nothing stated in these Instructions and Definitions, or in any Instructions or Definitions in which they are incorporated, shall be deemed an admission of any claim or defense, or any part thereof, nor shall they be deemed a waiver of any evidence or other argument that Plaintiff may make in support of claims or defenses, or any part thereto, made here or in any other proceeding.

1.      "InQuadron" means InQuadron, Inc., their predecessors and successors, parents, subsidiaries, divisions, affiliates, and other organizational or operating units of any of the foregoing, and its past and present directors, officers, employees, agents and representatives (including attorneys, accountants and consultants), and any other person acting on behalf of such entities.

2.      "Posdata" means Posdata Co., Ltd., their predecessors and successors, parents, subsidiaries, divisions, affiliates, and other organizational or operating units of any of the foregoing, and its past and present directors, officers, employees, agents and representatives (including attorneys, accountants and consultants), and any other person acting on behalf of such entities.

3.      The term "person" shall mean both natural persons and/or other business entities, associations, government agency or other organization recognizable at law and the "acts" of a person are defined to include the acts of directors, officers, owners, members, employees, agents or attorneys acting on the person's behalf.

4.      The term "document(s)" means the original and each non-identical copy of any written, printed, typed, recorded, computerized or electronic data, taped, graphic, or other matter,

1  in whatever form. whether in final or draft, including but not limited to all materials that

2  constitute "writings" or "recordings" within the meaning of Rule 1001 of the Federal Rules of

3  Evidence and all materials that constitute "documents" within the meaning of Rule 34 of the

4  Federal Rules of Civil Procedure. "Electronic data" includes without limitation all text files

5  (including word processing documents and presentations), spread sheets, electronic mail

6  documents (emails), databases, calendars, computer system activity logs, audit trails, data used

7  for electronic data interchange, Internet usage files, network access information, voicemail,

8  digitized audio, digital image files, video files (*e.g.*, data stored in MPEG, JPEG, GIF, TIFF, and

9  BMP formats) and any other information stored magnetically, optically or electronically, and data

10 stored on workstations, laptops, network servers, removable media, handheld devices, backup

11 tapes, hard disk drives, diskettes and other computer media such as magnetic tape, floppy disks,

12 memory sticks and recordable optical disks.  If documents are identified in lieu of answering an

13 interrogatory, identify the documents in sufficient detail to permit Plaintiff to locate and identify,

14 as readily as Defendants, the documents and portions therein from which the answer may be

15 ascertained.

16    5.    Any form of the terms "concerning" or "relating" shall mean referring to,

17 describing, evidencing, constituting, or otherwise discussing in any way the subject matter, or any

18 part thereof, identified in a request.

19    6.    The terms "communication" or "communications" shall mean any communication

20 regardless of the manner in which such communication took place, including but not limited to,

21 personal conversations, correspondence, electronic or computer mail (emails), telephone calls,

22 facsimile communications, or telegrams.

23    7.    The terms "and" and "or" shall be understood as either conjunctive or disjunctive

24 whichever is more inclusive in content.

25    8.    The terms "any" and "all" shall be considered to include "each and every."

26    9.    The singular form of a noun or pronoun shall be considered to include within its

27 meaning the plural form of a noun or pronoun so used, and vice versa.

28    10.    When asked to "identify" or describe the document, for each non-identical

document state (a) the date of the document, (b) the number of pages in the document, (c) the identity of all persons who prepared or signed a copy of the document, (d) the identity of all persons designated as addressees of the document, (e) the identity of all persons designated as copy recipients of any copy of the document, (f) the type of document (*e.g.* memorandum, pamphlet, or report), (g) the specific physical or electronic location where the document is stored or kept in the regular course of business and (h) the general subject matter of the document. If any responses to these questions refer to documents and things not in your possession, custody, or control, describe the circumstances under which you came to know about the disposition of the documents and things. If any responses to these questions refer to documents and things that are lost or destroyed, identify each lost or destroyed document and thing, as well as all files that contained them.

11.     When you are asked to identify a person or persons with knowledge of a given subject, contention, event or set of facts, please provide the person's first name, last name, place of employment (if known), last known address, email and telephone number.

12.     The term "things" has the broadest meaning prescribed in Rule 34, Fed. R. Civ. P., includes every kind of physical specimen or tangible item, other than a document, in your possession, custody or control.

13.     If you do not answer a question, or any part thereof, because of a claim of privilege or immunity, expressly set forth the specific privilege or immunity claimed, and describe the documents, communications, or things not produced or disclosed in a manner that would enable Posdata to assess the applicability of the privilege, including the following information:

(a)     the nature and subject matter of the document, communication, or thing;

(b)     the date the document, communication, or thing was acquired or came into existence;

(c)     the author;

(d)     all addresses, recipients, copyholders and other distributees;

(e)     the organization, if any, which each author, addressee, recipient,

1    copyholder or distributee was then connected to and his or her job title or description; and

2            (f)      if a document, the number of pages.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## WRITTEN QUESTIONS

1.     Describe how InQuadron's business or anticipated business, products or potential products, and/or services or potential services prior to May 1, 2007 was related to WiMAX technology but not WiBro technology?

     a.     Describe how InQuadron's business or anticipated business, products or potential products, and/or services or potential services prior to May 1, 2007 utilized Posdata's WiMAX, WiBro, or FLYVO technology, including but not limited to the Modular Channel Card Assembly ("MCCA") or Turtle Card or Turtle Board, Posdata's Digital Channel Card Unit ("DCCU") for the Pico RAS base station , Posdata's MAC and PHY source code, Posdata's printed circuit board ("PCB") design and layout, the DCCU or MCCA or Turtle Card or Turtle Board or Pico RAS base stations, the "Modular RAS Implementation" file, the "Rev. 0.4 DCCU Block Diagram" file, Posdata's Mobile Plugfest Reports, the NTT DoCoMo Reports, Posdata's IOT Reports, and Posdata's files or diagrams that depict, reveal, or demonstrate how processors and components, Posdata's PCB design and layout, and Posdata's software and source code create an architecture for interface between hardware and software?

     b.     Prior to May 1, 2007, describe how InQuadron's business or anticipated business, products or potential products, and/or services or potential services could compete in the WiMAX or WiBro marketplace or industry without utilizing any of Posdata's WiMAX, WiBro, or FLYVO technology, including but not limited to the Modular Channel Card Assembly ("MCCA") or Turtle Card or Turtle Board, Posdata's Digital Channel Card Unit ("DCCU") for the Pico RAS base station , Posdata's MAC and PHY source code, Posdata's printed circuit board ("PCB") design and layout, the DCCU or MCCA or Turtle Card or Turtle Board or Pico RAS base stations, the "Modular RAS Implementation" file, the "Rev. 0.4 DCCU Block Diagram" file, Posdata's Mobile Plugfest Reports, the NTT DoCoMo Reports, Posdata's IOT Reports, and Posdata's files or diagrams that depict, reveal, or demonstrate how processors and components, Posdata's PCB design and layout, and Posdata's software and source code create an architecture for interface between hardware and software?

c.    Prior to May 1, 2007, describe how InQuadron's "development of WiMAX (non-WiBro) basestation core technology that would lead to the development of a WiMAX basestation baseband modem ASIC for the US market" is possible without utilizing any of Posdata's WiMAX, WiBro, or FLYVO technology, including but not limited to the Modular Channel Card Assembly ("MCCA") or Turtle Card or Turtle Board, Posdata's Digital Channel Card Unit ("DCCU") for the Pico RAS base station , Posdata's MAC and PHY source code, Posdata's printed circuit board ("PCB") design and layout, the DCCU or MCCA or Turtle Card or Turtle Board or Pico RAS base stations, the "Modular RAS Implementation" file, the "Rev. 0.4 DCCU Block Diagram" file, Posdata's Mobile Plugfest Reports, the NTT DoCoMo Reports, Posdata's IOT Reports, and Posdata's files or diagrams that depict, reveal, or demonstrate how processors and components, Posdata's PCB design and layout, and Posdata's software and source code create an architecture for interface between hardware and software?

d.    Describe how InQuadron's business or anticipated business, products or potential products, and/or services or potential services prior to May 1, 2007 was different than any of Posdata's WiMAX, WiBro, or FLYVO technology, including but not limited to the Modular Channel Card Assembly ("MCCA") or Turtle Card or Turtle Board, Posdata's Digital Channel Card Unit ("DCCU") for the Pico RAS base station , Posdata's MAC and PHY source code, Posdata's printed circuit board ("PCB") design and layout, the DCCU or MCCA or Turtle Card or Turtle Board or Pico RAS base stations, the "Modular RAS Implementation" file, the "Rev. 0.4 DCCU Block Diagram" file, Posdata's Mobile Plugfest Reports, the NTT DoCoMo Reports, Posdata's IOT Reports, and Posdata's files or diagrams that depict, reveal, or demonstrate how processors and components, Posdata's PCB design and layout, and Posdata's software and source code create an architecture for interface between hardware and software?

2.    Describe how InQuadron's business or anticipated business, products or potential products, and/or services or potential services after May 1, 2007 was related to WiMAX technology but not WiBro technology?

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

a.     Describe how InQuadron's business or anticipated business, products or potential products, and/or services or potential services after May 1, 2007 utilized Posdata's WiMAX, WiBro, or FLYVO technology, including but not limited to the Modular Channel Card Assembly ("MCCA") or Turtle Card or Turtle Board, Posdata's Digital Channel Card Unit ("DCCU") for the Pico RAS base station, Posdata's MAC and PHY source code, Posdata's printed circuit board ("PCB") design and layout, the DCCU or MCCA or Turtle Card or Turtle Board or Pico RAS base stations, the "Modular RAS Implementation" file, the "Rev. 0.4 DCCU Block Diagram" file, Posdata's Mobile Plugfest Reports, the NTT DoCoMo Reports, Posdata's IOT Reports, and Posdata's files or diagrams that depict, reveal, or demonstrate how processors and components, Posdata's PCB design and layout, and Posdata's software and source code create an architecture for interface between hardware and software?

b.     After May 1, 2007, describe how InQuadron's business or anticipated business, products or potential products, and/or services or potential services could compete in the WiMAX or WiBro marketplace or industry without utilizing any of Posdata's WiMAX, WiBro, or FLYVO technology, including but not limited to the Modular Channel Card Assembly ("MCCA") or Turtle Card or Turtle Board, Posdata's Digital Channel Card Unit ("DCCU") for the Pico RAS base station, Posdata's MAC and PHY source code, Posdata's printed circuit board ("PCB") design and layout, the DCCU or MCCA or Turtle Card or Turtle Board or Pico RAS base stations, the "Modular RAS Implementation" file, the "Rev. 0.4 DCCU Block Diagram" file, Posdata's Mobile Plugfest Reports, the NTT DoCoMo Reports, Posdata's IOT Reports, and Posdata's files or diagrams that depict, reveal, or demonstrate how processors and components, Posdata's PCB design and layout, and Posdata's software and source code create an architecture for interface between hardware and software?

c.     After May 1, 2007, describe how InQuadron's "development of WiMAX (non-WiBro) basestation core technology that would lead to the development of a WiMAX basestation baseband modem ASIC for the US market" is possible without utilizing any of Posdata's WiMAX, WiBro, or FLYVO technology, including but not limited to the "Modular Channel Card Assembly ("MCCA") or Turtle Card or Turtle Board, Posdata's Digital Channel Card Unit ("DCCU") for the Pico RAS base station , Posdata's MAC and PHY source code, Posdata's printed circuit board ("PCB") design and layout, the DCCU or MCCA or Turtle Card or Turtle Board or Pico RAS base stations, the "Modular RAS Implementation" file, the "Rev. 0.4 DCCU Block Diagram" file, Posdata's Mobile Plugfest Reports, the NTT DoCoMo Reports, Posdata's IOT Reports, and Posdata's files or diagrams that depict, reveal, or demonstrate how processors and components, Posdata's PCB design and layout, and Posdata's software and source code create an architecture for interface between hardware and software?

d.     Describe how InQuadron's business or anticipated business, products or potential products, and/or services or potential services after May 1, 2007 was different than any of Posdata's WiMAX, WiBro, or FLYVO technology, including but not limited to the Modular Channel Card Assembly ("MCCA") or Turtle Card or Turtle Board, Posdata's Digital Channel Card Unit ("DCCU") for the Pico RAS base station , Posdata's MAC and PHY source code, Posdata's printed circuit board ("PCB") design and layout, the DCCU or MCCA or Turtle Card or Turtle Board or Pico RAS base stations, the "Modular RAS Implementation" file, the "Rev. 0.4 DCCU Block Diagram" file, Posdata's Mobile Plugfest Reports, the NTT DoCoMo Reports, Posdata's IOT Reports, and Posdata's files or diagrams that depict, reveal, or demonstrate how processors and components, Posdata's PCB design and layout, and Posdata's software and source code create an architecture for interface between hardware and software?

3.    Describe how InQuadron's business or anticipated business, products or potential products, and/or services or potential services for the next twelve months is related to WiMAX technology but not WiBro technology?

a.  Describe how InQuadron's business or anticipated business, products or potential products, and/or services or potential services for the next twelve months will utilize any of Posdata's WiMAX, WiBro, or FLYVO technology, including but not limited to the Modular Channel Card Assembly ("MCCA") or Turtle Card or Turtle Board, Posdata's Digital Channel Card Unit ("DCCU") for the Pico RAS base station , Posdata's MAC and PHY source code, Posdata's printed circuit board ("PCB") design and layout, the DCCU or MCCA or Turtle Card or Turtle Board or Pico RAS base stations, the "Modular RAS Implementation" file, the "Rev. 0.4 DCCU Block Diagram" file, Posdata's Mobile Plugfest Reports, the NTT DoCoMo Reports, Posdata's IOT Reports, and Posdata's files or diagrams that depict, reveal, or demonstrate how processors and components, Posdata's PCB design and layout, and Posdata's software and source code create an architecture for interface between hardware and software?

b.  Describe how InQuadron's business or anticipated business, products or potential products, and/or services or potential services for the next twelve months can compete in the WiMAX or WiBro marketplace or industry without utilizing any of Posdata's WiMAX, WiBro, or FLYVO technology, including but not limited to the Modular Channel Card Assembly ("MCCA") or Turtle Card or Turtle Board, Posdata's Digital Channel Card Unit ("DCCU") for the Pico RAS base station , Posdata's MAC and PHY source code, Posdata's printed circuit board ("PCB") design and layout, the DCCU or MCCA or Turtle Card or Turtle Board or Pico RAS base stations, the "Modular RAS Implementation" file, the "Rev. 0.4 DCCU Block Diagram" file, Posdata's Mobile Plugfest Reports, the NTT DoCoMo Reports, Posdata's IOT Reports, and Posdata's files or diagrams that depict, reveal, or demonstrate how processors and components, Posdata's PCB design and layout, and Posdata's software and source code create an architecture for interface between hardware and software?

c.   For the next twelve months, describe how InQuadron's "development of WiMAX (non-WiBro) basestation core technology that would lead to the development of a WiMAX basestation baseband modem ASIC for the US market" is possible without utilizing any of Posdata's WiMAX, WiBro, or FLYVO technology, including but not limited to the Modular Channel Card Assembly ("MCCA") or Turtle Card or Turtle Board, Posdata's Digital Channel Card Unit ("DCCU") for the Pico RAS base station , Posdata's MAC and PHY source code, Posdata's printed circuit board ("PCB") design and layout, the DCCU or MCCA or Turtle Card or Turtle Board or Pico RAS base stations, the "Modular RAS Implementation" file, the "Rev. 0.4 DCCU Block Diagram" file, Posdata's Mobile Plugfest Reports, the NTT DoCoMo Reports, Posdata's IOT Reports, and Posdata's files or diagrams that depict, reveal, or demonstrate how processors and components, Posdata's PCB design and layout, and Posdata's software and source code create an architecture for interface between hardware and software?

d.   Describe how InQuadron's business or anticipated business, products or potential products, and/or services or potential services for the next twelve months is different than any of Posdata's WiMAX, WiBro, or FLYVO technology, including but not limited to the Modular Channel Card Assembly ("MCCA") or Turtle Card or Turtle Board, Posdata's Digital Channel Card Unit ("DCCU") for the Pico RAS base station , Posdata's MAC and PHY source code, Posdata's printed circuit board ("PCB") design and layout, the DCCU or MCCA or Turtle Card or Turtle Board or Pico RAS base stations, the "Modular RAS Implementation" file, the "Rev. 0.4 DCCU Block Diagram" file, Posdata's Mobile Plugfest Reports, the NTT DoCoMo Reports, Posdata's IOT Reports, and Posdata's files or diagrams that depict, reveal, or demonstrate how processors and components, Posdata's PCB design and layout, and Posdata's software and source code create an architecture for interface between hardware and software?

4.   Has InQuadron or Seyoung Kim ever received, reviewed, discussed, or utilized technology related to Posdata's Digital Channel Card Unit ("DCCU") for the Pico RAS base station at any time?

(1)   If yes, describe in detail when InQuadron or Kim received, reviewed, discussed, or utilized the technology?

(2)   If yes, describe in detail how InQuadron or Kim received, reviewed, discussed, or utilized the technology?

5.   Has InQuadron or Seyoung Kim ever received, reviewed, discussed, or utilized technology related to Posdata's MAC and PHY source code at any time?

   (1)   If yes, describe in detail when InQuadron or Kim received, reviewed, discussed, or utilized the technology?

   (2)   If yes, describe in detail how InQuadron or Kim received, reviewed, discussed, or utilized the technology?

6.   Has InQuadron or Seyoung Kim ever received, reviewed, discussed, or utilized technology related to Posdata's printed circuit board ("PCB") design and layout at any time?

   (1)   If yes, describe in detail when InQuadron or Kim received, reviewed, discussed, or utilized the technology?

   (2)   If yes, describe in detail how InQuadron or Kim received, reviewed, discussed, or utilized the technology?

7.   Has InQuadron or Seyoung Kim ever received, reviewed, discussed, or utilized technology related to the DCCU or MCCA or Turtle Card or Turtle Board or Pico RAS base stations at any time?

   (1)   If yes, describe in detail when InQuadron or Kim received, reviewed, discussed, or utilized the technology?

   (2)   If yes, describe in detail how InQuadron or Kim received, reviewed, discussed, or utilized the technology?

8.   Has InQuadron or Seyoung Kim ever received, reviewed, discussed, or utilized technology related to the "Modular RAS Implementation" file at any time?

   (1)   If yes, describe in detail when InQuadron or Kim received, reviewed, discussed, or utilized the technology?

   (2)   If yes, describe in detail how InQuadron or Kim received, reviewed, discussed, or utilized the technology?

9.   Has InQuadron or Seyoung Kim ever received, reviewed, discussed, or utilized technology related to the "Rev. 0.4 DCCU Block Diagram" file at any time?

   (1)   If yes, describe in detail when InQuadron or Kim received, reviewed, discussed, or utilized the technology?

   (2)   If yes, describe in detail how InQuadron or Kim received, reviewed, discussed, or utilized the technology?

10.   Has InQuadron or Seyoung Kim ever received, reviewed, discussed, or
      utilized Posdata's Mobile Plugfest Reports at any time?

            (1)   If yes, describe in detail when InQuadron or Kim received,
                  reviewed, discussed, or utilized the technology?

            (2)   If yes, describe in detail how InQuadron or Kim received,
                  reviewed, discussed, or utilized the technology?

11.   Has InQuadron or Seyoung Kim ever received, reviewed, discussed, or
      utilized the NTT DoCoMo Reports at any time?

            (1)   If yes, describe in detail when InQuadron or Kim received,
                  reviewed, discussed, or utilized the technology?

            (2)   If yes, describe in detail how InQuadron or Kim received,
                  reviewed, discussed, or utilized the technology?

12.   Has InQuadron or Seyoung Kim ever received, reviewed, discussed, or
      utilized Posdata's IOT Reports at any time?

            (1)   If yes, describe in detail when InQuadron or Kim received,
                  reviewed, discussed, or utilized the technology?

            (2)   If yes, describe in detail how InQuadron or Kim received,
                  reviewed, discussed, or utilized the technology?

13.   Has InQuadron or Seyoung Kim ever received, reviewed, discussed, or
      utilized technology related to Posdata's files or diagrams that depict,
      reveal, or demonstrate how processors and components, Posdata's PCB
      design and layout, and Posdata's software and source code create an
      architecture for interface between hardware and software at any time?

            (1)   If yes, describe in detail when InQuadron or Kim received,
                  reviewed, discussed, or utilized the technology?

            (2)   If yes, describe in detail how InQuadron or Kim received,
                  reviewed, discussed, or utilized the technology?

14.   Has InQuadron or Seyoung Kim ever received, reviewed, discussed, or
      utilized any other Posdata WiMAX, WiBro or FLYVO technology at any
      time?

            (1)   If yes, describe in detail when InQuadron or Kim received,
                  reviewed, discussed, or utilized the technology?

            (2)   If yes, describe in detail how InQuadron or Kim received,
                  reviewed, discussed, or utilized the technology?

15. Has InQuadron ever contacted or been contacted by any other person or entity about manufacturing, outsourcing, researching, developing, producing, or fabricating InQuadron products or technology?

   a. If yes, please describe each task or project that was outsourced, provide the date(s) the manufacturing, outsourcing, researching, developing, producing, or fabricating occurred, the name of the individual or company the task or project was outsourced to, their compensation, address, and contact information.

16. Has InQuadron ever contacted or been contacted by any other person or entity about manufacturing, outsourcing, researching, developing, producing, or fabricating WiMAX or WiBro products or technology?

   a. If yes, please describe each task or project that was outsourced, provide the date(s) the manufacturing, outsourcing, researching, developing, producing, or fabricating occurred, the name of the individual or company the task or project was outsourced to, their compensation, address, and contact information.

17. What was Seyoung Kim's net worth as of May 1, 2007?

   a. What was the value of Seyoung Kim's total assets as of May 1, 2007?

   b. For each asset, please describe the asset, the cost of acquisition, the date of acquisition, its current value, and any realized gain or loss from holding the asset.

   c. What was the value of Seyoung Kim's total liabilities as of May 1, 2007?

   d. For each liability, please describe the liability, the date the liability was incurred, the amount of initial liability, the current liability if applicable, and any realized gain or loss incurred as a result of the liability

18. What is Seyoung Kim's current net worth?

   a. What is the value of Seyoung Kim's current total assets?

   b. For each asset, please describe the asset, the cost of acquisition, the date of acquisition, its current value, and any realized gain or loss from holding the asset.

   c. What is the value of Seyoung Kim's current total liabilities?

MORRISON, FOERSTER &
DE CASTRO LLP
ATTORNEYS AT LAW
SAN DIEGO

1-SF/7628677.1

15

DEPOSITION OF INQUADRON
(C 07 2504 RMW)

d.  For each liability, please describe the liability, the date the liability was incurred, the amount of initial liability, the current liability if applicable, and any realized gain or loss incurred as a result of the liability

19. Does Seyoung Kim currently own any real property?

    a.  If yes, for each property provide its address, describe the type of property it is, the date you purchased it, and how much he purchased it for.

20. Has Seyoung Kim sold any real property within the last ten years?

    a.  If yes, for each property provide its address, describe the type of property it is, the date Seyoung Kim purchased it, how much Seyoung Kim purchased it for, the date Seyoung Kim sold it, how much Seyoung Kim sold it for, and any realized gain or lost from the transaction.

21. Identify each and every cash equivalent asset solely or jointly in Seyoung Kim's name, including but not limited to cash, checking accounts, savings accounts, money market funds, certificates of deposit, or other cash reserve accounts.

    a.  For each asset, please describe the asset, the cost of acquisition, the date of acquisition, its current value, and any realized gain or loss from holding the asset.

    b.  For every checking, savings, or investment account solely or jointly in Seyoung Kim's name, please list the institution, account number, and the current asset balance of the account.

22. Identify each and every cash equivalent asset solely or jointly in Seyoung Kim's name, including but not limited to cash, checking accounts, savings accounts, money market funds, certificates of deposit, or other cash reserve accounts as of May 1, 2007.

    a.  For each asset, please describe the asset, the cost of acquisition, the date of acquisition, the date of divestment of the asset if applicable, its value as of May 1, 2007, and any realized gain or loss from holding the asset.

    b.  For every checking, savings, or investment account solely or jointly in Seyoung Kim's name, please list the institution, account number, and the asset balance of the account as of May 1, 2007.

23. Identify each and every other asset solely or jointly in Seyoung Kim's name, including but not limited to stocks, annuities, limited partnerships, business interests, bonds, trust deeds, or other assets.

1-SF-7028677.1

a.    For each asset, please describe the asset, the cost of acquisition, the date of acquisition, its current value, and any realized gain or loss from holding the asset.

24.    Identify each and every other asset solely or jointly in Seyoung Kim's name as of May 1, 2007, including but not limited to stocks, annuities, limited partnerships, business interests, bonds, trust deeds, or other assets.

a.    For each asset, please describe the asset, the cost of acquisition, the date of acquisition, the date of divestment of the asset if applicable, its value as of May 1, 2007, and any realized gain or loss from holding the asset.

25.    Identify each and every other asset solely or jointly in Seyoung Kim's name not listed above.

a.    For each asset, please describe the asset, the cost of acquisition, the date of acquisition, the date it was sold if applicable, its current value if applicable, and any realized gain or loss from holding or selling the asset.

26.    Identify each and every other asset solely or jointly in Seyoung Kim's name as of May 1, 2007 not listed above.

a.    For each asset, please describe the asset, the cost of acquisition, the date of acquisition, the date it was sold if applicable, its value as of May 1, 2007 if applicable, and any realized gain or loss from holding or selling the asset.

27.    Identify each and every liability solely or jointly in Seyoung Kim's name, including but not limited to mortgages, loans, debts, or other liabilities.

a.    For each liability, please describe the liability, the date the liability was incurred, the amount of initial liability, the current liability if applicable, and any realized gain or loss incurred as a result of the liability.

28.    Identify each and every liability solely or jointly in Seyoung Kim's name as of May 1, 2007, including but not limited to mortgages, loans, debts, or other liabilities.

a.    For each liability, please describe the liability, the date the liability was incurred, the amount of the liability as of May 1, 2007, the current liability if applicable, and any realized gain or loss incurred as a result of the liability.

29.    Identify each and every source of income or benefits Seyoung Kim has had since October 27, 2006.

a.    For each source of income derived from employment, please state the name of his employer, their address, the dates of his employment with them, his position with them, the responsibilities of his position, salary, the amount of income received, and other compensation benefits.

b.    For every other source of income or benefits, describe the nature and source of the income, the amount of income received and other benefits received.

30.    Identify and each every source of income or benefits Seyoung Kim is expected to receive during next twelve months.

a.    For each source of expected income derived from employment, please state the name of his employer, their address, the dates of his employment with them, his position with them, the responsibilities of his position, salary, the amount of income to be received, and other compensation benefits.

b.    For every other source of income or benefits, describe the nature and source of the income, the amount of income to be received and other benefits received.

31.    Has Seyoung Kim incurred any legal expenses, fees, and costs since October 27, 2006?

a.    If yes, list the total expenses, fees, and costs incurred during this time, describe the nature of the legal services received by Seyoung Kim, and the person or entity that has performed the legal work

18