

## Posdata v. Kim
## Case No. C 07-2504 RMW
## Settlement Conference, August 3, 2007

**Dolan:** And technically you can be able to do whatever _____ for the purposes of getting discussion 1 ___ and ____ A-C _____.

**Elkins:** I don't think that will be any problem.

**Judge:** So let's reiterate that we are now putting the settlement or proposed settlement, it's not yet finalized on the record, and the first three points are taken from Judge Whyte's injunction order to hear the restraining order, which is why, the order itself paragraphs 1-A, B and C, is that right?

**Dolan:** Yes, Your Honor.

**Judge:** And then the second point after those, would you reiterate that for the record?

**Dolan:** It would be a separate D paragraph 1, which will concern a prohibition on solicitation on PosData employees, typical to the defendants. And we just felt basically, while we are off the record for a minute, I think we're, we believe we can work out the terms of this, were drafting the main bridge. I really like . . .

**Elkins:** Correct me if I am wrong, but the language of 1-D, would mirror the language of 1-A, and 1-B exception will apply to the non-solicitation of PosData employees. And so it would include the same limitation as 1-A and 1-B.

**Judge:** Is that fair?

**Elkins/Dolan:** Yes.

**Dolan:** And then the, the next paragraph of the consent would be, the next paragraph of the consent decree the return of documents and data, and it would be similar in form to the first full paragraph on page 2 of the secondary order, which was provided to Mr. Elkins by me on I believe August, provided previously, whatever the time that complaint was filed in the case.

**Judge:** Using, possessing, duplicating, copying.

**Dolan:** Returning;

**Judge:** I don't see that, number 1 on page 6?

**Dolan:** No, the page is, the first full paragraph on page 2 of a document entitled Stipulated Order, which was prepared indirectly and provided to Mr. Elkins sometime in, I think in May.

**Judge:** Okay.

**EXHIBIT A**



**Dolan:** The next term of the consent order would be, the consent judgment would be a provision for some form of forensic review of future products, prototypes or developments on _____ Dr. Kim, with such provision being similar in form, but not identical to the last paragraph on page 2 of the aforementioned document, previously sent to Mr. Elkins. In most notable respect, it would be for a 5 year period rather than a 2 year period. I am sorry, for a 2 year period rather then a 5 year period. The ...

**Elkins:** If I may add, the forensic review would be performed by an expert, a forensic expert, or a technical expert with some experience in the field who would be mutually agreed to by the parties.

**Dolan:** The expert is under the consent judgment would be a provision by which the defendants would make available to PosData the ability to review the documents taken from the hard drives of Inquadron employees, agents and others affiliated with the company, and the email of those same persons. The next provision would be a mutual non-disparagement provision and a, some kind of an agreed statement, were going to disposition to the litigation. And ...

**Elkins:** The agreed statement would be the only statement capable of being made by either side regarding this litigation.

**Dolan:** Pending the finalization of the agreed statement the parties have agreed that except for informing their principals, in case of Mr. Hahn, the folks as his headquarters was in Korea. Except for informing the principals of the parties will not, reveal anything regarding the settlement or proposed settlement until the time at which the agreed statement is agreed to be agreed upon. The known provision, the parties have agreed that PosData may propound, take a deposition, a 30(b)(6) deposition by written questions, of Inquadron and that's one of the two contingencies to completion, that is one of the two of the contingencies on the finalization of the settlement, two or three contingencies. Parties have also agreed that they enter, in addition to a consent judgment, a written settlement agreement. There were contingencies appropriate release of claims. The, one of the contingencies that was, has been identified is that in the event that the criminal prosecutions in Korea result in an acquittal, or a judgment that a minor crime or misdemeanor has been committed and in the event thereafter that Mr, or Dr. Kim and Mr. Troy seek to have the charges against them dismissed in Korea, they will, PosData will not object of their effort to do so. That is a contingency upon which Mr. Han is going to have to consult with his principals to determine if that term is acceptable to them.

**Elkins:** I believe ___ that request

**Dolan:** We have agreed that as part of this whole settlement in terms of the dates, we have agreed on the, on the probing or injunction motion and that the terms of the settlement, make that the proposed settlement may actually will be completed by, I don't think we agreed to a specific date, I want to say September 30th, is that okay?

**Elkins:** I think we will try to do it by the end of September, perhaps if we could, if we think that the parties will do their best efforts to conclude this as rapidly as possible.



**Dolan:** In no event will PosData be bound to be in bridge of any obligation by failing to conclude it before the conclusion of the criminal proceedings in Korea. And that I believe is everything. Oh! Thanks…Also as part of the consent judgment, there would be a secondary judgment in the amount of $750,000 against the defendants, which can not be executed upon by plaintiff absent a showing by clear convincing evidence of a breach of one of the provisions of the consent judgment. And the consent judgment will be mutually agreed upon settlement agreement, with such proof of such breach made by clear convincing evidence. And finally, I think that is that, for purposes of concluding the settlement, we ask that Your Honor retain jurisdiction over this matter and that if need be, if we could schedule either a phone consultation or in-person time with you.

**Judge:** And the court will if you have any problems that come up, just get in touch with us we will get back into session.

**Elkins:** One detail I wanted to add, was that the $30(b)(6)$ deposition that if the answers, in regards to the questions, if the answers would also be sworn, the answers would be sworn by every person and any answers will, of course, Inquadron comply with all of its obligations and fulfillments for the $30(b)(6)$ in answering its questions.

**Judge:** Is there anything that needs to be put on the record? This has been a long day for all of you.

**Elkins:** So hungry I can't think.

**Judge:** So hungry he can not think. Should we put on the record that judge lets nobody eat? No body sleep? A few people were allowed to go to the bathroom but that's about it? So first of all, thank you very much for your hard work. Don't let anything start simmering without getting back here because it is a complicated agreement with a lot of interesting and complex bullet points basically. So get back in here and lets get together before everything falls apart. And I thank you for your hard work.

**Dolan/Elkins:** Thank you, Your Honor.

**Judge:** And I am sorry that I didn't let anyone eat! Thank you and I will let Judge Whyte know.

**Dolan:** Are we still on record?

**Judge:** Yes.

**Elkins:** Your Honor, I think we better request that the transcript of this settlement be kept under seal, maintained under seal.

**Judge:** We actually don't transcribe it, because it goes on a disc, so we will keep the disc under seal and if you want to transcribe it then what you need to do is to come get a copy of the disc. I

- 3 -

 

think we sell them to you is what we do, and then you can have it transcribed but the disc itself will be kept under seal.

**Elkins:** Thank you Your Honor, I think that will …

**Judge:** And I have explained to everybody that I will see you at __ some constitutional issues concerning that and I will deal with those when and if they ever come up.

**Dolan:** Regarding Judge Whyte what I propose we can do is unless..

**Judge:** Well I do, I do a Minute Order that we had a settlement conference and I will put in the Minute Order that, how should I phrase it, tentative settlement in the works and he usually picks up on that pretty fast. And, so that he will know that it looks like it is settling.

**Dolan:** We submitted a stipulation for a continuance, there is some..

**Judge:** I am sure you will have no problem with that.

**Dolan:** Good enough, thank you.

**Judge:** Anything?

**Dolan/Elkins:** That's it.

**Judge:** Thank you very much. Have a good trip back home and some sleep before perhaps. Thank you, thank you for your hard work, this has been a long day for all of you. I appreciate your time here, so does Judge Whyte.

1  SQUIRE, SANDERS & DEMPSEY L.L.P.
   David S. Elkins (State Bar # 148077)
2  delkins@ssd.com
   Allison E. Pitigoi (State Bar # 242211)
3  apitigoi@ssd.com
   Xavier M. Brandwajn (State Bar # 246218)
4  xbrandwajn@ssd.com
   600 Hansen Way
5  Palo Alto, CA 94304-1043
   Telephone:   +1.650.856.6500
6  Facsimile:   +1.650.843.8777

7  SQUIRE, SANDERS & DEMPSEY L.L.P.
   Nathan Lane III (State Bar # 50961)
8  nlane@ssd.com
   One Maritime Plaza, Third Floor
9  San Francisco, CA 94111
   Telephone:   +1.415.954.0200
10 Facsimile:   +1.415.393.9887

11 Attorneys for Defendants
   SEYOUNG KIM and INQUADRON, INC.

12

13

14              UNITED STATES DISTRICT COURT

15              NORTHERN DISTRICT OF CALIFORNIA

16                      SAN JOSE DIVISION

17 POSDATA CO., LTD., a South Korean          Case No. C 07 2504 RMW (PVT)
   corporation,
18                                            **INQUADRON, INC.'S WRITTEN
                    Plaintiff,                RESPONSES TO PLAINTIFF'S
19                                            WRITTEN DEPOSITION QUESTIONS
                    vs.                       PURSUANT TO FEDERAL RULE OF
20                                            CIVIL PROCEDURE 30(b)(6)**

21 SEYOUNG KIM, an individual and
   INQUADRON, INC., a California
22 corporation,

                    Defendants.
23

24

25

26

27

28
                    INQUADRON, INC.'S WRITTEN RESPONSES TO PLAINTIFF'S WRITTEN DEPOSITION QUESTIONS

SQUIRE, SANDERS &
DEMPSEY L.L.P.                              **EXHIBIT B**
One Maritime Plaza
Palo Alto, Calif.            CASE NO. C 07 2504 RMW (PVT)

1    Pursuant to Rules 26, 30(b)(6) and 31 of the Federal Rules of Civil Procedure, and

2    pursuant to the agreement of the parties made as part of their settlement dated August 3, 2007,

3    defendant InQuadron, Inc. ("InQuadron") responds to PosData Co., Ltd.'s ("plaintiff" or

4    "PosData") deposition of InQuadron on written questions as follows:

5    **1.    Describe the corporate structure of InQuadron?**

6        InQuadron has authorized a total of 14,500,000 shares of stock, of which 2,500,000 shares

7    are designated as Series A Preferred Stock and the rest as Common Stock. There are presently

8    4,000,000 shares of Common Stock and 750,000 shares of Series A Preferred Stock issued and

9    outstanding. InQuadron has four directors: Seyoung Kim, Kenneth D. Lee, Hwayong Joung, and

10   Joonsug Chung. InQuadron's officers are Seyoung Kim, President, and Kenneth D. Lee,

11   Secretary and Treasurer.

12   **2.    Identify each person that has ever been an officer or director of InQuadron,**

13   **Inc.**

14       **a.    For each person identified, please provide their title, the dates they**

15   **have held an officer or director position, their job responsibilities as an**

16   **officer or director, salary, and other compensation benefits.**

17   **Seyoung Kim, Director and President from January 1, 2007**

18   Job Responsibilities: from InQuadron's Bylaws:

19
20       Section 3.1    Powers. Subject to the provisions of the California
     General Corporation Law and to any limitations in the articles of

21   incorporation or these bylaws requiring shareholder authorization or
     approval of a particular action, the business and affairs of the

22   corporation shall be managed, and all corporate powers shall be
     exercised, by or under the direction of the board of directors. The

23   board of directors may delegate the management of day-to-day
     operation of the business of the corporation to a management

24   company or other person; provided, however, that the business and
     affairs of the corporation shall be managed, and all corporate

25   powers shall be exercised, under the ultimate direction of the board
     of directors.

26
27       Section 4.4    President.    The president shall be the general
     manager and chief executive officer of the corporation and, subject

28   to the control of the board of directors, shall have general

1
2
3
4
5
6

supervision over and control of the business and officers of the corporation. In the absence of the chairman of the board or if that office is not filled, the president shall preside at all meetings of the shareholders and, if a member of the board of directors, at all meetings of the board of directors. The president shall have general power of management as well as any other powers and duties prescribed by the board of directors, and shall be primarily responsible for carrying out all orders and resolutions of the board of directors.

7
8

Salary:      US$185,000 per annum
Benefits:   Apartment and Auto; health, dental and vision coverage when available.

9

**Kenneth D. Lee, Director, Secretary and Treasurer from January 1, 2007**

10
11
12

Job Responsibilities: see Section 3.1 of InQuadron's Bylaws as cited above. Also the following sections from the Bylaws:

13
14
15
16
17
18
19
20
21

Section 4.6     Secretary.    The secretary shall keep a book of minutes of all meetings and actions of directors, committees of directors and shareholders. The minutes of each meeting shall state the time and place that it was held and such other information as shall be necessary to determine the actions taken thereat and whether the meeting was held in accordance with the law and these bylaws.   The secretary shall keep at the corporation's principal executive office, or at the office of its transfer agent or registrar, a share register showing the names and addresses of all shareholders and the number and class of shares held by each.    The secretary shall give notice of all meetings of shareholders, directors and committees required to be given by the bylaws. The secretary shall keep the seal of the corporation in safe custody and shall have such other powers and perform such other duties as may be prescribed by the board of directors, the chairman of the board or the president.

22
23
24
25
26
27
28

Section 4.7     Chief Financial Officer.  The chief financial officer shall have the custody of all moneys and securities of the corporation and shall keep regular books of account.   The chief financial officer shall disburse the funds of the corporation in payment of the just demands against the corporation or as may be ordered by the board of directors, taking proper vouchers for such disbursements, and shall render to the board of directors from time to time as may be required by the board of directors, an account of all transactions as chief financial officer and of the financial condition of the corporation.   The chief financial officer shall perform all duties incident to the office or which are properly

1     required by the board of directors, the chairman of the board or the
      president.
2

3     Salary:    US$125,000 per annum
      Benefits:  Health, dental and vision coverage when available

4     **Hwayong Joung: Director from January 1, 2007**

5
      Job Responsibilities: See Section 3.1 of InQuadron's Bylaws as cited above.
6

7     Salary: Uncompensated as a director.

8     **Joonsug Chung: Director from January 1, 2007**

9     Job Responsibilities: See Section 3.1 of InQuadron's Bylaws as cited above.

10    Salary: Uncompensated as a director.

11                **b.      Identify each person that is still currently an officer or director of**

12                **InQuadron, Inc.**

13    Seyoung Kim, Kenneth D. Lee, Hawyong Joung, and Joonsug Chung.

14    **3.      Why was InQuadron founded?**

15    InQuadron was founded to develop and license core technologies for the emerging global

16    mobile WiMax market.

17    **4.      Did InQuadron have a written business plan?**

18    Yes.

19                **a.      If yes, describe each document, including its title, number of pages and**

20                **description of content?**

21    Title: "Mobile Internet Core Technology Business Plan," 25 pages. This draft plan

22    describes the general WiMax market and InQuadron's technology roadmap. It also presents

23    information about various players in the market as well as general market trends.

24                **b.      If yes, identify each person who authored the business plan?**

25    Joonsug Chung and Seyoung Kim.

26                **c.      If yes, identify each person or entity who contributed any information**

27                **to the business plan?**

28    Joonsug Chung and Seyoung Kim.

SQUIRE, SANDERS &
DEMPSEY L.L.P.

    **d.**    **For each person that authored or contributed to InQuadron's business plan, describe their contribution, their job title, and company affiliation.**

Joonsug Chung composed the market overview, competition information, and financial projections. Seyoung Kim provided market trends, technology, and potential products information.

Joonsug Chung and Seyoung Kim are directors of InQuadron. Seyoung Kim is also the president of InQuadron.

**5.**    **Was InQuadron's business plan given to any person or entity?**

    **a.**    **If yes, identify each person or entity, including their address and phone number.**

| | | | |
|---|---|---|---|
| Chan Park<br>Retired Individual<br>908 Hosugreen<br>BLDG, 752-1<br>Janghang-dong<br>Ilsan-gu,<br>Gyeonggi-do<br>Korea<br>031-908-6568 | Dongkyu Choi<br>1259 Lakeside Drive,<br>#2223, Sunnyvale,<br>California 94085<br>USA<br>650-799-0218 | Byung-min Lee<br>Vice Korea<br>President<br>MtekVision, Inc.<br>Tower Palace<br>Dogok-dong,<br>Gangnam-gu, Seoul<br>011-216-4425 | Duk-yong Kim<br>CEO<br>Korea Microwave, Inc.<br>Yongin, Gyeonggi -do<br>Korea<br>(No further address<br>information)<br>031-370-8601 |
| Yong-choon Kim<br>President<br>NSC Korea<br>7F KLI 63 BLDG<br>60 Yoido, Seoul<br>Korea<br>02-3771-6909 | Kwang-sun Kim<br>President<br>D&T<br>Daedeok Valley 60-1<br>Jang-dong, Yuseong-<br>gu, Daejeon, Korea<br>02-2113-1530 | Yong-min Kim<br>President<br>STIC Investment Co.<br>VC<br>10F MSA BLDG<br>891-43 Daechi-dong<br>Kangnam-gu, Seoul<br>Korea<br>02-3404-7848 | Hoon Kim<br>Vice President<br>Woori Co.<br>Suite 5, 201 Dongil Techno<br>Town 202-6 Anyang7-<br>dong, Manan-gu, Anyang-<br>shi, Gyeonggi-do<br>Korea<br>031-449-1003 |
| Tae-ho Park<br>President<br>Woori Co.<br>Korea<br>Suite 5, 201 Dongil<br>Techno Town 202-<br>6 Anyang7-dong,<br>Manan-gu,<br>Anyang-shi,<br>Gyeonggi-do<br>031-449-1003 | Young-jo Lee<br>Team Manager<br>LG-Nortel<br>Korea<br>No business plan<br>given to this person. | | |

1    **6.    What is InQuadron's mission statement?**

2    InQuadron has not adopted a mission statement.

3    **7.    Provide a description of InQuadron's business.**

4    Research and development, manufacturing, and sales of telecommunication products.

5    **8.    Describe InQuadron's business or anticipated business, products or potential**

6    **products, and/or services or potential services from 2006 to the present?**

7    Development of WiMAX (non-WiBro) basestation core technology that would lead to the

8    development of a WiMAX basestation baseband modem ASIC for the US market.

9    **9.    Describe InQuadron's business or anticipated business, products or potential**

10    **products, and/or services or potential services for the next twelve months?**

11    Development of WiMAX (non-WiBro) basestation core technology that would lead to the

12    development of a WiMAX basestation baseband modem ASIC for the US market.

13    **10.    Has InQuadron's business or anticipated business, products or potential**

14    **products, and/or services or potential services ever been related in any way to**

15    **the WiMAX or WiBro technology industry?**

16    WiMax, yes, but not WiBro.

17    **a.    If yes, describe InQuadron's business or anticipated business from**

18    **2006 to the present.**

19    Development of WiMAX (non-WiBro) basestation core technology that would lead to the

20    development of a WiMAX basestation baseband modem ASIC for the US market.

21    **b.    Describe InQuadron's business or anticipated business during the next**

22    **twelve months.**

23    Development of WiMAX (non-WiBro) basestation core technology that would lead to the

24    development of a WiMAX basestation baseband modem ASIC for the US market.

25    **c.    Describe InQuadron's products or potential products from 2006 to the**

26    **present.**

27    InQuadron has not developed any existing products or potential products to date.

28

SQUIRE, SANDERS &
DEMPSEY L.L.P.

1           **d.**    **Describe InQuadron's products or potential products during the next**

2              **twelve months.**

3    Development of WiMAX (non-WiBro) basestation core technology that would lead to the

4    development of a WiMAX basestation baseband modem ASIC for the US market.

5           **e.**    **Describe InQuadron's services or potential services from 2006 to the**

6              **present.**

7    InQuadron has not provided any services to date.

8           **f.**    **Describe InQuadron's services or potential services during the next**

9              **twelve months.**

10    Development of WiMAX (non-WiBro) basestation core technology that would lead to the

11    development of a WiMAX basestation baseband modem ASIC for the US market.

12    **11.**    **If applicable, what is the current address of InQuadron's offices or facilities**

13         **in the United States, Korea or other countries?**

14    U.S.: 2310 Walsh Avenue, Santa Clara, California 95054.

15    Korea: Hyundai Office Building, 12th Floor, Suite 1702, 9-4 Soonae-dong, Seongnam-Si,

16    Bundang-gu, Gyeonggi-dong, 463-825 Korea.

17           **a.**    **For each address listed above, please provide a description of the**

18             **activities that take place at each office or facility.**

19    The US office activities include research and development and the corporate headquarters.

20    The Korean office activities include research and development.

21    **12.**    **Has InQuadron ever had a Research & Development ("R&D") center, lab, or**

22         **other facility where research and development of WiMAX or WiBro related**

23         **products or technology occurred?**

24    Yes; for WiMax (non-WiBro) products or technology.

25           **a.**    **If yes, what is the address of each InQuadron facility where research**

26             **or development activities took place?**

27    U.S.: 2310 Walsh Avenue, Santa Clara, California 95054.

28

SQUIRE, SANDERS &
DEMPSEY L.L.P.

1    Korea: Hyundai Office Building, 12th Floor, Suite 1702, 9-4 Soonae-dong, Seongnam-Si,

2    Bundang-gu, Gyeonggi-dong, 463-825 Korea.

3          **b.    If yes, please describe the type of research or development that has**

4                **taken place at each facility.**

5    InQuadron's activities to date were largely confined to establishing the company,

6    recruiting and hiring personnel and setting up physical offices. InQuadron did not commence

7    material substantive research and development work in either the U.S. or Korea before PosData's

8    legal demands and ultimately the onset of this litigation prevented such work from moving

9    forward.

10          **c.    If yes, please list the employees at each facility, including their dates of**

11                **employment, their position, their responsibilities, salary, and other**

12                **compensation benefits.**

13    U.S.:

14        • Seyoung Kim, President, April 1, 2007, responsible for overall management of the

15          company, $185,000 per year, apartment, automobile, health, dental and vision

16          coverages, when available.

17        • Kenneth D. Lee, Chief Operating Officer, February 1, 2007, responsible for

18          general management and administration of the company, $125,000 per year,

19          health, dental and vision coverages, when available.

20    Korea: No current employees.

21          **d.    If yes, please describe all equipment, tools and supplies, including but**

22                **not limited to computers, hardware, software and other materials**

23                **related to the research or development of WiMAX or WiBro**

24                **technology that is located at each facility.**

25    Three Dell desktop computers, four Dell laptops, one Dell LAN server, and one IBM

26    laptop in the U.S. Various computers and other equipment were located in Korea, but may have

27    been removed by Korean law enforcement officials.

28

SQUIRE, SANDERS &
DEMPSEY L.L.P.

1          **e.      If yes, please describe the research or development that has taken**

2                    **place with respect to InQuadron products or technology.**

3          As previously answered, InQuadron's legal issues arose before InQuadron could conduct

4   material substantive development work. The work performed before legal issues forced a

5   cessation of work was limited to product/technology conceptualization and development

6   planning.

7          **f.      If yes, please describe the research or development that has taken**

8                    **place with respect to the Modular Channel Card Assembly ("MCCA")**

9                    **or Turtle Card or Turtle Board?**

10         None.

11         **g.      Has InQuadron ever utilized technology related to Posdata's Digital**

12                   **Channel Card Unit ("DCCU") for the Pico RAS base station during its**

13                   **research and development?**

14         No.

15                   **(1)     If yes, describe how InQuadron utilized the technology?**

16         Not applicable.

17         **h.      Has InQuadron ever utilized technology related to Posdata's MAC**

18                   **and PHY source code during its research and development?**

19         No.

20                   **(1)     If yes, describe how InQuadron utilized the technology?**

21         Not applicable.

22         **i.      Has InQuadron ever utilized technology related to Posdata's printed**

23                   **circuit board ("PCB") design and layout during its research and**

24                   **development?**

25         No.

26                   **(1)     If yes, describe how InQuadron utilized the technology?**

27         Not applicable.

28

1          j.      Has InQuadron ever utilized technology related to the DCCU or

2                  MCCA or Turtle Card or Turtle Board or Pico RAS base stations

3                  during its research and development?

4    No.

5                  (1)     If yes, describe how InQuadron utilized the technology?

6    Not applicable.

7          k.      Has InQuadron ever utilized technology related to the "Modular RAS

8                  Implementation" file during its research and development?

9    No.

10                 (1)     If yes, describe how InQuadron utilized the technology?

11   Not applicable.

12         l.      Has InQuadron ever utilized technology related to the "Rev. 0.4

13                 DCCU Block Diagram" file during its research and development?

14   No.

15                 (1)     If yes, describe how InQuadron utilized the technology?

16   Not applicable.

17         m.      Has InQuadron ever utilized Posdata's Mobile Plugfest Reports

18                 during its research and development?

19   No.

20                 (1)     If yes, describe how InQuadron utilized the technology?

21   Not applicable.

22         n.      Has InQuadron ever utilized the NTT DoCoMo Reports during its

23                 research and development?

24   No.

25                 (1)     If yes, describe how InQuadron utilized the technology?

26   Not applicable.

27         o.      Has InQuadron ever utilized Posdata's IOT Reports during its

28                 research and development?

1    No.

2    **(1)    If yes, describe how InQuadron utilized the technology?**

3    Not applicable.

4    **p.    Has InQuadron ever utilized technology related to Posdata's files or**

5    **diagrams that depict, reveal, or demonstrate how processors and**

6    **components, Posdata's PCB design and layout, and Posdata's software**

7    **and source code create an architecture for interface between hardware**

8    **and software during its research and development?**

9    No.

10    **(1)    If yes, describe how InQuadron utilized the technology?**

11    Not applicable.

12    **q.    Has InQuadron ever utilized any other Posdata WiMAX, WiBro or**

13    **FLYVO technology during its research and development?**

14    No.

15    **(1)    If yes, describe how InQuadron utilized the technology?**

16    Not applicable.

17    **13.    Has InQuadron ever outsourced any research or development tasks or**

18    **projects related to InQuadron products or technology?**

19    No.

20    **a.    If yes, please describe each task or project that was outsourced,**

21    **provide the date(s) the outsourcing occurred, the name of the**

22    **individual or company the task or project was outsourced to, their**

23    **compensation, address, and contact information.**

24    Not applicable.

25    **14.    Has InQuadron ever outsourced any research or development tasks or**

26    **projects related to WiMAX or WiBro products or technology?**

27    No.

28

SQUIRE, SANDERS &
DEMPSEY L.L.P.

1           a.    **If yes, please describe each task or project that was outsourced,**

2                   **provide the date(s) the outsourcing occurred, the name of the**

3                   **individual or company the task or project was outsourced to, their**

4                   **compensation, address, and contact information.**

5  Not applicable.

6  **15.**    **Has InQuadron ever outsourced the manufacturing of InQuadron products**

7       **or technology?**

8  No.

9           a.    **If yes, please describe each task or project that was outsourced,**

10                   **provide the date(s) the outsourcing occurred, the name of the**

11                   **individual or company the task or project was outsourced to, their**

12                   **compensation, address, and contact information.**

13  Not applicable.

14  **16.**    **Has InQuadron ever outsourced the manufacturing of WiMAX or WiBro**

15       **products or technology?**

16  No.

17           a.    **If yes, please describe each task or project that was outsourced,**

18                   **provide the date(s) the outsourcing occurred, the name of the**

19                   **individual or company the task or project was outsourced to, their**

20                   **compensation, address, and contact information.**

21  Not applicable.

22  **17.**    **Is Seyoung Kim currently employed by InQuadron?**

23  Yes.

24           a.    **If yes, please state the name of his employer, his employer's address,**

25                   **his work number, the dates of his employment, his position, the**

26                   **responsibilities of his position, salary, and other compensation**

27                   **benefits.**

28

SQUIRE, SANDERS &
DEMPSEY L.L.P.
·· ·l· ·· Bl W
·N·· · ·· · ·· ·A· ·B· ·H· ·l·m·l·

1    InQuadron, Inc., 2310 Walsh Avenue, Santa Clara, California 95054.  (408) 727-6911,

2    Employed from April 1, 2007 to the present. Position: President. See the response to Question 2

3    for a description of Dr. Kim's duties. Salary and other compensation benefits: Annual salary -

4    $185,000, plus apartment and auto, and health, dental and vision coverage when available.

5    **18.    Has Seyoung Kim ever been employed as a consultant?**

6    No.

7         **a.    If yes, please state the name of his employer, his employer's address,**

8              **his work number, the dates of his employment, his position, the**

9              **responsibilities of his position, salary, and other compensation**

10             **benefits.**

11    Not applicable.

12    **19.    Since October 27, 2006, has Seyoung Kim been employed in any capacity by**

13         **an individual or company other than Posdata Co., Ltd. or InQuadron, Inc.?**

14    InQuadron objects to this question on the ground that it incorrectly assumes facts; namely,

15    that Seyoung Kim was employed by Posdata since October 27, 2006. Dr. Kim's employment

16    with Posdata was on or before that date. Subject to and without waiting its objection, InQuadron

17    responds as follows:  no.

18         **a.    If yes, please state the name of his employer, their address, their**

19             **contact number, the dates of his employment, his position with each**

20             **employer, the responsibilities of his position, salary, and other**

21             **compensation benefits.**

22    Not applicable.

23    **20.    Since October 27, 2006, has Seyoung Kim pursued or inquired about**

24         **employment with any individual or company other than Posdata Co., Ltd. or**

25         **InQuadron, Inc.?**

26    No.

27         **a.    If yes, please state the name of the potential employer, their address,**

28             **their contact number, the date(s) of his inquiry, a description of the**

1                         **position or capacity he inquired about, the responsibilities of the**

2                         **position, and the outcome of each inquiry.**

3     Not applicable.

4     **21.**     **Does Seyoung Kim have any plans during the next 12 months to work or seek**

5             **employment in any capacity?**

6     Yes.

7             **a.**     **If yes, please describe what type of work he may pursue, the names of**

8                    **potential employers, their address, their contact number, a description**

9                    **of the position or capacity he anticipates inquiring about, and the**

10                    **anticipated responsibilities of the position.**

11     Seyoung Kim is currently employed by InQuadron and intends to continue employment

12     with InQuadron in the same capacity and position and with the same responsibilities as he

13     currently holds.

14     **22.**     **Does Seyoung Kim have any plans during the next 12 months to start a**

15             **business, serve as consultant, or obtain employment in any capacity within**

16             **the WiMAX or WiBro technology industry?**

17     No.

18             **a.**     **If yes, please describe what type of work he may pursue or business he**

19                    **may start, the names of potential employers, their address, their**

20                    **contact number, a description of the position or capacity he anticipates**

21                    **inquiring about, and the anticipated responsibilities of the position or**

22                    **nature of the business.**

23     Not applicable.

24     **23.**     **Does Seyoung Kim have any plans during the next 12 months to start a**

25             **business, serve as consultant, or obtain employment in any capacity by**

26             **utilizing WiMAX, WiBro, or FLYVO technology?**

27     No.

28

SQUIRE, SANDERS &
DEMPSEY L.L.P.

INQUADRON, INC.'S WRITTEN RESPONSES TO PLAINTIFF'S WRITTEN DEPOSITION QUESTIONS
CASE NO. C 07 2504 RMW (PVT)

1

      **a.**    **If yes, please describe what type of work he may pursue or business he**

2

              **may start, the names of potential employers, their address, their**

3

              **contact number, a description of the position or capacity he anticipates**

4

              **inquiring about, the WiMAX, WiBro, or FLYVO technology he may**

5

              **utilize, and the anticipated responsibilities of the position or nature of**

6

              **the business,**

7

Not applicable.

8

**24.**    **Does Seyoung Kim have any plans during the next 12 months to start a**

9

      **business, serve as consultant, or obtain employment in any capacity by**

10

      **utilizing Posdata's WiMAX, WiBro, or FLYVO technology, including but not**

11

      **limited to the Modular Channel Card Assembly ("MCCA") or Turtle Card or**

12

      **Turtle Board, Posdata's Digital Channel Card Unit ("DCCU") for the Pico**

13

      **RAS base station , Posdata's MAC and PHY source code, Posdata's printed**

14

      **circuit board ("PCB") design and layout, the DCCU or MCCA or Turtle**

15

      **Card or Turtle Board or Pico RAS base stations, the "Modular RAS**

16

      **Implementation" file, the "Rev. 0.4 DCCU Block Diagram" file, Posdata's**

17

      **Mobile Plugfest Reports, the NTT DoCoMo Reports, Posdata's IOT Reports,**

18

      **and Posdata's files or diagrams that depict, reveal, or demonstrate how**

19

      **processors and components, Posdata's PCB design and layout, and Posdata's**

20

      **software and source code create an architecture for interface between**

21

      **hardware and software?**

22

No.

23

      **a.**    **If yes, please describe what type of work he may pursue or business he**

24

              **may start, the names of potential employers, their address, their**

25

              **contact number, a description of the position or capacity he anticipates**

26

              **inquiring about, Posdata's WiMAX, WiBro, or FLYVO technology he**

27

              **may utilize, and the anticipated responsibilities of the position or**

28

              **nature of the business.**

INQUADRON, INC.'S WRITTEN RESPONSES TO PLAINTIFF'S WRITTEN DEPOSITION QUESTIONS
CASE NO. C 07 2504 RMW (PVT)

1    Not applicable.

2    **25.    Describe how InQuadron's workforce was organized by division, unit, team,**

3    **lab, or other organizational structure as of May 1, 2007?**

4    InQuadron has not organized its workforce by division, unit, team, lab, or other

5    organizational structure.

6    **a.    For each grouping, describe the function of each grouping, the**

7    **employees in each grouping, and the location of each grouping?**

8    Not applicable.

9    **26.    Describe how InQuadron's workforce is currently organized by division, unit,**

10    **team, lab, or other organizational structure?**

11    InQuadron has not had the opportunity to organize its workforce. Its current workforce

12    consists of only two employees.

13    **a.    For each grouping, describe the function of each grouping, the**

14    **employees in each grouping, and the location of each grouping?**

15    Not applicable.

16    **27.    Identify each person that has ever been employed by InQuadron, Inc.**

17    InQuadron incorporates its answer to 12(c) here. In addition to the persons listed in 12(c):

18    Hwayong Joung, Seongdong Park, Jong Wook Lee, Jongkwan Choi and Hoon Paek.

19    **a.    For each person identified, please provide the dates of their**

20    **employment, their position, their job responsibilities, salary, and other**

21    **compensation benefits.**

22    In addition to the persons listed in response to 12(c), the following were employed at

23    InQuadron:

24    • Hwayong Joung, April 1, 2007 to September 30, 2007, Principal Engineer, Annual

25    Salary: 93 Million Korean Won; health, dental and vision insurance coverages

26    when available;

27

28

1        •  Seongdong Park, April 1, 2007 to September 30, 2007, Senior Staff Engineer;

2         Annual Salary 67 Million Korean Won; health, dental and vision insurance

3         coverages when available;

4        •  Jong Wook Lee, April 1, 2007 to September 30, 2007, Senior Staff Engineer;

5         Annual Salary: 60,450 Million Korean Won; health, dental and vision insurance

6         coverages when available;

7        •  Jongkwan Choi; April 1, 2007 to May 15, 2007; Principal Engineer; Annual Salary

8         $130,000; health, dental and vision insurance coverages when available; and

9        •  Hoon Paek, May 1, 2007 to May 15, 2007, Senior Staff Engineer, Annual Salary:

10         $115,000; options for the purchase of 50,000 shares; health, dental and vision

11         insurance coverages, when available.

12         **b.**    **For each person identified, please identify which individuals are still**

13            **currently employed by InQuadron. Inc.**

14    Seyoung Kim and Kenneth D. Lee.

15         **c.**    **For each current or former InQuadron employee identified, please**

16            **identify which individuals are current or former employees of Posdata.**

17    All but Kenneth D. Lee are former employees of PosData.

18    **28.**    **Identify each person that has ever been employed by InQuadron, Inc. as a**

19         **consultant or on a temporary basis.**

20    None.

21         **a.**    **For each person identified, please provide the dates of their**

22            **employment, their position, their job responsibilities, salary, and other**

23            **compensation benefits.**

24    Not applicable.

25         **b.**    **For each person identified, please identify which individuals are still**

26            **currently employed by InQuadron. Inc.**

27    Not applicable.

28

SQUIRE, SANDERS &
DEMPSEY L.L.P.

1              c.    **For each current or former InQuadron employee identified, please**

2                   **identify which individuals are current or former employees of Posdata.**

3    Not applicable.

4    **29.    Identify each person that has ever been employed for InQuadron, Inc.'s**

5            **benefit as a consultant or on a temporary basis.**

6    None.

7            a.    **For each person identified, please provide the dates of their**

8              **employment, their position, their job responsibilities, salary, and other**

9              **compensation benefits.**

10   Not applicable.

11           b.    **For each person identified, please identify which individuals are still**

12             **currently employed by InQuadron. Inc.**

13   Not applicable.

14           c.    **For each current or former InQuadron employee identified, please**

15             **identify which individuals are current or former employees of Posdata.**

16   Not applicable.

17   **30.    Identify each current or former Posdata employee that has ever been solicited**

18           **or contacted orally or in writing by Seyoung Kim or InQuadron to work for**

19           **InQuadron.**

20   InQuadron incorporates its response to Question 31.a.

21           a.    **For each person identified, please provide the dates they were solicited**

22             **or contacted, the position discussed, the job responsibilities for the**

23             **position, their proposed salary, and other compensation benefits**

24      • William Li (4/2007, SW engineer, no salary/other compensation benefits

25       discussed)

26      • Hwayong Joung (11/2006, Director, $93,000, 330,000 shares stock option)

27      • Choon Shin, (11/2006, HW engineer, no salary/other compensation benefits

28       discussed)

SQUIRE, SANDERS &
DEMPSEY L.L.P.

| | |
|---|---|
| 1 | • Jongkwan Choi (2/2007, HW engineer, $130,000, 330,000 shares stock option) |
| 2 | • Hojun Kim (2/2007, HW engineer, $130,000, 330,000 shares stock option) |
| 3 | • Seongdong Park (11/2006, SW engineer, $67,000, 330,000 shares stock option) |
| 4 | • Woojin Jeon (2/2007, HW engineer, $81,000, 330,000 shares stock option) |
| 5 | • Kangmin Lee (2/2007, System Engineer, $70,000, 160,000 shares of stock option) |
| 6 | • Choon Shin (2/2007, HW engineer, no salary/other compensation benefits |
| 7 | discussed) |
| 8 | • Younki Hong (3/2007, HW engineer, $105,000, 160,000 shares of stock option) |
| 9 | • Jinyoung Park (2/2007, SW engineer, $65,000 , 160,000 shares of stock option) |
| 10 | • Seungman Lee (12/2006, DSP engineer, no salary/other compensation benefits |
| 11 | discussed) |
| 12 | • Sejin Lim (3/2007, $65,000, 160,000 shares of stock option) |
| 13 | • Yongkeun Pang (3/2007, no salary/other compensation benefits discussed) |
| 14 | • Hunseung Oh (3/2007, $65,000, 160,000 shares of stock option) |
| 15 | • Jongwook Lee (3/2007, $70,000, 160,000 shares of stock option) |
| 16 | • Suckchan Lee (3/2007, $64,000, 160,000 shares of stock option) |
| 17 | • Kwangsuk Kim (3/2007, $64,000, 160,000 shares of stock option) |
| 18 | • Yerang Hur (2/2007, Systems Engineer, no salary/other compensation benefits |
| 19 | discussed) |
| 20 | • Jungnam Yun (2/2007, Systems Engineer, no salary/other compensation benefits |
| 21 | discussed) |
| 22 | • Hoon Paek (5/2007, Systems Engineer, applied for a job at Inquadron after his |
| 23 | termination from Posdata, $115,000, 160,000 shares of stock option) |
| 24 | • Bongho Kim (2/2007, applied for a position at InQuadron, decision was on hold) |
| 25 | • Sanggeun Hwang (11/2006, no salary/other compensation benefits discussed) |
| 26 | **b.     For each person identified, please identify which individuals were** |
| 27 | **offered employment with InQuadron.** |
| 28 | |

1    Hwayong Joung, Jongkwan Choi, Hojun Kim, Seongdong Park, Younki Hong, Woojin

2    Jeon, Kangmin Lee, Jinyoung Park, Sejin Lim, Hunseung Oh, Jongwook Lee, Suckchan Lee,

3    Kwangsuk Kim, Hoon Paek.

4              **c.    For each person identified, please identify which individuals accepted**

5                    **employment with InQuadron even if they never started working for**

6                    **InQuadron as a result of this lawsuit or other circumstances.**

7    Hwayong Joung, Jongkwan Choi, Hojun Kim, Seongdong Park, Jongwook Lee, Hoon

8    Paek.

9    **31.    Identify each person, excluding current or former Posdata employees, that**

10          **has ever been solicited or contacted orally or in writing by Seyoung Kim or**

11          **InQuadron to work for InQuadron.**

12    Joonsug Chung.

13              **a.    For each person identified, please provide the dates they were solicited**

14                    **or contacted, the position discussed, the job responsibilities for the**

15                    **position, their proposed salary, and other compensation benefits.**

16    October 2006. No specific position or salary was discussed.

17              **b.    For each person identified, please identify which individuals were**

18                    **offered employment with InQuadron.**

19    Employment was not offered.

20              **c.    For each person identified, please identify which individuals accepted**

21                    **employment with InQuadron even if they never started working for**

22                    **InQuadron as a result of this lawsuit or other circumstances.**

23    Not applicable.

24    **32.    Identify each person that has provided InQuadron with documents or**

25          **information related to Posdata's anticipated business, potential products,**

26          **products, goods/or services, marketing and sales efforts and**

27          **commercialization efforts.**

28    None.

- 20 -

SQUIRE, SANDERS &
DEMPSEY L.L.P.

1            **a.**    **For each person listed above, identify the InQuadron employee that**

2                  **received the information and describe the documents or information**

3                  **provided to InQuadron regarding Posdata's anticipated business,**

4                  **potential products, products, goods/or services, marketing and sales**

5                  **efforts and commercialization efforts.**

6    Not applicable.

7            **b.**    **For each person listed above, provide their employer, their job title**

8                  **and responsibilities, and address.**

9    Not applicable.

10            **c.**    **For each person listed above, identify any current or former Posdata**

11                  **employees that provided documents or information to InQuadron.**

12    Not applicable.

13    **33.**    **Identify each person that has provided Seyoung Kim with documents and**

14            **information related to Posdata's anticipated business, potential products,**

15            **products, goods/or services, marketing and sales efforts and**

16            **commercialization efforts.**

17    None.

18            **a.**    **For each person listed above, describe the documents or information**

19                  **provided to Seyoung Kim related to Posdata's anticipated business,**

20                  **potential products, products, goods/or services, marketing and sales**

21                  **efforts and commercialization efforts.**

22    Not applicable.

23            **b.**    **For each person listed above, provide their employer, their job title**

24                  **and responsibilities, and address.**

25    Not applicable.

26            **c.**    **For each person listed above, please identify any current or former**

27                  **Posdata employees that provided documents or information to**

28                  **InQuadron.**

SQUIRE, SANDERS &
DEMPSEY L.L.P.
...............
...............

InQUADRON, INC.'S WRITTEN RESPONSES TO PLAINTIFF'S WRITTEN DEPOSITION QUESTIONS
CASE NO. C 07-2504 RMW (PVT)

1   Not applicable.

2   **34.    Identify each person that has provided InQuadron with documents or**
3   **information related to Posdata's WiMAX, WiBro, or FLYVO technology,**
4   **including but not limited to the Modular Channel Card Assembly ("MCCA")**
5   **or Turtle Card or Turtle Board, Posdata's Digital Channel Card Unit**
6   **("DCCU") for the Pico RAS base station , Posdata's MAC and PHY source**
7   **code, Posdata's printed circuit board ("PCB") design and layout, the DCCU**
8   **or MCCA or Turtle Card or Turtle Board or Pico RAS base stations, the**
9   **"Modular RAS Implementation" file, the "Rev. 0.4 DCCU Block Diagram"**
10  **file, Posdata's Mobile Plugfest Reports, the NTT DoCoMo Reports, Posdata's**
11  **IOT Reports, and Posdata's files or diagrams that depict, reveal, or**
12  **demonstrate how processors and components, Posdata's PCB design and**
13  **layout, and Posdata's software and source code create an architecture for**
14  **interface between hardware and software.**

15  Choon Shin of Posdata gave the Turtle Board to Jongkwan (Jeff) Choi of Posdata, who
16  later became an InQuadron employee.  Choi gave the Turtle Board back to Choon Shin (then an
17  employee at Posdata's San Jose facility) in or about March 2007.

18  Dr. Kim came into possession of three draft technical memos related to WiMAX MIMO
19  technology some time in early 2007.  Dr. Kim does not recall the source of the memos.  The
20  documents were apparently contained in a folder on his Posdata-issued laptop computer.  At the
21  time Dr. Kim returned his laptop to PosData, he copied personal files he wanted to keep from the
22  laptop to portable storage media.  After InQuadron's counsel in this action engaged an electronic
23  discovery forensics consultant to extract all data from InQuadron computers and storage media,
24  Dr. Kim reviewed a listing of files copied from his laptop.  By reviewing that list, Dr. Kim
25  realized that when he copied his personal material from the Posdata-issued laptop, he
26  inadvertently also copied the WiMAX MIMO technology memos.  Dr. Kim was not aware he had
27  the copies until after he reviewed the file listing prepared by the electronic discovery forensic

28

1   consultant. InQuadron is providing these memos to Posdata in accordance with its settlement

2   obligations.

3      In an email dated December 9, 2006, Sang Geun Hwang briefly mentioned to Dr. Kim,

4   Jongkwan Choi, Hwayoung Joung, Joonsug Chung, Woojon Jeon, Choon Shin, Seong Deong

5   Park, and Hojun Kim a single test result from the GCT-IOT testing. InQuadron is providing this

6   document to Posdata in accordance with its settlement obligations.

7      Apart from those persons listed as senders in those certain e-mails already in Posdata's

8   possession and submitted as evidence in support of Posdata's application for a temporary

9   restraining order, InQuadron is not aware of any other person that has provided InQuadron with

10  information or documents related to Posdata's WiMAX, WiBro or FLYVO technology, as these

11  terms are defined in this question.

12         **a.    For each person listed above, identify the InQuadron employee that**

13              **received the information and describe the documents or information**

14              **provided to InQuadron regarding Posdata's anticipated business,**

15              **potential products, products, goods/or services, marketing and sales**

16              **efforts and commercialization efforts.**

17     InQuadron objects to this question on the ground of burden because it duplicates

18  Question 33a. InQuadron assumes that Question 34.a. was intended to incorporate the body of

19  Question 34. As so understood, InQuadron responds by incorporating its response to

20  Question 34.

21         **b.    For each person listed above, provide their employer, their job title**

22              **and responsibilities, and address.**

23     InQuadron incorporates its response to Question 34.

24         **c.    For each person listed above, identify any current or former Posdata**

25              **employees that provided documents or information to InQuadron.**

26     InQuadron incorporates its response to Question 34.

27     **35.    Identify each person that has provided Seyoung Kim with documents and**

28          **information after October 27, 2006 related to Posdata's WiMAX, WiBro, or**

- 23 -

1       FLYVO technology, including but not limited to the Modular Channel Card

2       Assembly ("MCCA") or Turtle Card or Turtle Board, Posdata's Digital

3       Channel Card Unit ("DCCU") for the Pico RAS base station , Posdata's MAC

4       and PHY source code, Posdata's printed circuit board ("PCB") design and

5       layout, the DCCU or MCCA or Turtle Card or Turtle Board or Pico RAS

6       base stations, the "Modular RAS Implementation" file, the "Rev. 0.4 DCCU

7       Block Diagram" file, Posdata's Mobile Plugfest Reports, the NTT DoCoMo

8       Reports, Posdata's IOT Reports, and Posdata's files or diagrams that depict,

9       reveal, or demonstrate how processors and components, Posdata's PCB

10      design and layout, and Posdata's software and source code create an

11      architecture for interface between hardware and software.

12  InQuadron incorporates its response to Question 34.

13          a.      For each person listed above, provide their employer, their job title

14                  and responsibilities, and address.

15  InQuadron incorporates its response to Question 34.

16          b.      For each person listed above, identify any current or former Posdata

17                  employees that provided documents or information to InQuadron.

18  InQuadron incorporates its response to Question 34.

19  36.     Identify each person or entity that has ever been a shareholder in InQuadron,

20          Inc.?

21  InQuadron incorporates its response to Question 36.a.

22          a.      For each shareholder, describe how many shares they received, when

23                  they received the shares, how much the shares cost them or how much

24                  of an investment was required, and whether there are any special

25                  restrictions on trading the shares.

26      •   Seyoung Kim: 2,000,000 shares of Common Stock issued on January 23, 2007,

27          for total consideration of $2,000.00.  Shares are subject to the terms and conditions

28          of a Stock Restriction Agreement.

SQUIRE, SANDERS &
DEMPSEY L.L.P.
[illegible]

1      • Kenneth D. Lee: 350,000 shares of Common Stock issued on January 23, 2007, for

2         total consideration of $350.00. Shares are subject to the terms and conditions of a

3         Stock Restriction Agreement.

4      • Hwayong Chung: 330,000 shares of Common Stock issued on January 23, 2007,

5         for total consideration of $330.00. Shares are subject to the terms and conditions

6         of a Stock Restriction Agreement.

7      • Joonsug Chung: 330,000 shares of Common Stock issued on January 23, 2007, for

8         total consideration of $330.00. Shares are subject to the terms and conditions of a

9         Stock Restriction Agreement.

10     • Jongkwan Choi: 330,000 shares of Common Stock issued on January 23, 2007, for

11        total consideration of $330.00. Shares are subject to the terms and conditions of a

12        Stock Restriction Agreement.

13     • Hojun Kim: 330,000 shares of Common Stock issued on January 23, 2007, for

14        total consideration of $330.00. Shares are subject to the terms and conditions of a

15        Stock Restriction Agreement.

16     • Seongdong Park: 330,000 shares of Common Stock issued on January 23, 2007,

17        for total consideration of $330.00. Shares are subject to the terms and conditions

18        of a Stock Restriction Agreement.

19     • Chan Park: 750,000 shares of Series A Preferred Stock issued on February 9,

20        2007, for total consideration of $750,000.00. The Shares of subject to the usual

21        restrictions of transfer and to the terms and conditions of an Investors' Rights

22        Agreement.

23        **b.      For each shareholder, have any of them sold their shares?**

24     No.

25        **c.      If the answer to the question above is yes, when were the shares sold,**

26             **for how much, and to whom were the shares sold?**

27     Not applicable.

28

**37.    Identify each person or entity that has been approached or solicited by Seyoung Kim, InQuadron, or anyone acting on their behalf to become an investor in InQuadron.**

Hoon Kim, Yongchoon Kim, Kwangsun Kim, Yongmin Kim, Dukyong Kim, Dongkyu Choi, Chan Park, Tae Min Choi, and Tae Hyun Choi.

**a.    For each person or entity identified, please describe the nature and description of their communications with Seyoung Kim, InQuadron, or anyone acting on Defendants' behalf and when the communications took place.**

Each individual was told that InQuadron was founded to develop a WiMAX (non-WiBro) basestation core technology that would lead to the development of a WiMAX basestation baseband modem ASIC for the US market, and each individual was asked to make an investment. Most, if not all, of these individuals also received a 25-page draft business plan entitled "Mobile Internet Core Technology Business Plan." This draft plan describes the general WiMax market and InQuadron's technology roadmap, and presents information about various players in the market as well as general market trends. InQuadrón may also have supplied investors or potential investors with a presentation entitled "Mobile WiMax Base Station and Mobile Station SOC Development for Global Market," a PowerPoint file that describes WiMAX and the business opportunities its adoption would present. The file also describes the technical strengths of the InQuadron team and the company's ultimate business areas and planned products.

**b.    For each person or entity identified, how much capital, if any, have they invested in InQuadron?**

Chan Park invested $750,000. No other person or entity identified has invested money. Dongkyu Choi committed to invest $500,000 and made an installment payment of $100,000 toward his commitment, but upon the public announcement of this lawsuit, he asked for and received the return of his investment and the cancellation of his commitment to invest.

SQUIRE, SANDERS &
DEMPSEY L.P.

1                c.     **If the answer to the question above is yes, when did the investor**

2                      **commit to give InQuadron capital and when did InQuadron actually**

3                      **receive the capital.**

4     InQuadron incorporates its responses to Questions 44 and 47. Apart from the investments

5     listed there, no others have committed to invest or have invested in InQuadron.

6     **38.**     **Identify each person or entity that has approached Seyoung Kim, InQuadron,**

7          **or anyone acting on their behalf to become an investor in InQuadron.**

8     None.

9           a.     **For each person or entity identified, please describe the nature and**

10             **description of their communications with Seyoung Kim, InQuadron,**

11             **or anyone acting on Defendants' behalf and when the communications**

12             **took place.**

13     Not applicable.

14     **39.**     **Identify each person or entity that has been supplied with documents or**

15          **information relating to InQuadron's anticipated business, potential products,**

16          **goods and/or services from 2006 to the present.**

17     InQuadron incorporates its response to Question No. 37.

18           a.     **For each person or entity identified, please describe the nature and**

19             **description of their communications with Seyoung Kim, InQuadron,**

20             **or anyone acting on Defendants' behalf, and when the communications**

21             **took place.**

22     InQuadron incorporates its response to Question No. 37.a.

23     **40.**     **Identify each person or entity that has approached Seyoung Kim, InQuadron,**

24          **or anyone acting on their behalf to become a business partner with**

25          **InQuadron.**

26     None.

27           a.     **For each person or entity identified, please describe the nature and**

28            **description of their communications with Seyoung Kim, InQuadron,**

1          **or anyone acting on Defendants' behalf, and when the communications**

2          **took place.**

3      Not applicable.

4      **41.    Identify each person or entity that has approached Seyoung Kim, InQuadron,**

5          **or anyone acting on their behalf to become a business partner of InQuadron.**

6      None.

7          **a.    For each person or entity identified, please describe the nature and**

8          **description of their communications with Seyoung Kim, InQuadron,**

9          **or anyone acting on Defendants' behalf and when the communications**

10          **took place.**

11      Not applicable.

12      **42.    Describe any documents or information relating to InQuadron's anticipated**

13          **business, potential products, products, goods and/or services that was**

14          **supplied or communicated to any investor or potential investor from 2006 to**

15          **the present.**

16      "Mobile Internet Core Technology Business Plan," a 25-page draft business plan that

17      describes the general WiMax market and InQuadron's technology roadmap. It also presents

18      information about various players in the market as well as general market trends. InQuadron may

19      also have supplied investors or potential investors with a presentation entitled "Mobile WiMax

20      Base Station and Mobile Station SOC Development for Global Market," a PowerPoint file that

21      describes WiMAX and the business opportunities its adoption would present. The file also

22      describes the technical strengths of the InQuadron team and the company's ultimate business

23      areas and planned products.

24      **43.    Describe any documents or information relating to Posdata's WiMAX,**

25          **WiBro, or FLYVO technology, including but not limited to the Modular**

26          **Channel Card Assembly ("MCCA") or Turtle Card or Turtle Board,**

27          **Posdata's Digital Channel Card Unit ("DCCU") for the Pico RAS base**

28          **station, Posdata's MAC and PHY source code, Posdata's printed circuit**

| | |
|---|---|
| 1 | board ("PCB") design and layout, the DCCU or MCCA or Turtle Card or |
| 2 | Turtle Board or Pico RAS base stations, the "Modular RAS Implementation" |
| 3 | file, the "Rev. 0.4 DCCU Block Diagram" file, Posdata's Mobile Plugfest |
| 4 | Reports, the NTT DoCoMo Reports, Posdata's IOT Reports, and Posdata's |
| 5 | files or diagrams that depict, reveal, or demonstrate how processors and |
| 6 | components, Posdata's PCB design and layout, and Posdata's software and |
| 7 | source code create an architecture for interface between hardware and |
| 8 | software, that was supplied or communicated to any investor or potential |
| 9 | investor from 2006 to the present. |

10    None.

11    **44.    Did Seyoung Kim or InQuadron discuss investing in InQuadron, Inc. with**
12    **Chan Park?**

13    Yes.

14            **a.    If the response to the question above is yes, please describe their job**
15            **title, job responsibilities and company affiliation if known.**

16    InQuadron objects that this question is vague and ambiguous; it does not make clear
17    whether it seeks information about Dr. Kim or any InQuadron individual, or about Mr. Park. For
18    purposes of this and each other like question below, InQuadron presumes that Posdata seeks
19    information about the potential investor. Subject to that understanding, InQuadron responds that
20    Mr. Park is a retired investor.

21            **b.    If the response to the question above is yes, please describe in detail the**
22            **nature of these discussions and when they took place.**

23    Dr. Kim held a number of discussions Mr. Park over a period of time from late 2006 to
24    early 2007. The discussions were of the same nature as that described in response to Question
25    37.a.

26            **c.    If the response to the question above is yes, did Chan Park or their**
27            **company promise to invest capital in InQuadron?**

28    Yes.

1             **d.**    **If the response to the question above is yes, did InQuadron receive**

2                   **capital from Chan Park or their company?**

3    Yes.

4             **e.**    **If the response to the question above is yes, how much capital did**

5                   **InQuadron receive from Chan Park or their company and when did**

6                   **InQuadron receive it?**

7    US$750,000.

8    **45.**    **Did Seyoung Kim or InQuadron discuss investing in InQuadron, Inc. with**

9         **Yong-choon Kim?**

10   Yes.

11            **a.**    **If the response to the question above is yes, please describe their job**

12                  **title, job responsibilities and company affiliation if known.**

13   Country Manager, National Semiconductor Korea.

14            **b.**    **If the response to the question above is yes, please describe in detail the**

15                  **nature of these discussions and when they took place.**

16   These discussions took place in or about March 2007 and were of the same nature as that

17   described in response to Question 37.a.

18            **c.**    **If the response to the question above is yes, did Yong-choon Kim or**

19                  **their company promise to invest capital in InQuadron?**

20   No.

21            **d.**    **If the response to the question above is yes, did InQuadron receive**

22                  **capital from Yong-choon Kim or their company?**

23   Not applicable.

24            **e.**    **If the response to the question above is yes, how much capital did**

25                  **InQuadron receive from Yong-choon Kim or their company and when**

26                  **did InQuadron receive it?**

27   None.

28

SQUIRE, SANDERS &
DEMPSEY L.L.P.

1    46.    Did Seyoung Kim or InQuadron discuss investing in InQuadron, Inc. with

2           Tae-ho Park?

3    No.

4           a.    If the response to the question above is yes, please describe their job

5                 title, job responsibilities and company affiliation if known.

6    Not applicable.

7           b.    If the response to the question above is yes, please describe in detail the

8                 nature of these discussions and when they took place.

9    Not applicable.

10          c.    If the response to the question above is yes, did Tae-ho Park or their

11                company promise to invest capital in InQuadron?

12   Not applicable.

13          d.    If the response to the question above is yes, did InQuadron receive

14                capital from Tae-ho Park or their company?

15   Not applicable.

16          e.    If the response to the question above is yes, how much capital did

17                InQuadron receive from Tae-ho Park or their company and when did

18                InQuadron receive it?

19   Not applicable.

20   47.    Did Seyoung Kim or InQuadron discuss investing in InQuadron, Inc. with

21          Dongkyu Choi?

22   Yes.

23          a.    If the response to the question above is yes, please describe their job

24                title, job responsibilities and company affiliation if known.

25   Individual investor.

26          b.    If the response to the question above is yes, please describe in detail the

27                nature of these discussions and when they took place.

28

SQUIRE, SANDERS &
DEMPSEY L.L.P.

1 These discussions took place in or about April 2007 and were of the same nature as that

2 described in response to Question 37.a.

3   **c.** **If the response to the question above is yes, did Dongkyu Choi or their**

4    **company promise to invest capital in InQuadron?**

5 Yes.

6   **d.** **If the response to the question above is yes, did InQuadron receive**

7    **capital from Dongkyu Choi or their company?**

8 Yes, but the capital was returned after Dongkyu Choi rescinded his agreement to invest.

9   **e.** **If the response to the question above is yes, how much capital did**

10    **InQuadron receive from Dongkyu Choi or their company and when**

11    **did InQuadron receive it?**

12 Dongkyu Choi paid to InQuadron US$100,000.00 of a US$500,000.00 investment

13 commitment, but his investment commitment was rescinded by mutual agreement after the

14 present lawsuit was filed and served.

15  **48.** **Did Seyoung Kim or InQuadron discuss investing in InQuadron, Inc. with**

16   **Kwang-sun Kim?**

17 Yes.

18   **a.** **If the response to the question above is yes, please describe their job**

19    **title, job responsibilities and company affiliation if known.**

20 CEO, D&T Inc.

21   **b.** **If the response to the question above is yes, please describe in detail the**

22    **nature of these discussions and when they took place.**

23 These discussions took place in or about March 2007 and were of the same nature as that

24 described in response to Question 37.a.

25   **c.** **If the response to the question above is yes, did Kwang-sun Kim or**

26    **their company promise to invest capital in InQuadron?**

27 No.

28

SQUIRE, SANDERS &
DEMPSEY L.L.P.

1          d.      If the response to the question above is yes, did InQuadron receive

2                  capital from Kwang-sun Kim or their company?

3      Not applicable.

4          e.      If the response to the question above is yes, how much capital did

5                  InQuadron receive from Kwang-sun Kim or their company and when

6                  did InQuadron receive it?

7      Not applicable.

8      **49.    Did Seyoung Kim or InQuadron discuss investing in InQuadron, Inc. with**

9              **Young-jo Lee?**

10     No.

11         a.      If the response to the question above is yes, please describe their job

12                 title, job responsibilities and company affiliation if known.

13     Not applicable.

14         b.      If the response to the question above is yes, please describe in detail the

15                 nature of these discussions and when they took place.

16     Not applicable.

17         c.      If the response to the question above is yes, did Young-jo Lee or their

18                 company promise to invest capital in InQuadron?

19     Not applicable.

20         d.      If the response to the question above is yes, did InQuadron receive

21                 capital from Young-jo Lee or their company?

22     Not applicable.

23         e.      If the response to the question above is yes, how much capital did

24                 InQuadron receive from Young-jo Lee or their company and when did

25                 InQuadron receive it?

26     Not applicable.

27     **50.    Did Seyoung Kim or InQuadron discuss investing in InQuadron, Inc. with**

28             **Yong-min Kim?**

1    Yes.

2           **a.**    **If the response to the question above is yes, please describe their job**

3                 **title, job responsibilities and company affiliation if known.**

4    President, STIC Investment Inc.

5           **b.**    **If the response to the question above is yes, please describe in detail the**

6                 **nature of these discussions and when they took place**

7    These discussions took place in or about March 2007 and were of the same nature as that

8    described in response to Question 37.a.

9           **c.**    **If the response to the question above is yes, did Yong-min Kim or their**

10                **company promise to invest capital in InQuadron?**

11    No.

12           **d.**    **If the response to the question above is yes, did InQuadron receive**

13                **capital from Yong-min Kim or their company?**

14    Not applicable.

15           **e.**    **If the response to the question above is yes, how much capital did**

16                **InQuadron receive from Yong-min Kim or their company and when**

17                **did InQuadron receive it?**

18    Not applicable.

19        **51.**    **Did Seyoung Kim or InQuadron discuss investing in InQuadron, Inc. with**

20            **Byung-joon Jeon?**

21    Yes.

22           **a.**    **If the response to the question above is yes, please describe their job**

23                 **title, job responsibilities and company affiliation if known.**

24    Director, Strategy, Korea Telecom Data Inc.

25           **b.**    **If the response to the question above is yes, please describe in detail the**

26                 **nature of these discussions and when they took place.**

27    These discussions took place in or about December 2006 and were of the same nature as

28    that described in response to Question 37.a.

SQUIRE, SANDERS &
DEMPSEY L.L.P.

1                     c.    **If the response to the question above is yes, did Byung-joon Jeon or**

2                          **their company promise to invest capital in InQuadron?**

3    No.

4                     d.    **If the response to the question above is yes, did InQuadron receive**

5                          **capital from Byung-joon Jeon or their company?**

6    Not applicable.

7                     e.    **If the response to the question above is yes, how much capital did**

8                          **InQuadron receive from Byung-joon Jeon or their company and when**

9                          **did InQuadron receive it?**

10   Not applicable.

11   **52.    Did Seyoung Kim or InQuadron discuss investing in InQuadron, Inc. with**

12         **Duk-yong Kim?**

13   Yes.

14                    a.    **If the response to the question above is yes, please describe their job**

15                         **title, job responsibilities and company affiliation if known.**

16   CEO, Korea Microwave Inc.

17                    b.    **If the response to the question above is yes, please describe in detail the**

18                         **nature of these discussions and when they took place.**

19   These discussions took place in or about March 2007 and were of the same nature as that

20   described in response to Question 37.a.

21                    c.    **If the response to the question above is yes, did Duk-yong Kim or their**

22                         **company promise to invest capital in InQuadron?**

23   No.

24                    d.    **If the response to the question above is yes, did InQuadron receive**

25                         **capital from Duk-yong Kim or their company?  N/A.**

26   Not applicable.

27

28

SQUIRE SANDERS &
DEMPSEY L.L.P.

1          **e.**    **If the response to the question above is yes, how much capital did**

2                  **InQuadron receive from Duk-yong Kim or their company and when**

3                  **did InQuadron receive it?**

4   Not applicable.

5   **53.**    **Did Seyoung Kim or InQuadron discuss investing in InQuadron, Inc. with**

6        **Hoon Kim?**

7   Yes.

8          **a.**    **If the response to the question above is yes, please describe their job**

9                  **title, job responsibilities and company affiliation if known.**

10   VP & CTO, We Corporation Inc.

11          **b.**    **If the response to the question above is yes, please describe in detail the**

12                  **nature of these discussions and when they took place.**

13   These discussions took place in or about December 2006 and were of the same nature as

14   that described in response to Question 37.a.

15          **c.**    **If the response to the question above is yes, did Hoon Kim or their**

16                  **company promise to invest capital in InQuadron?**

17   No.

18          **d.**    **If the response to the question above is yes, did InQuadron receive**

19                  **capital from Hoon Kim or their company?**

20   Not applicable.

21          **e.**    **If the response to the question above is yes, how much capital did**

22                  **InQuadron receive from Hoon Kim or their company and when did**

23                  **InQuadron receive it?**

24   Not applicable.

25   **54.**    **Did Seyoung Kim or InQuadron discuss investing in InQuadron, Inc. with**

26        **Seongdong Park?**

27   Yes.

28

SQUIRE, SANDERS &
DEMPSEY L.L.P.

1         **a.    If the response to the question above is yes, please describe their job**

2             **title, job responsibilities and company affiliation if known.**

3        Mr. Park was an employee of Posdata at the time of these discussions; InQuadron's

4  principal's cannot provide Mr. Park's job title and responsibilities at the time without speculating.

5         **b.    If the response to the question above is yes, please describe in detail the**

6             **nature of these discussions and when they took place.**

7        These discussions generally concerned the purpose of InQuadron (i.e., the development a

8  WiMAX (non-WiBro) basestation core technology that would lead to the development of a

9  WiMAX basestation baseband modem ASIC for the US market), InQuadron's formation and

10  investment opportunities. These discussions occurred during the last calendar quarter of 2006

11  and the first month of 2007.

12         **c.    If the response to the question above is yes, did Seongdong Park or**

13             **their company promise to invest capital in InQuadron?**

14        Yes.

15         **d.    If the response to the question above is yes, did InQuadron receive**

16             **capital from Seongdong Park or their company?**

17        Yes.

18         **e.    If the response to the question above is yes, how much capital did**

19             **InQuadron receive from Seongdong Park or their company and when**

20             **did InQuadron receive it?**

21        Mr. Park contributed US$330.00 in capital to InQuadron or about January 23, 2007.

22  **55.    Did Seyoung Kim or InQuadron discuss investing in InQuadron, Inc. with**

23       **Kenneth D. Lee?**

24        Yes.

25         **a.    If the response to the question above is yes, please describe their job**

26             **title, job responsibilities and company affiliation if known.**

27        At the time Mr. Lee was and is a lawyer in private practice.

28

SQUIRE, SANDERS &
DEMPSEY L.L.P.
INQUADRON, INC.'S WRITTEN RESPONSES TO PLAINTIFF'S WRITTEN DEPOSITION QUESTIONS
CASE NO. C 07 2504 RMW (PVT)

1              **b.**     **If the response to the question above is yes, please describe in detail the**

2                   **nature of these discussions and when they took place.**

3    These discussions generally concerned the purpose of InQuadron (i.e., the development a

4    WiMAX (non-WiBro) basestation core technology that would lead to the development of a

5    WiMAX basestation baseband modem ASIC for the US market), InQuadron's formation and the

6    possibility of Mr. Lee's employment by InQuadron as its CFO and general counsel.  These

7    discussions occurred during the last quarter of 2006.

8              **c.**     **If the response to the question above is yes, did Kenneth D. Lee or**

9                   **their company promise to invest capital in InQuadron?**

10    Yes.

11              **d.**     **If the response to the question above is yes, did InQuadron receive**

12                   **capital from Kenneth D. Lee or their company?**

13    Yes.

14              **e.**     **If the response to the question above is yes, how much capital did**

15                   **InQuadron receive from Kenneth D. Lee or their company and when**

16                   **did InQuadron receive it?**

17    Mr. Lee contributed US\$350.00 in capital to InQuadron in or about January 23, 2007.

18    **56.**     **Did Seyoung Kim or InQuadron discuss investing in InQuadron, Inc. with**

19         **Joonsug Chung?**

20    Yes.

21              **a.**     **If the response to the question above is yes, please describe their job**

22                   **title, job responsibilities and company affiliation if known.**

23    At the time of the discussions, Joonsug Chung was the Chief Technical Officer of FIH

24    Technology Korea Ltd..

25              **b.**     **If the response to the question above is yes, please describe in detail the**

26                   **nature of these discussions and when they took place.**

27    These discussions generally concerned the purpose of InQuadron (i.e., the development a

28    WiMAX (non-WiBro) basestation core technology that would lead to the development of a

SQUIRE, SANDERS &
DEMPSEY L.L.P.

1    WiMAX basestation baseband modem ASIC for the US market), InQuadron's formation and

2    Joonsug Chung's potential role at InQuadron. These discussions occurred during the last quarter

3    of 2006.

4              c.      If the response to the question above is yes, did Joonsug Chung or

5                      their company promise to invest capital in InQuadron?

6    Yes.

7              d.      If the response to the question above is yes, did InQuadron receive

8                      capital from Joonsug Chung or their company?

9    Yes.

10             e.      If the response to the question above is yes, how much capital did

11                     InQuadron receive from Joonsug Chung or their company and when

12                     did InQuadron receive it?

13   Joonsug Chung invested US$330.00 in capital in InQuadron in or about January 23, 2007.

14   57.      Did Seyoung Kim or InQuadron discuss investing in InQuadron, Inc. with

15            Jong Kwan Choi?

16   Yes.

17             a.      If the response to the question above is yes, please describe their job

18                     title, job responsibilities and company affiliation if known.

19   At the time of the discussions, Jongkwan Choi was a Posdata employee; InQuadron

20   cannot provide his title and responsibilities at the time without speculating.

21             b.      If the response to the question above is yes, please describe in detail the

22                     nature of these discussions and when they took place.

23   These discussions generally concerned the purpose of InQuadron (i.e., the development a

24   WiMAX (non-WiBro) basestation core technology that would lead to the development of a

25   WiMAX basestation baseband modem ASIC for the US market), InQuadron's formation and

26   investment opportunities in the company. These discussions took place at the end of 2006 and the

27   beginning of 2007.

28

SQUIRE, SANDERS &
DEMPSEY L.L.P.

1               **c.**    **If the response to the question above is yes, did Jong Kwan Choi or**

2                     **their company promise to invest capital in InQuadron?**

3     Yes.

4               **d.**    **If the response to the question above is yes, did InQuadron receive**

5                     **capital from Jong Kwan Choi or their company?**

6     Yes.

7               **e.**    **If the response to the question above is yes, how much capital did**

8                     **InQuadron receive from Jong Kwan Choi or their company and when**

9                     **did InQuadron receive it?**

10     Jongkwan Choi invested US$330.00 in capital in InQuadron in or about January 23, 2007.

11     **58.**    **Did Seyoung Kim or InQuadron discuss investing in InQuadron, Inc. with**

12            **Hwayong Joung?**

13     Yes.

14               **a.**    **If the response to the question above is yes, please describe their job**

15                   **title, job responsibilities and company affiliation if known.**

16     At the time of the discussions, Hwayong Joung was either unemplbyed or employed by

17     Korea Telecom Data, Inc.; InQuadron cannot provide his title and responsibilities at the time

18     without speculating.

19               **b.**    **If the response to the question above is yes, please describe in detail the**

20                   **nature of these discussions and when they took place.**

21     These discussions generally concerned the purpose of InQuadron (i.e., the development a

22     WiMAX (non-WiBro) basestation core technology that would lead to the development of a

23     WiMAX basestation baseband modem ASIC for the US market), InQuadron's formation and

24     investment opportunities in the company. These discussions took place at the end of 2006 and the

25     beginning of 2007.

26               **c.**    **If the response to the question above is yes, did Hwayong Joung or**

27                   **their company promise to invest capital in InQuadron?**

28     Yes.

SQUIRE, SANDERS &
DEMPSEY L.L.P.
INQUADRON, INC.'S WRITTEN RESPONSES TO PLAINTIFF'S WRITTEN DEPOSITION QUESTIONS
CASE NO. C 07 2504 RMW (PVT)

1           **d.    If the response to the question above is yes, did InQuadron receive**

2                   **capital from Hwayong Joung or their company?**

3   Yes.

4           **e.    If the response to the question above is yes, how much capital did**

5                **InQuadron receive from Hwayong Joung or their company and when**

6                **did InQuadron receive it?**

7   Hwayong Joung invested US$330.00 in capital in InQuadron in or about January 23,

8 2007.

9      **59.    Did Seyoung Kim or InQuadron, Inc. discuss investing in InQuadron, Inc. with**

10          **Tae Min Choi?**

11   Yes.

12          **a.    If the response to the question above is yes, please describe their job**

13                **title, job responsibilities and company affiliation if known.**

14   Tae Min Choi is the President of Genesis Vacuum Technologies, Inc.

15          **b.    If the response to the question above is yes, please describe in detail the**

16                **nature of these discussions and when they took place.**

17   These discussions generally concerned the purpose of InQuadron (i.e., the development a

18 WiMAX (non-WiBro) basestation core technology that would lead to the development of a

19 WiMAX basestation baseband modem ASIC for the US market), InQuadron's formation and

20 investment opportunities in the company. The discussions were held at the end of March and the

21 beginning of April of 2007.

22          **c.    If the response to the question above is yes, did Tae Min Choi or their**

23                **company promise to invest capital in InQuadron?**

24   No.

25          **d.    If the response to the question above is yes, did InQuadron receive**

26                **capital from Tae Min Choi or their company?**

27   No.

28

SQUIRE, SANDERS &
DEMPSEY L.L.P.

1           **e.**    **If the response to the question above is yes, how much capital did**

2               **InQuadron receive from Tae Min Choi or their company and when**

3               **did InQuadron receive it?**

4   Not applicable.

5   **60.**   **Did Seyoung Kim or InQuadron discuss investing in InQuadron, Inc. with**

6        **Tae Hyun Choi?**

7   Yes.

8           **a.**    **If the response to the question above is yes, please describe their job**

9               **title, job responsibilities and company affiliation if known.**

10   Tae Hyun Choi is the President of Taesan LCD Co., Ltd.

11           **b.**    **If the response to the question above is yes, please describe in detail the**

12               **nature of these discussions and when they took place.**

13   The discussions were held at the end of March and beginning of April of 2007 and were of

14   the same nature as that described in response to Question 37.a.

15           **c.**    **If the response to the question above is yes, did Tae Hyun Choi or their**

16               **company promise to invest capital in InQuadron?**

17   No.

18           **d.**    **If the response to the question above is yes, did InQuadron receive**

19               **capital from Tae Hyun Choi or their company?**

20   Not applicable.

21           **e.**    **If the response to the question above is yes, how much capital did**

22               **InQuadron receive from Tae Hyun Choi or their company and when**

23               **did InQuadron receive it?**

24   Not applicable.

25   **61.**   **Identify each and every place where documents related to InQuadron's**

26        **anticipated business, potential products, products, goods and/or services are**

27        **stored or retained in electronic form.**

28

SQUIRE, SANDERS &
DEMPSEY L.L.P.
InQUADRON, INC.'S WRITTEN RESPONSES TO PLAINTIFF'S WRITTEN DEPOSITION QUESTIONS
CASE NO. C 07 2504 RMW (PVT)

1    InQuadron documents related to its planned business and/or planned products are located

2    in electronic form in three physical locations:  on two laptop and two desktop computers at

3    InQuadron's office in the U.S.; on computers formerly located at InQuadron's Korea offices

4    (InQuadron is informed that these computers were removed by Korean law enforcement

5    officials); and on storage media maintained in confidence by First Advantage Litigation

6    Consulting, an electronic discovery forensic consulting company engaged by InQuadron's outside

7    counsel in this action.

8        **62.    Identify each and every place where documents related to InQuadron's**

9            **anticipated business, potential products, products, goods and/or services are**

10            **stored or retained in any form other than electronic form.**

11    InQuadron documents related to its planned business and/or planned products and in

12    printed or other non-electronic format, to the extent such documents exist are maintained at:

13    InQuadron's U.S. office; possibly at InQuadron's office in Korea (to the extent not removed by

14    Korean law enforcement officials); at the offices of InQuadron's outside counsel in this action;

15    and at the offices of Posdata's outside counsel (as documents produced in this action).

16        **63.    Does InQuadron maintain an off-site document storage facility?**

17    No.

18            **a.    If yes, what is the location of the facility?**

19    Not applicable.

20            **b.    If yes, describe the types of documents stored there.**

21    Not applicable.

22        **64.    Have current or former InQuadron employees ever maintained records, files,**

23            **or documents at any other location besides InQuadron's facilities?**

24    Not to InQuadron's knowledge.

25            **a.    If yes, what is the location of the facility?**

26    Not applicable.

27            **b.    If yes, describe the types of documents stored there.**

28    Not applicable.

SQUIRE, SANDERS &
DEMPSEY L.L.P.

1    **65.    Has Seyoung Kim ever maintained records, files, or documents at any other**
2          **location besides InQuadron's facilities.**

3    No.

4          **a.    If yes, what is the location of the facility?**

5    Not applicable.

6          **b.    If yes, describe the types of documents stored there.**

7    Not applicable.

8    **66.    Has InQuadron or its employees ever used a computer system as part of its**
9          **operations?**

10    InQuadron objects on the ground that the term "computer system" is vague and

11   ambiguous. As stated in response to prior questions, InQuadron employees had and have laptop

12   or desktop computers. The computers at InQuadron's U.S. office are connected via a local area

13   network (a "LAN") for the purpose of having broadband Internet access. The computers cannot

14   access any networked external storage devices. InQuadron is informed and believes that its

15   Korea office had a like configuration.

16          **a.    If yes, describe the network.**

17   InQuadron incorporates its response to Question 66.

18          **b.    If yes, has InQuadron ever maintained backup tapes?**

19   No.

20          **c.    If yes, does InQuadron use hard drives?**

21   InQuadron has not used hard drives external to the laptop and desktop computers

22   discussed in response to questions above.

23          **(1)    What type of hard drives?**

24   Not applicable.

25          **(2)    How many hard drives?**

26   Not applicable.

27          **(3)    Who uses them?**

28   Not applicable.

1     **(4) Where are the hard drives?**

2 Not applicable.

3    **d. If yes, does InQuadron use external hard drives?**

4 Not applicable.

5     **(1) What type of external hard drives?**

6 Not applicable.

7     **(2) How many external hard drives?**

8 Not applicable.

9     **(3) Who uses them?**

10 Not applicable.

11     **(4) Where are the external hard drives located?**

12 Not applicable.

13 **67. Has any current or former InQuadron employee maintained a home**

14   **computer system or laptop upon which InQuadron records are maintained?**

15 Not to InQuadron's knowledge.

16   **a. If yes, identify each employee, their position, the nature of the records**

17    **maintained on their home computer or laptop, and the current status**

18    **and location of their home computer or laptop.**

19 Not applicable.

20 **68. Has Seyoung Kim used any computer program or other software to erase**

21   **partitions and wipe hard drives of any computers owned by or in the**

22   **possession of Seyoung Kim, InQuadron, or their agents, representatives,**

23   **partners, or employees from 2006 to the present.**

24 Yes.

25   **a. If yes, please describe how Seyoung Kim used the software, when he**

26    **used the software, on what computers or hard drives he used the**

27    **software, and what documents or data were erased or destroyed.**

28

SQUIRE, SANDERS &
DEMPSEY L.L.P.

1    Seyoung Kim used Microsoft Windows (Windows Explorer) to display hard drive folders

2    and to delete certain files on a laptop computer that was issued to him by Posdata and that

3    Posdata allowed him to keep for several months following his termination by the company. Dr.

4    Kim deleted the files shortly before he returned the laptop computer to Posdata. The files that Dr.

5    Kim deleted were personal and other non-Posdata files. He did not keep a log or tally of the files

6    deleted.

7    **69.    Has InQuadron, or their agents, representatives, partners, or employees, used**

8    **any computer program or other software to erase partitions and wipe hard**

9    **drives of any computers owned by or in the possession of Seyoung Kim,**

10    **InQuadron, or their agents, representatives, partners, or employees from**

11    **2006 to the present.**

12    Not to InQuadron's knowledge.

13    **a.    If yes, please describe how InQuadron, or their agents,**

14    **representatives, partners, or employees, used the software, when they**

15    **used the software, on what computers or hard drives he used the**

16    **software, and what documents or data were erased or destroyed.**

17    Not applicable.

18    **70.    What was InQuadron's net worth as of May 1, 2007?**

19    InQuadron objects to this question on the ground that it seeks information that is not

20    relevant to the claim or defense of any party and imposes an undue burden of response. Subject

21    to and without waiving its objections, InQuadron responds as follows:  approximately

22    US$700,000.

23    **a.    What was the value of InQuadron's total assets as of May 1, 2007?**

24    InQuadron objects to this question on the ground that it seeks information that is not

25    relevant to the claim or defense of any party and imposes an undue burden of response. Subject

26    to and without waiving its objections, InQuadron responds as follows:  approximately

27    US$700,000.

28    **b.    What was the value of InQuadron's total liabilities as of May 1, 2007?**

Squire Sanders &
Dempsey L.L.P.

1    InQuadron objects to this question on the ground that it seeks information that is not

2    relevant to the claim or defense of any party and imposes an undue burden of response. Subject

3    to and without waiving its objections, InQuadron responds as follows: other than rent and lease

4    obligations and general office expenses (utilities, telephone and internet charges and the like)

5    InQuadron did not have any significant liabilities as of May 1, 2007.

6    **71.    What is InQuadron's current net worth?**

7    InQuadron objects to this question on the ground that it seeks information that is not

8    relevant to the claim or defense of any party and imposes an undue burden of response. Subject

9    to and without waiving its objections, InQuadron responds as follows: InQuadron currently has a

10   negative net worth as its current liabilities exceed its assets.

11   **a.    What is the value of InQuadron's current total assets?**

12   InQuadron objects to this question on the ground that it seeks information that is not

13   relevant to the claim or defense of any party and imposes an undue burden of response. Subject

14   to and without waiving its objections, InQuadron incorporates its response to Questions 73, 73.a.

15   and 73.b.

16   **b.    What is the value of InQuadron's current total liabilities?**

17   InQuadron objects to this question on the ground that it seeks information that is not

18   relevant to the claim or defense of any party and imposes an undue burden of response. Subject

19   to and without waiving its objections, InQuadron responds as follows: approximately

20   US$150,000 or more.

21   **72.    Has InQuadron ever owned any real property?**

22   No.

23   **a.    If yes, for each property provide its address, describe the type of**

24   **property it is, the date it purchased it, and how much it purchased the**

25   **property for.**

26   Not applicable.

27   **b.    If yes, has InQuadron sold any real property within the last year?**

28   Not applicable.

SQUIRE, SANDERS &
DEMPSEY L.L.P.

1            c.      **If yes, for each property provide its address, describe the type of**

2                    **property it is, the date InQuadron purchased it, how much InQuadron**

3                    **purchased it for, the date InQuadron sold it, how much InQuadron**

4                    **sold it for, and any realized gain or lost from the transaction.**

5      Not applicable.

6      73.      **Identify each and every cash equivalent asset that InQuadron has in its name,**

7             **including but not limited to cash, checking accounts, savings accounts, money**

8             **market funds, certificates of deposit, or other cash reserve accounts.**

9      InQuadron incorporates its response to Question 73.a. below.

10            a.      **For each asset, please describe the asset, the cost of acquisition, the**

11                    **date of acquisition, its current value, and any realized gain or loss**

12                    **from holding the asset.**

13      InQuadron maintains two checking accounts (general and payroll) at Bank of America;

14 their current aggregate balance is approximately $10,000. InQuadron maintains one checking

15 account in Korea with a current balance of about 19 million Korean Won.

16            b.      **For every checking, savings, or investment account solely or jointly in**

17                    **InQuadron's name, please list the institution, account number, and the**

18                    **current asset balance of the account.**

| Name of institution | Account No. | Current balance |
|---|---|---|
| Bank of America | 01573-40806 | ~$9,900 |
| Bank of America | 01578-60472 | ~$200 |
| Citibank Korea | 374-00099-240-01 | ~19 million Korean Won |

23      74.      **Identify each and every cash equivalent asset that InQuadron has in its name**

24             **as of May 1, 2007, including but not limited to cash, checking accounts,**

25             **savings accounts, money market funds, certificates of deposit, or other cash**

26             **reserve accounts.**

27      InQuadron incorporates its response to Questions 73, 73.a. and 73.b. above.

28

1          **a.    For each asset, please describe the asset, the cost of acquisition, the**

2          **date of acquisition, the date of divestment of the asset if applicable, its**

3          **value as of May 1, 2007, and any realized gain or loss from holding the**

4          **asset.**

5    InQuadron incorporates its response to Questions 73, 73.a. and 73.b. above.

6          **b.    For every checking, savings, or investment account solely or jointly in**

7          **InQuadron's name, please list the institution, account number, and the**

8          **asset balance of the account as of May 1, 2007.**

9    InQuadron incorporates its response to Questions 73, 73.a. and 73.b. above.

10   **75.    Identify each and every other asset solely or jointly in InQuadron's name,**

11         **including but not limited to stocks, annuities, limited partnerships, business**

12         **interests, bonds, trust deeds, or other assets.**

13   None.

14          **a.    For each asset, please describe the asset, the cost of acquisition, the**

15         **date of acquisition, its current value, and any realized gain or loss**

16         **from holding the asset.**

17   Not applicable.

18   **76.    Identify each and every other asset solely or jointly in InQuadron's name as**

19         **of May 1, 2007, including but not limited to stocks, annuities, limited**

20         **partnerships, business interests, bonds, trust deeds, or other assets.**

21   None.

22          **a.    For each asset, please describe the asset, the cost of acquisition, the**

23         **date of acquisition, the date of divestment of the asset if applicable, its**

24         **value as of May 1, 2007, and any realized gain or loss from holding the**

25         **asset.**

26   Not applicable.

27   **77.    Identify each and every other asset solely or jointly in InQuadron's name not**

28         **listed above.**

SQUIRE, SANDERS &
DEMPSEY L.L.P.

1   InQuadron owns several laptop and desktop computers, office furniture, office equipment

2   and supplies.

3       **a.**    **For each asset, please describe the asset, the cost of acquisition, the**

4           **date of acquisition, the date it was sold if applicable, its current value**

5           **if applicable, and any realized gain or loss from holding or selling the**

6           **asset.**

7   InQuadron objects to this question on the ground that it is not relevant to any claim or

8   defense and on the ground that determining the response is unduly burdensome, particularly in

9   light of the absence of relevance. Subject to and without waiving its objections, InQuadron

10  responds that the total acquisition cost of the assets described in response to Question 77 was less

11  than US$50,000.

12      **78.**    **Identify each and every other asset solely or jointly in InQuadron's name as**

13          **of May 1, 2007 not listed above.**

14  None.

15      **a.**    **For each asset, please describe the asset, the cost of acquisition, the**

16          **date of acquisition, the date of divestment of the asset if applicable, its**

17          **value as of May 1, 2007 if applicable, and any realized gain or loss**

18          **from holding or selling the asset.**

19  Not applicable.

20      **79.**    **Identify each and every other asset solely or jointly in another entity or**

21          **person's name that is being held for the benefit of InQuadron.**

22  None.

23      **a.**    **For each asset, please describe the asset, the cost of acquisition, the**

24          **date of acquisition, the date it was sold if applicable, its current value**

25          **if applicable, and any realized gain or loss from holding or selling the**

26          **asset.**

27  Not applicable.

28

1     **80.**    **Identify each and every other asset solely or jointly in another entity or**

2          **person's name that is being held for the benefit of InQuadron.**

3     None.

4          **a.**    **For each asset, please describe the asset, the cost of acquisition, the**

5              **date of acquisition, the date of divestment of the asset if applicable, its**

6              **value as of May 1, 2007 if applicable, and any realized gain or loss**

7              **from holding or selling the asset.**

8     Not applicable.

9     **81.**    **Identify each and every liability solely or jointly in InQuadron's name,**

10          **including but not limited to mortgages, loans, debts, or other liabilities.**

11     InQuadron objects to this question on the ground that it is not relevant to any claim or

12 defense and on the ground that determining the response is unduly burdensome, particularly in

13 light of the absence of relevance. Subject to and without waiving its objections, InQuadron is

14 liable for several leases (office space, apartment and automobile for Dr. Kim). Apart from these

15 leases, InQuadron has no liabilities of the type relevant to this question.

16          **a.**    **For each liability, please describe the liability, the date the liability was**

17              **incurred, the amount of initial liability, the current liability if**

18              **applicable, and any realized gain or loss incurred as a result of the**

19              **liability.**

20     InQuadron objects to this question on the ground that it is not relevant to any claim or

21 defense and on the ground that determining the response is unduly burdensome, particularly in

22 light of the absence of relevance.

23     **82.**    **Identify each and every liability solely or jointly in InQuadron's name as of**

24          **May 1, 2007, including but not limited to mortgages, loans, debts, or other**

25          **liabilities.**

26     InQuadron incorporates its objection and response to Question 81.

27          **a.**    **For each liability, please describe the liability, the date the liability was**

28              **incurred, the amount of initial liability, the liability as of May 1, 2007**

1                    **if applicable, and any realized gain or loss incurred as a result of the**

2                    **liability.**

3     InQuadron incorporates its objection to Question 81.a.

4     **83.**     **Has InQuadron incurred any legal expenses, fees, and costs since October 27,**

5           **2006?**

6     Yes.

7           **a.**     **If yes, list the total expenses, fees, and costs incurred during this time,**

8               **describe the nature of the legal services received by InQuadron, and**

9               **the person or entity that has performed the legal work.**

10     InQuadron objects to this question on the ground that it is not relevant to any claim or

11 defense and on the ground that determining the response is unduly burdensome, particularly in

12 light of the absence of relevance. Subject to and without waiving its objections, InQuadron states

13 that the total legal fees InQuadron has incurred since October 27, 2006 total approximately

14 $300,000.00. These fees were incurred in defense of this action, for the defense of InQuadron's

15 Korea-based employees on charges alleging the theft of Posdata trade secrets, and various visa-

16 related work. Legal services were provided by Squire, Sanders and Dempsey L.L.P. for

17 litigation, Kim, Shin & Yu and J. Lee, Esq. for the Korea matters, and Lee & Kim for visa-related

18 work.

19     **84.**     **Identify each and every source of income InQuadron has ever received.**

20     None.

21           **a.**     **For each source of income, describe the nature and source of the**

22               **income, that amount of income received and other benefits received.**

23     Not applicable.

24     **85.**     **Identify each and every source of capital that InQuadron has ever received.**

25     InQuadron's capital was contributed by its preferred and common stock shareholders.

26           **a.**     **For each source of capital, describe the nature and source of capital,**

27               **the amount of capital received, the date the capital was received, and**

28               **from whom or what company the capital was received.**

SQUIRE, SANDERS &
DEMPSEY L.L.P.
...
...
- 52 -
INQUADRON, INC.'S WRITTEN RESPONSES TO PLAINTIFF'S WRITTEN DEPOSITION QUESTIONS
CASE NO. C 07-2504 RMW (PVT)

1    InQuadron incorporates its response to Question 36.a.

2    **86.    Have financial statements ever been prepared for InQuadron, including**

3           **income statements, cash flow statements, or balance sheets?**

4    No.

5           **a.    If yes, please describe which financial statements have been prepared,**

6                 **when the statements were prepared, for whom the statements were**

7                 **prepared, and where copies of the statements can be found.**

8    Not applicable.

9    **87.    What is InQuadron's net revenue since its inception?**

10   Zero.

11   **88.    What is InQuadron's gross revenue since its inception?**

12   Zero.

13          **a.    Identify each and every source of InQuadron's gross revenue since its**

14                 **inception.**

15   Not applicable.

16          **b.    For every source listed, provide a description and amount of gross**

17                 **revenue.**

18   Not applicable.

19   **89.    What are InQuadron's total expenses since its inception?**

20   InQuadron objects to this question on the ground that it is not relevant to any claim or

21   defense and on the ground that determining the response is unduly burdensome, particularly in

22   light of the absence of relevance. Subject to and without waiving its objections, InQuadron

23   responds as follows: over US$750,000.

24          **a.    Identify each and every expense of InQuadron's since its inception.**

25   InQuadron objects to this question on the ground that it is not relevant to any claim or

26   defense and on the ground that determining the response is unduly burdensome, particularly in

27   light of the absence of relevance. Subject to and without waiving its objections, InQuadron states

28

SQUIRE, SANDERS &
DEMPSEY L.L.P.

1    that the vast majority of its expenses have been for, in order of decreasing magnitude, employee

2    compensation, legal fees and office leases.

3              b.    **For every expense, provide a description and amount of the expense.**

4    InQuadron incorporates its objections and response to Question 89.a.

5    **90.    Identify each person or entity that has been approached by Seyoung Kim,**

6          **InQuadron, or anyone acting on their behalf to become a customer of**

7          **InQuadron.**

8    None.

9              a.    **For each person or entity identified, please describe the nature and**

10                  **description of their communications with Seyoung Kim, InQuadron,**

11                  **or anyone acting on Defendants' behalf, and when the communications**

12                  **took place.**

13    Not applicable.

14    **91.    Identify each person or entity that has approached Seyoung Kim, InQuadron,**

15          **or anyone acting on their behalf to become a customer of InQuadron.**

16    None.

17              a.    **For each person or entity identified, please describe the nature and**

18                  **description of their communications with Seyoung Kim, InQuadron,**

19                  **or anyone acting on Defendants' behalf, and when the communications**

20                  **took place.**

21    Not applicable.

22    **92.    Identify each and every product, service, or other good that has ever been**

23          **sold by InQuadron.**

24    None.

25              a.    **For each sale, identify the product, service, or other good sold, the date**

26                  **of the sale, the quantity sold, the customer, the customer's address and**

27                  **contact information, the sale price, the InQuadron employees that**

28

SQUIRE, SANDERS &
DEMPSEY L.L.P.

1                   handled the sale, and the current location and status of the products,

2                   service, or goods sold.

3  Not applicable.

4     93.       Identify each and every product, service, or other good that has ever been

5           given by InQuadron to a customer or potential customer.

6  None.

7           a.       For each product, service, or other good given away, identify the

8                   product, service, or other given away, the date of the transaction, the

9                   quantity given away, the customer or potential customer, the

10                  customer's address and contact information, the sale price, the

11                  InQuadron employees that handled the transaction, and the current

12                  location and status of the product, service, or other good.

13 Not applicable.

14    94.       Identify each person or entity that has ever received or been given a Turtle

15          Card or "turtle board."

16 Seyoung Kim, Seongdong Park, Hwayong Joung, Jongkwan (Jeff) Choi and Choon Shin;

17 see also InQuadron's response to Question 34 above.

18          a.       For each person or entity that has received this item, identify the date

19                  of the transaction, the quantity received or given away, the person or

20                  entity's address and contact information, the sale price if applicable,

21                  the InQuadron employees that handled the transaction, and the

22                  current location and status of Turtle Card or "turtle board."

23 InQuadron is aware of only one "Turtle Board." In or about March 2007, Jongkwan (Jeff)

24 Choi provided the Turtle Board to Choon Shin of Posdata. InQuadron is informed and believes

25 that Choon Shin either discarded or destroyed the Turtle Board.

26          b.       Describe the current status, including but not limited to identifying the

27                  location, and person or entity in possession, or last in possession of

28

SQUIRE, SANDERS &
DEMPSEY L.L.P.

1    each Turtle Card or "turtle board" manufactured or fabricated by

2    Axstone Technology Co. Ltd.

3    The only Turtle Board of which InQuadron is aware of was provided by Jongkwan (Jeff)

4    Choi to Choon Shin of Posdata; InQuadron is informed and believes that Choon Shin either

5    discarded or destroyed the Turtle Board. No other Turtle Boards or Turtle Cards are in the

6    possession of InQuadron or its agents, representatives, partners, or employees.

7    **95.    Is any information or documents related to Posdata's Digital Channel Card**

8    **Unit ("DCCU") for the Pico RAS base station within the possession of**

9    **Defendants Seyoung Kim, InQuadron, Inc., or their agents, representatives,**

10   **partners, or employees.**

11   No.

12   **a.    If yes, please describe the information related to Posdata's DCCU for**

13   **the Pico RAS base station within the possession of Defendants Seyoung**

14   **Kim, InQuadron, Inc., or their agents, representatives, partners, or**

15   **employees.**

16   Not applicable.

17   **b.    If yes, please describe the documents related to Posdata's DCCU for**

18   **the Pico RAS base station within the possession of Defendants Seyoung**

19   **Kim, InQuadron, Inc., or their agents, representatives, partners, or**

20   **employees.**

21   Not applicable.

22   **c.    If yes, please describe how the information or documents related to**

23   **Posdata's DCCU for the Pico RAS base station within the possession of**

24   **Defendants Seyoung Kim, InQuadron, Inc., or their agents,**

25   **representatives, partners, or employees has been utilized by them in**

26   **any manner.**

27   Not applicable.

28

SQUIRE, SANDERS &
DEMPSEY L.L.P.

1              **d.**    **If yes, please describe how the information or documents related to**

2                     **Posdata's DCCU for the Pico RAS base station has been utilized in the**

3                     **research and development of WiMAX or WiBro technology under**

4                     **development by Defendants Seyoung Kim, InQuadron, Inc., or their**

5                     **agents, representatives, partners, or employees.**

6    Not applicable.

7               **e.**    **If yes, please describe all persons or companies other than InQuadron,**

8                     **Inc. or its employees that have received information or documents**

9                     **related to Posdata's DCCU for the Pico RAS base station from**

10                  **Defendants Seyoung Kim, InQuadron, Inc., or their agents,**

11                  **representatives, partners, or employees.**

12    Not applicable.

13               **f.**    **If yes, please describe in detail whether Defendants Seyoung Kim,**

14                  **InQuadron, Inc., or their agents, representatives, partners, or**

15                  **employees have disclosed, transmitted, or copied any information**

16                  **related to Posdata's DCCU for the Pico RAS base station.**

17    Not applicable.

18               **g.**    **If yes, please describe any instances that this information or**

19                  **documents related to Posdata's DCCU for the Pico RAS base station**

20                  **within the possession of Defendants Seyoung Kim, InQuadron, Inc., or**

21                  **their agents, representatives, partners, or employees has been sold,**

22                  **marketed, or commercialized by them in any manner.**

23    Not applicable.

24    **96.**    **Is any information or documents related to the Modular Channel Card**

25           **Assembly ("MCCA") or Turtle Card or Turtle Board within the possession of**

26           **Defendants Seyoung Kim, InQuadron, Inc., or their agents, representatives,**

27           **partners, or employees.**

28    No.

SQUIRE, SANDERS &
DEMPSEY L.L.P.

1          a.    **If yes, please describe the information related to the MCCA or Turtle**
2                **Card or Turtle Board within the possession of Defendants Seyoung**
3                **Kim, InQuadron, Inc., or their agents, representatives, partners, or**
4                **employees.**
5    Not applicable.
6          b.    **If yes, please describe the documents related to the MCCA or Turtle**
7                **Card or Turtle Board within the possession of Defendants Seyoung**
8                **Kim, InQuadron, Inc., or their agents, representatives, partners, or**
9                **employees.**
10   Not applicable.
11         c.    **If yes, please describe how the information or documents related to the**
12               **MCCA or Turtle Card or Turtle Board within the possession of**
13               **Defendants Seyoung Kim, InQuadron, Inc., or their agents,**
14               **representatives, partners, or employees has been utilized by them in**
15               **any manner.**
16   Not applicable.
17         d.    **If yes, please describe how the information or documents related to the**
18               **MCCA or Turtle Card or Turtle Board has been utilized in the**
19               **research and development of WiMAX or WiBro technology under**
20               **development by Defendants Seyoung Kim, InQuadron, Inc., or their**
21               **agents, representatives, partners, or employees.**
22   Not applicable.
23         e.    **If yes, please describe all persons or companies other than InQuadron,**
24               **Inc. or its employees that have received information or documents**
25               **related to the MCCA or Turtle Card or Turtle Board from Defendants**
26               **Seyoung Kim, InQuadron, Inc., or their agents, representatives,**
27               **partners, or employees.**
28   Not applicable.

- 58 -

SQUIRE, SANDERS &
DEMPSEY L.L.P.

      f.    **If yes, please describe in detail whether Defendants Seyoung Kim,**

           **InQuadron, Inc., or their agents, representatives, partners, or**

           **employees have disclosed, transmitted, or copied any information**

           **related to the MCCA or Turtle Card or Turtle Board.**

Not applicable.

      g.    **If yes, please describe any instances that this information or**

           **documents related to the MCCA or Turtle Card or Turtle Board**

           **within the possession of Defendants Seyoung Kim, InQuadron, Inc., or**

           **their agents, representatives, partners, or employees has been sold,**

           **marketed, or commercialized by them in any manner.**

Not applicable.

**97.**    **Is any information or documents related to Posdata's MAC and PHY source**

      **code within the possession of Defendants Seyoung Kim, InQuadron, Inc., or**

      **their agents, representatives, partners, or employees.**

No.

      a.    **If yes, please describe the information related to Posdata's MAC and**

           **PHY source code within the possession of Defendants Seyoung Kim,**

           **InQuadron, Inc., or their agents, representatives, partners, or**

           **employees.**

Not applicable.

      b.    **If yes, please describe the documents related to Posdata's MAC and**

           **PHY source code within the possession of Defendants Seyoung Kim,**

           **InQuadron, Inc., or their agents, representatives, partners, or**

           **employees.**

Not applicable.

      c.    **If yes, please describe how the information or documents related to**

           **Posdata's MAC and PHY source code within the possession of**

           **Defendants Seyoung Kim, InQuadron, Inc., or their agents,**

1    representatives, partners, or employees has been utilized by them in

2    any manner.

3    Not applicable.

4        d.    If yes, please describe how the information or documents related to

5    Posdata's MAC and PHY source code has been utilized in the research

6    and development of WiMAX or WiBro technology under development

7    by Defendants Seyoung Kim, InQuadron, Inc., or their agents,

8    representatives, partners, or employees.

9    Not applicable.

10       e.    If yes, please describe all persons or companies other than InQuadron,

11   Inc. or its employees that have received information or documents

12   related to Posdata's MAC and PHY source code from Defendants

13   Seyoung Kim, InQuadron, Inc., or their agents, representatives,

14   partners, or employees.

15   Not applicable.

16       f.    If yes, please describe in detail whether Defendants Seyoung Kim,

17   InQuadron, Inc., or their agents, representatives, partners, or

18   employees have disclosed, transmitted, or copied any information

19   related to Posdata's MAC and PHY source code.

20   Not applicable.

21       g.    If yes, please describe any instances that this information or

22   documents related to Posdata's MAC and PHY source code within the

23   possession of Defendants Seyoung Kim, InQuadron, Inc., or their

24   agents, representatives, partners, or employees has been sold,

25   marketed, or commercialized by them in any manner.

26   Not applicable.

27

28

SQUIRE, SANDERS &
DEMPSEY L.L.P.

98. **Is any information or documents related to Posdata's printed circuit board ("PCB") design and layout within the possession of Defendants Seyoung Kim, InQuadron, Inc., or their agents, representatives, partners, or employees.**

No.

a. **If yes, please describe the information related to Posdata's printed circuit board ("PCB") design and layout within the possession of Defendants Seyoung Kim, InQuadron, Inc., or their agents, representatives, partners, or employees.**

Not applicable.

b. **If yes, please describe the documents related to Posdata's printed circuit board ("PCB") design and layout within the possession of Defendants Seyoung Kim, InQuadron, Inc., or their agents, representatives, partners, or employees.**

Not applicable.

c. **If yes, please describe how the information or documents related to Posdata's printed circuit board ("PCB") design and layout within the possession of Defendants Seyoung Kim, InQuadron, Inc., or their agents, representatives, partners, or employees has been utilized by them in any manner.**

Not applicable.

d. **If yes, please describe how the information or documents related to Posdata's printed circuit board ("PCB") design and layout has been utilized in the research and development of WiMAX or WiBro technology under development by Defendants Seyoung Kim, InQuadron, Inc., or their agents, representatives, partners, or employees.**

Not applicable.

1        **e.**    **If yes, please describe all persons or companies other than InQuadron,**

2             **Inc. or its employees that have received information or documents**

3             **related to Posdata's printed circuit board ("PCB") design and layout**

4             **from Defendants Seyoung Kim, InQuadron, Inc., or their agents,**

5             **representatives, partners, or employees.**

6   Not applicable.

7        **f.**    **If yes, please describe in detail whether Defendants Seyoung Kim,**

8             **InQuadron, Inc., or their agents, representatives, partners, or**

9             **employees have disclosed, transmitted, or copied any information**

10            **related to Posdata's printed circuit board ("PCB") design and layout.**

11  Not applicable.

12        **g.**    **If yes, please describe any instances that this information or**

13            **documents related to Posdata's printed circuit board ("PCB") design**

14            **and layout within the possession of Defendants Seyoung Kim,**

15            **InQuadron, Inc., or their agents, representatives, partners, or**

16            **employees has been sold, marketed, or commercialized by them in any**

17            **manner.**

18  Not applicable.

19  **99.**   **Is any information or documents related to prototypes of the DCCU or**

20      **MCCA or Turtle Card or Turtle Board or Pico RAS base stations within the**

21      **possession of Defendants Seyoung Kim, InQuadron, Inc., or their agents,**

22      **representatives, partners, or employees.**

23  No.

24        **a.**    **If yes, please describe the information related to the DCCU or MCCA**

25            **or Turtle Card or Turtle Board or Pico RAS base stations within the**

26            **possession of Defendants Seyoung Kim, InQuadron, Inc., or their**

27            **agents, representatives, partners, or employees.**

28  Not applicable.

SQUIRE, SANDERS &
DEMPSEY L.L.P.

1       **b.**    **If yes, please describe the documents related to the DCCU or MCCA**

2           **or Turtle Card or Turtle Board or Pico RAS base stations within the**

3           **possession of Defendants Seyoung Kim, InQuadron, Inc., or their**

4           **agents, representatives, partners, or employees.**

5 Not applicable.

6       **c.**    **If yes, please describe how the information or documents related to the**

7           **DCCU or MCCA or Turtle Card or Turtle Board or Pico RAS base**

8           **stations within the possession of Defendants Seyoung Kim, InQuadron,**

9           **Inc., or their agents, representatives, partners, or employees has been**

10          **utilized by them in any manner.**

11 Not applicable.

12       **d.**    **If yes, please describe how the information or documents related to the**

13           **DCCU or MCCA or Turtle Card or Turtle Board or Pico RAS base**

14           **stations has been utilized in the research and development of WiMAX**

15           **or WiBro technology under development by Defendants Seyoung Kim,**

16           **InQuadron, Inc., or their agents, representatives, partners, or**

17           **employees.**

18 Not applicable.

19       **e.**    **If yes, please describe all persons or companies other than InQuadron,**

20           **Inc. or its employees that have received information or documents**

21           **related to the DCCU or MCCA or Turtle Card or Turtle Board or**

22           **Pico RAS base stations from Defendants Seyoung Kim, InQuadron,**

23           **Inc., or their agents, representatives, partners, or employees.**

24 Not applicable.

25       **f.**    **If yes, please describe in detail whether Defendants Seyoung Kim,**

26           **InQuadron, Inc., or their agents, representatives, partners, or**

27           **employees have disclosed, transmitted, or copied any information**

28

INQUADRON, INC.'S WRITTEN RESPONSES TO PLAINTIFF'S WRITTEN DEPOSITION QUESTIONS
CASE NO. C 07 2504 RMW (PVT)

SQUIRE, SANDERS &
DEMPSEY L.L.P.

| 1 | | related to the DCCU or MCCA or Turtle Card or Turtle Board or |
| 2 | | Pico RAS base stations. |
| 3 | Not applicable. | |
| 4 | g. | If yes, please describe any instances that this information or |
| 5 | | documents related to the DCCU or MCCA or Turtle Card or Turtle |
| 6 | | Board or Pico RAS base stations within the possession of Defendants |
| 7 | | Seyoung Kim, InQuadron, Inc., or their agents, representatives, |
| 8 | | partners, or employees has been sold, marketed, or commercialized by |
| 9 | | them in any manner. |
| 10 | Not applicable. | |
| 11 | 100. | Is any information or documents related to the "Modular RAS |
| 12 | | Implementation" file within the possession of Defendants Seyoung Kim, |
| 13 | | InQuadron, Inc., or their agents, representatives, partners, or employees. |
| 14 | No. | |
| 15 | a. | If yes, please describe the information related to the "Modular RAS |
| 16 | | Implementation" file within the possession of Defendants Seyoung |
| 17 | | Kim, InQuadron, Inc., or their agents, representatives, partners, or |
| 18 | | employees. |
| 19 | Not applicable. | |
| 20 | b. | If yes, please describe the documents related to the "Modular RAS |
| 21 | | Implementation" file within the possession of Defendants Seyoung |
| 22 | | Kim, InQuadron, Inc., or their agents, representatives, partners, or |
| 23 | | employees. |
| 24 | Not applicable. | |
| 25 | c. | If yes, please describe how the information or documents related to the |
| 26 | | "Modular RAS Implementation" file within the possession of |
| 27 | | Defendants Seyoung Kim, InQuadron, Inc., or their agents, |
| 28 | | |

SQUIRE, SANDERS &
DEMPSEY L.L.P.

1     representatives, partners, or employees has been utilized by them in

2     any manner.

3 Not applicable.

4     d.     If yes, please describe how the information or documents related to the

5     "Modular RAS Implementation" file has been utilized in the research

6     and development of WiMAX or WiBro technology under development

7     by Defendants Seyoung Kim, InQuadron, Inc., or their agents,

8     representatives, partners, or employees.

9 Not applicable.

10     e.     If yes, please describe all persons or companies other than InQuadron,

11     Inc. or its employees that have received information or documents

12     related to the "Modular RAS Implementation" file from Defendants

13     Seyoung Kim, InQuadron, Inc., or their agents, representatives,

14     partners, or employees.

15 Not applicable.

16     f.     If yes, please describe in detail whether Defendants Seyoung Kim,

17     InQuadron, Inc., or their agents, representatives, partners, or

18     employees have disclosed, transmitted, or copied any information

19     related to the "Modular RAS Implementation" file.

20 Not applicable.

21     g.     If yes, please describe any instances that this information or

22     documents related to the "Modular RAS Implementation" file within

23     the possession of Defendants Seyoung Kim, InQuadron, Inc., or their

24     agents, representatives, partners, or employees has been sold,

25     marketed, or commercialized by them in any manner.

26 Not applicable.

27

28

1    101.    Is any information or documents related to the "Rev. 0.4 DCCU Block

2            Diagram" file within the possession of Defendants Seyoung Kim, InQuadron,

3            Inc., or their agents, representatives, partners, or employees.

4    No.

5            a.    If yes, please describe the information related to the "Rev. 0.4 DCCU

6                  Block Diagram" file within the possession of Defendants Seyoung Kim,

7                  InQuadron, Inc., or their agents, representatives, partners, or

8                  employees.

9    Not applicable.

10           b.    If yes, please describe the documents related to the "Rev. 0.4 DCCU

11                 Block Diagram" file within the possession of Defendants Seyoung Kim,

12                 InQuadron, Inc., or their agents, representatives, partners, or

13                 employees.

14   Not applicable.

15           c.    If yes, please describe how the information or documents related to the

16                 "Rev. 0.4 DCCU Block Diagram" file within the possession of

17                 Defendants Seyoung Kim, InQuadron, Inc., or their agents,

18                 representatives, partners, or employees has been utilized by them in

19                 any manner.

20   Not applicable.

21           d.    If yes, please describe how the information or documents related to the

22                 "Rev. 0.4 DCCU Block Diagram" file has been utilized in the research

23                 and development of WiMAX or WiBro technology under development

24                 by Defendants Seyoung Kim, InQuadron, Inc., or their agents,

25                 representatives, partners, or employees.

26   Not applicable.

27           e.    If yes, please describe all persons or companies other than InQuadron,

28                 Inc. or its employees that have received information or documents

SQUIRE, SANDERS &
DEMPSEY L.L.P.

1           **related to the "Rev. 0.4 DCCU Block Diagram" file from Defendants**

2           **Seyoung Kim, InQuadron, Inc., or their agents, representatives,**

3           **partners, or employees.**

4   Not applicable.

5       **f.**     **If yes, please describe in detail whether Defendants Seyoung Kim,**

6           **InQuadron, Inc., or their agents, representatives, partners, or**

7           **employees have disclosed, transmitted, or copied any information**

8           **related to the "Rev. 0.4 DCCU Block Diagram" file.**

9   Not applicable.

10       **g.**     **If yes, please describe any instances that this information or**

11           **documents related to the "Rev. 0.4 DCCU Block Diagram" file within**

12           **the possession of Defendants Seyoung Kim, InQuadron, Inc., or their**

13           **agents, representatives, partners, or employees has been sold,**

14           **marketed, or commercialized by them in any manner.**

15   Not applicable.

16   **102.**    **Is any information or documents related to Posdata's Mobile Plugfest Reports**

17           **within the possession of Defendants Seyoung Kim, InQuadron, Inc., or their**

18           **agents, representatives, partners, or employees.**

19   Neither InQuadron nor its agents, representatives, partners or employees has any

20   information or documents related to Mobile Plugfest Reports apart from those certain e-mails

21   already in Posdata's possession and submitted as evidence in support of Posdata's motion for a

22   temporary retraining order.

23       **a.**     **If yes, please describe the information related to Posdata's Mobile**

24           **Plugfest Reports within the possession of Defendants Seyoung Kim,**

25           **InQuadron, Inc., or their agents, representatives, partners, or**

26           **employees.**

27   Not applicable.

28

1          b.      **If yes, please describe the documents related to Posdata's Mobile**

2                  **Plugfest Reports within the possession of Defendants Seyoung Kim,**

3                  **InQuadron, Inc., or their agents, representatives, partners, or**

4                  **employees.**

5      Not applicable.

6          c.      **If yes, please describe how the information or documents related to**

7                  **Posdata's Mobile Plugfest Reports within the possession of Defendants**

8                  **Seyoung Kim, InQuadron, Inc., or their agents, representatives,**

9                  **partners, or employees has been utilized by them in any manner.**

10     Not applicable.

11         d.      **If yes, please describe how the information or documents related to**

12                 **Posdata's Mobile Plugfest Reports has been utilized in the research**

13                 **and development of WiMAX or WiBro technology under development**

14                 **by Defendants Seyoung Kim, InQuadron, Inc., or their agents,**

15                 **representatives, partners, or employees.**

16     None of the information or documents related to Posdata's Mobile Plugfest Reports that

17 may have come into the possession of InQuadron or its agents, representatives, partners, or

18 employees has been utilized in any manner other than the e-mail from Choon Shin to Dr. Kim

19 dated February 20, 2007 that is attached as Exhibit 11 to the declarations of Ho Tae Tan and

20 Renee Yoon and submitted as evidence in support of Posdata's ex parte application for a

21 temporary restraining order.

22         e.      **If yes, please describe all persons or companies other than InQuadron,**

23                 **Inc. or its employees that have received information or documents**

24                 **related to Posdata's Mobile Plugfest Reports from Defendants**

25                 **Seyoung Kim, InQuadron, Inc., or their agents, representatives,**

26                 **partners, or employees.**

27

28

SQUIRE, SANDERS &
DEMPSEY L.L.P.

1         None of the information or documents related to Posdata's Mobile Plugfest Reports that

2    may have come into the possession of InQuadron, Dr. Kim or their agents, representatives,

3    partners, or employees has been disclosed by them to any third party.

4           **f.**    **If yes, please describe in detail whether Defendants Seyoung Kim,**

5                **InQuadron, Inc., or their agents, representatives, partners, or**

6                **employees have disclosed, transmitted, or copied any information**

7                **related to Posdata's Mobile Plugfest Reports.**

8         Neither InQuadron nor its agents, representatives, partners, or employees has disclosed,

9    transmitted or copied any information related to Posdata's Mobile Plugfest Reports in any way

10   other than that represented by the e-mail exchange between Dr. Kim and Choon Shin on February

11   20, 2007, which is attached as Exhibit 11 to the declarations of Ho Tae Tan and Renee Yoon and

12   submitted as evidence in support of Posdata's ex parte application for a temporary restraining

13   order.

14          **g.**    **If yes, please describe any instances that this information or**

15                **documents related to Posdata's Mobile Plugfest Reports within the**

16                **possession of Defendants Seyoung Kim, InQuadron, Inc., or their**

17                **agents, representatives, partners, or employees has been sold,**

18                **marketed, or commercialized by them in any manner.**

19         None of the information or documents related to Posdata's Mobile Plugfest Reports that

20   may have come into the possession of InQuadron or its agents, representatives, partners, or

21   employees has been sold, marketed or commercialized by them in any manner.

22        **103.**    **Is any information or documents related to the NTT DoCoMo Reports within**

23            **the possession of Defendants Seyoung Kim, InQuadron, Inc., or their agents,**

24            **representatives, partners, or employees.**

25        Yes.

26           **a.**    **If yes, please describe the information related to the NTT DoCoMo**

27                **Reports within the possession of Defendants Seyoung Kim,**

28

1            **InQuadron, Inc., or their agents, representatives, partners, or**

2            **employees.**

3       Apart from those certain e-mails already in Posdata's possession, InQuadron has within its

4   possession a document entitled "DCM Test Results R1.0," dated November 21, 2006. InQuadron

5   is providing this document to Posdata pursuant to the parties' settlement agreement.

6            **b.    If yes, please describe the documents related to the NTT DoCoMo**

7            **Reports within the possession of Defendants Seyoung Kim,**

8            **InQuadron, Inc., or their agents, representatives, partners, or**

9            **employees.**

10      Apart from those certain e-mails already in Posdata's possession, InQuadron has within its

11  possession a document entitled "DCM Test Results R1.0," dated November 21, 2006. InQuadron

12  is providing this document to Posdata pursuant to the parties' settlement agreement.

13           **c.    If yes, please describe how the information or documents related to the**

14           **NTT DoCoMo Reports within the possession of Defendants Seyoung**

15           **Kim, InQuadron, Inc., or their agents, representatives, partners, or**

16           **employees has been utilized by them in any manner.**

17      None of the information or documents related to the NTT DoCoMo Reports within the

18  possession of InQuadron or its agents, representatives, partners, or employees has been utilized in

19  any manner.

20           **d.    If yes, please describe how the information or documents related to the**

21           **NTT DoCoMo Reports has been utilized in the research and**

22           **development of WiMAX or WiBro technology under development by**

23           **Defendants Seyoung Kim, InQuadron, Inc., or their agents,**

24           **representatives, partners, or employees.**

25      None of the information or documents related to the NTT DoCoMo Reports that has come

26  into the possession of InQuadron or its agents, representatives, partners, or employees has been

27  utilized in any manner.

28

SQUIRE SANDERS &
DEMPSEY L.L.P.

1               **e.**   **If yes, please describe all persons or companies other than InQuadron,**

2                    **Inc. or its employees that have received information or documents**

3                    **related to the NTT DoCoMo Reports from Defendants Seyoung Kim,**

4                    **InQuadron, Inc., or their agents, representatives, partners, or**

5                    **employees.**

6      None of the information or documents related to the NTT DoCoMo Reports that has come

7 into the possession of InQuadron or its agents, representatives, partners, or employees has been

8 disclosed by them to any third party.

9                **f.**   **If yes, please describe in detail whether Defendants Seyoung Kim,**

10                    **InQuadron, Inc., or their agents, representatives, partners, or**

11                    **employees have disclosed, transmitted, or copied any information**

12                    **related to the NTT DoCoMo Reports.**

13      Not applicable.

14                **g.**   **If yes, please describe any instances that this information or**

15                    **documents related to the NTT DoCoMo Reports within the possession**

16                    **of Defendants Seyoung Kim, InQuadron, Inc., or their agents,**

17                    **representatives, partners, or employees has been sold, marketed, or**

18                    **commercialized by them in any manner.**

19      Not applicable.

20     **104.**   **Is any information or documents related to Posdata's IOT Reports within the**

21           **possession of Defendants Seyoung Kim, InQuadron, Inc., or their agents,**

22           **representatives, partners, or employees.**

23      Yes.

24                **a.**   **If yes, please describe the information related to Posdata's IOT**

25                    **Reports within the possession of Defendants Seyoung Kim,**

26                    **InQuadron, Inc., or their agents, representatives, partners, or**

27                    **employees.**

28

SQUIRE, SANDERS &
DEMPSEY L.P.

1    Apart from those certain e-mails already in Posdata's possession, InQuadron has within its
2    possession three documents: (1) one entitled "Posdata-GCT IOT Results Template v.01.1," dated
3    December 2, 2006; (2) one entitled "GCT IOT," dated November 28 through December 1, 2006;
4    and (3) an email from Sang Geun Hwang to Seyoung Kim, Jongkwan Choi, Hwayoung Joung,
5    Joonsug Chung, Woojon Jeon, Choon Shin, Seong Dong Park, and Hojun Kim, dated December
6    9, 2006, and bearing the subject line "Re: Fw: Inquadron, Inc." InQuadron is providing these
7    documents to Posdata pursuant to the parties' settlement agreement.

8                **b.    If yes, please describe the documents related to Posdata's IOT Reports**
9                    **within the possession of Defendants Seyoung Kim, InQuadron, Inc., or**
10                   **their agents, representatives, partners, or employees.**

11   Apart from those certain e-mails already in Posdata's possession, InQuadron has within its
12   possession three documents: (1) one entitled "Posdata-GCT IOT Results Template v.01.1," dated
13   December 2, 2006; (2) one entitled "GCT IOT," dated November 28 through December 1, 2006;
14   and (3) an email from Sang Geun Hwang to Seyoung Kim, Jongkwan Choi, Hwayoung Joung,
15   Joonsug Chung, Woojon Jeon, Choon Shin, Seong Dong Park, and Hojun Kim dated December
16   9, 2006, and bearing the subject line "Re: Fw: Inquadron, Inc." InQuadron is returning these
17   documents to Posdata in accordance with its settlement obligations.

18               **c.    If yes, please describe how the information or documents related to**
19                   **Posdata's IOT Reports within the possession of Defendants Seyoung**
20                   **Kim, InQuadron, Inc., or their agents, representatives, partners, or**
21                   **employees has been utilized by them in any manner.**

22   Neither InQuadron, Inc. nor its agents, representatives, partners, or employees is aware of
23   any use in any manner of the document entitled "Posdata-GCT IOT Results Template v.0.1,"
24   dated December 2, 2006, or of the document entitled "GCT IOT," dated November 28 through
25   December 1, 2006, or of the email from Sang Geun Hwang to Seyoung Kim, Jongkwan Choi,
26   Hwayoung Joung, Joonsug Chung, Woojon Jeon, Choon Shin, Seong Dong Park, and Hojun
27   Kim, dated December 9, 2006, and bearing the subject line "Re: Fw: Inquadron, Inc."

28

1           **d.    If yes, please describe how the information or documents related to**

2                     **Posdata's IOT Reports has been utilized in the research and**

3                     **development of WiMAX or WiBro technology under development by**

4                     **Defendants Seyoung Kim, InQuadron, Inc., or their agents,**

5                     **representatives, partners, or employees.**

6         Neither InQuadron, Inc. nor its agents, representatives, partners, or employees is aware of

7 any use in any manner of information or documents related to Posdata's IOT Reports.

8           **e.    If yes, please describe all persons or companies other than InQuadron,**

9                     **Inc. or its employees that have received information or documents**

10                     **related to Posdata's IOT Reports from Defendants Seyoung Kim,**

11                     **InQuadron, Inc., or their agents, representatives, partners, or**

12                     **employees.**

13         Neither InQuadron, Inc. nor its agents, representatives, partners, or employees is aware of

14 any person or company other than InQuadron, Inc. or its employees that may have received

15 information or documents related to Posdata's IOT Reports from them.

16           **f.    If yes, please describe in detail whether Defendants Seyoung Kim,**

17                     **InQuadron, Inc., or their agents, representatives, partners, or**

18                     **employees have disclosed, transmitted, or copied any information**

19                     **related to Posdata's IOT Reports.**

20         Apart from those certain e-mails already in Posdata's possession, neither InQuadron, Inc.

21 nor its agents, representatives, partners or employees, is aware of any instance in which they have

22 disclosed, transmitted, or copied any information related to Posdata's IOT Reports.

23           **g.    If yes, please describe any instances that this information or**

24                     **documents related to Posdata's IOT Reports within the possession of**

25                     **Defendants Seyoung Kim, InQuadron, Inc., or their agents,**

26                     **representatives, partners, or employees has been sold, marketed, or**

27                     **commercialized by them in any manner.**

28         None.

105.    Is any information or documents related to Posdata's files or diagrams that depict, reveal, or demonstrate how processors and components, Posdata's PCB design and layout, and Posdata's software and source code create an architecture for interface between hardware and software within the possession of Defendants Seyoung Kim, InQuadron, Inc., or their agents, representatives, partners, or employees.

No.

    a.    If yes, please describe the information related to Posdata's files or diagrams that depict, reveal, or demonstrate how processors and components, Posdata's PCB design and layout, and Posdata's software and source code create an architecture for interface between hardware and software within the possession of Defendants Seyoung Kim, InQuadron, Inc., or their agents, representatives, partners, or employees.

Not applicable.

    b.    If yes, please describe the documents related to Posdata's files or diagrams that depict, reveal, or demonstrate how processors and components, Posdata's PCB design and layout, and Posdata's software and source code create an architecture for interface between hardware and software within the possession of Defendants Seyoung Kim, InQuadron, Inc., or their agents, representatives, partners, or employees.

Not applicable.

    c.    If yes, please describe how the information or documents related to Posdata's files or diagrams that depict, reveal, or demonstrate how processors and components, Posdata's PCB design and layout, and Posdata's software and source code create an architecture for interface between hardware and software within the possession of Defendants

1                    **Seyoung Kim, InQuadron, Inc., or their agents, representatives,**

2                    **partners, or employees has been utilized by them in any manner.**

3     Not applicable.

4          **d.**   **If yes, please describe how the information or documents related to**

5                  **Posdata's files or diagrams that depict, reveal, or demonstrate how**

6                  **processors and components, Posdata's PCB design and layout, and**

7                  **Posdata's software and source code create an architecture for interface**

8                  **between hardware and software has been utilized in the research and**

9                  **development of WiMAX or WiBro technology under development by**

10                  **Defendants Seyoung Kim, InQuadron, Inc., or their agents,**

11                  **representatives, partners, or employees.**

12     Not applicable.

13          **e.**   **If yes, please describe all persons or companies other than InQuadron,**

14                  **Inc. or its employees that have received information or documents**

15                  **related to Posdata's files or diagrams that depict, reveal, or**

16                  **demonstrate how processors and components, Posdata's PCB design**

17                  **and layout, and Posdata's software and source code create an**

18                  **architecture for interface between hardware and software from**

19                  **Defendants Seyoung Kim, InQuadron, Inc., or their agents,**

20                  **representatives, partners, or employees.**

21     Not applicable.

22          **f.**   **If yes, please describe in detail whether Defendants Seyoung Kim,**

23                  **InQuadron, Inc., or their agents, representatives, partners, or**

24                  **employees have disclosed, transmitted, or copied any information**

25                  **related to Posdata's files or diagrams that depict, reveal, or**

26                  **demonstrate how processors and components, Posdata's PCB design**

27                  **and layout, and Posdata's software and source code create an**

28                  **architecture for interface between hardware and software.**

SQUIRE, SANDERS &
DEMPSEY L.L.P.

1    Not applicable.

2         g.    **If yes, please describe any instances that this information or**

3               **documents related to Posdata's files or diagrams that depict, reveal, or**

4               **demonstrate how processors and components, Posdata's PCB design**

5               **and layout, and Posdata's software and source code create an**

6               **architecture for interface between hardware and software within the**

7               **possession of Defendants Seyoung Kim, InQuadron, Inc., or their**

8               **agents, representatives, partners, or employees has been sold,**

9               **marketed, or commercialized by them in any manner.**

10   Not applicable.

11   **106.    Is any information or documents related to any other Posdata WiMAX,**

12          **WiBro or FLYVO technology within the possession of Defendants Seyoung**

13          **Kim, InQuadron, Inc., or their agents, representatives, partners, or**

14          **employees.**

15   No.

16         a.    **If yes, please describe the information related to any other Posdata**

17               **WiMAX, WiBro or FLYVO technology  within the possession of**

18               **Defendants Seyoung Kim, InQuadron, Inc., or their agents,**

19               **representatives, partners, or employees.**

20   Not applicable.

21         b.    **If yes, please describe the documents related to any other Posdata**

22               **WiMAX, WiBro or FLYVO technology within the possession of**

23               **Defendants Seyoung Kim, InQuadron, Inc., or their agents,**

24               **representatives, partners, or employees.**

25   Not applicable.

26         c.    **If yes, please describe how the information or documents related to**

27               **any other Posdata WiMAX, WiBro or FLYVO technology within the**

28               **possession of Defendants Seyoung Kim, InQuadron, Inc., or their**

| | |
|---|---|
| 1 | agents, representatives, partners, or employees has been utilized by |
| 2 | them in any manner. |
| 3 | Not applicable. |
| 4 |     **d.**   **If yes, please describe how the information or documents related to** |
| 5 | **any other Posdata WiMAX, WiBro or FLYVO technology has been** |
| 6 | **utilized in the research and development of WiMAX or WiBro** |
| 7 | **technology under development by Defendants Seyoung Kim,** |
| 8 | **InQuadron, Inc., or their agents, representatives, partners, or** |
| 9 | **employees.** |
| 10 | Not applicable. |
| 11 |     **e.**   **If yes, please describe all persons or companies other than InQuadron,** |
| 12 | **Inc. or its employees that have received information or documents** |
| 13 | **related to any other Posdata WiMAX, WiBro or FLYVO technology** |
| 14 | **from Defendants Seyoung Kim, InQuadron, Inc., or their agents,** |
| 15 | **representatives, partners, or employees.** |
| 16 | Not applicable. |
| 17 |     **f.**   **If yes, please describe in detail whether Defendants Seyoung Kim,** |
| 18 | **InQuadron, Inc., or their agents, representatives, partners, or** |
| 19 | **employees have disclosed, transmitted, or copied any information** |
| 20 | **related to any other Posdata WiMAX, WiBro or FLYVO technology.** |
| 21 | Not applicable. |
| 22 |     **g.**   **If yes, please describe any instances that this information or** |
| 23 | **documents related to any other Posdata WiMAX, WiBro or FLYVO** |
| 24 | **technology within the possession of Defendants Seyoung Kim,** |
| 25 | **InQuadron, Inc., or their agents, representatives, partners, or** |
| 26 | **employees has been sold, marketed, or commercialized by them in any** |
| 27 | **manner.** |
| 28 | Not applicable. |

SQUIRE, SANDERS & DEMPSEY L.L.P.
INQUADRON, INC.'S WRITTEN RESPONSES TO PLAINTIFF'S WRITTEN DEPOSITION QUESTIONS
CASE NO. C 07 2504 RMW (PVT)

1    **107.    Is any information or documents related to any other WiMAX, or WiBro**

2    **technology within the possession of Defendants Seyoung Kim, InQuadron,**

3    **Inc., or their agents, representatives, partners, or employees.**

4    InQuadron objects to this question on the ground that the phrase "any other WiMAX, or

5    WiBro technology" is vague and ambiguous. InQuadron understands the phrase to refer to

6    WiMAX or WiBro technology that is proprietary to Posdata other than the specific files or subject

7    matter addressed in prior questions above. Subject to and without waiving its objection,

8    InQuadron answers as follows: no.

9    **a.    If yes, please describe the information related to any other Posdata**

10    **WiMAX, WiBro or FLYVO technology within the possession of**

11    **Defendants Seyoung Kim, InQuadron, Inc., or their agents,**

12    **representatives, partners, or employees.**

13    Not applicable.

14    **b.    If yes, please describe the documents related to any other Posdata**

15    **WiMAX, WiBro or FLYVO technology within the possession of**

16    **Defendants Seyoung Kim, InQuadron, Inc., or their agents,**

17    **representatives, partners, or employees.**

18    Not applicable.

19    **c.    If yes, please describe how the information or documents related to**

20    **any other Posdata WiMAX, WiBro or FLYVO technology within the**

21    **possession of Defendants Seyoung Kim, InQuadron, Inc., or their**

22    **agents, representatives, partners, or employees has been utilized by**

23    **them in any manner.**

24    Not applicable.

25    **d.    If yes, please describe how the information or documents related to**

26    **any other Posdata WiMAX, WiBro or FLYVO technology has been**

27    **utilized in the research and development of WiMAX or WiBro**

28    **technology under development by Defendants Seyoung Kim,**

SQUIRE, SANDERS &
DEMPSEY L.L.P.

1          InQuadron, Inc., or their agents, representatives, partners, or

2          employees.

3      Not applicable.

4          e.   If yes, please describe all persons or companies other than InQuadron,

5               Inc. or its employees that have received information or documents

6               related to any other Posdata WiMAX, WiBro or FLYVO technology

7               from Defendants Seyoung Kim, InQuadron, Inc., or their agents,

8               representatives, partners, or employees.

9      Not applicable.

10         f.   If yes, please describe in detail whether Defendants Seyoung Kim,

11              InQuadron, Inc., or their agents, representatives, partners, or

12              employees have disclosed, transmitted, or copied any information

13              related to any other Posdata WiMAX, WiBro or FLYVO technology.

14     Not applicable.

15         g.   If yes, please describe any instances that this information or

16              documents related to any other Posdata WiMAX, WiBro or FLYVO

17              technology within the possession of Defendants Seyoung Kim,

18              InQuadron, Inc., or their agents, representatives, partners, or

19              employees has been sold, marketed, or commercialized by them in any

20              manner.

21     Not applicable.

22     Dated:  October 24, 2007                SQUIRE, SANDERS & DEMPSEY L.L.P.

23

24

25                                            By: _____

26                                                David S. Elkins

27                                                Attorneys for Defendants

28                                                SEYOUNG KIM and INQUADRON, INC.

- 79 -

INQUADRON, INC.'S WRITTEN RESPONSES TO PLAINTIFF'S WRITTEN DEPOSITION QUESTIONS
CASE NO. C 07 2504 RMW (PVT)

1

# **VERIFICATION**

2      I, Kenneth D. Lee, am the Chief Financial Officer and General Counsel of defendant

3  InQuadron, Inc. and am authorized to make this verification on InQuadron's behalf. I have

4  reviewed all of the foregoing questions and answers and am informed and believe that (i) the

5  answers are true and correct and (ii) they reflect the information known or reasonably available to

6  InQuadron.

7      I declare under penalty of perjury that the foregoing is true and correct.

8

9

10  Dated:  October 24, 2007

11                                          Kenneth D. Lee

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## PROOF OF SERVICE

2      I am a citizen of the United States and employed in Santa Clara County, California. I am

3      over the age of eighteen years and not a party to the within-entitled action. My business address

4      is 600 Hansen Way, Palo Alto, California 94304-1043. On October 24, 2007, a true and correct

5      copy of the within document:

6
     **INQUADRON, INC.'S WRITTEN RESPONSES TO PLAINTIFF'S**
     **WRITTEN DEPOSITION QUESTIONS PURSUANT TO**
7
     **FEDERAL RULE OF CIVIL PROCEDURE 30(b)(6)**

8
was served on:
9

     **VIA ELECTRONIC MAIL AND U.S. MAIL**
10

11      Brendan Dolan, Esq.
     bdolan@morganlewis.com

12      Morgan Lewis & Bockius LLP
     One Market Street

13      Spear Tower
     San Francisco, California 94105
14

15

     Service was accomplished as follows:
16

17    ☒    **By Electronic Mail:** On the above date, I electronically mailed the above
document(s) addressed to the above.

18
               **By US Mail:** I am readily familiar with the firm's practice of collection and
19    ☒    processing correspondence for mailing. Under that practice it would be deposited
with the U.S. Postal Service on that same day with postage thereon fully prepaid in
20      the ordinary course of business. I am aware that on motion of the party served,
service is presumed invalid if postal cancellation date or postage meter date is
21      more than one day after date of deposit for mailing in affidavit.

22
     I declare that I am employed in the office of a member of the bar of this court at whose
23
direction the service was made.
24
     Executed on October 24, 2007, at Palo Alto, California.
25

26

27

28

                                          PROOF OF SERVICE

Morgan, Lewis & Bockius LLP
One Market, Spear Street Tower
San Francisco, CA 94105-1126
Tel. 415.442.1000
Fax: 415.442.1001
www.morganlewis.com

**Morgan Lewis**
COUNSELORS AT LAW

Steven J. Garrett
Associate
415.442.1194

November 21, 2007

## VIA U.S. MAIL & FACSIMILE

David S. Elkins, Esq.
Squire Sanders & Dempsey LLP
600 Hansen Way Ste 100
Palo Alto, California 94304-1043

Re:     Posdata v. Kim

Dear Mr. Elkins:

We write to meet and confer regarding InQuadron's responses to Plaintiff's Written Deposition Questions Pursuant to Federal Rule of Civil Procedure 30(b)(6). As discussed, many of InQuadron's responses are inadequate, incomplete, insufficient in detail, and contradict evidence within Posdata's possession. Posdata is surprised and disappointed that some of the written responses are not open, truthful, and candid in light of the evidence attached to Posdata's moving papers that contradict your clients' responses. As you can imagine, the responses are alarming because they raise doubts as to whether your clients are genuinely disclosing all information within their possession or knowledge. The purpose of the written questions was to enable Posdata to be satisfied that it had uncovered all of the improper conduct of Kim and InQuadron. The lack of depth and truthfulness provided by the responses has not enabled Posdata to reach such a conclusion. We urge your clients to be forthright in providing complete and meaningful responses so that Posdata feels comfortable in proceeding with any settlement.

We understand from our conference call that Defendants have segregated all notes, files, data, correspondence, reports, test results, materials, documents, prototypes, and any promotional or marketing materials that are possibly related to Posdata's WiMAX, WiBro, or FLYVO technology. We request that you send these documents as well as all the documents referred to in InQuadron's written responses to us as soon as possible so that we may review them.

We ask your clients to review all of their responses, including but not limited, to the following:

1.  In response to **Question 10**, please elaborate in detail how InQuadron's anticipated

San Francisco  Philadelphia  Washington  New York  Los Angeles  Miami  Pittsburgh  Princeton  Chicago  Minneapolis
Palo Alto  Dallas  Houston  Harrisburg  Irvine  Boston  London  Paris  Brussels  Frankfurt  Beijing  Tokyo
1-SF/7627312.2

**EXHIBIT C**

David S. Elkins, Esq.
November 21, 2007
Page 2



Morgan Lewis
COUNSELORS AT LAW

business or business products or potential products, and/or services or potential services are related to WiMAX but not WiBro. In addition, specifically address: (1) how InQuadron's business, etc. is different from Posdata's plans, business, products or potential products, and/or services or potential services; and (2) how InQuadron can enter the WiMAX or WiBro marketplace without utilizing Posdata technology.

- With respect to **Question 10a**, please provide an explicit description of InQuadron's *past* (i.e. prior the filing of this lawsuit) plans, business, products or potential products, and/or services or potential services than the "Development of WiMAX (non-WiBro) basestation core technology that would lead to the development of a WiMAX basestation baseband modem ASIC for the US market."

- With respect to **Question 10b**, please provide a much more explicit description of InQuadron's *current and future* plans, business, products or potential products, and/or services or potential services. Please also explain how their current and future plans, etc. differ from their past plans, etc.

- InQuadron's response to **Question 10c** that it "has not developed any existing products or potential products to date" is simply not true based on the evidence within our possession. For instance, correspondence between Seyoung Kim and Kenneth Lee dated March 18 and 19, 2007 shows that InQuadron was developing and manufacturing a product referred to as "a first prototype," "test board," "working demo board," and the "new Channel Card PCB." *See* Exhibit 6 to the Supplemental Declaration of Ho Tae Han in Support of Posdata's Ex Parte Application. Please clarify whether the board was in fact an InQuadron product or if the board was indeed Posdata property that was being misappropriated for the benefit of InQuadron. Please provide a detailed candid response to these questions.

- For the **remaining subparts of Question 10**, please supplement the responses with more substantive answers than have been provided.

2. We also request that InQuadron provide clarification and greater detail with respect to its answer to **Question 12**. InQuadron responds to **Question 12b** that it "did not commence material substantive research and development work in either the U.S. or Korea before PosData's legal demands and ultimately the onset of this litigation prevented such work from moving forward." InQuadron similarly responds to **Question 12e** that "[t]he work performed before legal issues forced a cessation of work was limited to product/technology conceptualization and development planning." Please describe any

David S. Elkins, Esq.
November 21, 2007
Page 3



Morgan Lewis
COUNSELORS AT LAW

> *non-material substantive research and development work* that InQuadron has conducted
> related to the WiMAX or WiBro industry. In addition, please provide a detailed
> explanation reconciling these statements in light of the correspondence between Seyoung
> Kim and Kenneth Lee dated March 18 and 19, 2007 that shows InQuadron was either
> developing and manufacturing a product or misappropriating Posdata's technology. *See*
> Exhibit 6 to Mr. Han's Supplemental Declaration.
>
> - InQuadron's response to **Question 12c** should not be limited to current
>   employees. Please identify all InQuadron employees that have worked at each
>   facility, the dates of their employment, their position, their responsibilities, their
>   salary, and other compensation and benefits.
>
> - With respect to **Question 12f**, several documents within our possession, including
>   the correspondence cited above, demonstrates that InQuadron was working on
>   fabricating and developing a "a first prototype," "test board," "working demo
>   board," and the "new Channel Card PCB." Again, please provide a detailed and
>   frank response to the question.
>
> - For **Question 12g through 12q**, please disclose any utilization of these
>   technologies. Documents with Posdata clearly show that Defendants have some
>   of these items within their possession. For instance, Kim received two emails with
>   attached files named "MCCA PCB fab. Gerber data" and "MCCA REV>C
>   GERBER DATA" from Choon Shin on February 20 and March 2, 2007 which
>   contains information regarding Posdata's printed circuit board ("PCB") design
>   and layout. *See* Exhibit 11 to Mr. Han's Declaration. This Gerber data is
>   precisely the type of information that InQuadron would need to fabricate and
>   develop the "first prototype," "test board," "working demo board," and the "new
>   Channel Card PCB" referred to by Kim and Lee in their March 18 and 19, 2007
>   correspondence. *See* Exhibit 6 to Mr. Han's Supplemental Declaration. This is
>   only an example of InQuadron's deficient response. Please supplement the
>   answers to these questions with frank and candid responses.

3. In response to **Questions 14 through 16**, InQuadron responded "no." However, Posdata
   has several documents within its possession contradicting these denials. For instance,
   Exhibits 11 and 23 of Mr. Han's Declaration and Exhibits 2 through 6 of Mr. Han's
   Supplemental Declaration show that Kim and InQuadron outsourced the manufacturing
   and research and development of WiMAX and/or WiBro technology. Please amend
   these responses accordingly.

4. Seyoung Kim indicates in **Question 21** that he intends "to continue employment with

David S. Elkins, Esq.
November 21, 2007
Page 4


Morgan Lewis
COUNSELORS AT LAW

InQuadron in the same capacity and position with the same responsibilities." In response to **Questions 22 through 24**, Kim indicates he does not plan to operate within the WiMAX or WiBro industry. During our conference call you indicated that Kim and InQuadron may reenter the WiMAX industry in the very near future. Please reconcile these contradictory positions.

5. Please provide a frank and candid response to **Questions 25 and 26**. Although InQuadron claims it has not organized its workforce, we know this is untrue as evidenced by Exhibits 13 and 14 to Mr. Han's Declaration.

6. In response to **Questions 27 through 29**, InQuadron identifies a total of seven employees that worked for InQuadron. As for **Questions 30 and 31**, the list of the individuals contacted by InQuadron or Kim does not appear to be a complete list. A quick review of Exhibit 13 to Mr. Han's Declaration identifies 24 individuals employed by InQuadron. Please provide a frank and candid response to these questions.

7. InQuadron has provided incomplete responses to **Questions 32 through 35** because it only mentions three instances in which InQuadron came into possession of documents or information related to Posdata's WiMAX, WiBro or FLYVO technology. Although InQuadron refers to Posdata's moving papers for other instances, Posdata requires that InQuadron explicitly acknowledge which Exhibits are responsive to this Question. In addition, Posdata requests that InQuadron provide explicit detail for each instance that it has received information or documents related to Posdata's WiMAX, WiBro or FLYVO technology.

8. InQuadron has also failed to accurately answer **Questions 37 through 41** according to the documents already in our possession. For instance, in InQuadron has failed to acknowledge or describe its relationship with several individuals, including but not limited to, Kihong Bang, Axstone Technologies, Hoon Kin, or Mark Kelly, General Manager/CTO of Next Wave. *See* Exhibits 4 and 5 to Mr. Han's Supplemental Declaration and Exhibit 22 to Mr. Han's Declaration.

9. InQuadron's response to **Question 68** is incomplete in light of Kroll's forensic investigation which found that Kim used a software program called "Partition Magic" in an attempt to erase data stored on his computer. *See* Exhibit 33 to the Declaration of Renee Yoon in Support of Posdata's Ex Parte Application. Please update this response accordingly.

10. Posdata expects complete candor with respect to the financial status of InQuadron and Seyoung Kim especially since it is not currently seeking a monetary payment from them as part of a settlement. These questions are particularly relevant since InQuadron

David S. Elkins, Esq.
November 21, 2007
Page 5



Morgan Lewis
COUNSELORS AT LAW

claimed to be on the verge of bankruptcy and unable to pay any monetary settlement at the Settlement Conference.

- InQuadron has failed to specify the amount of its total liabilities as of May 1, 2007 as requested by **Question 70b**.

- InQuadron has also failed to disclose its current net worth as requested by **Question 71**.

- In response to **Question 81**, InQuadron states that it has no liabilities other than several leases, yet in **Question 71b** InQuadron claims to have liabilities of $150,000 or more. Please reconcile these two answers.

- Please list and explain in detail each and every liability for InQuadron requested by **Questions 81 and 82**.

11. InQuadron has also failed to identify and explain in detail its total expenses since its inception as required by **Question 89**. Please provide a detailed breakdown of each expense by month. Determining these expenses should not be too burdensome if InQuadron and Kim were able to prepare an operating budget as shown in Exhibit 13 to Mr. Han's Declaration.

12. InQuadron's responses to **Questions 94, 96, and 99** and their subparts are incomplete based on the documents within Posdata's possession that show InQuadron, Axstone and other entities have received a Turtle Card or "turtle board." The correspondence between Seyoung Kim and Kenneth Lee dated March 18 and 19, 2007 shows that InQuadron was developing and manufacturing a product referred to as "a first prototype," "test board," "working demo board," and the "new Channel Card PCB." *See* Exhibit 6 to the Mr. Han's Supplemental Declaration and Exhibit 23 to Mr. Han's Declaration. Please explain and reconcile InQuadron's response in light of this evidence. InQuadron should provide very detailed responses. Although Defendants have identified Seyoung Kim, Seongdong Park, and Hwayong Joung as people that have received a Turtle Card or "turtle board," Defendants have failed to provide any further detail regarding their receipt of this item as requested by **Questions 94, 96, and 99**.

13. InQuadron should also reconsider its responses to **Questions 95, 97, 98, 100, 101, 105, 106, and 107**. Posdata is aware that Defendants have some of these items within their possession. For example, Kim received two emails with attached files named "MCCA PCB fab. Gerber data" and "MCCA REV>C GERBER DATA" from Choon Shin on February 20 and March 2, 2007 which contains information regarding Posdata's printed circuit board ("PCB") design and layout. *See* Exhibit 11 to Mr. Han's Declaration.

David S. Elkins, Esq.
November 21, 2007
Page 6



Please provide complete and detailed to responses.

14. As part of its response to **Questions 102 through 104**, InQuadron refers to Posdata's moving papers for instances in which Defendants have documents or information within their possession. Posdata requires that InQuadron explicitly acknowledge which Exhibits are responsive to each Question and Posdata asks that InQuadron describe each instance in detail and answer each subpart to the questions.

If you believe that it would be easier to follow up on these written questions through in-person depositions, please let us know. We do not believe that we can go forward with the settlement without this information. However, for the purpose of keeping things moving at this time, we are enclosing a draft of the Settlement Agreement and General Release and the Consent Decree. We retain the right, however, to modify or change the language in the Settlement Agreement and General Release or the Consent Decree based upon the truthfulness and substance of the responses we receive from your clients. We intend to inform the court of the status of our recent discussions and the issues raised by this letter.

Please provide verified updated responses to these written questions as soon as possible. If you have any questions, please give us a call.

Very truly yours,

**MORGAN, LEWIS & BOCKIUS LLP**

Steven J. Garrett

Enclosures

1   BRENDAN DOLAN, State Bar No. 126732
    L. JULIUS M. TURMAN, State Bar. No. 226126
2   STEVEN J. GARRETT, State Bar No. 221021
    MORGAN, LEWIS & BOCKIUS LLP
3   One Market, Spear Street Tower
    San Francisco, CA 94105-1126
4   Tel: 415.442.1000
    Fax: 415.442.1001
5   E-mail: bdolan@morganlewis.com

6   Attorneys for Plaintiff
    POSDATA CO., LTD.
7

8                   UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10                     SAN JOSE DIVISION

11

12  POSDATA CO., LTD., a South Korean          Case No. C 07 2504 RMW
    corporation,
13                                             **STIPULATED CONSENT DECREE AND**
                      Plaintiff,               **JUDGMENT IN FAVOR OF POSDATA**
14                                             **CO., LTD. AND AGAINST SEYOUNG KIM**
                      vs.                      **AND INQUADRON, INC.**
15
    SEYOUNG KIM, an individual and
16  INQUADRON, INC., a California
    corporation,
17
                      Defendants.
18

19

20      WHEREAS, Plaintiff Posdata Co., Ltd. ("Plaintiff" or "Posdata") contends that Defendant

21  Seyoung Kim ("Kim") and other former and current employees of Posdata, acting in concert with

22  or in participation with Defendant Kim for the purpose of creating, forming and operating

23  Defendant InQuadron, Inc. ("InQuadron"), have engaged in unlawful conduct related to Posdata's

24  trade secrets, proprietary information, confidential information, intellectual property, tangible

25  property, and Posdata property;

26      WHEREAS, Plaintiff on May 10, 2007, filed and served a Complaint for Monetary

27  Damages and Injunctive Relief against Defendants Seyoung Kim ("Kim") and InQuadron, Inc.,

28  alleging nine causes of action against Defendants, including: (1) Misappropriation of Trade

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
    1-SF/7592687.2                 1                    CONSENT DECREE
                                                        (C 07 2504 RMW)

1    Secrets; (2) Interference with Prospective Economic Advantage; (3) Interference with Existing

2    Economic Relations; (4) Breach of Contract; (5) Breach of Duty of Loyalty; (6) Interference with

3    Contract; (7) Unfair Competition, Cal. Bus. & Prof. Code § 17200 and Common Law; (8) Unjust

4    Enrichment; and (9) Constructive Trust;

5        WHEREAS, Plaintiff filed and served a First Amended Complaint on May 18, 2007,

6    adding a cause of action for Conversion;

7        WHEREAS, Plaintiff filed an Ex Parte Application for Temporary Restraining Order for

8    Order to Show Cause Why a Preliminary Injunction Should Not Issue and Order permitting

9    Expedited Discovery ("Ex Parte Application for TRO") on June 21, 2007;

10       WHEREAS, the Honorable Ronald M. Whyte of the United states District Court for the

11   Northern District of California, heard Plaintiff's Ex Parte Application for TRO on June 26, 2007,

12   and granted a temporary restraining order against Defendants Kim and InQuadron on June 27,

13   2007;

14       WHEREAS, the Parties attended an Early Settlement Conference with the Honorable

15   Patricia Trumbull of the United States District Court for the Northern District of California on

16   August 3, 2007;

17       WHEREAS, the Parties agree that Posdata's trade secrets, proprietary information,

18   confidential information, intellectual property and tangible property include, but are not limited

19   to: Posdata's WiMAX technology, FLYVO system, copies or versions of the Digital Channel

20   Card Unit ("DCCU") for the Pico RAS base station; the Modular Channel Card Assembly

21   ("MCCA") file for the Turtle Card base station; MAC and PHY source code, printed circuit board

22   ("PCB") design and layout, prototypes of the DCCU or MCCA or Turtle Card and/or Pico RAS

23   base stations; the "Modular RAS Implementation" file, the "Rev. O.4 DCCU Block Diagram"

24   file, test methods, comparison data, Plugfest Reports, results of the trial runs from NTT DoCoMo,

25   and interoperability test data on the communication between Posdata's RAS, GCT mobile station

26   chip or any WiMAX technology; notes, files and diagrams that depict, reveal, or demonstrate the

27   processors and components used by Posdata, Posdata's PCB design and layout, and Posdata's

28   source code;

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7592687.2                           2                              CONSENT DECREE
                                                                        (C 07 2504 RMW)

1    WHEREAS, Plaintiff and Defendants have agreed to a consent decree, including a
2   permanent injunction against Kim and InQuadron and all those acting in concert or participation
3   with any of them and a monetary remedy in the event of a violation of the injunction to alleviate
4   the need for further litigation of this matter; and

5    WHEREAS, the parties now agree as follows:

6    1.    Defendants Seyoung Kim, InQuadron, Inc., and all those acting in concert or
7   participation with them and having knowledge of this Consent Decree, including but not limited
8   to Kenneth Lee, Joonsug Chung, Hwayong Joung, Seong Dong Park, Jong Wook Lee, Hojun
9   Kim, Jongkwan "Jeffrey" Choi, Ranny Hong, Choon Shin, Woo Jin Jeon, Se Jin Lim, Hung
10   Seung Oh, Kang Min Lee, Yerang Hur, Jungnam Yoon, Kiyoung Kwak, Suck Chan Lee, Jin
11   Young Park, Kwang Seok Kim, Sang Geun Hwang, Seung Man Lee, Ji-Myung Oh, William Li,
12   Hoon Paek, Chan Park, Dongkyu Choi, and Defendants' agents, representatives, partners,
13   employees and attorneys, are enjoined and restrained from engaging in or performing any of the
14   following acts:

15    a.    Using for any purpose: copies or versions of the Digital Channel Card Unit
16   ("DCCU") for the Pico RAS base station; the Modular Channel Card Assembly ("MCCA") file
17   for the Turtle Card base station; MAC and PHY source code, printed circuit board ("PCB")
18   design and layout, prototypes of the DCCU or MCCA or Turtle Card and/or Pico RAS base
19   stations; the "Modular RAS Implementation" file, the "Rev. O.4 DCCU Block Diagram" file, test
20   methods, comparison data, Plugfest Reports, results of the trial runs from NTT DoCoMo, and
21   interoperability test data pertaining to Posdata's RAS, GCT mobile station chip or any WiMAX
22   technology; notes, files and diagrams that depict, reveal, or demonstrate the processors and
23   components used by Posdata, Posdata's PCB design and layout, and Posdata's source code; and
24   all information and documents regarding Posdata, its past or current employees, and any
25   technology developed in whole or in part by Posdata, that was acquired as a result of Defendant
26   Kim's or any other persons employment or association with Posdata.

27

28
MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7592687.2

3                                   CONSENT DECREE
                                    (C 07 2504 RMW)

1                b.      Using for any purposes: any and all notes, files, data, correspondence,

2  reports, designs, diagrams, test results, materials, documents, prototypes of the DCCU, MCCA,

3  Pico RAS or the Turtle Card, and any promotional or marketing materials that pertain thereto.

4                c.      Disclosing, copying or transmitting any information, documents or other

5  property identified in paragraphs 1.a and 1.b above (collectively, "Protected Property").

6                d.      Directly or indirectly soliciting, orally or in writing, or otherwise

7  encouraging the departure, resignation or other termination of employment, of any of Plaintiff's

8  employees, independent contractors or consultants (collectively, "Plaintiff's Personnel"), to work

9  for Defendants or any entity that Defendants may own, be involved in, or affiliated with, that is

10  within the WiMAX technology industry, and for the purpose of having Plaintiff's Personnel

11  utilize, disclose, or share any of the Protected Property with Defendants or any entity that

12  Defendants may own, be involved in, or affiliated with.

13                e.      Directly or indirectly soliciting, orally or in writing, or otherwise

14  encouraging Plaintiff's Personnel to disclose, copy or transmit any Protected Property.

15        2.      Defendants explicitly agree that within five (5) business days of the approval and

16  entry of this Consent Decree by the Court, Defendants shall deliver to the attorneys of record of

17  Posdata all notes, files, data, correspondence, reports, test results, materials, documents,

18  prototypes, and any promotional, or marketing materials that pertain to or constitute the Protected

19  Property.

20        3.      If within two (2) years following entry of this Consent Decree by the Court,

21  Defendants plan to market, promote, commercialize, manufacture, transfer, or sell any intellectual

22  property or tangible property or products related to the WiMAX industry, Posdata and the

23  attorneys of record of Posdata shall receive no less than 120 days notice in writing and shall be

24  afforded the opportunity for a jointly selected technical expert to thoroughly examine, test,

25  analyze, review, or gather any necessary information from Defendants about products and/or the

26  technology, intellectual property or tangible property to determine whether Defendants' proposed

27  action to market, promote, commercialize, manufacture, transfer or sell such property or products

28  utilized any Posdata technology, including the Protected Property. If the parties cannot agree on a

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7592687.2                         4                                         CONSENT DECREE
(C 07 2504 RMW)

1    jointly selected technical expert, then Posdata shall have the right to select the technical expert to

2    thoroughly examine, test, analyze, review, or gather any necessary information from Defendants

3    about products and/or the technology, intellectual property or tangible property to determine

4    whether Defendants' proposed action to market, promote, commercialize, manufacture, transfer

5    or sell such property or products utilized any Posdata technology, including the Protected

6    Property.

7        4.      This Consent Decree is effective immediately upon the Court's approval and entry,

8    and shall continue in effect permanently, or until such other date as this Court may order in the

9    future.

10       5.      In the event that Defendants Seyoung Kim, InQuadron, Inc., or any person or

11   entity acting in concert or participation with either of them and having knowledge of this Consent

12   Decree or the Confidential Settlement Agreement and General Release executed by the Parties,

13   including but not limited to their agents, representatives, partners, employees and attorneys,

14   breaches paragraph 1, 2, or 3 above, then Plaintiff is entitled to an award of damages, pursuant to

15   this paragraph 5.

16           a.      Plaintiff may file a regularly noticed motion with this Court to enforce the

17   Consent Decree and/or the General Release and Settlement Agreement.

18           b.      If Plaintiff proves by clear and convincing evidence that Defendant

19   Seyoung Kim, InQuadron, Inc., or those acting in concert or participation with either of them, has

20   breached paragraph 1, 2, or 3 above, then the Court shall award damages to Plaintiff, and jointly

21   and severally against Defendants, for the total sum of Seven Hundred Fifty Thousand United

22   States Dollars ($750,000.00), plus its reasonable attorneys' fees and costs in connection with the

23   motion, including expert costs. This amount represents a negotiated compromise agreed upon by

24   the parties as part of their overall settlement of the Action, taking into account all the information

25   known to them at the time of execution of the Stipulated Consent Decree.

26       6.      Defendants waive any rights they have for a stay of execution, for requesting or

27   having a new trial or any right they may have to request or to have an appeal from judgment

28   entered as a result of this Consent Decree.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7592687 2

5

CONSENT DECREE
(C 07 2504 RMW)

1    7.    Each party is to bear its own costs, expenses and attorneys' fees with respect to

2    this action, except as expressly provided herein or in the Confidential Settlement Agreement and

3    General Release.

4    8.    The United States District Court Northern District of California shall retain

5    jurisdiction over the parties and over the subject matter herein for the purposes of enforcing this

6    Consent Decree and the Confidential Settlement Agreement, including the determination of

7    whether Defendants, or anyone acting with or on their behalf, violated any term of the Consent

8    Decree or the Confidential Settlement Agreement and General Release.

9

10   Dated:    November ___, 2007        MORGAN, LEWIS & BOCKIUS LLP

11

12                                      By _____
                                            Brendan Dolan
13                                          Attorneys for Plaintiff POSDATA CO.,
                                            LTD.

14   Dated:    November ___, 2007        SQUIRE, SANDERS & DEMPSEY LLP

15

16

17                                      By _____
                                            David S. Elkins
18                                          Attorneys for Defendants SEYOUNG KIM
                                            and INQUADRON, INC.

19

20   **IT IS SO ORDERED.**

21

22

23   Date:_____
                                        _____
24                                      Hon. RONALD M. WHYTE
                                        United States District Court Judge

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7592687.2                          6               CONSENT DECREE
                                                        (C 07 2504 RMW)

## CONFIDENTIAL SETTLEMENT AGREEMENT AND GENERAL RELEASE

This Confidential Settlement Agreement and General Release ("Agreement") is entered into by and between Plaintiff Posdata Co., Ltd. ("Plaintiff" or "Posdata") and Defendants Seyoung Kim ("Kim") and InQuadron, Inc. ("InQuadron") (Kim and InQuadron are collectively referred to as "Defendants"). Posdata, InQuadron and Kim are collectively referred to in this Agreement as "Parties," and each individually may be referred to as a "Party."

### RECITALS

WHEREAS, Posdata filed an action against Kim and InQuadron on May 10, 2007, encaptioned *Posdata Co., Ltd. v. Seyoung Kim and InQuadron, Inc.,* Case No. C 07 2504 RMW (hereafter referred to as the "Action"), now pending in the United States District Court for the Northern District of California (the "Court");

WHEREAS, Posdata alleged nine causes of action in the original complaint, namely: (1) Misappropriation of Trade Secrets; (2) Interference with Prospective Economic Advantage; (3) Interference with Existing Economic Relations; (4) Breach of Contract; (5) Breach of Duty of Loyalty; (6) Interference with Contract; (7) Unfair Competition, Cal. Bus. & Prof. Code § 17200 and Common Law; (8) Unjust Enrichment; and (9) Constructive Trust, and, by the first amended complaint, Posdata added a cause of action for Conversion;

WHEREAS, Posdata filed an Ex Parte Application for Temporary Restraining Order, for Order to Show Cause Why a Preliminary Injunction Should Not Issue and Order permitting Expedited Discovery ("Ex Parte Application for TRO") on June 21, 2007, and the Court, the Honorable Ronald M. Whyte presiding, granted a temporary restraining order against Kim and InQuadron on June 27, 2007; and

WHEREAS, to avoid the additional expenditure of time, money and resources attendant to resolving this matter by trial and to avoid the uncertainty of litigation, and with no admission or denial of the allegations in the Action by Kim and InQuadron, the Parties desire to compromise and resolve their dispute by agreement, including a Stipulated Consent Decree that provides for a permanent injunction against Kim and InQuadron and a monetary payment in the event of a breach of the injunction.

NOW, THEREFORE, in consideration of the mutual promises, obligations, and covenants set forth herein, and for other valuable consideration, the sufficiency and receipt of which is hereby acknowledged, the parties agree as follows:

1. Mutual General Release. Effective upon entry by the Court of the Stipulated Consent Decree pursuant to paragraph 3 of this Agreement, each of the Parties, on behalf of itself or himself and its or his representatives, attorneys, agents, partners, officers, shareholders, owners, investors, employees, independent contractors, affiliates, predecessors, successors, heirs, executors, beneficiaries and assigns, does hereby release and discharge each other parts, and its or his past and present representatives, attorneys, agents, partners, officers, shareholders, owners, investors, employees, independent contractors, affiliates, predecessors, successors, heirs, executors, beneficiaries and assigns, and each of them, from any and all claims of any kind, and

any and all demands, liabilities, statutory violations, actions, causes of action of every nature, character or description whatsoever, whether known or unknown, suspected or claimed. The releases do not extend to any claims that may arise out of the breach of this Agreement or the Stipulated Consent Decree by any Party, nor do they relieve the Parties of their obligations to perform and comply with the terms and conditions of this Agreement or the Stipulated Consent Decree.

2. <u>Waiver</u>. This Agreement is intended to be a full general release and final accord and satisfaction, extending to all claims of any nature that may exist, whether known or unknown, suspected or anticipated, or unsuspected or unanticipated. The Parties hereby expressly, voluntarily, and knowingly, waive, relinquish, and abandon each and every right, protection and benefit to which they would be entitled now or at any time hereafter under section 1542 of the California Civil Code, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
> WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT
> TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING
> THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE
> MATERIALLY AFFECTED HIS SETTLEMENT WITH THE
> DEBTOR.

3. <u>Stipulated Consent Decree</u>. Concurrent with signing this Agreement, the Parties will execute, the Stipulated Consent Decree, in the form attached to this Agreement as Exhibit A and incorporated herein by reference, providing for permanent injunctive relief and a monetary award in the amount of $750,000 in the event of breach of the injunction. This Agreement is conditioned upon the entry of the Stipulated Consent Decree by the Court. If the Court declines to approve and enter the Stipulated Consent Decree, then this Agreement will be null and void in its entirety.

4. <u>No Admission</u>. This Agreement is a compromise of disputed claims. Nothing contained in this Agreement shall be interpreted or construed to be an admission on the part of, or to the prejudice of any person or any Party.

5. <u>Confidentiality</u>. The terms of this Agreement are confidential, and the Parties agree that they will not reveal, discuss, publish or in any way communicate any of the terms of this Agreement to any person or entity except that each Party: (1) may disclose the terms of this Agreement as necessary, on a "need-to-know" basis only, for accounting, audit, insurance or tax purposes, or to investors or creditors, or for securing legal advice, or to officers, directors or senior management of the Parties on a need-to-know basis, so long as the disclosing Party advises the recipient of the obligation to maintain the information as confidential and the recipient agrees to maintain the information as confidential, or (2) may disclose the Agreement or its terms if required to do so pursuant to a subpoena, court order or order of any governmental agency, or by law, so long as the disclosing Party takes reasonable measures to maintain the information as confidential and provides all other Parties prompt notice, to the extent reasonably possible, prior to disclosure so that the other Parties, at their expense, may seek legal remedies to maintain the confidentiality of the information.

6. No Disparagement. For a period of four years, the Parties agree not to disparage each other, or Posdata's or InQuadron's past and present officers, directors or employees.

7. No Assignment. Each Party each represents and warrants that it or he has not heretofore assigned, transferred or hypothecated or purported to have assigned, transferred or hypothecated or will not in the future assign, transfer or hypothecate any debt, judgment, claim, liability, demand, action, cause of action, or any interest therein, based upon, or arising out of, or pertaining to, or concerning, or connected with any matter, facts, events, circumstances or things released herein.

8. Representations. Kim and InQuadron represent and warrant that the written answers they provided in response to written deposition questions, served on September 21 and November 21, 2007, are true and correct, and they acknowledge that Posdata relied on the information provided in those answers in determining whether and on what terms to settle its claims in the Action and enter into this Agreement. In the event of this representation and warranty is untrue, then Posdata's release of claims provided in paragraph 1 above, shall have no force and effect, and Kim and InQuadron shall waive any statute of limitations defense as to any such claims.

9. Binding Effect. The provisions of this Agreement will be binding upon and inure to the benefit of the heirs, executors, beneficiaries, successors and assigns of each of the Parties. The person signing this Agreement on behalf of each Party has the full authority to enter into this Agreement and to bind the Party to this Agreement.

10. Representation. Each Party represents and acknowledges that it or he conferred with, and has been represented by counsel of its or his own selection with respect to this Agreement, and all matters covered by or related to its subject. Each Party represents that it or he has read this Agreement, or has had it read or explained to it or him by counsel, has been fully advised with respect to all rights which are affected by this Agreement, and is voluntarily entering into this Agreement.

11. Attorneys' Fees. Each Party shall pay its or his own attorneys' fees, costs, and other expenses arising out of the Action and the settlement thereof, except as expressly provided herein.

12. Continuing Jurisdiction. Pursuant to the Stipulated Consent Decree to be approved and entered by the Court pursuant to paragraph 3, above, the Parties agree that the Court shall retain jurisdiction over the Parties and over the subject matter herein for the purposes of enforcing this Agreement and the Stipulated Consent Decree, and all claims arising out of or any motion to enforce this Agreement or the Stipulated Consent Decree shall be brought in the Court and each Party consents to ongoing personal jurisdiction with respect to such matters.

13. No Waiver. The waiver of any breach of this Agreement or of the Stipulated Consent Decree by any Party will not be a waiver of any other subsequent breach.

14. Entire Agreement / No Modification. This Agreement is the final written expression and the complete and exclusive statement of all the agreements, conditions, promises and covenants between and among the Parties with respect to the subject matter hereof. This

Agreement may not be altered, amended, or modified in any respect except by writing duly executed by all of the Parties, and specifically referring to this Agreement. This Agreement shall supersede and render null and void any and all prior agreements, implied, oral, or written, between the Parties.

15. Mutual Drafting / Construction. The terms of this Agreement have been freely negotiated by the Parties, and this Agreement shall not be construed against the drafter. Any presumption that uncertainties in a contract are interpreted against the party causing the uncertainty to exist, is hereby waived by all Parties. The headings are inserted for convenience only and do not define, describe or limit the scope or intent of this Agreement of any of its terms.

16. Recitals and Exhibit. The recitals and exhibit to this Agreement are incorporated as if fully set forth herein in this Agreement.

17. California Law. This Agreement is governed by the laws of the State of California, without regard or effect given to choice of law principles.

18. Counterparts / Facsimile Signatures. This document may be executed in counterparts which shall together constitute the agreement of the Parties. Signature pages transmitted via facsimile shall have the same force and effect as original signatures transmitted through the mail.

Dated: _____, 2007        POSDATA CO., LTD.

By: _____

Print Name: _____

Title: _____

Dated: _____, 2007        INQUADRON, INC.

By: _____

Print Name: _____

Title: _____

Dated: _____, 2007      SEYOUNG KIM

_____

1  BRENDAN DOLAN, State Bar No. 126732
   L. JULIUS M. TURMAN, State Bar. No. 226126
2  STEVEN J. GARRETT, State Bar No. 221021
   MORGAN, LEWIS & BOCKIUS LLP
3  One Market, Spear Street Tower
   San Francisco, CA 94105-1126
4  Tel: 415.442.1000
   Fax: 415.442.1001
5  E-mail: bdolan@morganlewis.com

6  Attorneys for Plaintiff
   POSDATA CO., LTD.
7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                        SAN JOSE DIVISION

11

12  | POSDATA CO., LTD., a South Korean | Case No. C 07 2504 RMW |
    | corporation, | |
13  | | **NOTICE OF DEPOSITION OF** |
    | Plaintiff, | **INQUADRON, INC. UPON** |
14  | | **SUPPLEMENTAL WRITTEN** |
    | vs. | **QUESTIONS** |
15  | | |
    | SEYOUNG KIM, an individual and | |
16  | INQUADRON, INC., a California | |
    | corporation, | |
17  | | |
    | Defendants. | |
18

19       **PLEASE TAKE NOTICE** that, pursuant to Rules 26, 30(b)(6) and 31 of the Federal

20  Rules of Civil Procedure, the undersigned will take the deposition of Defendant InQuadron, Inc.

21  ("InQuadron") upon written questions.

22       PLEASE TAKE FURTHER NOTICE that the matters on which examination of the

23  person(s) designated by InQuadron are identified in Attachment A to this Notice of Deposition of

24  InQuadron. As agreed upon by Plaintiff and Defendants and permitted by Rule 30(b)(6), the

25  deposition will conducted upon Plaintiff's written questions and InQuadron will provide written

26  responses. Each question identified in Attachment A shall be answered separately and fully in

27  writing under oath and shall be verified under the penalty of perjury by Kenneth D. Lee or other

28

1-SF/7628677.1                              1                    DEPOSITION OF INQUADRON
                                                                    (C 07 2504 RMW)
                                       **EXHIBIT D**

1   appropriate person(s) designated by InQuadron. The verified written responses should be served

2   upon Plaintiff's counsel within 30 days after the service of this notice of deposition.

3

4   Dated:     November 21, 2007               MORGAN, LEWIS & BOCKIUS LLP

5
                                              By
6
                                                 Steven J. Garrett
7                                                Attorneys for Plaintiff POSDATA CO.,
                                                 LTD.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **ATTACHMENT A**

Pursuant to Rules 26, 30(b)(6) and 31 of the Federal Rules of Civil Procedure, and subject to the parties' agreements in this action, Plaintiff Posdata Co., Ltd. ("Plaintiff") request Defendant InQuadron, Inc. ("InQuadron") answer the following written deposition questions, separately and fully, in writing under oath, within thirty days of service hereof.

## **INSTRUCTIONS AND DEFINITIONS**

These Instructions and Definitions are provided for purposes of facilitating discovery including without limitation narrowing the scope of the written questions. Nothing stated in these Instructions and Definitions, or in any Instructions or Definitions in which they are incorporated, shall be deemed an admission of any claim or defense, or any part thereof, nor shall they be deemed a waiver of any evidence or other argument that Plaintiff may make in support of claims or defenses, or any part thereto, made here or in any other proceeding.

1.    "InQuadron" means InQuadron, Inc., their predecessors and successors, parents, subsidiaries, divisions, affiliates, and other organizational or operating units of any of the foregoing, and its past and present directors, officers, employees, agents and representatives (including attorneys, accountants and consultants), and any other person acting on behalf of such entities.

2.    "Posdata" means Posdata Co., Ltd., their predecessors and successors, parents, subsidiaries, divisions, affiliates, and other organizational or operating units of any of the foregoing, and its past and present directors, officers, employees, agents and representatives (including attorneys, accountants and consultants), and any other person acting on behalf of such entities.

3.    The term "person" shall mean both natural persons and/or other business entities, associations, government agency or other organization recognizable at law and the "acts" of a person are defined to include the acts of directors, officers, owners, members, employees, agents or attorneys acting on the person's behalf.

4.    The term "document(s)" means the original and each non-identical copy of any written, printed, typed, recorded, computerized or electronic data, taped, graphic, or other matter,

1-SF 76286771                                    3                    DEPOSITION OF INQUADRON
                                                                      (C 07 2504 RMW)

1   in whatever form. whether in final or draft. including but not limited to all materials that

2   constitute "writings" or "recordings" within the meaning of Rule 1001 of the Federal Rules of

3   Evidence and all materials that constitute "documents" within the meaning of Rule 34 of the

4   Federal Rules of Civil Procedure. "Electronic data" includes without limitation all text files

5   (including word processing documents and presentations), spread sheets, electronic mail

6   documents (emails), databases, calendars, computer system activity logs, audit trails, data used

7   for electronic data interchange, Internet usage files, network access information, voicemail,

8   digitized audio, digital image files, video files (*e.g.*, data stored in MPEG, JPEG, GIF, TIFF, and

9   BMP formats) and any other information stored magnetically, optically or electronically, and data

10   stored on workstations, laptops, network servers, removable media, handheld devices. backup

11   tapes, hard disk drives, diskettes and other computer media such as magnetic tape, floppy disks,

12   memory sticks and recordable optical disks. If documents are identified in lieu of answering an

13   interrogatory, identify the documents in sufficient detail to permit Plaintiff to locate and identify,

14   as readily as Defendants, the documents and portions therein from which the answer may be

15   ascertained.

16       5.     Any form of the terms "concerning" or "relating" shall mean referring to,

17   describing, evidencing, constituting, or otherwise discussing in any way the subject matter, or any

18   part thereof, identified in a request.

19       6.     The terms "communication" or "communications" shall mean any communication

20   regardless of the manner in which such communication took place, including but not limited to,

21   personal conversations, correspondence, electronic or computer mail (emails), telephone calls,

22   facsimile communications. or telegrams.

23       7.     The terms "and" and "or" shall be understood as either conjunctive or disjunctive

24   whichever is more inclusive in content.

25       8.     The terms "any" and "all" shall be considered to include "each and every."

26       9.     The singular form of a noun or pronoun shall be considered to include within its

27   meaning the plural form of a noun or pronoun so used, and vice versa.

28       10.     When asked to "identify" or describe the document. for each non-identical

1  document state (a) the date of the document, (b) the number of pages in the document, (c) the
2  identity of all persons who prepared or signed a copy of the document, (d) the identity of all
3  persons designated as addressees of the document, (e) the identity of all persons designated as
4  copy recipients of any copy of the document, (f) the type of document (*e.g.* memorandum,
5  pamphlet, or report), (g) the specific physical or electronic location where the document is stored
6  or kept in the regular course of business and (h) the general subject matter of the document. If
7  any responses to these questions refer to documents and things not in your possession, custody, or
8  control, describe the circumstances under which you came to know about the disposition of the
9  documents and things. If any responses to these questions refer to documents and things that are
10 lost or destroyed, identify each lost or destroyed document and thing, as well as all files that
11 contained them.

12      11.     When you are asked to identify a person or persons with knowledge of a given
13 subject, contention, event or set of facts, please provide the person's first name, last name, place
14 of employment (if known), last known address, email and telephone number.

15      12.     The term "things" has the broadest meaning prescribed in Rule 34, Fed. R. Civ. P.,
16 includes every kind of physical specimen or tangible item, other than a document, in your
17 possession, custody or control.

18      13.     If you do not answer a question, or any part thereof, because of a claim of
19 privilege or immunity, expressly set forth the specific privilege or immunity claimed, and
20 describe the documents, communications, or things not produced or disclosed in a manner that
21 would enable Posdata to assess the applicability of the privilege, including the following
22 information:

23              (a)    the nature and subject matter of the document, communication, or thing;
24              (b)    the date the document, communication, or thing was acquired or came into
25 existence;
26              (c)    the author;
27              (d)    all addresses, recipients, copyholders and other distributees;
28              (e)    the organization, if any, which each author, addressee, recipient,

1    copyholder or distributee was then connected to and his or her job title or description; and

2            (f)      if a document, the number of pages.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

6    DEPOSITION OF INQUADRON
(C 07 2504 RMW)

## WRITTEN QUESTIONS

1.    Describe how InQuadron's business or anticipated business, products or potential products, and/or services or potential services prior to May 1, 2007 was related to WiMAX technology but not WiBro technology?

      a.    Describe how InQuadron's business or anticipated business, products or potential products, and/or services or potential services prior to May 1, 2007 utilized Posdata's WiMAX, WiBro, or FLYVO technology, including but not limited to the Modular Channel Card Assembly ("MCCA") or Turtle Card or Turtle Board, Posdata's Digital Channel Card Unit ("DCCU") for the Pico RAS base station , Posdata's MAC and PHY source code, Posdata's printed circuit board ("PCB") design and layout, the DCCU or MCCA or Turtle Card or Turtle Board or Pico RAS base stations, the "Modular RAS Implementation" file, the "Rev. 0.4 DCCU Block Diagram" file, Posdata's Mobile Plugfest Reports, the NTT DoCoMo Reports, Posdata's IOT Reports, and Posdata's files or diagrams that depict, reveal, or demonstrate how processors and components, Posdata's PCB design and layout, and Posdata's software and source code create an architecture for interface between hardware and software?

      b.    Prior to May 1, 2007, describe how InQuadron's business or anticipated business, products or potential products, and/or services or potential services could compete in the WiMAX or WiBro marketplace or industry without utilizing any of Posdata's WiMAX, WiBro, or FLYVO technology, including but not limited to the Modular Channel Card Assembly ("MCCA") or Turtle Card or Turtle Board, Posdata's Digital Channel Card Unit ("DCCU") for the Pico RAS base station , Posdata's MAC and PHY source code, Posdata's printed circuit board ("PCB") design and layout, the DCCU or MCCA or Turtle Card or Turtle Board or Pico RAS base stations, the "Modular RAS Implementation" file, the "Rev. 0.4 DCCU Block Diagram" file, Posdata's Mobile Plugfest Reports, the NTT DoCoMo Reports, Posdata's IOT Reports, and Posdata's files or diagrams that depict, reveal, or demonstrate how processors and components, Posdata's PCB design and layout, and Posdata's software and source code create an architecture for interface between hardware and software?

c. Prior to May 1, 2007, describe how InQuadron's "development of WiMAX (non-WiBro) basestation core technology that would lead to the development of a WiMAX basestation baseband modem ASIC for the US market" is possible without utilizing any of Posdata's WiMAX, WiBro, or FLYVO technology, including but not limited to the Modular Channel Card Assembly ("MCCA") or Turtle Card or Turtle Board, Posdata's Digital Channel Card Unit ("DCCU") for the Pico RAS base station, Posdata's MAC and PHY source code, Posdata's printed circuit board ("PCB") design and layout, the DCCU or MCCA or Turtle Card or Turtle Board or Pico RAS base stations, the "Modular RAS Implementation" file, the "Rev. 0.4 DCCU Block Diagram" file, Posdata's Mobile Plugfest Reports, the NTT DoCoMo Reports, Posdata's IOT Reports, and Posdata's files or diagrams that depict, reveal, or demonstrate how processors and components, Posdata's PCB design and layout, and Posdata's software and source code create an architecture for interface between hardware and software?

d. Describe how InQuadron's business or anticipated business, products or potential products, and/or services or potential services prior to May 1, 2007 was different than any of Posdata's WiMAX, WiBro, or FLYVO technology, including but not limited to the Modular Channel Card Assembly ("MCCA") or Turtle Card or Turtle Board, Posdata's Digital Channel Card Unit ("DCCU") for the Pico RAS base station, Posdata's MAC and PHY source code, Posdata's printed circuit board ("PCB") design and layout, the DCCU or MCCA or Turtle Card or Turtle Board or Pico RAS base stations, the "Modular RAS Implementation" file, the "Rev. 0.4 DCCU Block Diagram" file, Posdata's Mobile Plugfest Reports, the NTT DoCoMo Reports, Posdata's IOT Reports, and Posdata's files or diagrams that depict, reveal, or demonstrate how processors and components, Posdata's PCB design and layout, and Posdata's software and source code create an architecture for interface between hardware and software?

2. Describe how InQuadron's business or anticipated business, products or potential products, and/or services or potential services after May 1, 2007 was related to WiMAX technology but not WiBro technology?

1-SF/7628677.1

DEPOSITION OF INQUADRON
(C 07 2504 RMW)

a. Describe how InQuadron's business or anticipated business, products or potential products, and/or services or potential services after May 1, 2007 utilized Posdata's WiMAX, WiBro, or FLYVO technology, including but not limited to the Modular Channel Card Assembly ("MCCA") or Turtle Card or Turtle Board, Posdata's Digital Channel Card Unit ("DCCU") for the Pico RAS base station , Posdata's MAC and PHY source code, Posdata's printed circuit board ("PCB") design and layout, the DCCU or MCCA or Turtle Card or Turtle Board or Pico RAS base stations, the "Modular RAS Implementation" file, the "Rev. 0.4 DCCU Block Diagram" file, Posdata's Mobile Plugfest Reports, the NTT DoCoMo Reports, Posdata's IOT Reports, and Posdata's files or diagrams that depict. reveal, or demonstrate how processors and components, Posdata's PCB design and layout, and Posdata's software and source code create an architecture for interface between hardware and software?

b. After May 1, 2007, describe how InQuadron's business or anticipated business, products or potential products, and/or services or potential services could compete in the WiMAX marketplace or industry without utilizing any of Posdata's WiMAX, WiBro, or FLYVO technology, including but not limited to the Modular Channel Card Assembly ("MCCA") or Turtle Card or Turtle Board, Posdata's Digital Channel Card Unit ("DCCU") for the Pico RAS base station . Posdata's MAC and PHY source code, Posdata's printed circuit board ("PCB") design and layout. the DCCU or MCCA or Turtle Card or Turtle Board or Pico RAS base stations, the "Modular RAS Implementation" file, the "Rev. 0.4 DCCU Block Diagram" file, Posdata's Mobile Plugfest Reports, the NTT DoCoMo Reports, Posdata's IOT Reports, and Posdata's files or diagrams that depict. reveal, or demonstrate how processors and components, Posdata's PCB design and layout, and Posdata's software and source code create an architecture for interface between hardware and software?

c.   After May 1, 2007, describe how InQuadron's "development of WiMAX (non-WiBro) basestation core technology that would lead to the development of a WiMAX basestation baseband modem ASIC for the US market" is possible without utilizing any of Posdata's WiMAX, WiBro, or FLYVO technology, including but not limited to the Modular Channel Card Assembly ("MCCA") or Turtle Card or Turtle Board, Posdata's Digital Channel Card Unit ("DCCU") for the Pico RAS base station, Posdata's MAC and PHY source code, Posdata's printed circuit board ("PCB") design and layout, the DCCU or MCCA or Turtle Card or Turtle Board or Pico RAS base stations, the "Modular RAS Implementation" file, the "Rev. 0.4 DCCU Block Diagram" file, Posdata's Mobile Plugfest Reports, the NTT DoCoMo Reports, Posdata's IOT Reports, and Posdata's files or diagrams that depict, reveal, or demonstrate how processors and components, Posdata's PCB design and layout, and Posdata's software and source code create an architecture for interface between hardware and software?

d.   Describe how InQuadron's business or anticipated business, products or potential products, and/or services or potential services after May 1, 2007 was different than any of Posdata's WiMAX, WiBro, or FLYVO technology, including but not limited to the Modular Channel Card Assembly ("MCCA") or Turtle Card or Turtle Board, Posdata's Digital Channel Card Unit ("DCCU") for the Pico RAS base station, Posdata's MAC and PHY source code, Posdata's printed circuit board ("PCB") design and layout, the DCCU or MCCA or Turtle Card or Turtle Board or Pico RAS base stations, the "Modular RAS Implementation" file, the "Rev. 0.4 DCCU Block Diagram" file, Posdata's Mobile Plugfest Reports, the NTT DoCoMo Reports, Posdata's IOT Reports, and Posdata's files or diagrams that depict, reveal, or demonstrate how processors and components, Posdata's PCB design and layout, and Posdata's software and source code create an architecture for interface between hardware and software?

3.   Describe how InQuadron's business or anticipated business, products or potential products, and/or services or potential services for the next twelve months is related to WiMAX technology but not WiBro technology?

a.  Describe how InQuadron's business or anticipated business, products or potential products, and/or services or potential services for the next twelve months will utilize any of Posdata's WiMAX, WiBro, or FLYVO technology, including but not limited to the Modular Channel Card Assembly ("MCCA") or Turtle Card or Turtle Board, Posdata's Digital Channel Card Unit ("DCCU") for the Pico RAS base station, Posdata's MAC and PHY source code, Posdata's printed circuit board ("PCB") design and layout, the DCCU or MCCA or Turtle Card or Turtle Board or Pico RAS base stations, the "Modular RAS Implementation" file, the "Rev. 0.4 DCCU Block Diagram" file, Posdata's Mobile Plugfest Reports, the NTT DoCoMo Reports, Posdata's IOT Reports, and Posdata's files or diagrams that depict, reveal, or demonstrate how processors and components, Posdata's PCB design and layout, and Posdata's software and source code create an architecture for interface between hardware and software?

b.  Describe how InQuadron's business or anticipated business, products or potential products, and/or services or potential services for the next twelve months can compete in the WiMAX or WiBro marketplace or industry without utilizing any of Posdata's WiMAX, WiBro, or FLYVO technology, including but not limited to the Modular Channel Card Assembly ("MCCA") or Turtle Card or Turtle Board, Posdata's Digital Channel Card Unit ("DCCU") for the Pico RAS base station, Posdata's MAC and PHY source code, Posdata's printed circuit board ("PCB") design and layout, the DCCU or MCCA or Turtle Card or Turtle Board or Pico RAS base stations, the "Modular RAS Implementation" file, the "Rev. 0.4 DCCU Block Diagram" file, Posdata's Mobile Plugfest Reports, the NTT DoCoMo Reports, Posdata's IOT Reports, and Posdata's files or diagrams that depict, reveal, or demonstrate how processors and components, Posdata's PCB design and layout, and Posdata's software and source code create an architecture for interface between hardware and software?

1

2

3

4

5

6

7

8

9

10

    c.    For the next twelve months, describe how InQuadron's "development of WiMAX (non-WiBro) basestation core technology that would lead to the development of a WiMAX basestation baseband modem ASIC for the US market" is possible without utilizing any of Posdata's WiMAX, WiBro, or FLYVO technology, including but not limited to the Modular Channel Card Assembly ("MCCA") or Turtle Card or Turtle Board, Posdata's Digital Channel Card Unit ("DCCU") for the Pico RAS base station , Posdata's MAC and PHY source code, Posdata's printed circuit board ("PCB") design and layout, the DCCU or MCCA or Turtle Card or Turtle Board or Pico RAS base stations, the "Modular RAS Implementation" file, the "Rev. 0.4 DCCU Block Diagram" file, Posdata's Mobile Plugfest Reports, the NTT DoCoMo Reports, Posdata's IOT Reports, and Posdata's files or diagrams that depict, reveal, or demonstrate how processors and components, Posdata's PCB design and layout, and Posdata's software and source code create an architecture for interface between hardware and software?

11

12

13

14

15

16

17

18

19

20

    d.    Describe how InQuadron's business or anticipated business, products or potential products, and/or services or potential services for the next twelve months is different than any of Posdata's WiMAX, WiBro, or FLYVO technology, including but not limited to the Modular Channel Card Assembly ("MCCA") or Turtle Card or Turtle Board, Posdata's Digital Channel Card Unit ("DCCU") for the Pico RAS base station , Posdata's MAC and PHY source code, Posdata's printed circuit board ("PCB") design and layout, the DCCU or MCCA or Turtle Card or Turtle Board or Pico RAS base stations, the "Modular RAS Implementation" file, the "Rev. 0.4 DCCU Block Diagram" file, Posdata's Mobile Plugfest Reports, the NTT DoCoMo Reports, Posdata's IOT Reports, and Posdata's files or diagrams that depict, reveal, or demonstrate how processors and components, Posdata's PCB design and layout, and Posdata's software and source code create an architecture for interface between hardware and software?

21

22

    4.    Has InQuadron or Seyoung Kim ever received, reviewed, discussed, or utilized technology related to Posdata's Digital Channel Card Unit ("DCCU") for the Pico RAS base station at any time?

23

24

    (1)    If yes, describe in detail when InQuadron or Kim received, reviewed, discussed, or utilized the technology?

25

    (2)    If yes, describe in detail how InQuadron or Kim received, reviewed, discussed, or utilized the technology?

26

27

28

5.    Has InQuadron or Seyoung Kim ever received, reviewed, discussed, or utilized technology related to Posdata's MAC and PHY source code at any time?

      (1)    If yes, describe in detail when InQuadron or Kim received, reviewed, discussed, or utilized the technology?

      (2)    If yes, describe in detail how InQuadron or Kim received, reviewed, discussed, or utilized the technology?

6.    Has InQuadron or Seyoung Kim ever received, reviewed, discussed, or utilized technology related to Posdata's printed circuit board ("PCB") design and layout at any time?

      (1)    If yes, describe in detail when InQuadron or Kim received, reviewed, discussed, or utilized the technology?

      (2)    If yes, describe in detail how InQuadron or Kim received, reviewed, discussed, or utilized the technology?

7.    Has InQuadron or Seyoung Kim ever received, reviewed, discussed, or utilized technology related to the DCCU or MCCA or Turtle Card or Turtle Board or Pico RAS base stations at any time?

      (1)    If yes, describe in detail when InQuadron or Kim received, reviewed, discussed, or utilized the technology?

      (2)    If yes, describe in detail how InQuadron or Kim received, reviewed, discussed, or utilized the technology?

8.    Has InQuadron or Seyoung Kim ever received, reviewed, discussed, or utilized technology related to the "Modular RAS Implementation" file at any time?

      (1)    If yes, describe in detail when InQuadron or Kim received, reviewed, discussed, or utilized the technology?

      (2)    If yes, describe in detail how InQuadron or Kim received, reviewed, discussed, or utilized the technology?

9.    Has InQuadron or Seyoung Kim ever received, reviewed, discussed, or utilized technology related to the "Rev. 0.4 DCCU Block Diagram" file at any time?

      (1)    If yes, describe in detail when InQuadron or Kim received, reviewed, discussed, or utilized the technology?

      (2)    If yes, describe in detail how InQuadron or Kim received, reviewed, discussed, or utilized the technology?

13

10. Has InQuadron or Seyoung Kim ever received, reviewed, discussed, or utilized Posdata's Mobile Plugfest Reports at any time?

    (1)   If yes, describe in detail when InQuadron or Kim received, reviewed, discussed, or utilized the technology?

    (2)   If yes, describe in detail how InQuadron or Kim received, reviewed, discussed, or utilized the technology?

11. Has InQuadron or Seyoung Kim ever received, reviewed, discussed, or utilized the NTT DoCoMo Reports at any time?

    (1)   If yes, describe in detail when InQuadron or Kim received, reviewed, discussed, or utilized the technology?

    (2)   If yes, describe in detail how InQuadron or Kim received, reviewed, discussed, or utilized the technology?

12. Has InQuadron or Seyoung Kim ever received, reviewed, discussed, or utilized Posdata's IOT Reports at any time?

    (1)   If yes, describe in detail when InQuadron or Kim received, reviewed, discussed, or utilized the technology?

    (2)   If yes, describe in detail how InQuadron or Kim received, reviewed, discussed, or utilized the technology?

13. Has InQuadron or Seyoung Kim ever received, reviewed, discussed, or utilized technology related to Posdata's files or diagrams that depict, reveal, or demonstrate how processors and components, Posdata's PCB design and layout, and Posdata's software and source code create an architecture for interface between hardware and software at any time?

    (1)   If yes, describe in detail when InQuadron or Kim received, reviewed, discussed, or utilized the technology?

    (2)   If yes, describe in detail how InQuadron or Kim received, reviewed, discussed, or utilized the technology?

14. Has InQuadron or Seyoung Kim ever received, reviewed, discussed, or utilized any other Posdata WiMAX, WiBro or FLYVO technology at any time?

    (1)   If yes, describe in detail when InQuadron or Kim received, reviewed, discussed, or utilized the technology?

    (2)   If yes, describe in detail how InQuadron or Kim received, reviewed, discussed, or utilized the technology?

15. Has InQuadron ever contacted or been contacted by any other person or entity about manufacturing, outsourcing, researching, developing, producing, or fabricating InQuadron products or technology?

    a. If yes, please describe each task or project that was outsourced, provide the date(s) the manufacturing, outsourcing, researching, developing, producing, or fabricating occurred, the name of the individual or company the task or project was outsourced to, their compensation, address, and contact information.

16. Has InQuadron ever contacted or been contacted by any other person or entity about manufacturing, outsourcing, researching, developing, producing, or fabricating WiMAX or WiBro products or technology?

    a. If yes, please describe each task or project that was outsourced, provide the date(s) the manufacturing, outsourcing, researching, developing, producing, or fabricating occurred, the name of the individual or company the task or project was outsourced to, their compensation, address, and contact information.

17 What was Seyoung Kim's net worth as of May 1, 2007?

    a. What was the value of Seyoung Kim's total assets as of May 1, 2007?

    b. For each asset, please describe the asset, the cost of acquisition, the date of acquisition, its current value, and any realized gain or loss from holding the asset.

    c. What was the value of Seyoung Kim's total liabilities as of May 1, 2007?

    d. For each liability, please describe the liability, the date the liability was incurred, the amount of initial liability, the current liability if applicable, and any realized gain or loss incurred as a result of the liability

18. What is Seyoung Kim's current net worth?

    a. What is the value of Seyoung Kim's current total assets?

    b. For each asset, please describe the asset, the cost of acquisition, the date of acquisition, its current value, and any realized gain or loss from holding the asset.

    c. What is the value of Seyoung Kim's current total liabilities?

d.   For each liability, please describe the liability, the date the liability was incurred, the amount of initial liability, the current liability if applicable, and any realized gain or loss incurred as a result of the liability

19.   Does Seyoung Kim currently own any real property?

a.   If yes, for each property provide its address, describe the type of property it is, the date you purchased it, and how much he purchased it for.

20.   Has Seyoung Kim sold any real property within the last ten years?

a.   If yes, for each property provide its address, describe the type of property it is, the date Seyoung Kim purchased it, how much Seyoung Kim purchased it for, the date Seyoung Kim sold it, how much Seyoung Kim sold it for, and any realized gain or lost from the transaction.

21.   Identify each and every cash equivalent asset solely or jointly in Seyoung Kim's name, including but not limited to cash, checking accounts, savings accounts, money market funds, certificates of deposit, or other cash reserve accounts.

a.   For each asset, please describe the asset, the cost of acquisition, the date of acquisition, its current value, and any realized gain or loss from holding the asset.

b.   For every checking, savings, or investment account solely or jointly in Seyoung Kim's name, please list the institution, account number, and the current asset balance of the account.

22.   Identify each and every cash equivalent asset solely or jointly in Seyoung Kim's name, including but not limited to cash, checking accounts, savings accounts, money market funds, certificates of deposit, or other cash reserve accounts as of May 1, 2007.

a.   For each asset, please describe the asset, the cost of acquisition, the date of acquisition, the date of divestment of the asset if applicable, its value as of May 1, 2007, and any realized gain or loss from holding the asset.

b.   For every checking, savings, or investment account solely or jointly in Seyoung Kim's name, please list the institution, account number, and the asset balance of the account as of May 1, 2007.

23.   Identify each and every other asset solely or jointly in Seyoung Kim's name, including but not limited to stocks, annuities, limited partnerships, business interests, bonds, trust deeds, or other assets.

16                                    DEPOSITION OF INQUADRON
                                         (C 07 2504 RMW)

a. For each asset, please describe the asset, the cost of acquisition, the date of acquisition, its current value, and any realized gain or loss from holding the asset.

24. Identify each and every other asset solely or jointly in Seyoung Kim's name as of May 1, 2007, including but not limited to stocks, annuities, limited partnerships, business interests, bonds, trust deeds, or other assets.

    a. For each asset, please describe the asset, the cost of acquisition, the date of acquisition, the date of divestment of the asset if applicable, its value as of May 1, 2007, and any realized gain or loss from holding the asset.

25. Identify each and every other asset solely or jointly in Seyoung Kim's name not listed above.

    a. For each asset, please describe the asset, the cost of acquisition, the date of acquisition, the date it was sold if applicable, its current value if applicable, and any realized gain or loss from holding or selling the asset.

26. Identify each and every other asset solely or jointly in Seyoung Kim's name as of May 1, 2007 not listed above.

    a. For each asset, please describe the asset, the cost of acquisition, the date of acquisition, the date it was sold if applicable, its value as of May 1, 2007 if applicable, and any realized gain or loss from holding or selling the asset.

27. Identify each and every liability solely or jointly in Seyoung Kim's name, including but not limited to mortgages, loans, debts, or other liabilities.

    a. For each liability, please describe the liability, the date the liability was incurred, the amount of initial liability, the current liability if applicable, and any realized gain or loss incurred as a result of the liability.

28. Identify each and every liability solely or jointly in Seyoung Kim's name as of May 1, 2007, including but not limited to mortgages, loans, debts, or other liabilities.

    a. For each liability, please describe the liability, the date the liability was incurred, the amount of the liability as of May 1, 2007, the current liability if applicable, and any realized gain or loss incurred as a result of the liability.

29. Identify each and every source of income or benefits Seyoung Kim has had since October 27, 2006.

17

a.   For each source of income derived from employment, please state the name of his employer, their address, the dates of his employment with them, his position with them, the responsibilities of his position, salary, the amount of income received, and other compensation benefits.

b.   For every other source of income or benefits, describe the nature and source of the income, the amount of income received and other benefits received.

30.   Identify and each every source of income or benefits Seyoung Kim is expected to receive during next twelve months.

a.   For each source of expected income derived from employment, please state the name of his employer, their address, the dates of his employment with them, his position with them, the responsibilities of his position, salary, the amount of income to be received, and other compensation benefits.

b.   For every other source of income or benefits, describe the nature and source of the income, the amount of income to be received and other benefits received.

31.   Has Seyoung Kim incurred any legal expenses, fees, and costs since October 27, 2006?

a.   If yes, list the total expenses, fees, and costs incurred during this time, describe the nature of the legal services received by Seyoung Kim, and the person or entity that has performed the legal work

18

1

## PROOF OF SERVICE

2      I, the undersigned, declare:

3      I am over the age of eighteen (18) years, and not a party to the within action. I am
employed by Morgan, Lewis & Bockius, LLP and my business address is One Market, Spear

4      Street Tower, San Francisco, CA 94105.

5      On November 21, 2007, I served the following document(s):

6      **NOTICE OF DEPOSITION OF INQUADRON, INC. UPON SUPPLEMENTAL
WRITTEN QUESTIONS**

7

on the parties involved addressed as follows:

8

David S. Elkins, Esq.                                    Attorneys for Defendants
9      Squire Sanders & Dempsey LLP
600 Hansen Way Ste 100
10     Palo Alto, CA 94304-1043

11     Tel:    (650) 856-6500
Fax:    (650) 843-8777
12     EM:     delkins@ssd.com

13

14     |      |     **BY PERSONAL DELIVERY:** The within document(s) were served by hand in
an envelope addressed to the addressee(s) above on this date. The Proof of
15     Service by the process server will be filed within five (5) days.

16     | x |   **BY MAIL:** I am readily familiar with my employer's practice for collection and
processing of documents for mailing with the United States Postal Service and that
17     practice is that the documents are deposited with the United States Postal Service
with postage fully prepaid the same day as the day of collection in the ordinary
18     course of business. On this date, I served the above interested parties following
my employer's ordinary business practices.

19     | x |   **BY FACSIMILE:** By use of a facsimile machine telephone number
415/442-1001, I served a copy of the within document(s) on the above interested
20     parties at the facsimile numbers listed above. The transmission was reported as
complete and without error. The transmission report, which is attached to this
21     proof of service, was properly issued by the transmitting facsimile machine.

22     |      |     **BY FEDERAL EXPRESS OVERNIGHT DELIVERY:** I caused each
envelope, with delivery fees provided for, to be deposited in a box regularly
23     maintained by Federal Express. I am readily familiar with the practice for
collection and processing of documents for delivery by overnight service by
24     Federal Express of Morgan, Lewis & Bockius, LLP, and that practice is that the
document(s) are deposited with a regularly maintained Federal Express facility in
25     an envelope or package designated by Federal Express fully prepaid the same day
as the day of collection in the ordinary course of business.

26

27     |      |     **BY EMAIL:** By transmitting via electronic mail the document(s) listed above to
the email address(s) set forth below on this date (pursuant to a stipulation between
28     the parties).

1

2        I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed at San Francisco, California on November 21, 2007.

3

4

5                                       Deborah Stein

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Morgan, Lewis & Bockius LLP
One Market, Spear Street Tower
San Francisco, CA 94105-1126
TEL 415.442.1000
FAX 415.442.1001
eFax 877.432.9652
www.morganlewis.com

# Morgan Lewis
### COUNSELORS AT LAW

## FAX MESSAGE

| **SEND TO** | | | |
| --- | --- | --- | --- |
| Name | David S. Elkins, Esq. | Firm: | Squire Sanders & Dempsey LLP |
| FAX # | (650) 843-8777 | Telephone #: | (650) 856-6500 |

| **FROM** | | | |
| --- | --- | --- | --- |
| Name: | Steven J. Garrett | Floor: | |
| Operator Sending | | Telephone # | 415.442.1194 |
| FAX # | 877.432.9652 | Date Sent: | November 21, 2007 | No of Pages: *(including cover page)* **38** |

THE INFORMATION CONTAINED IN THIS FAX MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE NAMED RECIPIENT(S). THIS MESSAGE MAY BE AN ATTORNEY-CLIENT COMMUNICATION AND AS SUCH IS PRIVILEGED AND CONFIDENTIAL. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR AN AGENT RESPONSIBLE FOR DELIVERING IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT YOU HAVE RECEIVED THIS DOCUMENT IN ERROR AND THAT ANY REVIEW, DISSEMINATION, DISTRIBUTION OR COPYING OF THIS MESSAGE IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE TO US BY MAIL. THANK YOU.

| **COMMENTS** | |
| --- | --- |

| | |
|---|---|
| 1 | **PROOF OF SERVICE** |

2    I am a citizen of the United States and employed in Santa Clara County, California. I am

3    over the age of eighteen years and not a party to the within-entitled action. My business address

4    is 600 Hansen Way, Palo Alto, California 94304-1043. On November 27, 2007, a true and

5    correct copy of the within document:

6    **CONTINUED SETTLEMENT CONFERENCE STATEMENT OF
DEFENDANTS SEYOUNG KIM AND INQUADRON, INC.**

7

8    was served on:

9    **VIA FEDERAL EXPRESS**

10   Brendan Dolan, Esq.
     bdolan@morganlewis.com
11   Morgan Lewis & Bockius LLP
     One Market Street
12   Spear Tower
13   San Francisco, California 94105

14

15   Service was accomplished as follows:

16   ☒    **By Other Express Service Carrier.** On the above date, I sealed the above
          document(s) in an envelope or package designated by Federal Express, an express
17        service carrier, addressed to the above, and I deposited that sealed envelope or
          package in a box or other facility regularly maintained by the express service
18        carrier, or delivered that envelope to an authorized courier or driver authorized by
          the express service carrier to receive documents, located at Palo Alto, California,
19        with delivery fees paid or otherwise provided for.

20   I declare that I am employed in the office of a member of the bar of this court at whose

21   direction the service was made.

22   Executed on November 27, 2007, at Palo Alto, California.

23

24

25                                                    _____
                                                      Daniela Fontana

26   PALOALTO/106100 1

27

28